## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR BROADWAY BANK, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| | ) | Case No. |
| v. | ) ) | JURY DEMANDED |
| DEMETRIS GIANNOULIAS, GEORGE GIANNOULIAS, JAMES MCMAHON, SEAN CONLON, STEVEN DRY, DONNA ZAGORSKI, STEVEN BALOURDOS, GLORIA SGUROS, ANTHONY D'COSTA | ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiff the Federal Deposit Insurance Corporation, as Receiver for Broadway Bank ("FDIC-R"), for its Complaint, states:

## I.    INTRODUCTION

1.    FDIC-R brings this lawsuit in its capacity as Receiver for Broadway Bank ("Broadway" or the "Bank") to recover over $104 million in losses that the Bank suffered on seventeen commercial real estate ("CRE") and acquisition, development and construction ("ADC") loans (collectively, the "Loss Loans").

2.    These losses were caused by the gross negligence, negligence and breaches of fiduciary duty of seven former directors of Broadway (the "Director Defendants") and two former officers of Broadway (the "Officer Defendants") (collectively the "Defendants"), who approved the Loss Loans.

3.     As members of the Board of Directors and the Bank's Loan Committee, the Director Defendants and Officer Defendants recklessly implemented a strategy of rapidly growing Broadway's assets by approving high-risk loans without regard for appropriate underwriting and credit administration practices, the Bank's written loan policies, federal lending regulations and warnings from the Bank's regulators.

4.     In fact, the Director Defendants approved two of the worst Loss Loans on June 24, 2008, after a meeting earlier that same day with the Bank's regulators in which the regulators specifically warned the Director Defendants about the risks that these types of loans posed to the Bank.  That day, the regulators also discussed with the Director Defendants the need to enter into a Memorandum of Understanding with Broadway which would impose restrictions on the Bank designed to stop this type of high-risk lending.  In all, the Defendants approved three Loss Loans on or after June 24, 2008, which caused over $20 million in losses to the Bank, and were among the largest Loss Loans approved by the Defendants.

5.      On April 23, 2010, the Illinois Department of Financial and Professional Regulation ("IDFPR") closed Broadway and appointed the FDIC as Receiver.  At failure, the Bank's assets were $1.06 billion.  The estimated loss to the FDIC's Deposit Insurance Fund from the Bank's failure is $391.4 million.

## II.      PARTIES

6.     The FDIC is a corporation organized and existing under the laws of the United States of America.  12 U.S.C. § 1811, et seq.  The FDIC is an instrumentality of the United States of America and is charged with, among other things, the orderly liquidation of failed financial institutions.  Pursuant to 12 U.S.C. §1821(d)(2), the FDIC as Receiver succeeds to all of the rights, powers and privileges of the insured institution as well as the rights of any

2128929-2

stockholder, member, account holder, depositor or officer or director with respect to the assets of the institution.

7.      Broadway was a state-chartered, nonmember bank established by the IDFPR and insured by the FDIC.   Broadway was a wholly-owned subsidiary of Broadway Bancorp, Inc.  The Bank's principal place of business was Chicago, Illinois.

## THE DIRECTOR DEFENDANTS

8.      Demetris Giannoulias was the Bank's President and Chief Executive Officer (from 2006 through closure) and a member of its Board of Directors (from 1994 through closure).  From 2005 through closure, he also was a member of the Loan Committee.  Demetris Giannoulias approved each of the 17 Loss Loans.

9.      George Giannoulias was a member of the Bank's Board of Directors (from 1999 through closure).  In 2006, he became Chairman of the Board of Directors.   From 2005 through closure, he also was a member of the Loan Committee.  George Giannoulias approved each of the 17 Loss Loans.

10.      James McMahon was a member of Broadway's Board of Directors from 2003 through December 22, 2008.  As a member of the Board, McMahon approved the $28 million loan to Normandy Shores, LLC, which caused over $19 million in losses to the Bank.  Despite his Board responsibilities, McMahon repeatedly missed critical Board meetings.

11.      Sean Conlon was a member of Broadway's Board of Directors from 2005 through December 22, 2009.  As a member of the Board, Conlon approved the 12 Loss Loans that were presented to the Board during his tenure.

12.      Steven Dry was a member of Broadway's Board of Directors from 2005 through closure.  As a member of the Board, Dry approved the 12 Loss Loans that were presented to the

Board during his tenure.

13.     Donna Zagorski was a member of Broadway's Board of Directors from 2006 through closure.  As a member of the Board, Zagorski approved the 11 Loss Loans that were presented to the Board during her tenure.

14.     Steven Balourdos was a member of Broadway's Board of Directors from 2006 through closure.  As a member of the Board, Balourdos approved the 11 Loss Loans that were presented to the Board during his tenure.

## THE OFFICER DEFENDANTS

15.     Gloria Sguros was a Vice-President for Lending at Broadway from 2005 through closure.  During that same period, she was a member of the Loan Committee and, in that position, approved all of the Loss Loans.

16.     Anthony D'Costa was a Vice-President for Lending at Broadway from 2005 through closure.  In 2006, he became a member of the Loan Committee.  He approved each of the Loss Loans presented to the Loan Committee while he was a member.

### III.     JURISDICTION AND VENUE

17.     The Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1345.

18.     Venue is proper in this district under 28 U.S.C. § 1391(b).

19.     The Court has personal jurisdiction over Defendants under 735 ILCS § 5/2-209, *et seq*.

### IV.     BACKGROUND FACTS

#### A.     Broadway's Lending Operations and Concentrations

20.     Broadway Bank was an institution driven by a disregard for risk and a willingness

to lend millions of dollars to uncreditworthy borrowers for speculative commercial building projects not only in Illinois, where the Bank was located, but in New York, Florida, California and other locales. From 2000 through 2009, Broadway's assets grew by more than 500 percent. This explosive growth was fueled by an unsustainable expansion of the Bank's CRE and ADC loans. These types of loans, which are highly sensitive to market fluctuations, require close monitoring, lending expertise and respect for lending risk. None of these were present at Broadway Bank.

21.     Broadway's concentrations in CRE and ADC loans were well in excess of its peer group banks. In 2007, 2008 and 2009, Broadway's ADC loans represented 307%, 390% and 793% of total capital. During that same period, Broadway's peers reduced their exposure to ADC loans. In 2007, 2008 and 2009, the ADC loans held by Broadway's peer group were 147%, 139% and 97% of total capital. The same trends applied to Broadway's CRE concentration. In 2007, 2008 and 2009, Broadway's CRE loans represented 409%, 574% and 1157% of total capital. In contrast, in 2007, 2008 and 2009, the CRE loans held by Broadway's peer group were 309%, 307% and 267% of total capital.

22.     The risks associated with Broadway's portfolio were exacerbated because many of these projects were located outside of Illinois. The Bank did not have sufficient staff to monitor these out-of-state projects adequately and deferred excessively to its borrowers regarding market evaluations and risk. On April 23, 2010, when the Bank was closed, more than half of the Bank's loan portfolio was secured by projects outside of Illinois.

23.     In addition to risks posed to the Bank by the out-of-territory CRE and ADC loans, Broadway's lending portfolio also was compromised by Defendants' decisions to approve an excessive number of loans for condominium development and hospitality industry

construction, even though those markets were saturated and showed signs of decline when the loans were made.

24.     During this period of reckless growth and excessive CRE, ADC and out-of-territory loan concentrations, Defendants failed to implement procedures that would have lessened the risks of the Bank's lending practices.   Underwriting was perfunctory or non-existent.   Limits on loan to value ratios repeatedly were ignored.   Loans were made without appraisals or with grossly deficient appraisals.   Construction draws were used for improper purposes with little or no active monitoring by the Bank.   Little or no attention was paid to whether loan guarantors had sufficient liquidity to protect the Bank's interest.   Loans were made to uncreditworthy borrowers with a history of bad loans - - in some cases with Broadway itself.

**B.     The Bank's Loan Policy**

25.     On paper, Broadway had a loan policy (the "Loan Policy") designed to protect the Bank from the shortcomings described above.   The Loan Policy required diligent underwriting in conformity with state and federal law, close monitoring of concentrations of credit and rigorous documentation and prudent evaluation of borrower and project risk.   In approving the Loss Loans, however, Defendants routinely ignored and repeatedly failed to enforce the Loan Policy's provisions.   The Bank's loan approval policies also were frequently bypassed.

**C.     Broadway's Regulatory History**

26.     Defendants were warned by state and federal bank examiners of the significant weaknesses in Broadway's lending and loan administration practices.   The criticisms and warnings had no effect.

**The January 2007 Examination**

27.     In January 2007, IDFPR examined Broadway's condition as of September 30,

2006.  In the Report of Examination ("RoE"), the examiners noted their concern with the Bank's increasing concentrations in "construction and development, total out-of-area, State of New York, collateral type [hotel/motel] and relationship" loans.  Examiners also noted weaknesses in loan administration and underwriting, including failing to obtain current financial statements from borrowers and the failure to obtain global cash flow analyses from borrowers with multiple loans.  Additionally, the examiners criticized Broadway's Allowance for Loan and Lease Losses ("ALLL") methodology for failing to include an impairment analysis and failing to downgrade loans that were classified at previous examinations.   The regulators concluded that Defendants' failure to ensure accurate ALLL calculations overstated the Bank's financial performance.

28.    As part of the January 2007 examination, state regulators made several recommendations to enhance risk management practices and maintain more accurate reporting procedures.  Defendants ignored these recommendations.  In March 2007, the regulators met with management to discuss the examination findings.  In April 2007, the RoE was provided to the Board of Directors.

### The March 2008 Examination

29.    In March 2008, the FDIC and IDFPR conducted a joint investigation of the Bank's condition as of December 31, 2007.

30.    The regulators again found the Bank's overall condition less than satisfactory and criticized the deteriorating quality of the Bank's assets.  They also criticized the Bank's inadequate loan review and watch-list programs, its ALLL methodology and its failure to improve credit risk management practices, including failing to properly identify and report developing risks and downgrade credit ratings in a timely manner.

31.    The criticism of the ALLL calculations once again suggested that the Defendants

2128929-2

were understating the losses imbedded in the Bank's portfolio. Based on the Bank's deficiencies, the examiners required a $5.1 million adjustment to the ALLL, as of April 30, 2008.

32.     On June 24, 2008, federal and state regulators met with the Board of Directors to discuss the regulators' concerns. At that meeting, regulators discussed with the Board a draft Memorandum of Understanding ("MOU"), which directed the Bank to take steps to improve its lending operations and to reduce risk in its loan portfolio. The regulators provided a sustained and constructive critique of the Bank's operations and, through the MOU, sought a written commitment from Defendants to address the criticisms and reduce the Bank's excessive risk-taking.

33.     Defendants ignored the regulators. Indeed, immediately following the June 24, 2008 meeting, the Board of Directors approved two grossly imprudent loans which resulted in losses to the Bank of approximately $12 million.

### 2008 Visitations and Communications

34.     In a July 22, 2008 communication to the Board of Directors, the FDIC warned that a high volume of adversely classified ADC loans in the Bank's portfolio, primarily related to projects located in Florida, had eroded Broadway's earnings and undermined its capital.

35.     On September 17, 2008, Broadway entered into the MOU to address the weaknesses noted in the March 2008 examination. The MOU required a workout plan for classified assets, development of a sound loan review and grading system, more accurate charge-off losses and special mention deficiencies, complete loan documentation (including global cash flows for borrowers with multiple loans or projects) and provisions for loan and lease losses and ongoing review of ALLL adequacy. Defendants ignored the MOU's requirements.

36.     On December 16, 2008, as a result of the significant deterioration of Broadway's

2128929-2

assets, IDFPR and the FDIC conducted a joint visitation. The regulators concluded that the deterioration of Broadway's assets was continuing and noted a dramatic increase in loan delinquencies in October 2008 and November 2008 as a result of grossly improvident transactions approved by Defendants, notwithstanding regulatory criticisms.

### The April 2009 Examination

37.     In April 2009, the FDIC and IDFPR jointly examined Broadway's condition as of March 31, 2009. The regulators found the Bank to be deeply troubled and examiners informed the Board of Directors that (a) the Bank's asset quality was critically deficient; (b) adverse classifications were at unacceptable levels; (c) the Bank's internal grading system was inadequate and understated the nature of the Bank's problems; (d) the Bank's underwriting was substandard and the loan files were grossly incomplete; (e) management had not adequately analyzed or monitored the Bank's securities portfolio; and (f) the Loan Committee failed to keep accurate minutes of its deliberations. The regulators again noted that Defendants had not properly computed ALLL reserves and ordered a $19 million adjustment. The regulators concluded that "management performance is deficient" and that Defendants' failure to recognize and curtail risk was a significant cause of the Bank's poor financial condition.

38.     On July 20, 2009, regulators informed the Board that Broadway was undercapitalized. On February 4, 2010, regulators informed the Board that Broadway's capital level had dropped to significantly undercapitalized. On April 23, 2010, Broadway was closed by the IDFPR and the FDIC was appointed receiver.

2128929-2

## D. The Loss Loans and the Damage They Caused

39.     The loans made and approved by Defendants caused significant injury to the Bank.  The following table lists seventeen such Loss Loans and identifies the Officer Defendants and Director Defendants who voted to approve each loan.

| Loss Loan | D. Giannoulias | G. Giannoulias | Balourdos | Conlon | Dry | McMahon | Zagorski | Sguros | D'Costa |
|---|---|---|---|---|---|---|---|---|---|
| 1.   Gold Johnson Hold.  LLC | x | x | x | x | x | | x | x | x |
| 2.   Wilshire Blvd. BH, LLC | x | x | x | x | x | | x | x | x |
| 3.   Federal Street L.A. LLC | x | x | x | x | x | | x | x | x |
| 4.   Southside House LLC* | x | x | | | | | | x | x |
| 5.   625 W. Div. Condos, LP* | x | x | | | | | | x | x |
| 6.   Shubh Oceanic LLC* | x | x | | | | | | x | x |
| 7.   Prospect R. Equities LLC | x | x | x | x | x | | x | x | x |
| 8.   Prospect R. Equities LLC | x | x | x | x | x | | x | x | x |
| 9.   ASAT, Inc. | x | x | x | x | x | | x | x | x |
| 10. 261 E. 78 Realty Corp. | x | x | x | x | x | | x | x | x |
| 11. Shubh Hotels S. LLC | x | x | x | x | x | | x | x | x |
| 12. Shubh Boca Condo LLC | x | x | x | x | x | | x | x | x |
| 13. Lawrence Prop. LLC* | x | x | | | | | | x | x |
| 14. John R. DeSilva | x | x | x | x | x | | x | x | x |
| 15. 4750 N. Winthrop* | x | x | | | | | | x | x |
| 16. The Bedford Lofts LLC | x | x | x | x | x | | x | x | x |
| 17. Normandy Shores LLC | x | x | | x | x | x | | x | |

*Loan approved by Loan Committee only; no Board of Directors approval required.*

40.     With regard to these loans, Defendants routinely failed to assess the repayment abilities of borrowers and guarantors, relied excessively on brokered deposits to finance the expanding loan portfolio, violated the Bank's loan policies, allowed use of interest reserves without adequately considering borrowers' repayment abilities, made out-of-territory loans without sufficient staff to monitor performance, failed to monitor the use of loan funds, and

renewed loans without adequate underwriting or obtaining sufficient security. The Loss Loans were made in violation of the general safety and soundness standards of 12 C.F.R. §364.101, Appendix A, the general underwriting standards of 12 C.F.R. §364.101, Appendix A and the real estate lending standards of 12 C.F.R. §365.2, Appendix A. Much of this imprudent lending occurred after the real estate market began its precipitous decline.

41.     The Bank repeatedly understated the losses imbedded in its portfolio by manipulation of loss reserves, overstating income and engaging in transactions designed to artificially remove non-performing assets from the Bank's balance sheet.

42.     The indiscriminate use of interest reserves funded by loan proceeds gave the appearance that the loans were performing when, in fact, the interest payments came only from the Bank. Few of these borrowers or guarantors contributed their own funds to reduce the debt or meet interest obligations. The risk of these transactions was borne almost entirely by the Bank.

43.     The current estimated losses from the seventeen Loss Loans total approximately $104 million.

### Wilshire Blvd. BH, LLC

44.     In May 2008, Officer Defendants Sguros and D'Costa and Director Defendants Demetris Giannoulias and George Giannoulias, as members of the Loan Committee, approved a one-year $22.04 million interest-only loan to Wilshire Blvd. BH, LLC, guaranteed by Hagop Sarisian. The purpose of the loan was to refinance the land loan on a vacant site in Beverly Hills, California and to provide funds to redevelop the property into a luxury condominium with retail space and parking. The interest payments were funded by an interest reserve created by the loan's proceeds. On June 24, 2008, the Board of Directors, including Demetris Giannoulias,

George Giannoulias, Balourdos, Conlon, Dry and Zagorski, approved the loan *immediately* following a meeting with federal regulators that sharply criticized the making of such loans.

45.     The Officer Defendants and Director Defendants caused this loan to be made at the request of Connaught Real Estate Finance ("CREF") of which Director Defendant Conlon was a major shareholder.  CREF loaned Wilshire Blvd. BH, LLC an additional $6.8 million; it was essential to CREF's financial interests that Broadway make the loan.  Despite his interest in CREF and CREF's interest in Wilshire Blvd., Defendant Conlon did not recuse himself from the Bank's approval process and voted to approve the loan.

46.     The making of this loan and the Federal Street loan on the heels of the June 24, 2008 meeting with federal and state regulators reflects Defendants' disdain for the regulatory process and disregard for the regulators' expressed concern that Defendants' conduct jeopardized the Bank's safety and soundness.

47.     The loan had numerous other deficiencies including, but not limited to, the following:

   a.     Defendants caused the loan to be made even though there had been a major downturn in southern California's housing market, which was expected to further deteriorate, causing collateral values to plummet.

   b.     Defendants failed to require proper underwriting.  The borrower had no ability to repay the loan.  The guarantor's finances were not verified.  His self-prepared financial statement showed that most of his assets were illiquid.  In violation of the Bank's loan policy, he did not provide his 2005 or 2007 tax returns.  In violation of the Bank's loan policy, a credit report was not obtained.

   c.     The loan evidenced Defendants' repeated disregard of regulatory warnings about the Bank's underwriting and its over-concentration of ADC/CRE out-of-territory loans.

48.     Upon depletion of the interest reserve, the borrower and guarantor defaulted on the loan.  The loan went into foreclosure.  Defendants took no action to pursue the loan's

guarantor to mitigate the Bank's losses.

49.     The Bank has sustained estimated damages of $3.4 million plus accrued interest on this loan.

### Federal Street L.A. LLC

50.     In June 2008, Officer Defendants Sguros and D'Costa and Director Defendants Demetris Giannoulias and George Giannoulias, as members of the Loan Committee, approved a one-year $26.88 million interest-only loan to Federal Street L.A. LLC, guaranteed by Michael Winter and Judi Fishman, to acquire and refurbish an apartment building in Los Angeles, California and convert the building to condominiums.  The interest payments were to be funded by an interest reserve and cash flow, if any, from the borrower's property.  On June 24, 2008, the Board of Directors, including Demetris Giannoulias, George Giannoulias, Balourdos, Conlon, Dry and Zagorski, approved the loan *immediately* following the June 24, 2008 meeting with the state and federal regulators that sharply criticized the making of such loans.

51.     The making of this loan and the Wilshire Blvd. loan on the heels of the June 24, 2008 meeting with federal and state regulators reflects Defendants' disdain for the regulatory process and disregard for the regulators' expressed concern that Defendants' conduct jeopardized the Bank's safety and soundness.

52.     The loan had numerous other deficiencies including, but not limited to, the following:

> a.      Defendants approved the loan without proper underwriting.  The borrower did not have the ability to repay the loan.  The guarantors did not submit an application; their finances were not verified.  Their financial statements showed that the guarantors' assets were illiquid.  In violation of the Bank's loan policy, Winter did not provide his 2006 tax returns.  Although Winter had other loans at the Bank, he was not required to provide a global cash flow analysis to assess his repayment ability.

b. Defendants caused the loan to be made on the basis of an "as completed" appraisal instead of the property's value "as is." Had the "as is" value been used, the loan would have violated the loan-to-value ratio required by the Loan Policy.

c. The loan evidenced Defendants' disregard of repeated regulatory warnings about the Bank's underwriting and over-concentrations of ADC/CRE out-of-territory loans.

d. In August 2009, after the original note had matured, Defendant members of the Loan Committee approved a renewal of the loan even though financial information provided by guarantor Winter demonstrated that his financial condition was deteriorating. Further, several interest payments on this loan had been late and Winter was having difficulty making payments on other of his loans at the Bank. The renewal was made without requiring a new appraisal, despite the continuing downturn in the economy and real estate market.

53. Within a few months after the loan was renewed, the loan defaulted. No effort was made to pursue either Winter or Fishman as guarantors.

54. The Bank has sustained estimated damages of $8.5 million plus accrued interest on this loan.

**<u>Loans to Atul Bisaria and Entities Owned or Controlled by Bisaria</u>**

55. In April 2007 and August 2007, Officer Defendants Sguros and D'Costa and Director Defendants Demetris Giannoulias and George Giannoulias, as members of the Loan Committee, approved two loans totaling $26.2 million to Atul Bisaria and entities owned or controlled by him. The loans included an eighteen-month $10.2 million interest-only loan to Shubh Boca Condominium LLC and Bisaria to acquire land and build an office condominium in Boca Raton, Florida, and an eighteen-month $16 million interest-only loan to Shubh Hotels Springdale LLC and Bisaria to refinance and reflag a hotel in Cincinnati, Ohio. The Board of Directors, including Defendants Demetris Giannoulias, George Giannoulias, Balourdos, Conlon, Dry and Zagorski, also approved these loans. The interest payments for each loan were funded

by an interest reserve created out of the loan's proceeds.

56.     Additionally, in August 2007, Defendant members of the Loan Committee approved a two-year $3.2 million interest-only loan to Shubh Oceanic, LLC, Bisaria, and his wife, ostensibly to purchase a passenger boat and transport it to Mumbai, India, to be used for "special events."

57.     These loans shared numerous deficiencies including, but not limited to, the following:

     a.    Defendants approved the loans without proper underwriting. All three loans were based on the same self-prepared and unaudited financial information for Bisaria, which was incomplete and inadequate. Bisaria did not submit loan applications for any of the transactions. His tax returns were incomplete. The borrowers themselves had no ability to pay down the loans and Bisaria's assets were illiquid.

     b.    The loans improperly were approved on the value of the projects "as completed;" if based on the value of the properties "as is," the loans would have exceeded the Loan Policy's permitted loan-to-value ratio.

     c.    The loans evidenced Defendants' disregard of repeated regulatory warnings about the Bank's over-concentrations of ADC/CRE out-of-territory loans.

     d.    Defendants failed to monitor and administer the loans properly. Although more than $2.5 million in construction draws were disbursed on the hotel loan, when the Bank inspected the property, no major construction had occurred.

     e.    In December 2008, Defendant members of the Loan Committee renewed both the office building and hotel loans for six additional months despite a poor history of loan performance. New appraisals, updated financials and/or additional collateral were not obtained.

     f.    Defendant members of the Loan Committee imprudently increased the boat loan by $200,000 to meet the working capital requirements of Bisaria's hotel business in Detroit, Michigan, without requiring updated financial information or new appraisals.

58.     In December 2008, when the loans were renewed, Bisaria and entities he owned

and controlled had in excess of $58 million in obligations to Mutual Bank of Harvey, Illinois ("Mutual Bank"), an institution on the brink of failure. Ultimately, Bisaria's loans at Mutual Bank defaulted. Defendants undertook insufficient due diligence on these and other of Bisaria's positions at other banks or simply ignored the risk.

59.     After the loans were renewed, they went into default. Defendants took no action to pursue Bisaria.

60.     The Bank has sustained estimated damages of $21.4 million plus accrued interest on these loans.

### **Gold Johnson Holding, LLC**

61.     In December 2008, Officer Defendants Sguros and D'Costa and Director Defendants Demetris Giannoulias and George Giannoulias, as members of the Loan Committee, approved a two-year $22.1 million interest-only loan to Gold Johnson Holding, LLC to purchase a note from Yaron Hershco, a Broadway borrower. The Board of Directors, including Defendants Demetris Giannoulias, George Giannoulias, Balourdos, Conlon, Dry and Zagorski, also approved the loan. The Hershco note, however, was in default. The property securing the loan was vacant land in Brooklyn, New York, of uncertain value.

62.     Gold Johnson Holding, LLC was owned or controlled by Sam Chang, one of Broadway's largest borrowers, with loans from the Bank totaling approximately $44 million. Chang was a developer of hotel properties in New York with a history of distressed projects. Chang was experiencing severe difficulties with other banks. By December 2008, Chang had substantial outstanding commitments to Mutual Bank that were lurching towards default. Defendants' due diligence on Chang and his relationship to Mutual Bank either was insufficient or Defendants simply ignored the risk.

2128929-2

63. This loan had numerous other deficiencies including, but not limited to, the following:

a.  Defendants approved the loan without proper underwriting. Gold Johnson Holdings, LLC had no assets with which to pay back the loan. The stated value of Chang's assets did not take into account his compromised financial condition or his multiple loans from Broadway and from other banks.

b.  Defendants approved the loan based on the assumption that Hershco had purchased the rights to additional buildable square footage, increasing the land's value. Defendants, however, performed no due diligence on whether such additional rights were ever obtained. Hershco had not obtained these rights.

c.  In violation of the Loan Policy, Defendants approved the loan before receiving a completed appraisal. When the appraisal was received, it resulted in a loan-to-value ratio in excess of that allowed under the Loan Policy.

d.  Approval of this loan evidenced Defendants' disregard of repeated regulatory warnings about the Bank's underwriting and over-concentrations of ADC/CRE out-of-territory loans.

64. In effect, Defendants caused a large, nonperforming loan to be transferred to a borrower with equally poor prospects of repayment. This permitted the Bank to avoid recognizing losses attendant to the initial loan's nonperformance in the Bank's financial records. At maturity, the borrower defaulted on the loan.

65. The Bank has sustained estimated damages of $11 million plus accrued interest on this loan.

### Normandy Shores, LLC

66. In May 2006, Officer Defendant Sguros and Director Defendants Demetris Giannoulias and George Giannoulias, as members of the Loan Committee, approved a two-year $28 million, interest-only loan to Normandy Shores, LLC, guaranteed by Les G. Jones. The Board of Directors, including Defendants Demetris and George Giannoulias, Conlon, McMahon

and Dry, also approved the loan. The loan's purpose was to refinance a land loan and development of a townhouse condominium project in Miami Beach, Florida. The first year of interest payments was funded by a loan reserve created out of the loan proceeds.

67.     The loan had numerous deficiencies including, but not limited to, the following:

a.      Defendants approved the loan without proper underwriting. In violation of the Loan Policy, neither the borrower nor the guarantor submitted a loan application or tax returns. The guarantor's financial information demonstrated that his net worth was limited and generally illiquid. The guarantor (who had lived in Brazil for the preceding five years) did not have the ability to repay the loan.

b.      Defendants caused the loan to be approved even though it was based on the appraised value of the property "as completed" as opposed to its value "as is." Had the "as is" value been used, the loan would have violated the Loan Policy's allowed loan-to-value ratio. Indeed, the "as is" value of the collateral was less than the loan amount.

c.      Even though construction was behind schedule and millions of dollars over budget, Defendants made no effort to protect the Bank either by requiring additional collateral or modifying the loan's terms.

68.     When the interest reserve was depleted, the loan went into default. Defendants did not pursue the guarantor to mitigate the Bank's losses.

69.     The Bank has sustained estimated damages of $19.5 million plus accrued interest on this loan.

## ASAT, Inc.

70.     In May 2007, Officer Defendants Sguros and D'Costa and Director Defendants Demetris Giannoulias and George Giannoulias, as members of the Loan Committee, approved a two-year $12.7 million interest-only construction loan to ASAT, Inc. and Mohammed Siddiqui. The Board of Directors, including Defendants Demetris and George Giannoulias, Balourdos, Conlon, Dry and Zagorski, also approved the loan. The loan's purpose was to develop a mixed-use building in Chicago. The interest payments were funded by an interest reserve created out of

18

the loan proceeds.

71.     The loan had numerous deficiencies including, but not limited to, the following:

a.      Defendants approved the loan without proper underwriting. The borrowers did not submit a loan application. Siddiqui's unaudited, self-prepared financial statements contained little detail; his tax returns lacked information about his business income. The borrowers were not required to provide global cash flow analyses.

b.      When the interest reserve funded by the loan was depleted, the loan went into default. Construction draws continued to be funded even though the borrower was in default, the loan had not yet been renewed, and it was evident that the Bank would not be repaid.

c.      In August 2009, three months after the borrower's default, the loan was renewed without an updated appraisal despite the borrowers' obviously deteriorating financial conditions and the deterioration of the real estate market.

d.      The loan and its imprudent renewal evidenced Defendants' disregard for repeated regulatory warnings about the Bank's loan administration practices.

72.     When the loan went into default, Defendants did not pursue the borrowers.

73.     The Bank has sustained estimated damages of $8.2 million plus accrued interest on this loan.

### **261 East 78 Realty Corp.**

74.     In April 2007, Officer Defendants Sguros and D'Costa and Director Defendants Demetris Giannoulias and George Giannoulias, as members of the Loan Committee, approved a one-year $10 million interest-only loan to 261 East 78 Realty Corp. and Lee Moncho. The Board of Directors, including Defendants Demetris and George Giannoulias, Balourdos, Conlon, Dry and Zagorski, also approved the loan. The loan's purpose was to refinance property and acquire an adjacent building in New York, New York. The plan was to redevelop the properties as a medical office building. The interest payments were funded by an interest reserve created

out of the loan proceeds. Between June 2008 and September 2009, the loan was renewed four times and, at the last renewal, the loan was increased by $2.475 million.

75.     The loan had numerous deficiencies including, but not limited to, the following:

    a.     Defendants approved the loan without proper underwriting. The borrowers did not submit a loan application. The borrowers had no capacity to repay the loan. Unaudited, self-prepared financial statements showed that virtually all of Moncho's assets were illiquid. His tax returns did not include information about his business income.

    b.     Defendants approved the loan before a completed appraisal on the property was received.

    c.     Defendants took no steps to obtain additional security or modify the loan's terms when it became clear that neither the borrowers nor the collateral could support the loan.

    d.     Defendants' multiple renewals of the loan were imprudent. Each of the four loan renewals was made after the loan had defaulted and the real estate market was in sharp decline. The September 2009 renewal and loan increase was without Board of Directors' approval.

    e.     The loan and its renewals evidenced Defendants' disregard for regulatory warnings about the Bank's underwriting and over-concentrations of ADC/CRE out-of-territory loans.

76.     When the interest reserve was depleted, the loan went into default. Defendants took no action to pursue the borrowers.

77.     The Bank has sustained estimated damages of $4.6 million plus accrued interest on this loan.

### Loan to John R. DeSilva

78.     In March 2007, Officer Defendants Sguros and D'Costa and Director Defendants Demetris Giannoulias and George Giannoulias, as members of the Loan Committee, approved a one-year $10.5 million interest-only loan to John DeSilva. The Board of Directors, including Defendants Demetris and George Giannoulias, Balourdos, Conlon, Dry and Zagorski, also

approved the loan. The loan's primary purposes were to refinance and renovate investment properties in Florida, buy out DeSilva's business partner in a Florida resort, acquire a personal residence in Florida, and renovate other properties in California and Florida. The loan was collateralized by a first mortgage on two of the Florida properties. Interest payments were funded by an interest reserve created out of the loan's proceeds.

79.     The loan had numerous deficiencies including, but not limited to, the following:

a.      Defendants approved the loan without proper underwriting. The borrower did not submit a loan application; DeSilva's unaudited financial statements showed that virtually all of his assets were illiquid.

b.      Defendants allowed the loan to be funded before the Board of Directors approved the loan and before a completed appraisal had been received.

c.      In June 2008, Defendants allowed the loan to be renewed and increased by over $2 million after the loan had matured and defaulted, without an updated appraisal. Defendants approved this increase even though the borrower's financial condition had deteriorated and the value of the collateral had decreased.

d.      The loan and its renewal evidenced Defendants' disregard of repeated regulatory warnings about the Bank's underwriting and over-concentrations of ADC/CRE out-of-territory loans.

80.     When the interest reserve was depleted, the loan went into default. Defendants took no action to pursue DeSilva.

81.     The estimated damages to the Bank related to this loan are $10 million, plus accrued interest.

### Southside House, LLC

82.     In December 2007, Officer Defendants Sguros and D'Costa and Director Defendants Demetris Giannoulias and George Giannoulias, as members of the Loan Committee, approved a one-year $1.5 million interest-only loan to South Side House, LLC, Menachem Stark, and Israel Perlmutter. The loan's purpose was to provide working capital for the

borrowers' New York-based real estate business. The last four interest payments were funded by an interest reserve.

83.     The loan had numerous deficiencies including, but not limited to, the following:

    a.    Defendants approved the loan without proper underwriting. The borrowers did not submit a loan application; their unaudited financial statements contained little detail; virtually all of the borrowers' assets were illiquid and the borrowers did not have the ability to repay the loan.

    b.    The loan presentation did not adequately describe the purpose of the loan, merely stating that the loan would be used for "working capital" for the borrowers' real estate business.

    c.    The loan was secured by a $1.5 million second mortgage on a property in New York behind a $29 million mortgage.

    c.    The loan evidenced Defendants' disregard for repeated regulatory warnings about loans outside of the Bank's territory.

84.     Any chance of the loan being repaid was lost when the borrower defaulted on the first mortgage and foreclosure proceedings were initiated by the first mortgage holder, extinguishing the Bank's interest in the collateral. Defendants took no action to pursue Stark and Perlmutter.

85.     The Bank has sustained estimated damages of $1.5 million plus accrued interest on this loan.

### 625 W. Division Condominiums, L.P.

86.     In December 2007, Officer Defendants Sguros and D'Costa and Director Defendants Demetris Giannoulias and George Giannoulias, as members of the Loan Committee, approved a nine-month $5.35 million interest-only loan to 625 W. Division Condominiums, L.P., John Breugelmans, and Jan-Peter Breugelmans. The loan's purpose was to refinance raw land in Chicago, Illinois, at a time when the real estate market was in sharp decline. The interest payments were funded by an interest reserve created out of the loan proceeds.

2128929-2

87.    The loan had numerous deficiencies including, but not limited to, the following:

a.    Defendants approved the loan without proper underwriting. The borrowers' financial statements showed that virtually all of their assets were illiquid. The borrowers did not submit tax returns in violation of the Bank's Loan Policy.

b.    Defendants approved the loan even though the appraisal of the subject property was over a year old and did not reflect its current value.

c.    In September 2009, Defendants approved a renewal of the loan even though the investors who were expected to make the payments for the renewal term had been indicted and the borrower had been unable to obtain funding to redevelop the land.

88.    When the interest reserve was depleted, the borrowers defaulted on the loan. Defendants took no action to pursue the Breugelmans.

89.    The Bank has sustained estimated damages of $1.9 million plus accrued interest on this loan.

**Loans to Lawrence Properties, 4750 N. Winthrop,
James Gouskos and Alexander Dobroveanu**

90.    In March and April 2007, Officer Defendants Sguros and D'Costa and Director Defendants Demetris Giannoulias and George Giannoulias, as members of the Loan Committee, approved two loans to James Gouskos, Alexander Dobroveanu, and real estate entities owned by them known as Lawrence Properties, LLC and 4750 N. Winthrop, LLC.

91.    The April 2007 loan was a five-year $2.9 million loan to refinance a commercial property in Chicago secured by a mortgage on the commercial property being refinanced by the loan. The March 2007 loan was a six-month $2.7 million interest-only loan secured by a mortgage on a vacant lot in Chicago on which the borrower was planning to develop a mixed use condominium building. The interest payments on the March 2007 loan were funded by an interest reserve created out of the loan proceeds.

23

92.     These loans had numerous deficiencies including, but not limited to, the following:

    a.     Defendants approved the loan without proper underwriting. The borrowers did not submit a loan application. Their unaudited, self-prepared, outdated financial statements showed that their assets were limited and illiquid. The Bank's cash flow analysis of the April 2007 loan showed that the expected rental income for the property could not service the debt.

    b.     In violation of the Loan Policy, the appraisal for the March 2007 loan was received after the loan was approved.

    c.     Defendants renewed the March 2007 loan, even though the borrowers had defaulted when the six-month interest reserve was depleted.

93.     After the loans closed, a second bank claimed to have a first mortgage on certain property securing the loans. Defendants did not conduct proper due diligence on this issue or protect the Bank's interest. When the renewed interest reserve was depleted, the March 2007 loan went into default. Likewise, the borrower defaulted on the April 2007 loan. Defendants commenced foreclosure proceedings on both loans, but these proceedings were fatally compromised by the second bank's claim that it had a first mortgage on the property.

94.     The Bank has sustained estimated damages of $4 million plus accrued interest on these loans.

**Prospect Rochester Equities, LLC**

95.     In June 2007, Officer Defendants Sguros and D'Costa and Director Defendants Demetris Giannoulias and George Giannoulias, as members of the Loan Committee, approved two loans totaling $15.5 million to Prospect Equities, LLC and Yaron Hershco. The first was an eighteen-month $9 million interest-only loan to purchase raw land in Brooklyn, New York. The second was an eighteen-month $6.5 million revolving line of credit to develop the property. The Board of Directors, including Defendants Demetris Giannoulias, George Giannoulias, Conlon,

Dry, Balourdos, and Zagorski, also approved the loans. Both were collateralized by the raw land. Interest payments were funded by an interest reserve created out of the loan proceeds.

96. These loans had numerous deficiencies including, but not limited to, the following:

a. Defendants approved the loans without proper underwriting. Neither the borrower nor the guarantor submitted adequate financial information or tax returns. Defendants did not verify the assets described in the self-prepared, unaudited financial statements submitted by the borrower and guarantor.

b. Defendants approved the loan even though the loan-to-value ratio did not meet the standards set forth in the Loan Policy.

c. Monitoring of the borrowers' construction draws was inadequate. Virtually all of the construction funds were drawn by the time construction was only 50% complete.

d. In June 2008, the Defendants increased the second note to $7.1 million even though the borrower had sold part of the collateral securing the loan and no new collateral was provided.

e. Defendants renewed the loan in March 2009, even though the borrowers' financial difficulties were known, the project was not completed and the project's value had dramatically decreased.

f. Defendants' approval of this loan and renewals evidenced their disregard of repeated regulatory warnings about the Bank's underwriting and loan administration practices and over-concentrations of ADC/CRE out-of-territory loans.

97. At maturity, the borrowers defaulted on both loans.

98. The Bank has sustained estimated damages of $8.1 million plus accrued interest on these loans.

### The Bedford Lofts, LLC

99. In February, 2007, the Bank made a $6.2 million construction loan to the Bedford Lofts, LLC, Menachem Stark, and Israel Perlmutter to develop a condominium project in

25

Brooklyn, New York. The loan was approved by Officer Defendants Sguros and D'Costa and the Board of Directors, including Demetris and George Giannoulias, Balourdos, Conlon, Dry and Zagorski. Interest payments were funded by an interest reserve created from the loan proceeds.

100. This loan had numerous deficiencies including, but not limited to, the following:

    a. Defendants approved the loan without proper underwriting. The borrowers' financial statements showed that they were highly illiquid and unable to pay the loan. Perlmutter lacked sufficient credit to obtain a credit score; Stark's credit score was poor.

    b. Despite the real estate market's condition, the depletion of the interest reserve and the borrowers' deteriorating financial condition, the Defendant members of the Loan Committee (Demetris and George Giannoulias, Sguros, and D'Costa) renewed the loan twice, without requiring an updated appraisal or complete and current financial information from the borrowers. These renewals included new interest reserves, which masked borrower repayment stress.

    c. Approving this loan and its renewals evidenced Defendants' disregard of repeated regulatory warnings about out-of-territory loans and poor underwriting.

101. When the interest reserves from the loan renewals were exhausted, the loans went into default.

102. The Bank sustained estimated damages of $1.5 million plus accrued interest on this loan.

## CLAIMS FOR RELIEF

### COUNT I

**(Gross Negligence – Director Defendants and Officer Defendants)**

103. FDIC-R realleges and incorporates by reference the allegations contained in paragraphs 1 through 102 as if fully set forth herein.

104. Section 1821(k) of the Financial Institutions Reform, Recovery and Enforcement Act ("FIRREA") holds directors and officers of financial institutions personally liable for loss or

26

damage caused by their "gross negligence," as defined by applicable state law.

105.    The Officer Defendants and Director Defendants owed Broadway a duty to use reasonable care, skill, and diligence in the performance of their duties, including, but not limited to:  (a) conducting proper due diligence on each proposed loan to inform themselves about the risks such loan posed to the Bank before approving it; (b) complying with the Bank's Loan Policy; (c) ensuring that the loans they approved were underwritten in a safe and sound manner; (d) ensuring that the loans they approved were secured by sufficiently valuable collateral and guarantees to prevent or minimize the Bank's risk of loss; (e) ensuring that the loans they approved did not violate applicable banking laws and regulations; (f) ensuring that the loans they approved did not create unsafe and unsound concentrations of credit; and (g) properly monitoring the performance of loans to minimize the Bank's risk of loss.

106.    Given the Officer Defendants' and Director Defendants' knowledge of the Bank's troubled condition, the receipt of multiple regulatory warnings and the impaired state of the real estate market, the Officer Defendants' and Director Defendants' responsibilities to the Bank were heightened.

107.    Notwithstanding these obligations, the Officer Defendants and Director Defendants disregarded these duties and were grossly negligent by, among other things: (a) failing to conduct proper due diligence on each of the Loss Loans and failing to inform themselves about the risks the loans posed to the Bank before approving them; (b) disregarding the Bank's loan policies and approving the Loss Loans on terms that violated the Bank's Loan Policy; (c) failing to ensure that the Loss Loans were underwritten in a safe and sound manner; (d) failing to ensure that the Loss Loans were secured by sufficiently valuable collateral and guarantees to prevent or minimize the Bank's risk of loss; (e) failing to ensure that the Loss

Loans did not violate applicable banking laws and regulations; (f) failing to ensure that the Loss Loans did not create unsafe and unsound concentrations of credit; and (g) ignoring regulatory warnings about the Bank's lending operations.

108.    The Officer Defendants and Director Defendants knew or should have known of the risks that such deficient practices represented but they persisted in this grossly negligent conduct by approving the Loss Loans.  This was very great or gross negligence.  It also was reckless.

109.    Defendant members of the Board of Directors were grossly inattentive to the affairs of the Bank – deferring excessively to the whims of the Giannoulias family.  As a consequence, reports were not closely read, little or no due diligence into the Bank's condition was done, regulatory criticisms were discounted, and, for Defendant McMahon, important Board meetings frequently were missed or ignored.  Further, the Director Defendants' monitoring of internal controls was lax and their oversight of financial reporting was deeply flawed.

110.    As a direct and proximate cause of the gross negligence of the Officer Defendants and Director Defendants, the Bank suffered damages in excess of $104 million.

## COUNT II

**(Breach of Fiduciary Duty of Care – Director Defendants and Officer Defendants)**

111.    FDIC-R realleges and incorporates by reference the allegations contained in paragraphs 1 through 102, as if fully set forth herein.

112.    Based on their positions as officers and directors, the Officer Defendants and Director Defendants were fiduciaries of the Bank and owed the Bank fiduciary duties.

113.    The Officer Defendants and Director Defendants owed Broadway fiduciary duties to exercise reasonable care, skill and diligence in the performance of their responsibilities,

28

including: (a) conducting proper due diligence on each proposed loan to inform themselves about the risks the loans posed to the Bank before approving it; (b) complying with the Bank's Loan Policy and approving loans on terms that complied with the Loan Policy; (c) ensuring that the loans they approved were underwritten in a safe and sound manner; (d) ensuring that the loans they approved were secured by sufficiently valuable collateral and guarantees to prevent or minimize the Bank's risk of loss; (e) ensuring that the loans they approved did not violate applicable banking laws and regulations; (f) ensuring that the loans they approved did not create unsafe and unsound concentrations of credit; and (g) properly monitoring the performance of loans to minimize the Bank's risk of loss.

114.    Given the Officer Defendants' and Director Defendants' knowledge of the Bank's troubled condition, the receipt of multiple regulatory warnings and the impaired state of the real estate market, the Officer Defendants' and Director Defendants' responsibilities to the Bank were heightened.

115.    The Officer Defendants and Director Defendants breached these fiduciary duties by, among other things:  (a) failing to conduct proper due diligence on each of the Loss Loans and failing to inform themselves about the risks such loans posed to the Bank before they approved them; (b) approving the Loss Loans on terms that violated the Bank's loan policies; (c) failing to ensure that the Loss Loans were underwritten in a safe and sound manner; (d) failing to ensure that the Loss Loans were secured by sufficiently valuable collateral and guarantees in order to prevent or minimize the Bank's risk of loss; (e) failing to ensure that the Loss Loans did not violate applicable banking laws and regulations; (f) failing to ensure that the Loss Loans did not create unsafe and unsound concentrations of credit; and (g) ignoring regulatory warnings about the Bank's lending operations.

2128929-2

116.     Defendant members of the Board of Directors were grossly inattentive to the affairs of the Bank – deferring excessively to the whims of the Giannoulias family.  As a consequence, reports were not closely read, regulatory criticisms were discounted, and, for Defendant McMahon, important Board meetings frequently were missed or ignored. Further, the Director Defendants' monitoring of internal controls was lax and their oversight of financial reporting was deeply flawed.

117.     As a direct and proximate cause of the breach of the fiduciary duty of care by the Officer Defendants and Director Defendants, the Bank suffered damages in excess of $104 million.

## COUNT III

### (Negligence – Director Defendants and Officer Defendants)

118.     FDIC-R realleges and incorporates by reference the allegations contained in paragraphs 1 through 102, as if fully set forth herein.

119.     The allegations of negligence in this Count III are pleaded in the alternative to the allegations of breach of fiduciary duty in Count II.

120.     The Officer Defendants and Director Defendants owed Broadway a duty to use reasonable care, skill and diligence in the performance of their duties, including, but not limited to: (a) conducting proper due diligence on each proposed loan to inform themselves about the risks the loans posed to the Bank before approving it; (b) complying with the Bank's Loan Policy; (c) ensuring that the loans they approved were underwritten in a safe and sound manner; (d) ensuring that the loans they approved were secured by sufficiently valuable collateral and guarantees to prevent or minimize the Bank's risk of loss; (e) ensuring that the loans they approved did not violate applicable banking laws and regulations; (f) ensuring that the loans they

approved did not create unsafe and unsound concentrations of credit; and (g) properly monitoring the performance of loans to minimize the Bank's risk of loss.

121. Given the Officer Defendants' and Director Defendants' knowledge of the Bank's troubled condition, the receipt of multiple regulatory warnings and the impaired state of the real estate market, the Officer Defendants' and Director Defendants' responsibilities to the Bank were heightened.

122. Defendants, however, breached these duties and were negligent by, among other things: (a) failing to conduct proper due diligence on each of the Loss Loans and failing to inform themselves about the risks such loans posed to the Bank before they approved them; (b) approving the Loss Loans on terms that violated the Bank's loan policies; (c) failing to ensure that the Loss Loans were underwritten in a safe and sound manner; (d) failing to ensure that the Loss Loans were secured by sufficiently valuable collateral and guarantees to prevent or minimize the Bank's risk of loss; (e) failing to ensure that the Loss Loans did not violate applicable banking laws and regulations; (f) failing to ensure that the Loss Loans did not create unsafe and unsound concentrations of credit; and (g) ignoring regulatory warnings about the Bank's lending operations.

123. Defendant members of the Board of Directors were grossly inattentive to the affairs of the Bank – deferring excessively to the whims of the Giannoulias family. As a consequence, reports were not closely read, regulatory criticisms were discounted, and, for Defendant McMahon, important Board meetings frequently were missed or ignored. Further, the Director Defendants' monitoring of internal controls was lax and their oversight of financial reporting was deeply flawed.

124. As a direct and proximate cause of the negligence of the Officer Defendants and

Director Defendants, the Bank suffered damages in excess of $104 million.

**FOR THESE REASONS**, the Federal Deposit Insurance Corporation as Receiver for Broadway Bank, seeks judgment in its favor, and against Defendants, for damages in an amount in excess of $104 million, plus accrued interest, and whatever further and other relief the Court deems just and proper.

## JURY DEMAND

THE FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR BROADWAY BANK REQUESTS A TRIAL BY JURY ON ALL ISSUES TRIABLE OF RIGHT BY JURY.

Dated:  March  7, 2012

Respectfully submitted,

/s/ F. Thomas Hecht
One of the Attorneys for the Federal Deposit Insurance Corporation as Receiver for Broadway Bank

F. Thomas Hecht
Susan G. Feibus
Dean Polales
Richard Tilghman
**UNGARETTI & HARRIS LLP**
3500 Three First National Plaza
Chicago, Illinois 60602
(312) 977-4400
(312) 977-4405 (facsimile)

John Letteri
Counsel, Professional Liability Unit
Federal Deposit Insurance Corporation
3501 Fairfax Drive
Arlington, VA 22226
(703) 562-6297

2128929-2