IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| FEDERAL DEPOSIT INSURANCE CORPORATION, AS RECEIVER FOR BROADWAY BANK, | |
| Plaintiff, | |
| v. | No. 12-cv-1665 |
| DEMETRIS GIANNOULIAS, GEORGE GIANNOULIAS, JAMES MCMAHON, SEAN CONLON, STEVEN DRY, DONNA ZAGORSKI, STEVEN BALOURDOS, GLORIA SGUROS, ANTHONY D'COSTA, | JURY DEMANDED  Judge John F. Grady |
| Defendants. | |

**CERTAIN DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS/STRIKE FDIC'S FIRST AMENDED COMPLAINT**

Respectfully submitted,

DEMETRIS GIANNOULIAS, GEORGE GIANNOULIAS, SEAN CONLON, STEVEN DRY, DONNA ZAGORSKI, STEVEN BALOURDOS and ANTHONY D'COSTA

By:   s/ Rachel T. Copenhaver
      One of Their Attorneys

Randall M. Lending
Rachel T. Copenhaver
Vedder Price P.C.
222 North LaSalle Street, Suite 2600
Chicago, Illinois  60601-1003
T:  (312) 609-7500
F:  (312) 609-5005
rlending@vedderprice.com
rcopenhaver@vedderprice.com
Dated:  June 20, 2012

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ...................................................................................................1

II.     FACTUAL BACKGROUND AND COMPLAINT ALLEGATIONS ............................2

III.    LEGAL STANDARD............................................................................................3

IV.     ARGUMENT .....................................................................................................4

    A.     The FDIC Fails to Adequately Allege Gross Negligence under FIRREA in Count I ........................................................................................................4

    B.     The Business Judgment Rule Precludes the FDIC's Purported Claims for Breach of Fiduciary Duty (Count II) and Negligence (Count III) ........................7

    C.     The FDIC Fails to Plead Any Facts to Support the Inference that the Defendants Proximately Caused the Alleged Loan Losses ..................................10

    D.     The FDIC Improperly Attempts to Apply a Strict Liability Standard .................11

    E.     The FDIC Fails to Plead Tortious Conduct on the Part of the Defendants..........13

         1.    Response to Regulatory Warnings........................................................ 13

         2.    Growth of Broadway's Loan Portfolio .................................................. 17

         3.    Failure to Follow Broadway's Loan Policy ............................................ 19

         4.    Approval of Loss Loans....................................................................... 20

    F.     The FDIC Has Insufficiently Alleged Any Wrongful Conduct by the Outside Directors ....................................................................................22

    G.     The FDIC Has Insufficiently Alleged Any Wrongful Conduct by Officer Defendant, Anthony D'Costa.....................................................................24

    H.     The FDIC's Duplicative Claims Should Be Dismissed......................................24

V.      IMMATERIAL ALLEGATIONS SHOULD BE STRICKEN .......................................25

VI.     CONCLUSION.................................................................................................. 25

i

# TABLE OF AUTHORITIES

**Page**

<u>Cases</u>

*Albert v. Alex. Brown Mgmt. Servs., Inc.*,
No. Civ. A. 762-N, 2005 WL 2130607 (Del. Ch. Aug. 26, 2005)..........................................5,6

*Ashcroft v. Iqbal*,
556 U.S. 662, 129 S. Ct. 1937 (2009)....................................................................................3,4

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)....................................................................................................................3

*Beringer v. Standard Parking O'Hare Joint Venture*,
Nos. 07 C 5027, 07 C 5119, 2008 WL 4890501 (N.D. Ill. Nov. 12, 2008)..............................24

*Becker v. Billings*,
304 Ill. 190 (1922) ...................................................................................................................12

*Chicago Title & Trust Co. v. Munday*,
297 Ill. 555 (1921) ...................................................................................................................12

*E.E.O.C. v. Concentra Health Servs., Inc.*,
496 F.3d 773 (7th Cir. 2007) ......................................................................................................4

*FDIC v. Atherton*,
519 U.S. 213, 216 (1997)..........................................................................................................23

*FDIC v. Bierman*,
2 F.3d 1424 (7th Cir. 1993) ......................................................................................................10

*FDIC v. Brown*,
812 F. Supp. 722 (S.D. Tex. 1992) .............................................................................................8

*FDIC v. Gravee*,
966 F. Supp. 622 (N.D. Ill. 1997) ...............................................................................................5

*FDIC v. Saphir*,
No. 10 C 7009, 2011 WL 3876918 (N.D. Ill. Sept. 1, 2011)............................................5,8,24

*FDIC v. Schuchmann*,
235 F.3d 1217 (10th Cir. 2000) ................................................................................................21

*FDIC v. Skow*,
No. 1:11-cv-00111-SCJ, (N.D. Ga. Feb. 27, 2012) ...................................................................9

*FDIC v. Spangler*,
No. 10-cv-4288, 2011 WL 6754022 (N.D. Ill. Dec. 22, 2011)...........................................5,8,24

*FDIC v. Stahl*,
854 F. Supp. 1565 (S.D. Fla. 1994) ............................................................................................8

*FDIC v. Stanley*,
770 F. Supp. 1281 (N.D. Ind. 1991) ....................................................................................12,20

*Ferris Elevator Co. v. Neffco, Inc.*,
285 Ill. App. 3d 350 (3d Dist. 1996).........................................................................................7

*First Nat'l Bank of Bellaire v. Comptroller of Currency*,
697 F.2d 674 (5th Cir. 1983) .................................................................................................17,18

*First Nat'l Bank of Lincolnwood v. Keller*,
318 F. Supp. 339 (N.D. Ill. 1970) .......................................................................................19,20

CHICAGO/#2321120.6

*Gen. Elec. Cap. Corp. v. Lease Resolution Corp.*,
   128 F. 3d 1074 (7th Cir. 1997) ...................................................................13,15
*Guttman v. Huang*,
   823 A.2d 492 (Del. Ch. 2003)...........................................................................9
*Holzer v. Prudential Equity Group LLC*,
   520 F. Supp. 2d 922 (N.D. Ill. 2007).............................................................25
*IMR USA, Inc. v. GES Exposition Servs., Inc.*,
   No. 04 C 100, 2005 WL 736589 (N.D. Ill. Mar. 31, 2005) ...........................5
*In re Berg*,
   387 B.R. 524 (Bankr. N.D. Ill. 2008) ..............................................................5
*In re ITT Corp. Derivative Litig.*,
   653 F. Supp. 2d 453, 464 (S.D.N.Y. 2009)....................................................22
*In re Netzel*,
   442 B.R. 896 (Bankr. N.D. Ill. 2011) ..............................................................5
*Laborers Pension Fund v. Lake City Janitorial, Inc.*,
   758 F. Supp. 2d 607 (N.D. Ill. 2010) ...............................................................6
*Lavery v. Kearns*,
   792 F. Supp. 847 (D. Me. 1992) .....................................................................21
*Massa v. Dep't of Registration & Educ.*,
   116 Ill. 2d 376 (1987) ......................................................................................5
*Miller v. Thomas*,
   275 Ill. App. 3d 779 (1st Dist. 1995) ...........................................................8,10
*Murphy v. Candor*,
   263 Ill. App. 226 (2d Dist. 1931).....................................................................23
*Murphy v. Capital One Bank*,
   No. 08 C 801, 2008 WL 3876138 (N.D. Ill. Aug. 18, 2008)...........................25
*People v. Khan*,
   136 Ill. App. 3d 754 (1st Dist. 1985) ...............................................................4
*Peregrine Emerging CTA Fund, LLC v. Tradersource, Inc.*,
   No. 07 C 5528, 2008 WL 474369 (N.D. Ill. Feb. 19, 2008)............................5
*Powell v. W. Ill. Elec. Coop.*,
   180 Ill. App. 3d 581 (4th Dist. 1989) ...............................................................7
*RTC v. Acton*,
   844 F. Supp. 307 (N.D. Tex. 1994) .................................................................22
*RTC v. Franz*,
   909 F. Supp. 1128 (N.D. Ill. 1995) ...........................................................4,5,6,23
*RTC v. Gallagher*,
   10 F.3d 416, 424–25 (7th Cir. 1993) ...............................................................23
*RTC v. O'Connell*,
   No. 94 C 4186, 1996 WL 153866 (N.D. Ill. Mar. 29, 1996) ...........................4
*Rush Univ. Med. Ctr. v. Minnesota Mining & Mfg. Co.*,
   No. 04 C 6878, 2007 WL 4198233 (N.D. Ill. Nov. 21, 2007)..........................5
*Seidman v. OTS*,
   37 F.3d 911 (3d Cir. 1994)...............................................................................21
*Shaper v. Bryan*,
   371 Ill. App. 3d 1079 (1st Dist. 2007) .........................................................7,20

iii

*Stamp v. Touche Ross & Co.*,
    263 Ill. App. 3d 1010 (1st Dist. 1993) ...............................................................9,10
*Starrels v. First Nat'l Bank,*
    870 F.2d 1168 (7th Cir. 1989) ...............................................................................8
*Treco, Inc. v. Land of Lincoln Sav. & Loan,*
    749 F.2d 374 (7th Cir. 1984) ..............................................................................5,7
*Venture Assocs. Corp. v. Zenith Data Sys. Corp.*,
    987 F.2d 429 (7th Cir. 1993) ...............................................................................13
*Wallach v. Billings*,
    277 Ill. 218 (1917) ..........................................................................................12,20
*Zahl v. Krupa*,
    399 Ill. App. 3d 993, 927 N.E. 2d 262 (2d Dist. 2010) ....................................10,12
*Ziarko v. Soo Line R.R.*,
    161 Ill. 2d 267 (1994) ...........................................................................................6

Statutes

12 U.S.C. § 1821(k) ....................................................................................... 4,23
12 U.S.C. § 1831p-1 ........................................................................................ 21
205 ILCS § 5/16 ............................................................................................ 7,23
12 C.F.R. §365, App. A ................................................................................... 21

Other Authorities

WILLIAM PROSSER, THE LAW OF TORTS § 34 (4th ed. 1971) ...................................... 4

Rules

FED. R. CIV. P. 12(b) ..................................................................................... 24
FED. R. CIV. P. 12(f) ...................................................................................... 25
FED. R. EVID. 201 .......................................................................................... 13

iv

As and for their Memorandum of Law in support of their Motion to Dismiss/Strike the First Amended Complaint ("Complaint" or "Compl.") of Plaintiff Federal Deposit Insurance Corporation (the "FDIC"), Defendants Demetris Giannoulias, George Giannoulias, Sean Conlon, Steven Dry, Donna Zagorski, Steven Balourdos, and Anthony D'Costa (collectively, the "Defendants") state as follows:[1]

## I.    **INTRODUCTION**

Ignoring the thousands of good loans made by Broadway Bank ("Broadway" or the "Bank") prior to its closure on April 23, 2010, the FDIC, through its Complaint, seeks to recover over $114 million for losses allegedly suffered by the Bank on 20 "CRE" (commercial real estate) and "ADC" (acquisition, development and construction) loans (collectively, the "Loss Loans"). The FDIC's Complaint likewise ignores that all 20 Loss Loans were initially approved when Broadway had an overall composite rating of "1"—the highest rating available, indicating that the Bank was considered to be "sound in every respect"—as reflected in the regulators' Reports of Examination ("ROE" or "ROEs"). The Complaint misrepresents the regulatory relationship in an attempt to create a false picture of the Board and management ignoring regulatory warnings. The FDIC's own documents contradict its allegations. During the period of substantial growth in the Bank's loan portfolio from 2005 to 2007, the regulators upgraded Broadway's overall composite rating from the second highest rating of a "2" to the highest rating of a "1." In addition to receiving high overall composite ratings, the Bank received the highest management rating of a "1," which indicates "strong performance by management" and "strong risk management practices," in the 2006 and 2007 ROEs.

As Broadway became impacted by the worst financial crisis since the Great Depression, the Bank's directors heeded the comments of the regulators, as reflected in the ROEs, from

---

[1] Defendants incorporate by reference all arguments made by co-defendant James McMahon in his motion to dismiss and memorandum in support of his motion to dismiss.

which the FDIC misleadingly and selectively quotes. In fact, as demonstrated by the ROEs cited in the Complaint, regulatory warnings were issued *after* all of the Loss Loans were made. In the aftermath of such a monumental financial crisis, the FDIC now claims after-the-fact that the Defendants should be held personally liable for their decisions to approve the 20 Loss Loans. The FDIC, in the role of "Monday morning quarterback," inappropriately second-guesses the Defendants' business decisions and wrongly presumes that the Defendants were in a position to anticipate the unprecedented collapse of the financial and real estate markets, which actually caused the losses, if any, at issue in this litigation, and which the FDIC itself did not foresee.

The Complaint, which is based solely on actions which can only be criticized with the benefit of 20/20 hindsight, is legally deficient and must be dismissed for at least the following reasons: (i) the FDIC fails to state a claim for its FIRREA-based gross negligence claim as defined by Illinois law; (ii) the FDIC's claims for breach of fiduciary duty and negligence are barred by the business judgment rule; (iii) the FDIC fails to sufficiently allege that any conduct on the part of each Defendant proximately caused the losses at issue; (iv) the FDIC improperly attempts to apply a strict liability standard; (v) the FDIC fails to allege any tortious conduct on the part of the Defendants; (vi) the FDIC asserts duplicative causes of action in Counts II and III; and (vii) the FDIC's Complaint contains immaterial and impertinent allegations, which do not give rise to a cognizable claim.

## II.    FACTUAL BACKGROUND AND COMPLAINT ALLEGATIONS

Broadway was a state-chartered, nonmember bank in Illinois. (Compl. ¶ 7.) Defendants Demetris Giannoulias, George Giannoulias, Sean Conlon, Steven Dry, Donna Zagorski, and Steven Balourdos (collectively, the "Director Defendants") served on Broadway's Board of Directors. (*Id.* ¶¶ 8–9, 11–14.) Demetris Giannoulias served as a director from 1994 through the Bank's closing in April 2010, was a member of the Bank's Loan Committee, and was

Broadway's President and Chief Executive Officer from 2006 through the Bank's closure.  (*Id.* ¶ 8.)  George Giannoulias was a director from 1999 through the Bank's closing, was a member of the Bank's Loan Committee, and was Chairman of the Bank's Board of Directors since 2006.  (*Id.* ¶ 9.)  Sean Conlon was an outside director from 2005 through December 22, 2009.  (*Id.* ¶ 11.)  Steven Dry was an outside director from 2005 through the Bank's closing in April 2010.  (*Id.* ¶ 12.)  Donna Zagorski was an outside director from 2006 through the Bank's closing in April 2010.  (*Id.* ¶ 13.)  Steven Balourdos was an outside director beginning in 2006.[2]  (*Id.* ¶ 14.)  Anthony D'Costa was a Vice-President for Lending at the Bank from 2005 through the Bank's closing in April 2010 and was a member of the Loan Committee.  (*Id.* ¶ 16.)

The FDIC alleges three causes of action involving the Defendants:  Gross Negligence (Count I); Breach of the Fiduciary Duty of Care (Count II); and Negligence (Count III). (*Id.* ¶¶ 129–150.)  In support of its claims that the Defendants breached the various alleged duties that they owed to Broadway, the FDIC alleges several purported failures:  (1) inadequate response to regulatory warnings; (2) rapid growth of Broadway's loan portfolio; (3) failure to follow the bank's loan policy; and (4) approval of 20 Loss Loans on which Broadway lost money.  (*Id.* ¶¶ 20–150.)  As explained below, each cause of action against the Defendants fails.

## III.    LEGAL STANDARD

Courts "are not bound to accept as true legal conclusions couched as factual allegations." *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  Indeed, a plaintiff's obligation to provide the grounds of entitlement to relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555.  Allegations "must be

---

[2] The Complaint inaccurately alleges that Defendant Steven Balourdos was an outside director through the Bank's closing.

sufficient to raise the possibility of relief above the 'speculative level.'" *E.E.O.C. v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007). Only a complaint "that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 129 S. Ct. at 1949–50.

## IV. ARGUMENT

### A. The FDIC Fails to Adequately Allege Gross Negligence under FIRREA in Count I

While Illinois law does not recognize a cause of action for gross negligence, such a claim is nonetheless created by the Financial Institutions Reform, Recovery and Enforcement Act ("FIRREA"). *RTC v. Franz*, 909 F. Supp. 1128, 1139 (N.D. Ill. 1995). The precise standard, however, is to be determined by Illinois' definition of "gross negligence." *See* 12 U.S.C. § 1821(k); *Franz*, 909 F. Supp. at 1139. The definition of "gross negligence" under Illinois law was clearly articulated by the Northern District of Illinois trial court in *Franz*—which equates gross negligence with "recklessness"—and should govern here.

In *Franz*, the Northern District of Illinois conducted a rigorous analysis of potential definitions for gross negligence under Illinois law before concluding that the best definition of gross negligence was "recklessness." 909 F. Supp. at 1140–41 (*citing, e.g.*, *People v. Khan*, 136 Ill. App. 3d 754, 758 (1st Dist. 1985) ("[t]he term[ ] . . . "gross negligence" [is] the historical predecessor[ ] of the term 'recklessness' and [they] have the same meanings")). The *Franz* court noted that "[d]efining gross negligence as recklessness is consistent with horn book law." 909 F. Supp. at 1141 (citing William Prosser, THE LAW OF TORTS § 34 (4th ed. 1971)). In a subsequent RTC case, the Northern District applied the same definition of gross negligence, stating that "this Court held that Illinois courts would define gross negligence as recklessness." *RTC v. O'Connell*, No. 94 C 4186, 1996 WL 153866, at *3 (N.D. Ill. Mar. 29, 1996).[3] Moreover, this

---

[3] Copies of all electronically published and unpublished cases are attached in alphabetical order as **Exhibit A**.

definition has continued to be applied by the Northern District. *See, e.g.*, *In re Berg*, 387 B.R. 524, 567 (Bankr. N.D. Ill. 2008) (stating that, under Illinois law, gross negligence is recklessness); *Rush Univ. Med. Ctr. v. Minnesota Mining & Mfg. Co.*, No. 04 C 6878, 2007 WL 4198233, at *4 (N.D. Ill. Nov. 21, 2007) (noting that "Illinois law defines 'gross negligence' . . . as recklessness."); *IMR USA, Inc. v. GES Exposition Servs., Inc.*, No. 04 C 100, 2005 WL 736589, at *5 n.2 (N.D. Ill. Mar. 31, 2005) (observing that "In Illinois, 'gross negligence' [and] 'recklessness' … are synonymous.").[4]

Further, it is well established that Illinois courts may look to Delaware for guidance on issues of corporate law. *See Treco, Inc. v. Land of Lincoln Sav. & Loan*, 749 F.2d 374, 379 (7th Cir. 1984) (noting a "well-established willingness of Illinois courts to make other jurisdictions' recent determinations part of Illinois corporate law"); *In re Netzel*, 442 B.R. 896, 901 (Bankr. N.D. Ill. 2011) ("[t]he Illinois Supreme Court is also likely to be guided by the decisions of other jurisdictions, particularly the Delaware Supreme Court, on important issues of corporate law"). Delaware law "employs a strict definition of gross negligence," requiring, "[i]n the corporate context . . . [that] a plaintiff must prove that the defendant acted with a 'devil-may-care attitude or indifference to duty *amounting to recklessness*.'" *Peregrine Emerging CTA Fund, LLC v. Tradersource, Inc.*, No. 07 C 5528, 2008 WL 474369, at *7 (N.D. Ill. Feb. 19, 2008) (quoting *Albert v. Alex. Brown Mgmt. Servs., Inc.*, 2005 WL 2130607, at *4 (Del. Ch. Aug. 26, 2005)) (emphasis added). Indeed, in *Alex. Brown Mgmt.*, a Delaware court defined gross negligence as

---

[4] In two recent decisions, trial courts in the Northern District of Illinois have articulated a different definition of gross negligence and have held that gross negligence means "very great negligence." *See FDIC v. Spangler*, No. 10-cv-4288, 2011 WL 6754022, at *5 (N.D. Ill. Dec. 22, 2011) (quoting *FDIC v. Gravee*, 966 F. Supp. 622, 636 (N.D. Ill. 1997)); *see also FDIC v. Saphir*, No. 10 C 7009, 2011 WL 3876918, at *6 (N.D. Ill. Sept. 1, 2011) (viewing gross negligence as "very great negligence" but failing to conduct any review or analysis of Illinois case law aside from the *Gravee* decision). While the district court in *Gravee* rejected a recklessness standard for gross negligence, it did so in reliance on an Illinois state court case—*Massa v. Dep't of Registration & Educ.*, 116 Ill. 2d 376 (1987)—which was carefully analyzed and rejected by the *Franz* court. *See Franz*, 909 F. Supp. at 1141.

"reckless indifference to or a deliberate disregard of the whole body of stockholders or actions which are without the bounds of reason." 2005 WL 2130607, at *4. In light of the described precedent from the Northern District of Illinois and the guidance provided by Delaware law, the FDIC's gross negligence claim in Count I should be governed by a "recklessness" standard.

Under Illinois law, recklessness "denotes 'a course of action which . . . shows an utter indifference to or a conscious disregard for a person's own safety and the safety of others.'" *Franz*, 909 F. Supp. at 1141 (quoting *Ziarko v. Soo Line R.R.*, 161 Ill. 2d 267, 279 (1994)). Here, the FDIC has failed to allege facts that show the requisite utter indifference or conscious disregard of a duty owed to Broadway. Instead, the FDIC relies solely on conclusory allegations in Count I regarding the Defendants' purported failures in approving the Loss Loans and ignoring regulatory warnings concerning the Bank's lending operations. However, the FDIC's conclusory statements that the Defendants' conduct was "very great or gross negligence" and "reckless" do not sufficiently state a claim in order to survive a 12(b)(6) motion to dismiss. *See, e.g.*, *Laborers Pension Fund v. Lake City Janitorial, Inc.*, 758 F. Supp. 2d 607, 611 (N.D. Ill. 2010). Absent any allegations of fact establishing that the Defendants acted with utter indifference or conscious disregard of their duties to the Bank, Count I fails as a matter of law. Even if the lesser standard of "very great negligence" is applied here, the FDIC has failed to allege any facts establishing any conduct on the part of the Defendants that amounted to such "very great negligence." At best, the FDIC's allegations may sound in negligence, but, for the reasons set forth in Section IV(B) below, any claim for negligence is precluded by the business judgment rule. Moreover, the same allegations in the FDIC's complaint for gross negligence (Count I) and negligence (Count III) cannot support both causes of action.

Lastly, under the Illinois Banking Act, the Director Defendants were entitled to rely upon "advice, information, opinions, reports or statements, including financial statements and financial

-6-

data, prepared or presented by: (1) one or more officers or employees of the bank whom the director believes to be reliable and competent in the matter presented . . ." 205 ILCS 5/16. None of the FDIC's allegations provides any basis for concluding that the Director Defendants were wrong to rely upon the loan write-ups recommending the loans or that they were grossly negligent in doing so. Aside from conclusory allegations, no facts have been alleged showing that the Director Defendants knew or were reckless in not knowing that the information in the loan write-up was purportedly incorrect or deficient. As such, Count I should be dismissed.

**B.      The Business Judgment Rule Precludes the FDIC's Purported Claims for Breach of Fiduciary Duty (Count II) and Negligence (Count III)**

The FDIC's claims for breach of fiduciary duty and negligence in Counts II and III, respectively, must be dismissed for failure to plead around the business judgment rule (the "BJR"). Specifically, the BJR creates a "presumption that directors of a corporation make business decisions on an informed basis, in good faith, and with the honest belief that the course taken was in the best interests of the corporation." *Ferris Elevator Co. v. Neffco, Inc.*, 285 Ill. App. 3d 350, 354 (3d Dist. 1996); *see also, e.g.*, *Powell v. W. Ill. Elec. Coop.*, 180 Ill. App. 3d 581, 585 (4th Dist. 1989) (same).[5] Further, the BJR provides that directors "will not be held liable for honest errors or mistakes of judgment." *Treco*, 749 F.2d at 377. Consequently, directors are not held strictly liable for mere failure to be familiar with all aspects of their business decisions. *See, e.g.*, *Shaper v. Bryan*, 371 Ill. App. 3d 1079, 1090 (1st Dist. 2007) ("the duty of the Board to inform itself before making business decisions does not require that the

---

[5] The FDIC itself has acknowledged the presumption afforded by the BJR, stating that "U.S. courts review the actions of directors according to the business judgment rule, developed by state common law. The business judgment rule is a *presumption* that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." Valentine V. Craig, THE CHANGING CORPORATE GOVERNANCE ENVIRONMENT: IMPLICATIONS FOR THE BANKING INDUSTRY, FDIC BANKING REVIEW, THE FUTURE OF BANKING IN AMERICA (*available at*: http://www.fdic.gov/bank/analytical/banking/2005jan/article4.html) (emphasis added and internal citations omitted).

Board be intimately familiar with every proposal and fact"). The BJR is especially important in the inherently risky world of banking:

> [W]ith the benefit of hindsight, the FDIC . . . could almost always allege one or more acts of negligence by bank directors in approving a bad loan. Had the directors obtained better or more current appraisals, more or better security for the loan, and had the bank better monitored the payment history of the loan and subsequent changes in the credit-worthiness of the borrower, almost any loan could have been made more secure, or at least the bank could have suffered a smaller loss on it. The business judgment rule protects bank directors from being guarantors on loans made by banks . . . The rule also encourages directors to exercise their judgment in making loans and not to foreclose credit markets to all but blue-chip borrowers.

*FDIC v. Brown*, 812 F. Supp. 722, 723 (S.D. Tex. 1992); *see also Starrels v. First Nat'l Bank*, 870 F.2d 1168, 1171 (7th Cir. 1989) (complaint did not survive business judgment rule because the "allegations merely show[ed] with hindsight that these loans were a mistake"); *FDIC v. Stahl*, 854 F. Supp. 1565, 1568–69 (S.D. Fla. 1994) (board decisions must be assessed at the time of the decision and not in "hindsight").

Under Illinois law, the BJR may properly be considered at the pleading stage of litigation. *See, e.g.*, *Miller v. Thomas*, 275 Ill. App. 3d 779, 788 (1st Dist. 1995). The Northern District's most recent opinion on a motion to dismiss an FDIC complaint adopted the presumptive approach to the BJR, requiring the FDIC to plead around it at the motion to dismiss stage. *Spangler*, 2011 WL 6754022, at *10–11. In *Spangler*, the court noted that "Illinois courts have repeatedly clarified that the 'business judgment rule is a presumption' that arises by operation of law." *Id.* (citations omitted). Thus, "at the motion to dismiss phase, it stands to reason that the burden of proof is on the party challenging a corporate decision made by a director to present allegations that rebut the presumption created by the business judgment rule." *Id.*[6]

---

[6] It should be noted that the Northern District has been inconsistent in its application of the BJR at the pleading stage. *See, e.g.*, *Saphir*, 2011 WL 3876918, at *5 (finding that the BJR is an affirmative defense and inapplicable at the pleadings stage). Notably, in *Saphir*, the Court addressed the BJR in a single sentence citing a single case that has no application here. 2011 WL 3876918, at *5.

As previously noted, Illinois courts may look to Delaware corporate law for guidance, and in Delaware, courts routinely consider the BJR at the motion to dismiss stage. *See, e.g.*, *Guttman v. Huang*, 823 A.2d 492, 507 (Del. Ch. 2003). Further, in a recent FDIC lawsuit, the Northern District of Georgia relied on the presumption of Georgia's BJR in dismissing causes of action for negligence and breach of fiduciary duty against former officers and directors of a failed bank. *FDIC v. Skow*, No. 1:11-cv-00111-SCJ, at 18–19 (N.D. Ga. Feb. 27, 2012).

Here, the BJR warrants dismissal of the FDIC's claims for breach of fiduciary duty and negligence. Illinois case law implies a two-pronged analysis under the BJR: (i) an inquiry must be made as to whether the allegations attack an exercise of business judgment by the defendant; and (ii) a court must determine whether the plaintiff has sufficiently pled around those presumptions, specifically by alleging "bad faith, fraud, illegality or gross overreaching." *See Stamp v. Touche Ross & Co.*, 263 Ill. App. 3d 1010, 1016 (1st Dist. 1993). Illinois courts take a liberal approach when determining what constitutes an exercise of business judgment. In *Stamp*, for example, the court found that the plaintiff's allegations of breach of fiduciary duty and negligent mismanagement fell within the ambit of the BJR, noting that the defendants were charged with "failure to develop 'adequate' underwriting procedures and controls, from which it may be reasonably inferred that they did develop some underwriting procedures and controls although, in plaintiff's opinion, they were inadequate." *Id.* at 1016–17. The *Stamp* court further analyzed the plaintiff's complaint, noting that:

> The allegations which come the closest to establishing plaintiff's cause of action are [those that] charge defendants with failing to oversee the performance of managing general agents, wrongful delegations of responsibility, and failure to properly manage and supervise. . . . *[T]hese allegations, as currently framed, attack no more than the defendants' actual exercise of their business judgment and are consequently within the parameters of the business judgment rule.*

*Id.* at 1017 (emphasis added). Such allegations were "exactly the type of second-guessing which the business judgment rule was designed to preclude." *Id.*

The allegations of the Complaint make clear that the FDIC is attacking the exercise of the business judgment of the Defendants by claiming that they: failed in approving certain loans; failed to follow the Bank's loan policy; failed to "expect further" deterioration in the real estate market; made loans when the real estate market had already experienced a downturn; failed to conclude that certain borrowers' financials were insufficient; renewed, rather than called, loans; approved loans with appraisals that the FDIC says were insufficient; and ignored regulatory warnings. (*See, e.g.,* Compl. ¶¶ 20–24, 39–43, 47, 57.) Thus, the FDIC's allegations of breach of fiduciary duty and negligence fall within the domain of the BJR. Despite the presumption afforded by the BJR at the pleadings stage, the Complaint is devoid of any facts establishing bad faith, fraud, illegality or gross overreaching by the Defendants. Accordingly, Counts II and III must be dismissed. *See Miller*, 275 Ill. App. 3d at 788 (acknowledging that failure to plead around the presumption of good faith warrants dismissal of complaint).

### C.     The FDIC Fails to Plead Any Facts to Support the Inference that the Defendants Proximately Caused the Alleged Loan Losses

The FDIC has the burden to plead a basis upon which the Court may infer that the Defendants were a proximate cause of the losses alleged in the Complaint. *See FDIC v. Bierman*, 2 F.3d 1424, 1434 (7th Cir. 1993). Specifically, the FDIC must allege that each Defendant's act or omission proximately caused Broadway's losses. *Id.* Moreover, a plaintiff is required to plead "what was apparent to the defendant at the time, rather than "what may appear through the exercise of hindsight." *Zahl v. Krupa*, 399 Ill. App. 3d 993, 927 N.E. 2d 262, 287 (2d Dist. 2010). The FDIC presents only conclusory statements that the Bank suffered damages as "a direct and proximate cause" of the Defendants' alleged conduct. (Compl. ¶¶ 136, 143,

-10-

150.)   The FDIC fails to allege sufficient facts that show that the Defendants knew or should have known, at the time of the lending decisions at issue in the Complaint, that their actions would in fact result in losses to Broadway.   The Complaint is likewise devoid of any allegations explaining how the specific facts known to each Defendant proximately resulted in the claimed losses.   That is because the proximate cause of the loan losses was the unprecedented global meltdown in the economy—facts that the government regulators acknowledged on their own during their examinations of the Bank[7] and which the FDIC recognizes in its Complaint.   In conclusory fashion, the FDIC alleges in the Complaint that much of Defendants' "imprudent lending" took place "after the real estate market began its precipitous decline."   (Compl. ¶ 40.) Because the FDIC concedes that there was a collapse in the market and attempts, albeit unsuccessfully, to lessen the impact of the collapse on the Bank's financial condition through self-serving, conclusory allegations, the FDIC is unable to plead any basis upon which the Court can infer proximate cause, such that all Counts of the Complaint should be dismissed.

### D.    The FDIC Improperly Attempts to Apply a Strict Liability Standard

The Complaint must be dismissed because the FDIC also improperly attempts to hold the Defendants strictly liable for Broadway's losses.   For each cause of action, the facts in the Complaint must support the FDIC's allegations that the Defendants breached duties owed to Broadway.   In an attempt to avoid its pleading obligations, the FDIC seeks to hold the Defendants to a heightened standard by alleging in conclusory statements that the Defendants' "responsibilities to the Bank were heightened."   (Compl. ¶¶ 132, 140, 147.)   The Complaint is full of allegations that the defendants were supposed to "ensure" certain results, e.g., to ensure that loans were properly underwritten, to ensure that collateral was sufficiently valuable, to ensure that loans did not violate laws, and to ensure that loans did not create unsafe and unsound

---

[7] As will be discussed in detail in Section IV(E)(1) below, the regulators noted in certain ROEs that the severe downturn in the market was responsible for the deterioration of the Bank's asset quality.

concentrations of credit. (*Id.* ¶¶ 133, 141, 148.) However, it is clear that bank directors owe a duty of *ordinary* care. *See, e.g.*, *Zahl*, 399 Ill. App. at 1016–18 (interpreting previous Illinois bank cases to stand for the proposition that directors owe a duty of ordinary care); *Becker v. Billings*, 304 Ill. 190, 209 (1922) (duty owed by bank directors is "one of ordinary diligence and care"); *Chicago Title & Trust Co. v. Munday*, 297 Ill. 555 (1921) ("we hold that directors must exercise ordinary care and prudence in the administration of the affairs of a bank").

Bank directors "are not liable for every loss which happens to occur," because "[s]uch a rule would make a bank director an insurer, which he is not." *Wallach v. Billings*, 277 Ill. 218, 233 (1917). *See also FDIC v. Stanley*, 770 F. Supp. 1281, 1310 (N.D. Ind. 1991) ("directors are not insurers or guarantors of the fidelity and proper conduct of the executive officers of the bank, and they are not responsible for losses resulting from their wrongful acts or omissions, provided they have exercised ordinary care in the discharge of their own duties as directors"). Alleging the failure "to ensure" these certain results is no different than designating the directors as insurers. The FDIC should not be allowed to flout the law and allege that the directors breached their duties by "failing to ensure" the result the FDIC thinks appropriate.

As will be set forth in greater detail below, the allegations in the Complaint fail to support a claim that the Defendants breached any duties owed to Broadway—ordinary *or* heightened. By failing to adequately plead the elements of its causes of action, the FDIC is essentially seeking to hold the Defendants strictly liable for the Bank's losses. This tactic has already been firmly rejected by the Supreme Court of Illinois:

> [T]he case for the complainant seems to have been prepared and presented upon the theory that when a bank has failed and it appears that there was a general supineness and looseness of management by the directors the burden of exoneration for the losses is on the directors. This is not a correct theory.

*Wallach*, 277 Ill. at 232.

### E.     The FDIC Fails to Plead Tortious Conduct on the Part of the Defendants

Arguing ad hoc, with the benefit of hindsight, the FDIC alleges that the following conduct is actionable:  (1) inadequate response to regulatory warnings; (2) rapid growth of Broadway's loan portfolio; (3) failure to follow the bank's loan policy; and (4) approval of 20 Loss Loans on which Broadway lost money.  (Compl ¶¶ 20–150.)  By relying on conclusory allegations regarding the Defendants' purportedly tortious conduct, the FDIC has failed to provide facts demonstrating any plausible claim for relief.  Accordingly, all Counts of the Complaint should be dismissed.

### 1.     Response to Regulatory Warnings

The FDIC attempts to allege that Broadway's failure resulted from the failure to correct deficiencies identified and described by regulators in certain ROEs.  (Compl. ¶¶ 26–38.)  A review of Broadway's ROEs, the Material Loss Review of Broadway ("MLR") prepared by the Office of Inspector General in November 2010, and the ratings assigned by the regulators shows that these allegations are entirely without basis.[8]  Indeed, the allegations of the Complaint are belied by the ROEs, which demonstrate the Bank's ongoing compliance with the regulators' feedback.  Further, for much of the relevant time period in the Complaint, and when all 20 Loss Loans were approved between May 2006 and June 2008, Broadway received the highest composite rating and the highest and second highest component ratings from the regulators:

---

[8] This Court can consider the ROEs because the documents are referred to in the FDIC's Complaint and are central to the FDIC's allegations.  *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993).  The ROEs for 2005 through 2009 are filed contemporaneously herewith under seal in support of the Defendants' Motion to Dismiss as **Exhibits B**, **C, D, E**, and **F**.  This Court can also take judicial notice of the MLR, along with the other FDIC publications of public record cited herein, because the MLR is published by the Office of Inspector General, Federal Deposit Insurance Corporation, and it is a public record available at http://www.fdicoig.gov/reports11%5C11-004.pdf.  *See* FED. R. EVID. 201; *Gen. Elec. Cap. Corp. v. Lease Resolution Corp.*, 128 F. 3d 1074, 1080–81 (7th Cir. 1997).  Copies of the pages referenced in the MLR are attached as **Exhibit G**.

| Report Date | Exam Start Date | Composite[9] | Capital | Asset | Manage-ment | Earnings | Liquidity | Sensitivity to Market Risk |
|---|---|---|---|---|---|---|---|---|
| 3/4/05 | 1/3/05 | 2 | 1 | 2 | 2 | 1 | 2 | 2 |
| 4/06 | 2/13/06 | 1 | 1 | 2 | 1 | 1 | 2 | 1 |
| 4/23/07 | 2/13/07 | 1 | 1 | 2 | 1 | 1 | 2 | 1 |

The FDIC's allegations that the Defendants "repeatedly ignored" warnings from bank examiners regarding weaknesses in the Bank's lending practices is in stark contrast to the ratings received by Broadway. If the Defendants had in fact ignored prior warnings from regulators, such failures would be noted in the ROEs (which they are not) and Broadway would not have received such high ratings, particularly with regard to its management practices. The FDIC also selectively and misleadingly quotes from the ROEs in the Complaint. For example, quoting from the ROE from 2007, the FDIC alleges that the regulators "noted their concerns" with Broadway's apparently increasing concentrations in "construction and development, total out-of-area, State of New York, collateral type [hotel/motel], and relationship" loans. (Compl. ¶ 27.) However, the FDIC conveniently ignores the language in the 2007 ROE that immediately precedes this quoted portion, wherein the regulators acknowledged that "management is adequately monitoring concentrations of credit." (2007 ROE at 1.) Moreover, the FDIC ignores

---

[9] Financial institutional regulators and examiners use the Uniform Financial Institutions Rating System ("UFIRS") to evaluate a bank's performance in six component areas represented by the CAMELS acronym as follows: Capital adequacy, Asset quality, Management practices, Earnings performance, Liquidity position, and Sensitivity to market risk. (*See* "Uniform Financial Institutions Rating System," available at http://www.fdic.gov/regulations/laws/rules/5000-900.html.) Each component, and an overall composite score, is assigned a rating of 1 through 5, with 1 having the least regulatory concern and 5 having the greatest concern. The first six numbers in the chart refer to the Bank's component CAMELS ratings. The final number refers to the Bank's overall composite rating. The "composite" ratings "are based on a careful evaluation of an institution's managerial, operational, financial, and compliance performance." (*Id.*) A financial institution that receives a composite score of "1" is considered to be "sound in every respect" and to "exhibit the strongest performance and risk management practices relative to the institution's size, complexity, and risk profile, and give no cause for supervisory concern." (*Id.*) A financial institution that receives a composite score of "2" is considered to be "fundamentally sound," "stable and are capable of withstanding business fluctuations," "[o]verall risk management practices are satisfactory relative to the institution's size, complexity, and risk profile," and there "are no material supervisory concerns." (*Id.*)

CHICAGO/#2321120.6

the fact that, in the 2007 ROE, Broadway received a rating of "1" for management practices[10] and a rating of "2" for asset quality,[11] as well as an overall composite rating of "1." (MLR at 16.) The FDIC's allegations concerning the Defendants' purportedly repeated failure to follow regulatory warnings and recommendations are wholly contradicted by the 2007 ROE and the ratings contained therein, which expressly noted that the "overall financial condition of the bank remains strong." (2007 ROE at 1.) Significantly, all 20 Loss Loans were approved when Broadway had an overall composite rating of "1" according to the regulators and before the 2008 ROE dated July 23, 2008, which resulted in a composite rating of "3"[12] and the September 17, 2008 Memorandum of Understanding ("MOU").

The FDIC's allegations regarding the MOU and the Defendants' failure to adhere to it are likewise belied by the language of the MOU itself. In the Complaint, the FDIC alleges that the Defendants "ignored the regulators" by approving two out-of-state loans in California in contravention of the draft MOU circulated to the Bank's Board of Directors. (Compl. ¶¶ 32–33, 44–46, 50–51.) However, a review of the MOU shows that nowhere therein did the regulators instruct the Bank to stop making any loans.[13] Additionally, as noted in the MLR, the regulators did not recommend that the Bank reduce its loan concentration levels during the 2008 exam

---

[10] A component rating of "1" for management practices "indicates strong performance by management and the board of directors and strong risk management practices relative to the institution's size, complexity, and risk profile. All significant risks are consistently and effectively identified, measured, monitored, and controlled. Management and the board have demonstrated the ability to promptly and successfully address existing and potential problems and risks." (*See* "Uniform Financial Institutions Rating System," available at http://www.fdic.gov/regulations/laws/rules/5000-900.html.)

[11] A component rating of "2" for asset quality "indicates satisfactory asset quality and credit administration practices." (*See* "Uniform Financial Institutions Rating System," available at http://www.fdic.gov/regulations/laws/rules/5000-900.html.)

[12] A composite rating of "3" suggests that "[f]ailure appears unlikely . . . given the overall strength and financial capacity of [the institution]." (*See* "Uniform Financial Institutions Rating System," available at http://www.fdic.gov/regulations/laws/rules/5000-900.html.)

[13] This Court can consider the MOU because it is referred to in FDIC's Complaint and it is central to the FDIC's allegations. *Venture Assocs. Corp.*, 987 F.2d at 431. The MOU is filed contemporaneously herewith under seal in further support of Defendants' Motion to Dismiss as part of the 2008 ROE.

-15-

cycle; in fact, "it was not until January 2010 that the examiners required Broadway to take action to develop written plans to reduce concentration levels." (MLR at 22.) Further, the 2008 ROE, to which the MOU relates, discusses out-of-area real estate concentrations in New York and Florida; it does not discuss any concentration of loans in California. (2008 ROE at 1.) As such, the FDIC's contention that the Defendants ignored the regulators by approving two loans in California is contradicted by the MOU and the 2008 ROE. And this contention is conclusively contradicted by the fact that in the very detailed 2009 ROE that occurred *after* these loans were made, there is no criticism of any kind of the Board or management for making or approving these loans. Had it been in contravention of any regulatory directive, as the FDIC now asserts, it certainly would have had to be mentioned at the examination.

In reality, the MOU, ROEs, and MLR demonstrate the Defendants' compliance with regulators' feedback. In the 2009 ROE, the FDIC specifically noted Broadway's compliance with the MOU. (2009 ROE at 2, 18) (noting that "management has acted upon each part of the Memorandum" and that "[p]rocedures to prevent the recurrence of violations identified in the March 24, 2008 examination appear to have been implemented"). The 2009 ROE further noted that the Bank "enhanced the loan review and identified higher risk credits," that "[a]ll assets classified Loss in the Report have been eliminated from the bank's books," and that "management has been aggressive in managing and monitoring credits." (*Id*. at 3, 19–20.) The MLR also shows that the Defendants responded to, rather than ignored, the regulators' feedback. (MLR at 18) (noting that, "[d]espite Broadway's efforts to comply with the various enforcement actions issued by the FDIC and IDFPR, the bank's condition continued to deteriorate").

Lastly, the regulators' opinions about Broadway's sound financial condition and its management did not change until the 2008 ROE dated July 23, 2008, which was after approval had already been given for the Loss Loans identified in the Complaint. The MLR, as well as the

-16-

2008 ROE, highlights the downturn in the real estate market and its effect on the Bank's condition. (MLR at 3) (noting that, "real estate markets in the bank's lending areas began to decline, which led to substantial asset quality deterioration and net losses in 2008 and 2009"); (MLR at 19) (stating that "examiners also acknowledged the negative impact that the severe economic downturn had on the institution"); (2008 ROE at 8) (acknowledging the impact of the "downturn in the real estate market" on the deterioration of asset quality at the Bank). Only after the sudden, sustained collapse of the real estate markets did the regulators downgrade Broadway's overall composite rating and management rating from a "1" to a "3" in the 2008 ROE. Due to the nationwide turmoil in real estate markets and the compete global financial meltdown that took place in late 2008, the Bank's financial condition further deteriorated in 2009 and 2010. Yet, none of these events—which in fact caused Broadway's failure—can be reasonably attributed to the Defendants or their alleged failure to heed the regulators' warnings.

### 2. Growth of Broadway's Loan Portfolio

The FDIC alleges that Broadway experienced "explosive growth" in its loan portfolio "fueled by an unsustainable expansion of the Bank's CRE and ADC loans." (Compl. ¶ 20.) It is, in fact, the business of the Bank, and all banks, to grow by making loans. There is nothing *per se* actionable about increasing a bank's loan portfolio, and the FDIC attempts to paint this conduct as tortious by manufacturing a duty to follow peer institutions. (*Id.* ¶ 21.) Even if the FDIC could show that failure to follow peer institutions was a duty owed by the Defendants, it cannot adequately allege proximate causation. In *First Nat'l Bank of Bellaire v. Comptroller of Currency*, for example, the Fifth Circuit Court of Appeals was presented with a regulator's argument based on a peer analysis and noted that "[w]ithout a connection between the peer group analysis and a finding of unsafe and unsound capital levels, therefore, the peer group analysis does not support the Comptroller's finding that the Bank's capital level was unsafe and

-17-

unsound." 697 F.2d 674, 686 (5th Cir. 1983). Here, aside from conclusory statements, the FDIC does not plead any correlation between the peer group bank standard and bank stability. The FDIC does not allege that Broadway's peer banks were all stable, suffered no loan losses, and survived the "Great Recession." Instead, with no factual support, the FDIC points to an apparent statistical difference between Broadway and "peer banks." (Compl. ¶ 21.) This does not constitute a basis upon which to hold the Defendants individually liable.

The FDIC also attempts to allege that Broadway experienced "reckless growth" due to out-of-territory loan concentrations and its excessive number of CRE and ADC loans for condominium development and hospitality industry construction. (*Id.* ¶¶ 23–24.) However, as demonstrated in the MLR, Broadway's growth was closely monitored by regulators during the time period at issue in the Complaint. The FDIC, in conjunction with the IDFPR, provided ongoing supervision of Broadway. Between 2005 and 2010, the FDIC and IDFPR conducted five onsite examinations and three visitations of Broadway. (MLR at 15–16.)

Following every single full-scope examination during the years 2005 through 2007, the regulators assigned Broadway a very favorable asset quality rating of "2"—the second highest component rating. (MLR at 16.) The regulators assigned a management rating of "2" in 2005 and a management rating *increase to* "1" in 2006 and 2007. (*Id.*) Perhaps most notably, Broadway received an overall composite rating of "2" in 2005 followed by an upgrade in 2006 to an overall composite rating of "1," which indicates that the overall financial condition of the Bank was "sound in every respect." (*Id.*) In 2007, the Bank again received an overall composite rating of "1." (*Id.*) Comparing these ratings to the Bank's annual growth rates during this time period is telling. During the 2005 to 2006 time frame when Broadway was upgraded from a composite rating of "2" to a "1," Broadway's loan portfolio grew at its fastest pace, significantly faster than the years preceding and following the more critical examination reports. In the year

-18-

ending 12/31/05, the Bank's loan portfolio grew by 35%, and the Bank was upgraded to a composite "1" rating at the following exam. (*Id*. at 3–4.) The Bank maintained this "1" rating after further growth in 2006 of 30.42%. (*Id*.) Clearly, the Bank's loan growth *per se* or in relation to its peer group was not an issue to examiners at this time. The Bank's growth slowed considerably to 16% in 2007 and 9.03% in 2008. (*Id*.) Notably, after Broadway received a composite rating of "3" in the 2008 ROE, the Bank shrunk the loan portfolio by 6.37% in 2009 and continued to reduce it at annualized -22.48% for the first three months of 2010, showing that the Bank was heeding, and not ignoring, the regulators' concerns. (*Id*.)

As reflected in the MLR, Broadway was cognizant of the risk associated with its CRE and ADC loan concentrations, and through 2008, it "maintained capital ratios that were above those required for *Well Capitalized* banks and often in excess of peers." (MLR at 7.) The consistently favorable regulator ratings received by Broadway from 2005 through 2007, along with the Bank's high capital ratios, contradict the FDIC's conclusory allegations regarding the Bank's "explosive" and "reckless growth." (*See id*. at 16) (stating that Broadway "consistently received CAMELS composite ratings of '1' or '2' for the 2005 through 2007 examinations").

### 3.    Failure to Follow Broadway's Loan Policy

The FDIC's reliance on Broadway's internal lending policies and procedures as a source of actionable duties fails. The FDIC acknowledges the adequacy of Broadway's loan policy in that it "required diligent underwriting in conformity with state and federal law, close monitoring of concentrations of credit and rigorous documentation and prudent evaluation of borrower and project risk." (Compl. ¶ 25.) To the extent the FDIC attempts to reconcile such praise with its conclusory allegations that "Defendants routinely ignored and repeatedly failed to enforce the loan policy's provisions" and that the Bank's loan approval policies and procedures were "frequently bypassed," such an argument is unavailing. (*Id*.) In *First Nat'l Bank of Lincolnwood*

-19-

*v. Keller*, a national banking association sued a former director, attempting to impose personal liability for what the Office of the Comptroller of the Currency determined to be "loss loans." 318 F. Supp. 339 (N.D. Ill. 1970). In assessing the bank's heavy reliance "on the fact that [director defendant] failed to follow Bank regulations in certain of his dealings," the court noted that "violation of a bank's internal rules and regulations with regard to lending procedure does not, without more, make a director and officer liable for the default of such loans," and that common law "*does not make [a director] an insurer of the success of all ventures merely because corporate procedures are ignored.*" *Id.* (emphasis added).

### 4.    Approval of Loss Loans

The FDIC seeks to hold the Defendants liable for the losses incurred on 20 Loss Loans merely because those loans allegedly turned out to be unsuccessful. At most, the Complaint alleges that Broadway entered into loan transactions that resulted in losses to the Bank. Moreover, the FDIC does not allege each Defendant's role regarding the alleged loan losses, other than identifying which loans they "voted" for or alleging that certain Defendants "approved" certain loans. (*See* Compl. ¶ 39.) However, bank directors are not insurers or guarantors of the profitability of their business decisions. *Stanley*, 770 F. Supp. at 1310; *Wallach*, 277 Ill. at 233. Moreover, "the duty of the Board to inform itself before making business decisions does not require that the Board be intimately familiar with every proposal and fact," as the Complaint incorrectly suggests. *Shaper*, 371 Ill. App. 3d at 1090.

The FDIC fails to allege any facts in support of its conclusory allegations that the Defendants breached their duties by failing to conduct proper due diligence and underwriting. (Compl. ¶¶ 24, 133, 141, 148.) The Complaint alleges that the Defendants approved certain of the Loss Loans "without proper underwriting" due to various borrowers' purportedly insufficient capacity to repay the loans. (*See, e.g.*, *id.* ¶¶ 47, 52, 57, 70, 75.) However, the Complaint

-20-

ignores the FDIC's own guidelines for approving loans. The FDIC's Guidelines for Real Estate Lending identify a number of factors for underwriting consideration, and note that "capacity of the borrower, *or income from the underlying property*, to adequately service the debt" is only one "relevant credit factor."[14]  12 C.F.R. § 365, App. A (emphasis added); *see also Lavery v. Kearns*, 792 F. Supp. 847 (D. Me. 1992)  ("It was not unusual banking practice to make commercial loans for real estate development to developers who did not have strong cash positions.…The Bank had appraisals of [the] properties done and relied on those as an indication of whether to make the loans, because repayment was expected to come from the developed property.")  The FDIC should not be allowed to base the Defendants' liability on alleged improper underwriting when its guidelines contradict its allegations.

The FDIC also attempts to allege that the Defendants' approval of the Loss Loans is actionable because the loans "were made in violation of" three provisions of the Code of Federal Regulations (the "CFR").  (Compl. ¶ 40.)  However, even if these allegations are true, the CFR does not bestow upon a shareholder (in whose shoes the FDIC now stands) the right to bring a cause of action against bank directors.  *See FDIC v. Schuchmann*, 235 F.3d 1217, 1222 (10th Cir. 2000).  *Id.* (citing *Seidman v. OTS*, 37 F.3d 911, 931 (3d Cir. 1994)).  Moreover, 12 U.S.C. § 1831p-1 provides specific actions that may be taken by the FDIC should the standards it articulates under the statute not be met.  A private cause of action is not one of those remedies.

Further, the FDIC asserts that making many of these loans at a time when the real estate market had experienced a "major downturn" and when the market "was expected to further deteriorate" was inappropriate.  (*See, e.g.,* Compl. ¶¶ 47(a), 81(a).)  The FDIC's position

---

[14] Per the FDIC's guidelines, other relevant credit factors include: the value of the mortgaged property; the overall creditworthiness of the borrower; the level of equity invested in the property; any security sources of repayment; and any additional collateral or credit enhancements. *See* 12 C.F.R. § 365, App. A.

suggests that no financial institution, regardless of its capital status, should be making loans after a major market downturn. The Defendants should not be liable for failing to correctly predict the market. The FDIC further challenges Broadway for making construction loans based on appraisals "as completed," rather than "as is," and for renewing certain loans. (*See, e.g.,* Compl. ¶¶ 52(b), 75(e).) As described in more detail in the Motion to Dismiss of co-defendant James McMahon, there is nothing inappropriate with making construction loans on an "as completed" basis or renewing loans.

Finally, for the reasons set forth above in Section IV(E)(1), the FDIC has failed to allege any facts showing that the Defendants failed to ensure that the Loss Loans did not create unsafe and unsound concentrations of credit. (Compl. ¶¶ 133, 141, 148.) That is due to the fact that all 20 Loss Loans were approved before the results of the 2008 ROE concerning concentrations of credit were received by the Bank's Board of Directors.

F.     **The FDIC Has Insufficiently Alleged Any Wrongful Conduct by the Outside Directors**

The FDIC has alleged the same three causes of action against a combination of inside Directors, outside Directors, and officers of the Bank. Specifically as to the outside Directors—Defendants Sean Conlon, Steven Dry, Donna Zagorski, and Steven Balourdos (collectively, the "Outside Directors")—the FDIC has wholly failed to take into account the unique position of the Outside Directors, and, as such, the FDIC has not alleged any wrongful conduct on their part in the Complaint. The Court can and should reject the FDIC's improper group pleading. *See In re ITT Corp., Derivative Litig.*, 653 F. Supp. 2d 453, 464 (S.D.N.Y. 2009) (pleading "director defendants" as a single entity is insufficient); *RTC v. Acton*, 844 F. Supp. 307, 315 (N.D. Tex. 1994) (pleadings did not materially differentiate between the different classes of directors).

First, the Complaint fails to allege any facts showing the Outside Directors' specific conduct or knowledge regarding the Loss Loans other than identifying for which loans they "voted." (*See* Compl. ¶ 39.) As such, the FDIC has not sufficiently alleged any tortious conduct on the part of the Outside Directors. Second, there is no legal basis to support a negligence claim (Count III) against the Outside Directors. As previously noted, under FIRREA, directors of failed banks can only be liable for gross negligence and can only be liable for a standard less than gross negligence if applicable state law provides a stricter standard. *See* 12 U.S.C. § 1821(k); *FDIC v. Atherton*, 519 U.S. 213, 216 (1997); *RTC v. Gallagher*, 10 F.3d 416, 424–25 (7th Cir. 1993); *Franz*, 909 F. Supp. at 1131. Under Illinois law, absent allegations of "illegal acts, fraudulent practices, ultra vires acts … or profiting personally" (which are not alleged in this case), "directors are not liable for slight negligence, nor for errors in judgment while acting in good faith." *Murphy v. Candor*, 263 Ill. App. 226, 232 (2d Dist. 1931). Indeed, public policy and Illinois law dictate that outside directors of banks "should not be held to a too high degree of care; otherwise responsible persons will not assume that position." *Id.*

Finally, the Outside Directors are entitled to rely upon "advice, information, opinions, reports or statements, including financial statements and financial data, prepared or presented by: (1) one or more officers or employees of the bank whom the director believes to be reliable and competent in the matter presented" under the Illinois Banking Act. 205 ILCS 5/16. The Complaint fails to provide any basis for concluding that the Outside Directors were wrong to rely upon the loan write-ups recommending the loans or that they were grossly negligent in doing so. Indeed, for the time period relevant to the approval of all 20 Loss Loans, the Bank's management received a "1." Thus, all Counts directed against the Outside Directors should be dismissed.

### G. The FDIC Has Insufficiently Alleged Any Wrongful Conduct by Officer Defendant, Anthony D'Costa

As is the case with the Outside Directors, all of the FDIC's claims against Officer Defendant, Anthony D'Costa, should be dismissed because the Complaint engages in improper group pleading and fails to identify any specific conduct on the part of Mr. D'Costa that is tortious. The Complaint only alleges that Mr. D'Costa was a Vice-President of Lending at Broadway and member of the Bank's Loan Committee, and that he approved 18 out of the 20 Loss Loans. (Compl. ¶¶ 16, 39.) No other wrongful conduct has been alleged as to Mr. D'Costa. The Complaint inappropriately groups Mr. D'Costa with the Director Defendants even though Mr. D'Costa, as an officer at the Bank, did not receive the ROEs or MOU that form the basis of many of the FDIC's allegations. Because the Complaint does not sufficiently allege any facts demonstrating any wrongful conduct specific to Mr. D'Costa, the FDIC has not provided Mr. D'Costa "fair notice" of the factual predicate for the claims asserted against him, and therefore, all Counts against Mr. D'Costa should be dismissed.

### H. The FDIC's Duplicative Claims Should Be Dismissed

Counts II (breach of fiduciary duty) and III (negligence) of the Complaint are duplicative of each other and should be dismissed under Rule 12(b)(6). Under Illinois law, causes of action alleging the same facts and injury may be dismissed as duplicative on a 12(b)(6) motion to dismiss. *See, e.g.*, *Beringer v. Standard Parking O'Hare Joint Venture*, Nos. 07 C 5027, 07 C 5119, 2008 WL 4890501, at *5 (N.D. Ill. Nov. 12, 2008). Merely cloaking identical causes of action with distinct titles does not prevent them from being duplicative. The FDIC ran into this problem in *Spangler* and *Saphir*, having its duplicative negligence and breach of fiduciary duty claims dismissed. *See, e.g.*, *Spangler*, 2011 WL 6754022, at *12; *Saphir*, 2011 WL 3876918, at *9. Here, the FDIC has attempted to surreptitiously avoid this problem by presenting Count III (negligence) "in the alternative" to Count II (breach of fiduciary duty). (Compl. ¶ 145.) Despite

-24-

being pled "in the alternative," it is clear that Counts II and III allege the same underlying facts, and they allege identical purported breaches. (*See* Compl. ¶¶ 141, 148.) The "same injury" component is established here, as both Counts seek to recover damages allegedly resulting from the Defendants' approval of the Loss Loans and allege an identical amount of losses. (*Id*. ¶¶ 143, 150.) Since Counts II and III allege the same facts and injury, one of them must be dismissed.

## V.      IMMATERIAL ALLEGATIONS SHOULD BE STRICKEN

Under the Federal Rules of Civil Procedure, courts are authorized to "strike from a pleading . . . any redundant, immaterial, impertinent, or scandalous matter." FED. R. CIV. P. 12(f). The purpose behind such a motion is "to exclude irrelevant material from pending litigation." *Murphy v. Capital One Bank*, No. 08 C 801, 2008 WL 3876138 (N.D. Ill. Aug. 18, 2008). Motions to strike "may be granted if they remove unnecessary clutter from the case and serve to expedite, not delay." *Holzer v. Prudential Equity Group LLC*, 520 F. Supp. 2d 922, 928 (N.D. Ill. 2007). The FDIC's Complaint contains immaterial and impertinent matter about the alleged acts and/or omissions of the Defendants in Paragraphs 24, 56, 135, 142, and 149.[15] These allegations are not necessary for the FDIC to plead its claims and are designed to portray the Defendants in a negative light that serve no legitimate interest in this case.

## VI.     CONCLUSION

For all the foregoing reasons, the Defendants respectfully request that this Court grant their Motion to Dismiss/Strike the FDIC's Complaint and dismiss all Counts against them.

---

[15] In Paragraph 24 of the Complaint, the FDIC alleges that, "[i]n some instances, loans were made to assist other financial institutions avoid regulatory intervention or loss recognition." In Paragraph 56 of the Complaint, the FDIC alleges that the Loan Committee approved a loan to Shubh Oceaninc, LLC, Atul Bisaria, and Mr. Bisaria's wife "ostensibly to purchase a passenger boat and transport it to Mumbai, India, to be used for 'special events.'" Later, in Paragraphs 135, 142, and 149, the FDIC alleges that the Bank's Board of Directors "were grossly inattentive to the affairs of the Bank—deferring excessively to the whims of the Giannoulias family."

-25-

## CERTIFICATE OF SERVICE

I, Rachel T. Copenhaver, an attorney, hereby certify that on June 20, 2012, I caused to be electronically filed the foregoing CERTAIN DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS/STRIKE FDIC'S FIRST AMENDED COMPLAINT with the Clerk of the Court using the Court's Case Management/Electronic Case Files (CM/ECF) system, which will send notifications of such filing to the following counsel of record:

| | |
|---|---|
| Susan G. Feibus | sgfeibus@uhlaw.com |
| Dean J. Polales | djpolales@uhlaw.com |
| F. Thomas Hecht | fthecht@uhlaw.com |
| Richard Henry Tilghman | rhtilghman@uhlaw.com |
| Nancy A. Temple | ntemple@kattentemple.com |
| John M. George, Jr. | jgeorge@kattentemple.com |
| Allen H. Shapiro | skpahs@aol.com |

/s/ Rachel T. Copenhaver