12-1665.132-RSK                                              October 23, 2013

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| FEDERAL DEPOSIT INSURANCE CORP., AS RECEIVER FOR BROADWAY BANK, <br><br> Plaintiff, <br><br> v. <br><br> DEMETRIS GIANNOULIAS, GEORGE GIANNOULIAS, JAMES MCMAHON, SEAN CONLON, STEVEN DRY, DONNA ZAGORSKI, STEVEN BALOURDOS, GLORIA SGUROS, ANTHONY D'COSTA, <br><br> Defendants. | ) ) ) ) ) ) ) No. 12 C 1665 ) ) ) ) ) ) ) ) |

**MEMORANDUM OPINION**

Before the court are: (1) the motion of plaintiff Federal Deposit Insurance Corporation, as receiver for Broadway Bank ("FDIC"), for a protective order; (2) the defendants' motions to compel; (3) the FDIC's motion regarding search terms; and (4) the defendants' motions to add certain search terms.[1] For the reasons explained below, we grant the FDIC's motion for a protective order; deny the defendants' motions to compel; grant in part and deny in part the FDIC's motion regarding search terms; and grant in part

---

[1] Defendants Steven Balourdos, Sean Conlon, Anthony D'Costa, Steven Dry, Gloria Sguros, and Donna Zagorski have taken the laboring oar during the parties' the current discovery dispute. (See generally Certain Defs.' Mot. to Compel and for Entry of Defs.' ESI Protocol (hereinafter, "Certain Defs.' Mot.").) The remaining defendants — Demetris Giannoulias, George Giannoulias, and James McMahon — have filed tag-along motions adopting their co-defendants' arguments.

and deny in part the defendants' motions to add certain search terms.

## BACKGROUND

Plaintiff Federal Deposit Insurance Corporation, as receiver for Broadway Bank ("FDIC-R"), has filed this lawsuit to recover approximately $114 million in losses that the bank suffered on 20 commercial real estate loans. (Am. Compl. ¶ 1.) The FDIC-R alleges that the defendants — seven former directors of Broadway Bank and two former officers — negligently approved the loans. (Id. at ¶ 2.) The defendants have served on the FDIC 242 separate requests for production. The FDIC represents that it has already produced approximately 500,000 pages of documents in response to the defendants' requests (what the FDIC refers to as "Phase I" discovery). These documents include the loan files for the 20 loans at issue in this case and other documents that the FDIC can readily identify as responsive to the defendants' requests. (See FDIC's Mem. in Supp. of its Mot. for a Protective Order (hereinafter, "FDIC's Mem. (Protective Order)") at 1, 5-6.) So-called "Phase II" discovery consists of other electronically-stored information ("ESI") — mostly emails — that the FDIC cannot readily identify as responsive to the defendants' requests. The parties have worked together to generate a list of approximately 250 unique search terms to identify relevant materials in the ESI. (See "Search Results by Category," attached as Ex. 6 to the FDIC's

- 3 -

Consolidated Report/Mot. Regarding Search Terms and Supp. in Supp. of Mot. for Protective Order (hereinafter, "FDIC's Mem. (Search Terms)".) Those search terms have produced approximately 150,000 "hits." The parties disagree about whether the FDIC should include six additional search terms, which if adopted would yield approximately 16,800 additional hits. The parties also disagree about what should be done with the ESI once the search terms have been finalized. Under the defendants' proposed "ESI Protocol," the FDIC would be required to review the filtered ESI to determine whether the materials were in fact responsive to the defendants' requests before producing them to the defendants. Also, the FDIC would be required to organize and label the production to correspond to the defendants' requests for production. The FDIC contends that the defendants' proposal is unduly burdensome. It instead proposes to upload onto a database (called "Relativity") documents generated by the agreed-upon search terms. The defendants would be permitted to search and review the discovery materials on the database and identify the documents that they wish to receive. The FDIC would then review those documents for privilege and produce any non-privileged documents.

## DISCUSSION

### A. Search Terms

We agree with the defendants that the following search terms should be added to the parties' agreed-upon list: (1)

- 4 -

"BrookWeiner;" (2) "Brook near2 Weiner; (3) "Plante Moran;" and (4) "Harry near4 Shah." BrookWeiner, LLC and Plante Moran, PLLC both served as outside auditors to Broadway Bank. As such, the proposed search terms may capture emails or other documents relevant to the FDIC's claims about defendants' management of the bank. We acknowledge the FDIC's concern that the terms may also capture irrelevant documents, and that some (perhaps many) of the relevant hits will also be captured by other search terms. (See FDIC Mem. (Search Terms) at 4-5.) However, the total number of hits (approximately 3,000) is relatively small. For the same reasons, we will require the FDIC to use the search term "Harry near4 Shah." Harry Shah brokered several of the loans at issue in this case. And as the defendants point out, the FDIC has sought information regarding the defendants' communications with Shah that is not strictly limited to the challenged loans. (See Defs.' Mem. (Search Terms) at 7-8.)

On the other hand, we will not require the FDIC to use the search terms "Capitalized" and "Capitalization." The complaint expresses the bank's concentration in risky commercial real estate loans as a percentage of total "capital." (See, e.g., Compl. ¶ 21.) And the bank was ultimately closed because regulators concluded that it was "undercapitalized." (See id. at ¶ 38.) But the connection between the terms "capitalized" and "capitalization" and the complaint's core negligence allegations is tenuous, and the

- 5 -

likelihood of entirely irrelevant hits appears high.  Moreover, the number of hits — approximately 8,700 — is substantial.  Finally, the fact the FDIC initially proposed these terms is essentially irrelevant.  The defendants have not relied in any way on the FDIC's initial proposal, so we see no reason to prevent the FDIC from changing its mind.

## B.    Responsiveness Review

A party responding to discovery must inspect its records and produce only those documents that are responsive to the opposing party's requests.  See, e.g., Rothman v. Emory Univ., 123 F.3d 446, 455 (7th Cir. 1997) (upholding sanctions against a plaintiff who refused to fulfill "his obligation to sort through the documents and produce only those responsive to [defendant's] request").  At the same time, "there is no obligation on the part of a responding party to examine every scrap of paper in its potentially voluminous files in order to comply with its discovery obligations. Rather, it must conduct a diligent search, which involves developing a reasonably comprehensive search strategy." Treppel v. Biovail Corp., 233 F.R.D. 363, 374 (S.D.N.Y. 2006).  Employing search terms to search ESI is one such strategy.  See id.  The defendants contend, however, that filtering the ESI using search terms is insufficient to satisfy the FDIC's burden.  Instead, it must inspect the documents resulting from the initial search to determine whether they are in fact responsive.  In this particular

- 6 -

case, we conclude that the burden such a review would impose on the FDIC far outweighs any benefit to the defendants. The defendants' discovery requests are voluminous and, it appears, appropriately so: the complaint alleges a broad failure by the defendants to properly manage the bank's financial risks across 20 loans. It seems likely that the vast majority of the material generated by the parties' narrowly-tailored search terms will be relevant to one of the defendants' 242 requests. (<u>See, e.g.</u>, Giannoulias Defs.' First Req. for Prod. No. 1 ("[A]ll documents concerning Demetris Giannoulias."); McMahon's First Req. for Prod. No. 11 ("Any and all documents relating to each of the Loss Loans attributed to Defendant James McMahon . . . ."); Certain Defs.' First Req. for Prod. No. 7 ("All documents relating to each of the Loss Loans . . . .").) False hits are probably inevitable, but we will not require the FDIC to review thousands of documents to weed out a presumably small subset of irrelevant materials.[2]

**C.  Whether the FDIC Must Organize Its Production to Correspond to the Defendants' Requests**

Federal Rule of Civil Procedure 34 provides that, "[u]nless otherwise stipulated or ordered by the court," "[a] party must produce documents as they are kept in the usual course of business *or* must organize and label them to correspond to the categories in

---

[2] We acknowledge that the court in <u>FDIC v. Briscoe</u>, Civil Action No. 1:11-cv-2303-SCJ reached a different conclusion on the facts before it. However, on the facts of this case, we take a different view of the relative benefits and burdens that a further responsiveness review would entail.

- 7 -

the request . . . ." Fed. R. Civ. P. 34(b)(2)(E) (emphasis added).
The defendants cite several cases holding that the "usual course of
business" alternative is simply unavailable to an agency like the
FDIC. See, e.g., FDIC v. Appleton, No. 1:11-cv-00476-JAK, Dkt. No.
188, slip op. at 5-6 (C.D. Cal. Nov. 29, 2012); see also W Holding
Co., Inc. v. Chartis Ins. Co. of Puerto Rico, No. CIV 11-2271 GAG,
2013 WL 1352426, *3 (D.P.R. April 3, 2013). After the FDIC took
over Broadway Bank, it created a database to store many of the
bank's documents in searchable electronic form. The defendants
argue that the FDIC has not satisfied its burden to show that the
database preserves the documents exactly as they were maintained
prior to the bank's closure. We think that the defendants'
interpretation of Rule 34's requirements is overly technical.
Emails are produced as they are maintained in the "usual course of
business" when they are sorted chronologically by custodian. See,
e.g., Valeo Electrical Systems, Inc. v. Cleveland Die & Mfg. Co.,
No. 08-cv-12486, 2009 WL 1803216, *2 (E.D. Mich. June 17, 2009).
The FDIC represented at the hearing on the parties' motions that
the emails, which we understand to be the main focus of the Phase
II production, can be electronically sorted in the same fashion
using metadata. The FDIC's electronic database also includes
materials that the bank originally maintained in hard copy form.
(See FDIC Mem. (Search Terms) at 1, 12.) The FDIC represents that
the defendants can use metadata associated with these documents to

- 8 -

identify the original location of the materials using a "Master
Inventory." (See id. at 12; see also Master Inventory, attached as
Ex. 1 to FDIC's Mem. (Search Terms).)[3] Strictly speaking, this may
not be production in the "usual course of business," but the
practical difference is elusive. Conversely, requiring the FDIC to
organize its production according to the defendants' numerous
discovery requests would impose a substantial burden:

> [T]he producing party does have a burden to select and
> produce the items requested rather than simply dumping
> large quantities of unrequested materials onto the
> discovering party along with the items actually sought
> under Rule 34. Requiring further that these requested
> materials be segregated according to the requests would
> impose a difficult and usually unnecessary additional
> burden on the producing party. The categories are devised
> by the propounding party and often overlap or are
> elastic, so that the producing party might be compelled
> to decide which best suits each item in order to consign
> it to the proper batch. Such an undertaking would usually
> not serve any substantial purpose, and it could become
> quite burdensome if considerable numbers of documents
> were involved.

8B Charles A. Wright and Arthur R. Miller, Federal Practice and
Procedure, § 2213 (3d ed.). The Federal Rules give the court
leeway to modify the parties' discovery obligations to take these
sorts of practical considerations into account. See Fed. R. Civ.
P. 34(b)(E) (requiring parties to produce materials as they are
kept in the usual course of business or organized according to the
opposing parties' requests "[u]nless otherwise stipulated or

---

[3] The Master Inventory describes the contents of 77 boxes of documents
and for each document identifies a physical location (e.g., "Upstairs Vault") or
custodian (e.g., "Demetris Giannoulias").

*ordered by the court* . . . .") (emphasis added); Fed. R. Civ. P. 26(c) ("The court may, for good cause, issue an order to protect a party from annoyance, embarrassment, oppression, or undue burden or expense . . . ."). Under the circumstances, we will not require the FDIC to organize its Phase II production according to the defendants' numerous discovery requests.

The current status and organization of the Phase I production is less clear. We understand that those materials were produced in electronic form, (<u>see</u> Decl. of Ray Rivard, attached as Ex. B to FDIC Mem. (Protective Order), ¶ 11), but it is not clear whether those materials were produced with metadata showing where they were maintained by the bank. On the other hand, the FDIC has created an index of documents produced to date that describes the documents (e.g., "Broadway Loan Policy (2003)") and identifies them by Bates range. (<u>See</u> Index of Docs. Prod., dated as of Aug. 30, 2013, attached as Ex. 3 to FDIC Mem. (Search Terms).) Also, the FDIC indicates that it will supplement its responses to written discovery to identify responsive documents by Bates number. (<u>See</u> FDIC Mem. (Search Terms) at 10.) Finally, as the executives responsible for the bank's management during the relevant time period, the defendants in this case are arguably more familiar with the documents than the FDIC. Under the circumstances, the risk that important documents will be obscured (deliberately or inadvertently) appears slim. Bearing in mind the FDIC's offer to supplement its written responses, we will not compel it to

categorize its Phase I production according to the defendants' requests at this time.

## D.    Who Should Bear the Costs of Production

We told the parties at the hearing on their motions that we will defer ruling on which side should bear certain costs at this time.  So, consistent with the general presumption in discovery, the FDIC will bear the costs of production as they arise subject to the possibility that we may later require contribution from the defendants.  See Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 358 (1978) ("Under [the discovery] rules, the presumption is that the responding party must bear the expense of complying with discovery requests, but he may invoke the district court's discretion under Rule 26(c) to grant orders protecting him from 'undue burden or expense' in doing so, including orders conditioning discovery on the requesting party's payment of the costs of discovery.").

<u>CONCLUSION</u>

The FDIC's motion regarding search terms [114] is granted in part and denied in part.  The defendants' motions to add certain search terms [115, 117, 119] are granted in part and denied in part.  The parties shall add the following search terms to their already agreed-upon list: "BrookWeiner;" "Brook near2 Weiner;" "Plante Moran;" and "Harry near4 Shah."  The FDIC's motion for a protective order [88] is granted in part and taken under advisement

- 11 -

in part.  The defendants' motions to compel [91, 95, 97] are denied
in part and taken under advisement in part.  By October 30, 2013,
the FDIC shall submit to the court a revised proposed ESI protocol
consistent with this opinion.  For now, the FDIC shall bear all
production costs subject to the possibility that the court may
later determine that cost-shifting is appropriate.


        DATE:          October 23, 2013


        ENTER:         _____

                       John F. Grady, United States District Judge