IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| FEDERAL DEPOSIT INSURANCE ) <br> CORPORATION AS RECEIVER FOR ) <br> BROADWAY BANK, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> DEMETRIS GIANNOULIAS, GEORGE ) <br> GIANNOULIAS, JAMES MCMAHON, ) <br> SEAN CONLON, STEVEN DRY, DONNA ) <br> ZAGORSKI, STEVEN BALOURDOS, ) <br> GLORIA SGUROS and ANTHONY ) <br> D'COSTA, ) <br> ) <br> Defendants. ) | Case No: 12 C 1665 <br><br> Magistrate Judge Daniel G. Martin |

## ORDER

For the reasons and to the extent stated herein, Defendant Demetris Giannoulias's Motion to Compel Second Interrogatory Responses by Plaintiff [157] is granted in part and denied in part, Certain Defendants' Motion for Leave to File Document Under Seal [160] is denied, Certain Defendants' Renewed Motion to Compel Certain Interrogatory Answers [162] is granted in part and denied in part, and Plaintiff FDIC-R's Motion for Protective Order Regarding Interrogatory Answers [165] is granted in part and denied in part.

## STATEMENT

Plaintiff Federal Deposit Insurance Corporation, as receiver for Broadway Bank ("FDIC-R"), has filed a three-count Second Amended Complaint alleging that the approval of 20 loans (the "Loss Loans") by Defendants–seven former directors of Broadway Bank and two former officers–was grossly negligent (Count I), in breach of their fiduciary duties (Count II), and alternatively, negligent (Count III). The FDIC-R seeks to recover approximately $115 in damages as losses caused by Defendants' alleged improper approval of the 20 Loss Loans. Defendants have alleged six affirmative defenses: business judgment rule, Illinois Banking Act, waiver and

estoppel, failure to mitigate, comparative negligence, and lack of standing. Certain of these defense are the subject of the FDIC-R's motion to strike, currently pending before District Judge John F. Grady.

This case has been referred to the undersigned Magistrate Judge by the district court for resolution of Defendant Demetris Giannoulias's Motion to Compel Second Interrogatory Responses by Plaintiff, Certain Defendants' Motion for Leave to File Document Under Seal, Certain Defendants' Renewed Motion to Compel Certain Interrogatory Answers, and Plaintiff FDIC-R's Motion for Protective Order Regarding Interrogatory Answers. In his motion to compel, Defendant Demetris Giannoulias seeks an order directing the FDIC-R to fully answer Giannoulias's Second Set of Interrogatories. Defendant Steven Dry moves to compel the FDIC-R to fully answer his Interrogatory No. 11, which concerns the FDIC-R's damages. Defendant Donna Zagorski seeks an order compelling the FDIC-R to fully answer her Interrogatory No. 2, which seeks information concerning the FDIC-R's allegation that Broadway's loan concentrations in commercial real estate ("CRE") and acquisition, development, and construction ("ADC") loans was far in excess of its "peer group" banks. The FDIC-R has filed a Motion for Protective Order that mirrors Defendants' motions to compel and seeks an order providing that FDIC-R is not required to provide further responses to Defendant Demetris Giannoulias's Second Set of Interrogatories, Defendant Steven Dry's Interrogatory No. 11 and Defendant Donna Zagorski's Interrogatory No. 2. Lastly, Defendants Steven Dry and Donna Zagorski move for an order permitting them to file an exhibit under seal in connection with their Renewed Motion to Compel. The motions are fully briefed and ripe for resolution.

## DISCUSSION

Federal Rule of Civil Procedure 33(a)(2) permits interrogatories that "relate to any matter that may be inquired into under Rule 26(b)." Fed. R. Civ. P. 33(a)(2). Under Rule 26(b), "[p]arties

may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party . . . . Relevant information need not be admissible at trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." Fed. R. Civ. P. 26(b)(1). Upon a showing of good cause, a court may order "discovery of any matter relevant to the subject matter involved in the action." Id. A court shall limit discovery if it determines the discovery sought to be unreasonably cumulative or duplicative, the party seeking discovery has had ample opportunity to obtain the information by discovery in the action, or the burden or expense of the proposed discovery outweighs its likely benefit. Fed. R. Civ. P. 26(b)(2)(C)(i)–(iii). Magistrate judges are granted broad discretion in addressing and resolving discovery disputes. Weeks v. Samsung Heavey Indus., Co., Ltd., 126 F.3d 926, 943 (7th Cir. 1997). With these familiar standards in mind, the Court addresses the parties' discovery motions in turn below.

**A.      Defendant Demetris Giannoulias's Second Set of Interrogatories**

In his motion, Defendant Demetris Giannoulias ("Giannoulias") seeks full answers to his Second Set of Interrogatories. The FDIC-R objects to further answering these interrogatories based on relevancy. Specifically, the FDIC-R agues that Giannoulias's demand for information not directly related to the 20 Loss Loans at issue seeks irrelevant information in violation of the district court's prior ruling denying access to information beyond the 20 Loss Loans.

On October 16, 2013, Judge Grady orally denied Giannoulias's motion to compel answers to his first set of interrogatories. (Docs. 130, 1581-1). At the hearing on the motion, Judge Grady declined to require the FDIC to answer interrogatories about Broadway Bank's overall condition, explaining that "[t]here's absolutely no point in the court addressing or a jury addressing the question of whether the bank, generally speaking was well run. We're talking about 20 loans." (Doc. 158-1 at 5). Judge Grady noted that the interrogatories were understandable given the breadth of the FDIC-R's complaint. He stated: "Whoever drafted the complaint really misled the

defendants in terms of what this case is about, but the court understands what the case is about, and it's about 20 loans." Id. The district court ordered the FDIC-R to file an amended complaint "eliminating certain general allegations that the court deems unnecessary, as discussed in open court." (Doc. 130).

Subsequent to the district court's order, the FDIC-R filed its Second Amended Complaint ("SAC"), which the FDIC-R says focuses exclusively on the 20 Loss Loans. Giannoulias takes a different view of the SAC. According to Giannoulias, the SAC continues to repeatedly allege that the 20 Loss Loans are the consequence of an alleged systemic irresponsibility at Broadway Bank. Giannoulias urges the Court to "not take seriously the FDIC's assertion that its Second Amended Complaint . . . does not 'go[] beyond the 20 Loss Loans.'" (Doc. 173 at 1).

Giannoulias's Interrogatory No. 1 concerns loans, other than the Loss Loans, that the FDIC-R considered for inclusion in the complaint. Interrogatory No. 1 asks the FDIC-R to "identify all of the loans that [were] analyzed in contemplation of bringing this action." Giannoulias argues that this information will help him prove that out of a portfolio of thousands of loans, the FDIC-R could ascertain no more than twenty loans to form the basis of its complaint, which will disprove the FDIC-R's claim of gross negligence. The FDIC-R objected, in part, to Interrogatory No. 1 on the ground that the information sought is protected attorney work product as the FDIC-R's investigation leading to the filing of the complaint was conducted by counsel in anticipation of litigation.

The work product doctrine is codified in Federal Rule of Civil Procedure 26(b)(3). Rule 26(b)(3) protects "documents and tangible things ... prepared in anticipation of litigation or for trial." The Supreme Court's definition of work product in Hickman v. Taylor, 329 U.S. 495 (1947), extends work protect protection to "intangible" things. U.S. v. Deloitte LLP, 610 F.3d 129, 136 (D.C. Cir. 2010) (stating "Hickman provides work-product protection for intangible work product independent of Rule 26(b)(3)."). The work product doctrine protects against "invading the privacy of an

attorney's course of preparation [which] is so well recognized and so essential to an orderly working of our system of legal procedure that a burden rests on the one would invade that privacy to establish adequate reasons to justify production through a subpoena or court order." Hickman, 329 U.S. at 512. An opponent may discover a party's work product only upon a showing that the party seeking discovery "has substantial need of the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means." Fed. R. Civ. P. 26(b)(3)(A)(ii). If a court orders production of work product materials, "it must protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation." Fed. R. Civ. P. 26(b)(3)(B).

The FDIC-R's work product objection to Giannoulias's Interrogatory No. 1 is sustained. The nature and scope of the FDIC-R's counsel's pre-complaint investigation is classic opinion attorney work product. Giannoulias is asking the FDIC-R to identify what loans its counsel analyzed in anticipation of litigation, which would necessarily reveal its counsel's mental impressions and opinions. Even if counsel's pre-complaint investigation is also factual in nature, Giannoulias has not shown "substantial need" and "undue hardship." The motion to compel is denied and the protective order is granted as to Interrogatory No. 1.

Giannoulias's Interrogatories Nos. 2, 4, and 8 are contention interrogatories, seeking the FDIC's contentions regarding what overall level of interest reserves at the Bank would not be excessive for the period 2003-2010, what overall amount of CRE and ADC loans from 2003 to 2010 would have been sustainable, and what aspects of the Bank were deep troubled other than the Loss Loans as of March 31, 2009. Interrogatories Nos. 5-7 are also contention interrogatories, asking whether the FDIC-R contends that the Bank failed to "close[ly] monitor" loans other than the Loss Loans, lacked the "lending expertise" to properly underwrite CRE and ADC loans other than the Loss Loans, or lacked "respect for lending risk" of any CRE and ADC loans other than the Loss

Loans.

Rule 33(a) authorizes the use of contention interrogatories. Fed. R. Civ. P. 33(a) (stating an interrogatory is "not objectionable merely because it asks for an opinion or contention that relates to fact or the application of fact to law."). While contention interrogatories are a permissible form of written discovery, they are generally used to elicit an opposing party's contentions regarding its own claims or defenses. "Basically, contention interrogatories require the answering party to commit to a position and give factual specifics supporting its claims." Ziemack v. Centel Corp., 1995 WL 729295, at *2 (N.D. Ill. Dec. 7, 1995). The "basic purpose of contention interrogatories should be to find out essentially what the other party is contending in the case." Matter of Chicago Police Officer Promotions, 1997 WL 610286, at *2 (N.D. Ill. Sept. 29, 1997); see also In re Ocwen Loan Servicing, 491 F.3d 638, 641 (7th Cir. 2007) (approving defendants use of "contention interrogatories designed to smoke out what exactly the plaintiffs are charging.").

The Court will not compel the FDIC-R to answer contention interrogatories regarding loans other than the Loss Loans or Broadway Bank's overall condition. For purposes of this lawsuit, the only relevant aspect of the Bank's operation is the 20 Loss Loans. The FDIC-R's position on loans other than the Loss Loans and the Bank's overall condition is irrelevant to the FDIC-R's theories of liability as the FDIC-R is not seeking to recover for any aspects of the Bank's operation other than the 20 Loss Loans. Giannoulias's Interrogatories Nos. 2 and 4-8 inappropriately seek to force the FDIC-R to take positions on irrelevant issues and theories which relate to loans other than the 20 loans at issue and the Bank's overall condition. Giannoulias may use contention interrogatories to determine the factual basis for the FDIC-R's contentions but not to explore contentions not advanced by the FDIC-R. The motion to compel is denied and the motion for protective order is granted with regard to Interrogatories Nos. 2 and 4-8.

Giannoulias's Interrogatories Nos. 3, 10, and 15-17 each identify a specific paragraph of the SAC and ask the FDIC-R to provide information related to loans other than the 20 Loss Loans. Interrogatories Nos. 3 and 10 ask whether the Bank approved any loans other than the Loss Loans "without regard for appropriate underwriting and credit administration practices, the Bank's written loan policies, federal lending regulations, and warnings from the Bank's regulators," and with "disdain for the regulatory process" as alleged in Paragraphs 3 and 43 of the SAC and if so, explain. Similarly, Interrogatories Nos. 15-17 ask whether the Bank's failure to conduct proper due diligence as alleged in paragraph 130 of the Complaint was limited to the Loss Loans or was a systemic problem, whether Defendants deferred excessively to the Giannoulias family in connection with loans other than the Loss Loans as alleged in paragraph 132 of the Complaint, and whether Defendants failed to consider regulatory criticisms with respect to loans other than the Loss Loans as alleged in paragraph 132 of the Complaint. Giannoulias argues that evidence that Defendants did not regularly act as the FDIC-R alleges will help Defendants show the FDIC-R's allegations that they acted inappropriately on twenty discrete occasions to be "incredible and baseless." (Doc. 158 at 10). The FDIC-R responds that information about loans other than the 20 Loss Loans is irrelevant.

The FDIC-R's allegations in paragraphs 3, 43, 130, and 132 of the SAC do not justify Giannoulias's overbroad interrogatories seeking information about loans other than the Loss Loans. The factual allegations in Paragraphs 3, 43, and 130 of the SAC are expressly limited to the "re-approv[al] [of] the 20 Loss Loans," the Wilshire Blvd. and Federal Street loans, and "each of the Loss Loans." (Doc. 144 at 2, 11, and 32). Contrary to Giannoulias's claim that the FDIC-R has placed the Bank's entire lending strategy and management at issue, the FDIC-R's protective order motion makes it abundantly clear that the FDIC-R has limited its case to the 20 Loss Loans. The FDIC-R explains that Defendant Giannoulias "misreads the SAC as going beyond the 20 Loss

Loans, which the SAC does not." (Doc. 166 at 9). The FDIC-R, as master of its own complaint, confirms that the SAC "is focused on the 20 Loss Loans." Id. In so limiting the SAC, the FDIC-R has effectively restricted the allegations in Paragraph 132 of the SAC to the 20 Loss Loans. Given the narrow scope of the FDIC-R's claims, information about loans other than the Loss Loans sought in Interrogatories Nos. 3, 5-7 and 15-17 is irrelevant. The Court also does not buy Giannoulias's argument that Defendants did not act inappropriately with regard to the 20 Loss Loans because the Defendants did not act as the FDIC-R alleges in connection with the remainder of Broadway Bank's loan portfolio. Giannoulias has submitted no case law in support of this theory. Evidence that Defendants did not regularly act as the FDIC-R alleges appears irrelevant to the question of whether Defendants acted inappropriately on the 20 Loss Loans. The motion to compel is denied and the protective order is granted as Interrogatories Nos. 3, 10, and 15-17.

This leaves resolution of Giannoulias's motion to compel fuller answers to his Interrogatories Nos. 11-14, which are also contention interrogatories. Giannoulias's Interrogatories Nos. 11-14 ask whether (1) the FDIC-R contends that its allegations about Defendants disdain for the regulatory process can be reconciled with the overall CAMELS ratings given to the Bank in 2006 and 2007; (2) the FDIC-R contends that the CAMELS ratings awarded to the Bank in each of 2005, 2006, 2007, 2008, and 2009 inaccurately reflected the condition, risk profile and risk exposure of the Bank in any way, and if so, then explain specifically when and how; (3) the FDIC-R contends that the FDIC acting in its corporate capacity examined and supervised the Bank for safety and soundness and consumer protection incompetently in any way between 2005-2009, and if so, then explain in detail how and when; and (4) the FDIC-R contends that the Bank's underwriting practices materially changed in any way between 2005 and 2009, and if so, then explain specifically how and when. A CAMELS rating is based on an evaluation of a bank's capital, assets, management, earnings, liquidity and sensitivity to market risk (CAMELS) and ranges from

"1" to "5", with "1" being the highest. Giannoulias explains that federal and state banking regulators awarded Broadway Bank the highest possible CAMELS rating in 2006 and 2007 and the second highest in 2005.

The FDIC-R objected to Interrogatories Nos. 11-14 on various grounds, including as irrelevant, not reasonably calculated to lead to the discovery of admissible evidence, and duplicative of prior interrogatories that the district court has already ruled improper. As to Interrogatory No. 11, the FDIC-R answered that the interrogatory "improperly assumes that the allegations regarding Defendants' disdain for the regulatory process must be 'reconciled' with the overall ratings given the Bank during 2006 and 2007." (Doc. 158-4 at 11). The FDIC-R's only substantive answer provided to Interrogatory No. 12 was that "[w]hether and on what basis a particular CAMELS rating was assigned to the Bank at any given point in time has no bearing on the specific decision to make any of the Loss Loans that are the focus of the FDIC-R's claims." Id. As to Interrogatory No. 14, the FDIC answered: "The underwriting practices alleged to be actionable in this case and the timing of such deficient practices are set forth in the FDIC's answers to the parties' interrogatories and the Second Amended Complaint." Id. at 12.

The FDIC-R's claims about the 20 Loss Loans rest expressly on the regulators' criticisms of the Bank's condition between January 2007 and April 2009 (SAC at ¶¶ 24, 27, 33, and 34). For example, the SAC points out that in the April 2007 Report of Examination, the examiners: (1) noted their concern with the Bank's increasing concentrations in "construction and development, total out-of-area, State of New York, collateral type [hotel/motel] and relationship" loans and (2) noted weakness in loan administration and underwriting, including failing to obtain current financial statements from borrowers and the failure to obtain global cash flow analyses from borrowers with multiple loans, and (3) criticized Broadway's Allowance for Loan and Lease Losses (ALLL) methodology for failing to include an impairment analysis and failing to downgrade loans that were

classified at previous examinations. SAC at ¶ 24. As another example, the SAC alleges that in March 2008, "regulators again found the Bank's overall condition less than satisfactory and criticized the deteriorating quality of the Bank's assets. They also criticized the Bank's inadequate loan review and watch-list programs, its ALLL methodology and its failure to improve credit risk management practices, including failing to properly identify and report developing risks and downgrade credit ratings in a timely manner." SAC at ¶ 27. The FDIC-R alleges that the warnings and criticisms by state and federal bank examiners of the significant weaknesses in Broadway's lending and loan administration practices "had no effect on the approval of the 20 Loss Loans." SAC at ¶ 23. The FDIC-R avers that Defendants' "receipt of multiple regulatory warnings" along with their knowledge of the Bank's troubled condition and the impaired state of the real estate market "heightened" their responsibilities to the Bank. SAC ¶¶ 129, 137,144. The FDIC further alleges that Defendants breached their duties with regard to the 20 Loss Loans by, among other things, "ignoring regulatory warnings about the Bank's lending operations." SAC ¶¶ 130, 138, 145. Thus, the FDIC's case about the 20 Loss Loans necessarily implicates the regulators' findings.

The Court finds that Giannoulias is entitled to explore the FDIC-R's contentions regarding Broadway's regulatory history and ratings because such information relates directly to the FDIC-R's claims regarding the 20 Loss Loans. The FDIC cannot rely on the regulators' criticisms and ignore positive statements and ratings made by the same regulators. Given the FDIC-R's explicit reliance on the regulators' criticisms in connection with the 20 Loss Loans, fairness dictates that Giannoulias should be permitted to discover the FDIC-R's contentions regarding the Bank's regulatory history and positive CAMELS ratings. As the FDIC-R points out and Judge Grady noted, it may "be that the bank was very well run as far as the examiners could determine at the time, but lurking beneath that well-run surface were all kinds of mismanagement in regard to these 20 loans." (Doc. 158-1 at 5). If that is the case, the FDIC-R should so state in its interrogatory answers.

Apart from its reliance on the district court's prior ruling, the FDIC-R has offered no reason why the information sought regarding the Bank's regulatory history and findings is irrelevant. The motion to compel is granted as to Interrogatories Nos. 11-14 and the corresponding portion of the protective order motion is denied.

**B.      Defendant Steven Dry's Interrogatory No. 11**

Defendant Steven Dry ("Dry") moves to compel the FDIC-R to fully answer his Interrogatory No. 11. Dry's Interrogatory No. 11 seeks the total amount of the FDIC-R's damages, the formula used by the FDIC-R to measure damages, each component part of the FDIC-R's damages, the identity of each document relied upon by the FDIC-R to compute damages, and the identity of each person who assisted the FDIC-R in computing damages. The FDIC-R objected to providing the requested information on the grounds that the interrogatory was premature, called for expert testimony, and required the FDIC-R to disclose opinions of confidential consultants in violation of Federal Rule of Civil Procedure 26(b)(4)(D). Dry's Renewed Motion to Compel is granted in part and denied in part.

At the October 30, 2013 hearing on Dry's initial motion to compel, Judge Grady ordered the FDIC-R to answer Dry Interrogatory No. 11. Judge Grady stated: "[F]or breakdowns as to how the alleged loss on each of the 20 loans was calculated, . . . I am going to let [the FDIC-R] figure out how to do that. You don't have to have ten pages on each loan. I would think that give them one page on each loan. But they're entitled to know what to look for and what to chase on their part of discovery." (Doc. 183-2 at 10-11). Dry's initial motion to compel was "granted as to defendants' request for more detailed calculations of the alleged loss on each of the 20 loans at issue and as to defendants' request for a supplemental response that specifies the gross income on, any expenses deducted from that income, a net income on each of the loans." (Doc. 141).

In response to the district court's October 30, 2013 ruling, the FDIC-R supplemented its response to Dry Interrogatory No. 11 with a one-page preliminary damages calculation for each of the 20 Loss Loans through June 30, 2013 and a one-page summary of its preliminary damages calculation through June 30, 2013 – which totals over $115 million. Each preliminary damages calculation includes the original loan amount, any pre-closing charge-offs, the loan balance at closure, post-closing charge-offs, any FDIC adjustments to those charge-offs pursuant to the Purchase and Assumption Agreement between the FDIC and MB Financial ("MB") (which was the acquiring institution), accrued interest, reimbursable expenses and any recoveries. If the Loss Loan is outstanding, the preliminary summary includes the loan balance. Also included in each preliminary summary is the total covered loss pursuant to the FDIC-MB Loss-Share Agreement and the FDIC-R's share of that loss. The FDIC-R states that it had previously given Defendants all of the documents on which the preliminary damages calculations are based.

In his Renewed Motion to Compel, Dry argues that the FDIC-R's answer to his Interrogatory No. 11 is still deficient because the FDIC-R failed to: (i) provide specific computations for many of the damage components that it has identified (Interrogatory 11(c)); (ii) identify the documents referenced and/or relied upon by the FDIC-R to compute its damages (Interrogatory 11(d)); and (iii) identify each person who assisted and/or other participated in the computation of such damages (Interrogatory No. 11(e)). The FDIC objects to providing any further damage information at this fact discovery stage of the proceedings as the issue of damages will be the subject of expert analysis.

As to his Interrogatory No. 11(c), Dry argues that the FDIC-R does not sufficiently identify how the "reimbursable expenses," "charge-offs" and "FDIC Adjustments" are calculated. For example, the FDIC-R identifies $3,036,907 in "reimbursable expenses" for one of the Loss Loans but does not identify the components of these "reimbursable expenses." FDIC-BW0041501. Dry

argues that he should not have to guess what the damage component parts "reimbursable expenses," "charge offs" and "adjustments" include. The Court finds that Dry is entitled to information identifying what these three component parts of the FDIC-R's damages claim include. The FDIC-R shall provide a general description with respect to each Loss Loan of what the "reimbursable expenses," "charge-offs" and "FDIC adjustments" damage component parts include.

Dry next argues that the FDIC-R's supplemental answer to Interrogatory No. 11(d) does not sufficiently identify any records from which the FDIC-R's total damages or component parts can be derived. The FDIC-R responds that it has produced each document referenced or relied upon by the FDIC-R to compute damages, along with a detailed index. The FDIC-R explains that its preliminary damages calculations and summary were based on: (a) the Loss-Share Agreement between the FDIC and MB Financial, the acquiring institution, which was part of the FDIC and MB's Purchase and Assumption Agreement, and (b) quarterly loss share certificates submitted to the FDIC by MB Financial. (Doc. 183 at 3). The FDIC-R also says that the damages-related material is identified as "Loss Share Data" (FDIC-BW 0037305-0037915), "Additional Loss Share Data (FDIC-BW 0040042-0040057), "Additional Loss Share Data and Damages-Related Documents" (FDIC-BW 0040915-0041339), and "Updated Damages Figure/Calculation" (FDIC-BW 0041490-0041510) on its document index.

Dry replies that the FDIC-R produced material labeled as "Loss Share Data" or "Damages-Related Documents" on a document index without identifying to which Loss Loans these documents refer. Defendants have reviewed the produced materials, which consist of reports, payment vouchers, and spreadsheets relating to the FDIC-R's loss-share arrangement with MB Financial Dry states that the produced materials relate not only to the Loss Loans, but also concern many other Broadway loans acquired by MB Financial.

The Court agrees with the FDIC-R that is preliminary damages summaries satisfy the district court's October 30, 2013 order. However, the FDIC-R's answer to Interrogatory No. 11 refers only to its preliminary loss analysis to support its total damages per Loss Loan and damage component parts and does not refer to any underlying documents. The Court will require the FDIC-R to supplement its answer to Interrogatory No. 11(d) to provide a general description of the types of documents on which its calculations are grounded, such as by stating whether the Loss-Share Agreement and the quarterly loss share certificates or other type(s) of documents were relied upon by the FDIC-R to compute damages. In advance of the exchange of expert reports, the FDIC-R need not identify specific documents which support its damages calculations.

As to Dry Interrogatory No. 11(e), the FDIC-R argues that Dry is not entitled to the identity of all persons who assisted the FDIC-R with its damages calculation. The FDIC-R represents that "anyone who assisted the FDIC-R is a consulting expert protected from disclosure" by Federal Rule of Civil Procedure 26(b)(4)(D). (Doc. 166 at 12). No fact witness assisted and/or otherwise participated in the FDIC-R's preliminary computation of damages. In reply, Dry states that if that is the case, then the FDIC-R's answer should be supplemented to reflect that only consulting experts assisted and participated in the computation of FDIC-R's damages. The Court agrees that the FDIC-R needs to supplement its answer accordingly.

Dry's citation to Magistrate Judge Kim's March 10, 2104 order in <u>FDIC v. Mahajan, et al.</u>, Case No. 11 C 7590, does not compel a different result. In <u>Mahajan</u>, the FDIC's interrogatory responses with respect to its damages only referred to the complaint and the FDIC's Rule 26(a)(1) Disclosures, which listed a total loss figure for each loss loan. Judge Kim ordered the FDIC to give the defendants "more details" and to "explain the analysis it used to arrive" at its damages calculation. Judge Kim also ordered the FDIC to "identity any witness comments, statements, or testimony relied on in calculating its damages in addition to records and documents." Judge Kim

ordered the FDIC to produce and identify the "proper document numbers" of the documents used to calculate damages.

In this case, Judge Grady likewise ordered "more detailed calculations of the alleged loss on each of the 20 loans at issue." (Doc. 141). The FDIC-R has provided Defendants with the details and explanation required by Judge Grady and the Mahajan order. In response to Judge Grady's October 30, 2013 order, the FDIC-R gave Defendants a one page summary describing the losses attendant to each of the 20 Loss Loans. The FDIC-R has represented that its damages calculation is not based on fact witness statements or testimony. So, it has no additional persons to identify. Finally, the FDIC-R has produced and identified the documents used to calculate damages: "Loss Share Data" (FDIC-BW 0037305-0037915), "Additional Loss Share Data (FDIC-BW 0040042-0040057), "Additional Loss Share Data and Damages-Related Documents" (FDIC-BW 0040915-0041339), and "Updated Damages Figure/Calculation" (FDIC-BW 0041490-0041510). The FDIC-R has complied with Judge Grady's order.

C.  **Certain Defendants' Motion for Leave to File Document Under Seal**

On a related matter, Defendants Steven Dry and Donna Zagorski have moved for leave to file the FDIC-R's preliminary loss analysis under seal because the FDIC-R designed its preliminary loss analysis as "Confidential" under the Protective Order. The FDIC-R has filed a Response (doc. 183) arguing that there is good cause for sealing the its preliminary loss analysis. The motion for leave to file under seal is denied.

The parties are in the middle of fact discovery, which closes on November 16, 2014. (Doc. 74). The FDIC-R argues that at the fact discovery stage and in the context of a motion to compel, preliminary summaries of the FDIC-R's damages estimates, which will be the subject of the expert testimony, should be sealed. To comply with Judge Grady's October 30, 2013 order, the FDIC-R employed expert assistance to prepare its preliminary damages calculation during the fact

discovery stage. In support of the request to seal, the FDIC-R relies on Rule 5(d), which provides that information exchanged in discovery "must not be filed" until it is "used in the proceeding" or until "the court orders filing." Fed. R. Civ. P. 5(d). According to the FDIC-R, "[s]ince the parties have not entered the expert discovery stage, the FDIC-R's preliminary damage estimates and summary was the work of a consulting expert protected by Federal Rule of Civil Procedure 26(b)(4)(D)." (Doc. 183).

Under Rule 26(c), a court "may, for good cause, issue an order" sealing certain documents "to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Fed. R. Civ. P. 26(c). "Discovery rarely takes place in public." Seattle Times Co. v. Rhinehart, 467 U.S. 20, 33 n. 19. Rather, "[t]he rights of the public kick in when material produced during discovery is filed with the court." Bond v. Utreras, 585 F.3d 1061, 1075 (7th Cir. 2009). "At this point, the documents have been 'used in [a court] proceeding,' . . . and consequently the possibility exists that they could 'influence or underpin the judicial decision' and they are therefore presumptively 'open to public inspection unless they meet the definition of trade secret or other categories of bona fide long-term confidentiality.'" Id; Citizens First Nat'l Bank of Princeton v. Cincinnati Ins. Co., 178 F.3d 943, 944-45 (7th Cir. 1999) (explaining that although pretrial discovery usually occurs in private, "the public at large pays for the courts and therefore has an interest in what goes on at all stages of a judicial proceeding.").

No good cause exists here for sealing the FDIC-R's preliminary loss analysis. The preliminary loss analysis is not a trade secret or otherwise protectable category of information. Although preliminary, the FDIC-R's loss analysis is highly relevant to the issue of damages in this case. Information important to the litigation is less likely to be subject to confidentiality restrictions. See Baxter Intern., Inc. v. Abbott Laboratories, 297 F.3d 544, 546 (7th Cir. 2002) (stating "very few categories of documents are kept confidential once their bearing on the merits of a suit has been

revealed."); Union Oil Co. of California v. Leavell, 220 F.3d 562, 567 (7th Cir. 2000) (recognizing that an executive's salary would not be entitled to confidential treatment "if a dispute erupted about payment (or termination)."). The FDIC-R has also not demonstrated any harm or prejudice that will result if its preliminary loss analysis is disclosed in a public filing. The fact that the FDIC-R prefers to keep its preliminary loss analysis confidential until expert discovery is not a sufficient reason for sealing where the FDIC-R was ordered to produce the preliminary loss analysis to Defendants during fact discovery and the preliminary loss analysis was then the subject of Dry's renewed motion to compel and the basis of this decision. The request for leave to file under seal is denied.

**D.     Donna Zagorski's Interrogatory No. 2**

Defendant Donna Zagorski ("Zagorski") moves to compel the FDIC-R to fully answer her Interrogatory No. 2. Zagorski's Interrogatory No. 2 asks the FDIC to identify Broadway Bank's "peer group" banks for each of the years 2003 to 2010 and each "peer group" bank's loan concentrations in CRE and ADC loans. As to the first part of Zagorski's Interrogatory No. 2 seeking the identity of each of Broadway Bank's "peer group" banks, the FDIC-R directed Defendants to a list of the Bank's peer group as of June 30, 2010 (the closest date available to when the Bank was closed), which contains approximately 319 banks. The FDIC-R objected to the second part of Zagorski's Interrogatory No. 2 which requests that the FDIC-R describe each peer group bank's CRE and ADC concentrations over a eight-year period as vague, overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence because: (a) Broadway Bank's "peer group" banks are not static; these groups change as banks increase their asset base; (b) peer group bank data is publicly available at: https://cdr.ffiec.gov/public/ManageFacsimiles.aspx and therefore is equally accessible to Defendants; and (c) the information upon which the allegations about Broadway's peer group banks in Paragraph 20 of the SAC are based is in the Material Loss Review, which has been provided to

Defendants. (FDIC-BW 37257-37304). The Material Loss Reviews contains a table showing Broadway's ADC loans as a percent of average gross loans, when compared to its peers between December 2004 and March 2010. (Doc. 166 at 8-9). The Material Loss Review also charts Broadway Bank's CRE and ADC loan concentrations as a percent of total capital as compared to its peers between December 2004 and March 2010. Id. at 9.

Zagorski explains that Interrogatory No. 2 is based on the FDIC-R's allegations in Paragraph 20 of the SAC. Paragraph 20 of the SAC alleges: "From 2000 through 2009, Broadway's assets grew by more than 500 percent. This explosive growth was fueled by an unsustainable expansion of the Bank's CRE and ADC loans far in excess of the Bank's peer group." (Doc. 144 at 4-5). Zagorski argues that in light of the FDIC-R's continued general allegations regarding Broadway's loan concentrations vis-à-vis its "peer group" banks, Defendants are entitled to discovery regarding the factual support for its allegations. Zagorski complains that rather than providing factual support for this allegation which concerns the years 2000 through 2009, the FDIC-R only provides certain statistics on the Bank's peer group banks for the reporting period ending June 30, 2010, which is after the Bank closed on April 23, 2010. Thus, Zagorski argues, the FDIC-R has failed to provide any responsive information regarding the identity of the Bank's "peer group" banks and each "peer group" bank's loan concentrations in CRE and ADC loans for the time period relevant to the Bank's operations or for the time period alleged in the SAC.

The FDIC-R responds that it would impossible and unduly burdensome for it to provide a more full answer to Interrogatory No. 2. First, the FDIC-R states that the issue of Broadway's peer group banks is raised by only one reference in an introductory paragraph in the SAC and is "collateral to the main issues in the litigation." (Doc. 166 at 14). The FDIC-R explains that the identity of the banks within a "peer group" changes because it is based on asset amount. For example, in 2007, when Broadway Bank's assets grew to over $1 billion, it moved into the "peer

group" of "insured commercial banks having assets between $1 billion and $3 billion." Prior to that time, Broadway was in the peer group of "insured commercial banks having assets between $300 million and $1 billion." As of June 30, 2010, there were over 315 banks in the peer group of "insured commercial banks having assets between $1 billion and $3 billion." In 2007, before the Bank reached $1 billion in assets, there were over 1100 banks in the peer group of "insured commercial banks having assets between $300 million and $1 billion." The FDIC-R also contends that knowing the specific CRE and ADC concentrations for each of thousands of banks in Broadway's peer groups from 2003-2010 "does not advance the ball in this litigation." (Doc. 166 at 14). According to the FDIC-R, "[d]rilling down to the specific CRE and ADC concentrations of the thousands of banks in Broadway's peer group is not material to the larger critique that Defendants' approval of the Loss Loans further subjected the Bank to the risks of a downturn in the CRE/ADC market." Id.

Second, the FDIC-R represents that it has provided all of the responsive information in its possession, custody, or control and has directed Defendants to publically available information regarding the CRE and ADC concentrations for each bank in each peer group. The FDIC-R states that the publically available Uniform Bank Performance Report ("UBPR") data does not provide the specific CRE and ADC concentrations for each bank in each peer group. Rather, on a quarterly basis, the UBPR data provides summaries of the CRE and ADC loan concentrations for the group of banks in each "peer group." The FDIC-R says that it has no additional information in its possession, custody or control that it can provide to Defendants regarding CRE and ADC loan concentrations for the group of banks in each "peer group."

Zagorski is entitled to discover the factual basis for the FDIC-R's allegations. However, given the limited scope of the FDIC-R's case to the 20 Loss Loans, the FDIC-R's representations regarding the insignificance of its "peer group" allegation to the main issues in the litigation, the

substantial burden to the FDIC-R of providing a fuller interrogatory answer, and the public availability of additional responsive information, the burden of further answering Interrogatory No. 2 likely outweighs the benefit to Defendants. Accordingly, Zagorski's motion to compel the FDIC-R to (a) identify Broadway's "peer group" banks for 2003 to 2010 and (b) identify each peer group bank's loan concentrations in CRE and ADC loans is denied. Rather, the FDIC-R shall provide a supplemental answer to Interrogatory No. 2 advising whether it will contend at trial that Broadway's CRE and ADC concentrations were far in excess of its peers, and if so, describe the proof it will offer on this matter. If the FDIC-R intends to rely on this peer group allegation for possible use at trial, Defendants are entitled to discover the specific evidence the FDIC-R will offer to substantiate that assertion. If the FDIC-R does not intend to rely on this peer group allegation at trial, its answer to Interrogatory No. 2 is sufficient and need not be supplemented.

## CONCLUSION

For these reasons and to the extent stated above, the Court grants in part and denies in part Defendant Demetris Giannoulias's Motion to Compel Second Interrogatory Responses by Plaintiff [157], Certain Defendants' Renewed Motion to Compel Certain Interrogatory Answers [162], and Plaintiff FDIC-R's Motion for Protective Order Regarding Interrogatory Answers [165]. Certain Defendants' Motion for Leave to File Document Under Seal [160] is denied.

**Date: March 21, 2014**          /s/ *Daniel G. Martin*