UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR BROADWAY BANK, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 12 CV 1665 |
| DEMETRIS GIANNOULIAS, GEORGE GIANNOULIAS, JAMES MCMAHON, SEAN CONLON, STEVEN DRY, DONNA ZAGORSKI, STEVEN BALOURDOS, GLORIA SGUROS, and ANTHONY D' COSTA, | ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

**DEFENDANT JAMES MCMAHON'S ANSWERS AND AMENDED
AFFIRMATIVE DEFENSES TO PLAINTIFF'S SECOND AMENDED COMPLAINT**

Defendant, James McMahon ("McMahon"), by and through his counsel, Howard & Howard Attorneys PLLC, hereby submits his Answers and Amended Affirmative Defenses to Plaintiff's, Federal Deposit Insurance Corporation as Receiver for Broadway Bank ("FDIC-R"), Second Amended Complaint.

## I.     INTRODUCTION

1.     FDIC-R brings this lawsuit in its capacity as Receiver for Broadway Bank ("Broadway" or the "Bank") to recover over $114 million in losses that the Bank suffered on 20 commercial real estate ("CRE") and acquisition, development and construction ("ADC") loans (collectively, the "Loss Loans").

**ANSWER:**     McMahon admits that the FDIC-R has brought this lawsuit in its capacity as
Receiver for Broadway Bank.     McMahon denies the remaining allegations
contained in Paragraph 1.

2.    These losses were caused by the gross negligence, negligence and breaches of fiduciary duty by seven former directors of Broadway (the "Director Defendants") and two former officers of Broadway (the "Officer Defendants") (collectively the "Defendants"), who approved and caused the Loss Loans to be made.

**ANSWER:**    McMahon denies the allegations contained in Paragraph 2.

3.    As members of the Board of Directors and the Bank's Loan Committee, the Director Defendants and Officer Defendants recklessly re-approved the 20 Loss Loans without regard for appropriate underwriting and credit administration practices, the Bank's written loan policies, federal lending regulations and warnings from the Bank's regulators.

**ANSWER:**    McMahon denies the allegations contained in Paragraph 3.

4.    In fact, the Director Defendants approved two of the worst Loss Loans on June 24, 2008, after a meeting earlier that same day with the Bank's regulators in which the regulators specifically warned the Director Defendants about the risks that these types of loans posed to the Bank. That day, the regulators also discussed with the Director Defendants the need to enter into a Memorandum of Understanding with Broadway which would impose restrictions on the Bank designed to stop this type of high-risk lending.  In all, the Defendants approved three Loss Loans on or after June 24, 2008, which caused over $20 million in losses to the Bank, and were among the largest Loss Loans approved by the Defendants.

**ANSWER:**    McMahon is without knowledge or information sufficient to form a belief as to

the allegations contained in Paragraph 4.

5.    On April 23, 2010, the Illinois Department of Financial and Professional Regulation ("IDFPR") closed Broadway and appointed the FDIC as Receiver. At failure, the Bank's assets were $1.06 billion. The estimated loss to the FDIC's Deposit Insurance Fund from the Bank's failure is $391.4 million.

**ANSWER:**    McMahon admits that on April 23, 2010, the Illinois Department of Financial and

Professional Regulation ("IDFPR") closed the Bank and appointed the FDIC as

Receiver.  McMahon is without knowledge or information sufficient to form a

belief as to the allegations contained in Paragraph 5 regarding alleged loss to the

FDIC's Deposit Insurance Fund.  McMahon denies all remaining allegations

contained in Paragraph 5.

## II.    PARTIES

6.      The FDIC is a corporation organized and existing under the laws of the United States of America. 12 U.S.C. § 1811, et seq. The FDIC is an instrumentality of the United States of America and is charged with, among other things, the orderly liquidation of failed financial institutions. Pursuant to 12 U.S.C. §1821(d)(2), the FDIC as Receiver succeeds to all of the rights, powers and privileges of the insured institution as well as the rights of any stockholder, member, account holder, depositor or officer or director with respect to the assets of the institution.

**ANSWER:**    McMahon Admits the allegations in Paragraph 6 regarding the organization of the

FDIC.  Answering further, McMahon states that 12 U.S.C. §1811 et seq. speaks

for itself, and McMahon therefore denies any allegations in Paragraph 6 to the

extent they are inconsistent with 12 U.S.C. §1811 et seq.

7.      Broadway was a state-chartered, nonmember bank established by the IDFPR and insured by the FDIC.  Broadway was a wholly-owned subsidiary of Broadway Bancorp, Inc. The Bank's principal place of business was Chicago, Illinois.

**ANSWER:**    McMahon admits the allegations contained in Paragraph 7.

### THE DIRECTOR DEFENDANTS

8.      Demetris Giannoulias was the Bank's President and Chief Executive Officer (from 2006 through closure) and a member of its Board of Directors (from 1994 through closure). From 2005 through closure, he also was a member of the Loan Committee. Demetris Giannoulias approved each of the 20 Loss Loans.

**ANSWER:**    Upon information and belief, McMahon admits that Demetris Giannoulias was

the Bank's President and Chief Executive Officer from 2006 through the Bank's

closure, was a member of its Board of Directors from approximately 1994

through the Bank's closure, and was a member of the Loan Committee from 2005

through 2009 or 2010.  McMahon is without knowledge or information sufficient

to form a belief as to the remaining allegations contained in Paragraph 8.

9.      George Giannoulias was a member of the Bank's Board of Directors (from 1999 through closure). In 2006, he became Chairman of the Board of Directors. From 2005 through

closure, he also was a member of the Loan Committee. George Giannoulias approved each of the 20 Loss Loans.

**ANSWER:**    Upon information and belief, McMahon admits that George Giannoulias was a

member of the Bank's Board of Directors from 1999 through the Bank's closure,

became Chairman of the Board of Directors in 2006, and was a member of the

Loan Committee.  McMahon is without knowledge or information sufficient to

form a belief as to the remaining allegations contained in Paragraph 9.

10.    James McMahon was a member of Broadway's Board of Directors from 2003 through December 22, 2008. As a member of the Board, McMahon approved four of the Loss Loans, including the $28 million loan to Normandy Shores, LLC, which caused over $19 million in losses to the Bank. Despite his Board responsibilities, McMahon repeatedly missed critical Board meetings.

**ANSWER:**    McMahon admits that he was a member of Broadway's Board of the Directors

from 2003 through late 2008.  McMahon is without knowledge or information

sufficient to form a belief as to the remaining allegations contained in Paragraph

10.

11.    Sean Conlon was a member of Broadway's Board of Directors from 2005 through December 22, 2009. As a member of the Board, Conlon approved the 15 Loss Loans that were presented to the Board during his tenure.

**ANSWER:**    Upon information and belief, McMahon admits that Sean Conlon was a member

of Broadway's Board of Directors from 2005 through late 2008 or early 2009.

McMahon is without knowledge or information sufficient to form a belief as to

the remaining allegations contained in Paragraph 11.

12.    Steven Dry was a member of Broadway's Board of Directors from 2005 through closure. As a member of the Board, Dry approved the 15 Loss Loans that were presented to the Board during his tenure.

**ANSWER:**    Upon information and belief, McMahon admits that Steven Dry was a member of

Broadway's Board of Directors from 2005 through the Bank's closure.  McMahon

4

is without knowledge or information sufficient to form a belief as to the

remaining allegations contained in Paragraph 12.

13.     Donna Zagorski was a member of Broadway's Board of Directors from 2006 through closure. As a member of the Board, Zagorski approved the 14 Loss Loans that were presented to the Board during her tenure.

**ANSWER**:     Upon information and belief, McMahon admits that Donna Zagorski was a

member of Broadway's Board of Directors from 2006 through the Bank's closure.

McMahon is without knowledge or information sufficient to form a belief as to

the remaining allegations contained in Paragraph 13.

14.     Steven Balourdos was a member of Broadway's Board of Directors from 2006 through closure. As a member of the Board, Balourdos approved the 14 Loss Loans that were presented to the Board during his tenure.

**ANSWER**:     Upon information and belief, McMahon admits that Steven Balourdos was a

member of Broadway's Board of Directors from approximately 2006 through

early 2010.  McMahon is without knowledge or information sufficient to form a

belief as to the remaining allegations contained in Paragraph 14.

## THE OFFICER DEFENDANTS

15.     Gloria Sguros was a Vice-President for Lending at Broadway from 2005 through closure. During that same period, she was a member of the Loan Committee and, in that position, approved all of the Loss Loans.

**ANSWER**:     Upon information and belief, McMahon admits that Gloria Sguros was a Vice-

President for Lending at Broadway and a member of the Loan Committee from

2005 through the Bank's closure.  McMahon is without knowledge or information

sufficient to form a belief as to the remaining allegations contained in Paragraph

15.

16.     Anthony D'Costa was a Vice-President for Lending at Broadway from 2005 through closure. In 2006, he became a member of the Loan Committee. He approved each of the

Loss Loans considered by the Loan Committee while he was a member, with the exception of the Water Street Realty Loan on which he did not express an opinion.

**ANSWER:**     Upon information and belief, McMahon admits that Anthony D'Costa was a

Vice-President for Lending at Broadway from 2005 through the Bank's closure,

and that in 2006 he became a member of the Loan Committee.  McMahon is

without knowledge or information sufficient to form a belief as to the remaining

allegations contained in Paragraph 16.

### III.     JURISDICTION AND VENUE

17.     The Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1345.

**ANSWER:**     McMahon admits that this Court has subject matter jurisdiction pursuant to 28

U.S.C. §§ 1331 and 1345, but denies any liability for the causes of action alleged

by Plaintiff.

18.     Venue is proper in this district under 28 U.S.C. § 1391(b).

**ANSWER:**     Defendant McMahon admits that venue is proper in this district under 28 U.S.C. §

1391(b), but denies any liability for the causes of action alleged by Plaintiff.

19.     The Court has personal jurisdiction over Defendants under 735 ILCS § 5/2-209, *et seq.*

**ANSWER:**     Defendant McMahon admits that this Court has personal jurisdiction over him

pursuant to 737 ILCS § 5/2-209, but denies any liability for the causes of action

alleged by Plaintiff.

### IV.     BACKGROUND FACTS

**A.     Broadway's Lending Operations and Concentrations**

20.     From 2000 through 2009, Broadway's assets grew by more than 500 percent. This explosive growth was fueled by an unsustainable expansion of the Bank's CRE and ADC loans far in excess of the Bank's peer group. These types of loans, which are highly sensitive to market

fluctuations, require close monitoring, lending expertise and respect for lending risk. None of these were present at Broadway Bank.

**ANSWER:**    McMahon is without knowledge or information sufficient to form a belief as to

the allegations that Broadway's assets grew by more than 500 percent between

2000 and 2009. McMahon admits that generally CRE and ADC loans require

monitoring, lending expertise, and awareness of lending risk. McMahon denies

the remaining allegations contained in Paragraph 20.

21.    Regarding the 20 Loss Loans at issue, Defendants failed to implement procedures that would have lessened the risks of the Bank's lending practices. Underwriting was perfunctory or non-existent. Limits on loan to value ratios repeatedly were ignored. Loans were made without appraisals or with grossly deficient appraisals. Construction draws were used for improper purposes with little or no active monitoring by the Bank. Little or no attention was paid to whether loan guarantors had sufficient liquidity to protect the Bank's interest. Loans were made to uncreditworthy borrowers with a history of bad loans - - in some cases with Broadway itself. In some instances, loans were made to assist other financial institutions avoid regulatory intervention or loss recognition.

**ANSWER:**    McMahon denies the allegations contained in Paragraph 21.

**B.    The Bank's Loan Policy**

22.    Broadway's loan policy (the "Loan Policy") required diligent underwriting in conformity with state and federal law, close monitoring of concentrations of credit and rigorous documentation and prudent evaluation of borrower and project risk. In approving the Loss Loans, however, Defendants routinely ignored and repeatedly failed to enforce the Loan Policy's provisions. The Bank's loan approval policies and procedures also were frequently bypassed.

**ANSWER:**    McMahon admits that the Loan Policy required underwriting in conformity with

state and federal law, monitoring of concentrations of credit and documentation

and evaluation of borrower and project risk. McMahon denies the remaining

allegations contained in Paragraph 22.

**C.    Broadway's Regulatory History**

23.    Defendants were warned by state and federal bank examiners of the significant weaknesses in Broadway's lending and loan administration practices. The criticisms and warnings had no effect on the approval of the 20 Loss Loans.

**ANSWER:**     McMahon admits that the Bank, from time to time, had meetings with state and federal bank examiners. McMahon denies the remaining allegations contained in Paragraph 23.

### The January 2007 Examination

24.     In January 2007, IDFPR examined Broadway's condition as of September 30, 2006. In the Report of Examination ("RoE"), the examiners noted their concern with the Bank's increasing concentrations in "construction and development, total out-of-area, State of New York, collateral type [hotel/motel] and relationship" loans. Examiners also noted weaknesses in loan administration and underwriting, including failing to obtain current financial statements from borrowers and the failure to obtain global cash flow analyses from borrowers with multiple loans. Additionally, the examiners criticized Broadway's Allowance for Loan and Lease Losses ("ALLL") methodology for failing to include an impairment analysis and failing to downgrade loans that were classified at previous examinations. The regulators concluded that Defendants' failure to ensure accurate ALLL calculations overstated the Bank's financial performance.

**ANSWER:**     McMahon admits that in January 2007 the IDFPR examined the Bank's condition as of September 30, 2006. Answering further, McMahon states that the RoE speaks for itself and therefore denies the allegations contained in paragraph 24 to the extent they are inconsistent with the RoE.

25.     As part of the January 2007 examination, state regulators made several recommendations to enhance risk management practices and maintain more accurate reporting procedures. Defendants ignored these recommendations. In March 2007, the regulators met with management to discuss the examination findings. In April 2007, the RoE was provided to the Board of Directors.

**ANSWER:**     McMahon admits that the IDFPR made recommendations, that the regulators met with the Bank in 2007, and that the RoE was presented to the Board of Directors. McMahon is without knowledge or information sufficient to form a belief as to the remaining allegations contained in Paragraph 25.

### The March 2008 Examination

26.     In March 2008, the FDIC and IDFPR conducted a joint investigation of the Bank's condition as of December 31, 2007.

**ANSWER:**     McMahon admits the allegations contained in Paragraph 26.

26.     27.     The regulators again found the Bank's overall condition less than satisfactory and criticized the deteriorating quality of the Bank's assets. They also criticized the Bank's inadequate loan review and watch-list programs, its ALLL methodology and its failure to improve credit risk management practices, including failing to properly identify and report developing risks and downgrade credit ratings in a timely manner.

**ANSWER:**     McMahon states that the 2008 RoE speaks for itself and therefore denies the

allegations in Paragraph 27 to the extent they are inconsistent with the 2008 RoE.

McMahon denies the remaining allegations contained in Paragraph 27.

28.     The criticism of the ALLL calculations once again suggested that the Defendants were understating the losses imbedded in the Bank's portfolio. Based on the Bank's deficiencies, the examiners required a $5.1 million adjustment to the ALLL, as of April 30, 2008,

**ANSWER:**     McMahon states that the 2008 RoE speaks for itself and therefore denies the

allegations in Paragraph 28 to the extent they are inconsistent with the 2008 RoE.

McMahon denies the remaining allegations contained in Paragraph 28.

29.     On June 24, 2008, federal and state regulators met with the Board of Directors to discuss the regulators' concerns. At that meeting, regulators discussed with the Board a draft Memorandum of Understanding ("MOU"), which directed the Bank to take steps to improve its lending operations and to reduce risk in its loan portfolio. The regulators provided a sustained and constructive critique of the Bank's operations and, through the MOU, sought a written commitment from Defendants to address the criticisms and reduce the Bank's excessive risk-taking.

**ANSWER:**     Upon information and belief, McMahon admits that on or around June 24, 2008,

the Board of Directors met with federal and state regulators and that a draft

Memorandum of Understanding was discussed.  Answering further, McMahon

states that the Memorandum of Understanding speaks for itself and therefore

denies the allegations in Paragraph 29 to the extent they are inconsistent with the

Memorandum of Understanding.  McMahon denies the remaining allegations

contained in Paragraph 29.

30.     Defendants ignored the regulators. Indeed, immediately following the June 24, 2008 meeting, the Board of Directors approved two grossly imprudent loans which resulted in losses to the Bank of approximately $12 million.

**ANSWER:**     McMahon is without knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 30 regarding alleged loss from these two loans or the exact date they were approved.  McMahon denies the remaining allegations contained in Paragraph 30.

### 2008 Visitations and Communications

31.     In a July 22, 2008 communication to the Board of Directors, the FDIC warned that a high volume of adversely classified ADC loans in the Bank's portfolio, primarily related to projects located in Florida, had eroded Broadway's earnings and undermined its capital.

**ANSWER:**     McMahon is without sufficient knowledge or information to form a belief as to the allegations contained in Paragraph 31.

32.     On September 17, 2008, Broadway entered into the MOU to address the weaknesses noted in the March 2008 examination. The MOU required a workout plan for classified assets, development of a sound loan review and grading system, more accurate charge-off losses and special mention deficiencies, complete loan documentation (including global cash flows for borrowers with multiple loans or projects) and provisions for loan and lease losses and ongoing review of ALLL adequacy. Defendants ignored the MOU's requirements.

**ANSWER:**     McMahon admits that the Bank entered into a Memorandum of Understanding in the Fall of 2008.  Answering further, McMahon states that the Memorandum of Understanding speaks for itself and therefore denies the allegations in Paragraph 32 to the extent they are inconsistent with the Memorandum of Understanding. McMahon denies the remaining allegations contained in Paragraph 32.

33.     On December 16, 2008, as a result of the significant deterioration of Broadway's assets, IDFPR and the FDIC conducted a joint visitation. The regulators concluded that the deterioration of Broadway's assets was continuing and noted a dramatic increase in loan delinquencies in October 2008 and November 2008 as a result of grossly improvident transactions approved by Defendants, notwithstanding regulatory criticisms.

**ANSWER:** McMahon admits that the IDFPR and FDIC conducted a joint examination in 2008. McMahon is without knowledge or information sufficient to form a belief as to the regulator's conclusions. McMahon denies the remaining allegations contained in Paragraph 33.

## The April 2009 Examination

34.     In April 2009, the FDIC and IDFPR jointly examined Broadway's condition as of March 31, 2009. The regulators found the Bank to be deeply troubled and examiners informed the Board of Directors that (a) the Bank's asset quality was critically deficient; (b) adverse classifications were at unacceptable levels; (c) the Bank's internal grading system was inadequate and understated the nature of the Bank's problems; (d) the Bank's underwriting was substandard and the loan files were grossly incomplete; (e) management had not adequately analyzed or monitored the Bank's securities portfolio; and (f) the Loan Committee failed to keep accurate minutes of its deliberations. The regulators again noted that Defendants had not properly computed ALLL reserves and ordered a $19 million adjustment. The regulators concluded that "management performance is deficient" and that Defendants' failure to recognize and curtail risk was a significant cause of the Bank's poor financial condition.

**ANSWER:** Upon information and belief, McMahon admits that in or around April 2009, the FDIC and IDFPR examined the Bank's condition as of March 31, 2009. Answering further, McMahon states that the 2009 RoE speaks for itself and therefore denies the allegations in Paragraph 34 to the extent they are inconsistent with the 2009 RoE.

35.     On July 20, 2009, regulators informed the Board that Broadway was undercapitalized. On February 4, 2010, regulators informed the Board that Broadway's capital level had dropped to significantly undercapitalized. On April 23, 2010, Broadway was closed by the IDFPR and the FDIC was appointed receiver.

**ANSWER:** McMahon admits that on April 23, 2010 Broadway was closed by the IDPFR and the FDIC was appointed receiver. McMahon is without knowledge or information sufficient to form a belief as to the remaining allegations contained in Paragraph 35.

## D. The Loss Loans and the Damage They Caused

36.     The loans made and approved by Defendants caused significant injury to the Bank. The following table lists 20 such Loss Loans and identifies the Officer Defendants and Director Defendants who voted to approve each loan.

| Loss Loan | D. Giannoulias | G. Giannoulias | Balourdos | Conlon | Dry | McMahon | Zagorski | Sguros | D'Costa |
|---|---|---|---|---|---|---|---|---|---|
| 1.  Gold Johnson Hold. LLC | X | X | X | X | X |  | X | X | X |
| 2.  Wilshire Blvd. BH, LLC | X | X | X | X | X |  | X | X | X |
| 3.  Federal Street L.A. LLC | X | X | X | X | X |  | X | X | X |
| 4.  Water Street Realty Group, LLC | X | X | X | X | X | X | X |  |  |
| 5.  Southside House LLC* | X | X |  |  |  |  |  | X | X |
| 6.  625 W. Div. Condos, LP* | X | X |  |  |  |  |  | X | X |
| 7.  Shubh Oceanic LLC* | X | X |  |  |  |  |  | X | X |
| 8.  Prospect R. Equities LLC | X | X | X | X | X |  | X | X | X |
| 9.  Prospect R. Equities LLC | X | X | X | X | X |  | X | X | X |
| 10. ASAT, Inc. | X | X | X | X | X |  | X | X | X |
| 11. 261 E. 78 Realty Corp. | X | X | X | X | X |  | X | X | X |
| 12. Lynn & Anderson Homes, LLC | X | X | X | X | X | X | X | X | X |
| 13. Shubh Hotels S. LLC | X | X | X | X | X |  | X | X | X |
| 14. Shubh Boca Condo LLC | X | X | X | X | X |  | X | X | X |
| 15. Lawrence Prop. LLC* | X | X |  |  |  |  |  | X | X |
| 16. John R. DeSilva | X | X | X | X | X |  | X | X | X |
| 17. 4750 N. Winthrop* | X | X |  |  |  |  |  | X | X |
| 18. The Bedford Lofts LLC | X | X | X | X | X |  | X | X | X |
| 19. Krieger SPE, LLC | X | X | X | X | X | X | X | X | X |
| 20. Normandy Shores LLC | X | X |  | X | X | X |  | X |  |

*Loan approved by Loan Committee only; no Board of Directors approval required.*

**ANSWER:**     McMahon is without knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 36.

37.     With regard to these loans, Defendants routinely failed to assess the repayment abilities of borrowers and guarantors, relied excessively on brokered deposits to finance the expanding loan portfolio, violated the Bank's loan policies, allowed use of interest reserves without adequately considering borrowers' repayment abilities, made out-of-territory loans without sufficient staff to monitor performance, failed to monitor the use of loan funds, and renewed loans without adequate underwriting or obtaining sufficient security. The Loss Loans

were made in violation of the general safety and soundness standards of 12 C.F.R. §364.101, Appendix A, the general underwriting standards of 12 C.F.R. §364.101, Appendix A and the real estate lending standards of 12 C.F.R. §365.2, Appendix A. Much of this imprudent lending occurred after the real estate market began its precipitous decline.

**ANSWER:**     McMahon denies the allegations contained in Paragraph 37.

38.     The Bank repeatedly understated the losses imbedded in its portfolio by manipulation of loss reserves, overstating income and engaging in transactions designed to artificially remove non-performing assets from the Bank's balance sheet.

**ANSWER:**     McMahon denies the allegations contained in Paragraph 38.

39.     The indiscriminate use of interest reserves funded by loan proceeds gave the appearance that the loans were performing when, in fact, the interest payments came only from the Bank. Few of these borrowers or guarantors contributed their own funds to reduce the debt or meet interest obligations. The risk of these transactions was borne almost entirely by the Bank.

**ANSWER:**     McMahon denies the allegations contained in Paragraph 39.

40.     The current estimated losses from the 20 Loss Loans total approximately $114 million.

**ANSWER:**     McMahon is without knowledge or information sufficient to form a belief as to

the allegations contained in Paragraph 40, but denies that he caused any of the

alleged losses for the Loss Loans.

### Wilshire Blvd. BH LLC

41.     In May 2008, Officer Defendants Sguros and D'Costa and Director Defendants Demetris Giannoulias and George Giannoulias, as members of the Loan Committee, approved a one-year $22.04 million interest-only loan to Wilshire Blvd. BH, LLC, guaranteed by Hagop Sarisian. The purpose of the loan was to refinance the land loan on a vacant site in Beverly Hills, California and to provide funds to redevelop the property into a luxury condominium with retail space and parking. The interest payments were funded by an interest reserve created by the loan's proceeds. On June 24, 2008, the Board of Directors, including Demetris Giannoulias, George Giannoulias, Balourdos, Conlon, Dry and Zagorski, approved the loan immediately following a meeting with federal regulators that sharply criticized the making of such loans.

**ANSWER:**     McMahon is without knowledge or information sufficient to form a belief as to

the allegations contained in Paragraph 41.

42.     The Officer Defendants and Director Defendants caused this loan to be made at the request of Connaught Real Estate Finance ("CREF") of which Director Defendant Conlon was a major shareholder. CREF loaned Wilshire Blvd. BH, LLC an additional $6.8 million; it was essential to CREF's financial interests that Broadway make the loan. Despite his interest in CREF and CREF's interest in Wilshire Blvd., Defendant Conlon did not recuse himself from the Bank's approval process and voted to approve the loan.

**ANSWER:**     McMahon is without knowledge or information sufficient to form a belief as to

the allegations contained in Paragraph 42.

43.     The making of this loan and the Federal Street loan on the heels of the June 24, 2008 meeting with federal and state regulators reflects Defendants' disdain for the regulatory process and disregard for the regulators' expressed concern that Defendants' conduct jeopardized the Bank's safety and soundness.

**ANSWER:**     McMahon is without knowledge or information sufficient to form a belief as to

the allegations contained in Paragraph 43.

44.     The loan had numerous other deficiencies including, but not limited to, the following:

   a.     Defendants caused the loan to be made even though there had been a major downturn in southern California's housing market, which was expected to further deteriorate, causing collateral values to plummet.
   b.     Defendants failed to require proper underwriting. The borrower had no ability to repay the loan. The guarantor's finances were not verified. His self-prepared financial statement showed that most of his assets were illiquid. In violation of the Bank's loan policy, he did not provide his 2005 or 2007 tax returns. In violation of the Bank's loan policy, a credit report was not obtained.
   c.     The loan evidenced Defendants' repeated disregard of regulatory warnings about the Bank's underwriting and its over-concentration of ADC/CRE out-of-territory loans.

**ANSWER:**     McMahon is without knowledge or information sufficient to form a belief as to

the allegations contained in Paragraph 44.

45.     Upon depletion of the interest reserve, the borrower and guarantor defaulted on the loan. The loan went into foreclosure. Defendants took no action to pursue the loan's guarantor to mitigate the Bank's losses.

**ANSWER:**     McMahon is without knowledge or information sufficient to form a belief as to

the allegations contained in Paragraph 45.

46.     The Bank has sustained estimated damages of $3.4 million plus accrued interest on this loan.

**ANSWER:**     McMahon is without knowledge or information sufficient to form a belief as to

the allegations contained in Paragraph 46.

### Federal Street L.A. LLC

47.     In June 2008, Officer Defendants Sguros and D'Costa and Director Defendants Demetris Giannoulias and George Giannoulias, as members of the Loan Committee, approved a one-year $26.88 million interest-only loan to Federal Street L.A. LLC, guaranteed by Michael Winter and Judi Fishman, to acquire and refurbish an apartment building in Los Angeles, California and convert the building to condominiums. The interest payments were to be funded by an interest reserve and cash flow, if any, from the borrower's property. On June 24, 2008, the Board of Directors, including Demetris Giannoulias, George Giannoulias, Balourdos, Conlon, Dry and Zagorski, approved the loan immediately following the June 24, 2008 meeting with the state and federal regulators that sharply criticized the making of such loans.

**ANSWER:**     McMahon is without knowledge or information sufficient to form a belief as to

the allegations contained in Paragraph 47.

48.     The making of this loan and the Wilshire Blvd. loan on the heels of the June 24, 2008 meeting with federal and state regulators reflects Defendants' disdain for the regulatory process and disregard for the regulators' expressed concern that Defendants' conduct jeopardized the Bank's safety and soundness.

**ANSWER:**     McMahon is without knowledge or information sufficient to form a belief as to

the allegations contained in Paragraph 48.

49.     The loan had numerous other deficiencies including, but not limited to, the following:
    a.     Defendants approved the loan without proper underwriting. The borrower did not have the ability to repay the loan. The guarantors did not submit an application; their finances were not verified. Their financial statements showed that the guarantors' assets were illiquid. In violation of the Bank's loan policy, Winter did not provide his 2006 tax returns. Although Winter had other loans at the Bank, he was not required to provide a global cash flow analysis to assess his repayment ability.
    b.     Defendants caused the loan to be made on the basis of an "as completed" appraisal instead of the property's value "as is." Had the "as is" value been used, the loan would have violated the loan-to-value ratio required by the Loan Policy.

    c.    The loan evidenced Defendants' disregard of repeated regulatory warnings about the Bank's underwriting and over-concentrations of ADC/CRE out-of-territory loans.

    d.    In August 2009, after the original note had matured, Defendant members of the Loan Committee approved a renewal of the loan even though financial information provided by guarantor Winter demonstrated that his financial condition was deteriorating. Further, several interest payments on this loan had been late and Winter was having difficulty making payments on other of his loans at the Bank. The renewal was made without requiring a new appraisal, despite the continuing downturn in the economy and real estate market.

**ANSWER:**    McMahon is without knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 49.

50.    Within a few months after the loan was renewed, the loan defaulted. No effort was made to pursue either Winter or Fishman as guarantors.

**ANSWER:**    McMahon is without knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 50.

51.    The Bank has sustained estimated damages of $8.5 million plus accrued interest on this loan.

**ANSWER:**    McMahon is without knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 51.

**Loans to Atul Bisaria and Entities He Owned or Controlled**

52.    In April 2007 and August 2007, Officer Defendants Sguros and D'Costa and Director Defendants Demetris Giannoulias and George Giannoulias, as members of the Loan Committee, approved two loans totaling $26.2 million to Atul Bisaria and entities owned or controlled by him. The loans included an eighteen-month $10.2 million interest-only loan to Shubh Boca Condominium LLC and Bisaria to acquire land and build an office condominium in Boca Raton, Florida, and an eighteen-month $16 million interest-only loan to Shubh Hotels Springdale LLC and Bisaria to refinance and reflag a hotel in Cincinnati, Ohio. The Board of Directors, including Defendants Demetris Giannoulias, George Giannoulias, Balourdos, Conlon, Dry and Zagorski, also approved these loans. The interest payments for each loan were funded by an interest reserve created out of the loan's proceeds.

**ANSWER:**    McMahon is without knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 52.

53.     Additionally, in August 2007, Defendant members of the Loan Committee approved a two-year $3.2 million interest-only loan to Shubh Oceanic, LLC, Bisaria, and his wife, ostensibly to purchase a passenger boat and transport it to Mumbai, India, to be used for "special events."

**ANSWER:**     McMahon is without knowledge or information sufficient to form a belief as to

the allegations contained in Paragraph 53.

54.     These loans shared numerous deficiencies including, but not limited to, the following:

a.     Defendants approved the loans without proper underwriting. All three loans were based on the same self-prepared and unaudited financial information for Bisaria, which was incomplete and inadequate. Bisaria did not submit loan applications for any of the transactions. His tax returns were incomplete. The borrowers themselves had no ability to pay down the loans and Bisaria's assets were illiquid.

b.     The loans improperly were approved on the value of the projects "as completed;" if based on the value of the properties "as is," the loans would have exceeded the Loan Policy's permitted loan-to-value ratio.

c.     The loans evidenced Defendants' disregard of repeated regulatory warnings about the Bank's over-concentrations of ADC/CRE out-of-territory loans.

d.     Defendants failed to monitor and administer the loans properly. Although more than $2.5 million in construction draws were disbursed on the hotel loan, when the Bank inspected the property, no major construction had occurred.

e.     In December 2008, Defendant members of the Loan Committee renewed both the office building and hotel loans for six additional months despite a poor history of loan performance. New appraisals, updated financials and/or additional collateral were not obtained.

f.     Defendant members of the Loan Committee imprudently increased the boat loan by $200,000 to meet the working capital requirements of Bisaria's hotel business in Detroit, Michigan, without requiring updated financial information or new appraisals.

**ANSWER:**     McMahon is without knowledge or information sufficient to form a belief as to

the allegations contained in Paragraph 54.

55.     In December 2008, when the loans were renewed, Bisaria and entities he owned and controlled had substantial obligations to Mutual Bank of Harvey, Illinois ("Mutual Bank"), an institution on the brink of failure. Ultimately, Bisaria's loans at Mutual Bank defaulted. Defendants undertook insufficient due diligence on these and other of Bisaria's positions at other banks or simply ignored the risk.

**ANSWER:**     McMahon is without knowledge or information sufficient to form a belief as to

the allegations contained in Paragraph 55.

56.     After the loans were renewed, they went into default. Defendants took no action to pursue Bisaria.

**ANSWER:**     McMahon is without knowledge or information sufficient to form a belief as to

the allegations contained in Paragraph 56.

57.     The Bank has sustained estimated damages of $21.4 million plus accrued interest on these loans.

**ANSWER:**     McMahon is without knowledge or information sufficient to form a belief as to

the allegations contained in Paragraph 57.

### Loans to Yaron Hershco or Entities that He Owned or Controlled

**(a)     Gold Johnson Holding, LLC**

58.     In June 2007, Officer Defendants Sguros and D'Costa and Director Defendants Demetris Giannoulias and George Giannoulias, as members of the Loan Committee, approved a one-year $21 million loan to 167 Johnson Street, LLC, which was owned by Yaron Hershco. The Board of Directors, including Defendants Demetris Giannoulias, George Giannoulias, McMahon, Balourdos, Conlon, Dry and Zagorski, also approved the loan.

**ANSWER:**     McMahon is without knowledge or information sufficient to form a belief as to

the allegations contained in Paragraph 58.

59.     Hershco was one of the Bank's largest borrowers. The purpose of this loan was to refinance the mortgage on vacant land located in Brooklyn, New York, and pay pre-construction expenses to develop a multi-unit rental building on that land.

**ANSWER:**     McMahon is without knowledge or information sufficient to form a belief as to

the allegations contained in Paragraph 59.

60.     Defendants approved the loan even though (a) the borrower had no ability to repay the loan and repayment of the loan depended entirely upon the borrower obtaining construction financing (which he never did); (b) the borrower did not provide his 2006 income tax return, a Loan Policy violation; (c) the loan-to-value ratio of the borrower's existing Broadway loan portfolio using "as is" appraisals for the collateral exceeded 98 %, a Loan Policy violation; (d) no global cash flow or global liability analysis was performed, a violation of the

Loan Policy; and (e) the borrower's net worth cannot be determined from the loan file, because the borrower's financial statement presented only the "equity" for his holdings, without any detail on the liabilities attached to each of the holdings nor any of the payment obligations for any of these liabilities.

**ANSWER:**    McMahon is without knowledge or information sufficient to form a belief as to

the allegations contained in Paragraph 60.

61.    In August, 2007, the Loan Committee (Defendants Sguros, D'Costa, Demetris Giannoulias and George Giannoulias) renewed the loan for one year.

**ANSWER:**    McMahon is without knowledge or information sufficient to form a belief as to

the allegations contained in Paragraph 61.

62.    Since Herscho never obtained construction financing for the project, the loan went into default.

**ANSWER:**    McMahon is without knowledge or information sufficient to form a belief as to

the allegations contained in Paragraph 62.

63.    To avoid recognizing losses attendant to the loan's nonperformance and to cover up the imprudent initial loan approval, in December 2008, Officer Defendants Sguros and D'Costa and Director Defendants Demetris Giannoulias and George Giannoulias, as members of the Loan Committee, approved the sale of the Hershco note with the Bank providing the financing. The Board of Directors, including Defendants Demetris Giannoulias, George Giannoulias, Balourdos, Conlon, Dry and Zagorski, also approved the transaction.

**ANSWER:**    McMahon is without knowledge or information sufficient to form a belief as to

the allegations contained in Paragraph 63.

64.    The Bank financed the sale of the note with a new two-year $22.1 million interest-only loan to Gold Johnson Holding, LLC. The loan was approved based on the original appraisal, even though the credit analysis recognized that the property had declined in value significantly.

**ANSWER:**    McMahon is without knowledge or information sufficient to form a belief as to

the allegations contained in Paragraph 64.

65.    Gold Johnson Holding, LLC was owned or controlled by Sam Chang, one of Broadway's largest borrowers, with loans from the Bank totaling approximately $44 million.

Chang was a developer of hotel properties in New York with a history of distressed projects. Chang was experiencing severe difficulties with other banks.

**ANSWER:**   McMahon is without knowledge or information sufficient to form a belief as to

the allegations contained in Paragraph 65.

66.     By December 2008, Chang had substantial outstanding commitments to Mutual Bank that were lurching towards default. Defendants' due diligence on Chang and his relationship to Mutual Bank either was insufficient or Defendants simply ignored the risk.

**ANSWER:**   McMahon is without knowledge or information sufficient to form a belief as to

the allegations contained in Paragraph 66.

67.     This loan had numerous other deficiencies including, but not limited to, the following:

    a.     Defendants approved the loan without proper underwriting. Gold Johnson Holdings, LLC had no assets with which to pay back the loan. The stated value of Chang's assets did not take into account his compromised financial condition or his multiple loans from Broadway and from other banks.

    b.     Defendants approved the loan based on the assumption that Hershco had purchased the rights to additional buildable square footage, increasing the land's value. Defendants, however, performed no due diligence on whether such additional rights were ever obtained. Hershco had not obtained these rights.

    c.     In violation of the Loan Policy, Defendants approved the loan before receiving a completed appraisal. When the appraisal was received, it resulted in a loan-to-value ratio in excess of that allowed under the Loan Policy.

    d.     Approval of this loan evidenced Defendants' disregard of repeated regulatory warnings about the Bank's underwriting and over-concentrations of ADC/CRE out-of-territory loans.

**ANSWER:**   McMahon is without knowledge or information sufficient to form a belief as to

the allegations contained in Paragraph 67.

68.     In effect, Defendants caused a large, nonperforming loan to be transferred to a borrower with equally poor prospects of repayment. Defendants' initial imprudent approval of the loan to 167 Johnson Street LLC and Hershco ultimately led to the imprudent approval of the loan to Gold Johnson Holding LLC and Chang, which resulted in significant losses to the Bank, as the Board and senior management attempted to avoid the consequences of their initial negligence.

**ANSWER:**     McMahon is without knowledge or information sufficient to form a belief as to

the allegations contained in Paragraph 68.

69.     The Bank has sustained estimated damages of $11 million plus accrued interest on these loans.

**ANSWER:**     McMahon is without knowledge or information sufficient to form a belief as to

the allegations contained in Paragraph 69.

**(b)     Prospect Equities, LLC**

70.     In June 2007, the same time that Defendants approved the $21 million loan to Hershco's entity 167 Johnson Street, the Bank made two other loans, totaling $15.5 million, to Hershco and a second Hershco entity, Prospect Equities, LLC. The first loan was an eighteen-month $9 million interest-only loan to purchase raw land in Brooklyn, New York. The second was an eighteen-month $6.5 million revolving line of credit to develop the property. Both loans were collateralized by the raw land. Interest payments were funded by an interest reserve created out of the loan proceeds.

**ANSWER:**     McMahon is without knowledge or information sufficient to form a belief as to

the allegations contained in Paragraph 70.

71.     Officer Defendants Sguros and D'Costa and Director Defendants Demetris Giannoulias and George Giannoulias, as members of the Loan Committee, approved these loans. The loans also were approved by the Board of Directors, including Defendants Demetris Giannoulias, George Giannoulias, Conlon, Dry, Balourdos, and Zagorski.

**ANSWER:**     McMahon is without knowledge or information sufficient to form a belief as to

the allegations contained in Paragraph 71.

72.     These loans had numerous deficiencies including, but not limited to, the following:

      a.     Defendants approved the loans without proper underwriting. Neither the borrower nor the guarantor submitted adequate financial information or tax returns. Defendants did not verify the assets described in the self-prepared, unaudited financial statements submitted by the borrower and guarantor.

      b.     Defendants approved the loan even though the loan-to-value ratio did not meet the standards set forth in the Loan Policy.

      c.     Monitoring of the borrowers' construction draws was inadequate. Virtually all of the construction funds were drawn by the time construction was only 50% complete.

d.  In June 2008, the Defendants increased the second note to $7.1 million even though the borrower had sold part of the collateral securing the loan and no new collateral was provided.

e.  Defendants renewed the loan in March 2009, even though the borrowers' financial difficulties were known, the project was not completed and the project's value had dramatically decreased.

f.  Defendants' approval of this loan and renewals evidenced their disregard of repeated regulatory warnings about the Bank's underwriting and loan administration practices and over-concentrations of ADC/CRE out-of-territory loans.

**ANSWER:**   McMahon is without knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 72.

73.  At maturity, the borrowers defaulted on both loans.

**ANSWER:**   McMahon is without knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 73.

74.  The Bank has sustained estimated damages of $8.1 million plus accrued interest on these loans.

**ANSWER:**   McMahon is without knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 74.

**(c)   Water Street Realty Group, LLC**

75.  In April 2008, with the real estate market in shambles, the Bank made a one-year $8 million loan to Hershco and a third Herscho entity, Water Street Realty Group, LLC. Defendants approved this loan even though at the time, Hershco had five other loans with the Bank with a total principal balance of over $40 million. Much of Hershco's loan portfolio was in distress. Hershco gave no clear or specific purpose for the loan other than for use towards his "future real estate investments."

**ANSWER:**   Upon information and belief, McMahon admits that a one-year approximately $8 million loan was made to Herschco and Water Street Realty Group, LLC in approximately 2008, and that it was to be used toward future real estate investments.  McMahon is without knowledge or information sufficient to form a

belief as to the second and third sentences in Paragraph 75. McMahon denies the

remaining allegations contained in Paragraph 75.

76.     The loan was approved by Officer Defendant Sguros and Director Defendants Demetris Giannoulias and George Giannoulias, as members of the Loan Committee; Officer Defendant D'Costa was noted as "absent." The Board of Directors, including Director Defendants Demetris Giannoulias, George Giannoulias, Balourdos, Conlon, Dry, Zagorski and McMahon, also approved the loan.

**ANSWER:**     McMahon is without knowledge or information sufficient to form a belief as to

the allegations contained in Paragraph 76.

77.     The loan was secured by a second lien on an apartment building in Brooklyn, New York, and a first lien on eight of the units, the value of which was undetermined when the loan closed. Hershco built the project as condominiums but, when the real estate market fell, he began renting the units to generate cash flow. In February, 2009, less than a year after the $8 million loan was made, it became apparent that the value of the collateral was insufficient to protect the Bank.

**ANSWER:**     Upon information and belief, McMahon admits that the loan was secured by a

second lien and assignment of rents on a mixed use development in Brooklyn,

New York, and that the Bank was to receive a first mortgage on eight units within

that development. McMahon is without knowledge or information sufficient to

form a belief as to the remaining allegations contained in Paragraph 77.

78.     This loan had numerous deficiencies including, but not limited to, the following:
a.     The Loan Committee and Board of Directors approved the loan even though there had been a major downturn in the real estate market. The Bank increased its exposure to a single high-volume borrower at a time when collateral values were plummeting.
b.     The Loan Committee and Board of Directors failed to require proper underwriting. The borrower had insufficient liquid assets with which to repay the loan. The income to be generated from the collateral property was insufficient to service the loan obligations. The calculation of the borrower's cash flow from which the principal and interest was to be paid was based his adjusted gross income, which, given the declining real estate market, similarly was subject to decline. Moreover, the credit analysis did not describe his obligations to other lenders.
c.     The loan was inadequately collateralized. The credit analysis improperly calculated the loan-to-value ratio based on the purported value of the

project "as completed." Had the "as is" loan-to-value ratio been used, as it should have, the loan-to-value ratio would have violated the Bank's loan policy and 12 C.F.R. § 365.2, Appendix A. Moreover, the loan-to-value ratio of Hershco's portfolio at Broadway was based on "as completed" values and/or outdated appraisals, which did not reflect the declining real estate market.

d.   The loan presentation did not specify what the money would be used for, saying only that funds would be used for unspecified "future real estate investments." Given the declining real estate market when the loan was made, and the borrower's large preexisting indebtedness to the Bank, this was imprudent.

e.   The loan evidenced the Loan Committee and Board of Directors' repeated disregard of regulatory warnings about the Bank's underwriting and over-concentration of ADC/CRE out-of-territory loans.

**ANSWER:**   With respect to subparagraph (a), McMahon admits that the loan was approved and that the Bank increased its exposure to this borrower on this loan, but denies that he acted improperly in connection with the loan and further denies the remaining allegations contained in subparagraph (a).   With respect to subparagraph (b), McMahon denies that the loan was approved without proper underwriting.   McMahon is without knowledge or information sufficient to form a belief as to the remaining allegations in subparagraph (b).   With respect to subparagraph (c), McMahon denies that the loan was inadequately collateralized. McMahon is without knowledge or information sufficient to form a belief as to the remaining allegations in subparagraph (c).   McMahon denies the allegations contained in subparagraph (d).   McMahon denies the allegations contained in subparagraph (e).

79.   In February 2009, Water Street Realty Group, LLC filed for bankruptcy. The Bank took no efforts to pursue Hershco.

**ANSWER:**     Upon information and belief, McMahon admits that Water Street Realty Group, LLC filed for bankruptcy in 2009. McMahon denies the remaining allegations contained in Paragraph 79.

80.     The Bank has sustained estimated damages of $4.3 million plus accrued interest on this loan.

**ANSWER:**     McMahon is without knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 80, but denies that he caused any alleged damages in connection with this loan.

### Normandy Shores, LLC

81.     In May 2006, Officer Defendant Sguros and Director Defendants Demetris Giannoulias and George Giannoulias, as members of the Loan Committee, approved a two-year $28 million, interest-only loan to Normandy Shores, LLC, guaranteed by Les G. Jones. The Board of Directors, including Defendants Demetris and George Giannoulias, Conlon, McMahon and Dry, also approved the loan. The loan's purpose was to refinance a land loan and development of a townhouse condominium project in Miami Beach, Florida. The first year of interest payments was funded by a loan reserve created out of the loan proceeds.

**ANSWER:**     Upon information and belief, McMahon admits that a two-year approximately $28 million loan was approved in or around 2006 for Normandy Shores, LLC, and that the loan was guaranteed by Les G. Jones. McMahon is without knowledge or information sufficient to form a belief as to the composition of the Loan Committee or the Board when this loan was approved. Upon information and belief, McMahon further admits that the loan was to be used for the development of a townhouse condominium project in Miami Beach, Florida. Upon information and belief, McMahon further admits that interest payments on this loan were originally to be made from an interest reserve funded by the loan proceeds but denies that there was anything improper with such arrangement. McMahon denies the remaining allegations contained in Paragraph 81.

82. The loan had numerous deficiencies including, but not limited to, the following:

  a. Defendants approved the loan without proper underwriting. In violation of the Loan Policy, neither the borrower nor the guarantor submitted a loan application or tax returns. The guarantor's financial information demonstrated that his net worth was limited and generally illiquid. The guarantor (who had lived in Brazil for the preceding five years) did not have the ability to repay the loan.

  b. Defendants caused the loan to be approved even though it was based on the appraised value of the property "as completed" as opposed to its value "as is." Had the "as is" value been used, the loan would have violated the Loan Policy's allowed loan-to-value ratio. Indeed, the "as is" value of the collateral was less than the loan amount.

  c. Even though construction was behind schedule and millions of dollars over budget, Defendants made no effort to protect the Bank either by requiring additional collateral or modifying the loan's terms.

**ANSWER:** With respect to subparagraph (a), McMahon denies that the loan was approved without proper underwriting and further denies that the guarantor did not have the ability to repay the loan when the loan was approved.  McMahon is without knowledge or information sufficient to form a belief as the remaining allegations in subparagraph (a), but denies any suggestion that he acted improperly.  With respect to subparagraph (b), McMahon is without knowledge or information sufficient to form a belief as the truth of the allegations, but denies any suggestion that he acted improperly.  With respect to subparagraph (c), McMahon denies that no effort was made to protect the Bank.  McMahon is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in subparagraph (c), but denies any suggestion that he acted improperly.

83. When the interest reserve was depleted, the loan went into default.  Defendants did not pursue the guarantor to mitigate the Bank's losses.

**ANSWER:** McMahon admits the loan went into default.  McMahon denies that Defendants did not pursue the guarantor to mitigate the Bank's losses.  McMahon is without

knowledge or information sufficient to form a belief as to the remaining allegations contained in Paragraph 83.

84.     The Bank has sustained estimated damages of $19.4 million plus accrued interest on this loan.

**ANSWER:**     McMahon is without knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 84, but denies that he caused any alleged damages in connection with this loan.

## ASAT, Inc.

85.     In May 2007, Officer Defendants Sguros and D'Costa and Director Defendants Demetris Giannoulias and George Giannoulias, as members of the Loan Committee, approved a two-year $12.7 million interest-only construction loan to ASAT, Inc. and Mohammed Siddiqui. The Board of Directors, including Defendants Demetris Giannoulias and George Giannoulias, Balourdos, Conlon, Dry and Zagorski, also approved the loan. The loan's purpose was to develop a mixed-use building in Chicago. The interest payments were funded by an interest reserve created out of the loan proceeds.

**ANSWER:**     McMahon is without knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 85.

86.     The loan had numerous deficiencies including, but not limited to, the following:
   a.     Defendants approved the loan without proper underwriting. The borrowers did not submit a loan application. Siddiqui's unaudited, self-prepared financial statements contained little detail; his tax returns lacked information about his business income. The borrowers were not required to provide global cash flow analyses.
   b.     When the interest reserve funded by the loan was depleted, the loan went into default. Construction draws continued to be funded even though the borrower was in default, the loan had not yet been renewed, and it was evident that the Bank would not be repaid.
   c.     In August 2009, three months after the borrower's default, the loan was renewed without an updated appraisal despite the borrowers' obviously deteriorating financial conditions and the deterioration of the real estate market.
   d.     The loan and its imprudent renewal evidenced Defendants' disregard for repeated regulatory warnings about the Bank's loan administration practices.

**ANSWER:**     McMahon is without knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 86.

87.     When the loan went into default, Defendants did not pursue the borrowers.

**ANSWER:**     McMahon is without knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 87.

88.     The Bank has sustained estimated damages of $8.1 million plus accrued interest on this loan.

**ANSWER:**     McMahon is without knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 88.

### 261 East 78 Realty Corp.

89.     In April 2007, Officer Defendants Sguros and D'Costa and Director Defendants Demetris Giannoulias and George Giannoulias, as members of the Loan Committee, approved a one-year $10 million interest-only loan to 261 East 78 Realty Corp. and Lee Moncho. The Board of Directors, including Defendants Demetris and George Giannoulias, Balourdos, Conlon, Dry and Zagorski, also approved the loan. The loan's purpose was to refinance property and acquire an adjacent building in New York, New York. The plan was to redevelop the properties as a medical office building. The interest payments were funded by an interest reserve created out of the loan proceeds. Between June 2008 and September 2009, the loan was renewed four times and, at the last renewal, the loan was increased by $2.475 million.

**ANSWER:**     McMahon is without knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 89.

90.     The loan had numerous deficiencies including, but not limited to, the following:
   a.     Defendants approved the loan without proper underwriting. The borrowers did not submit a loan application. The borrowers had no capacity to repay the loan. Unaudited, self-prepared financial statements showed that virtually all of Moncho's assets were illiquid. His tax returns did not include information about his business income.
   b.     Defendants approved the loan before a completed appraisal on the property was received.
   c.     Defendants took no steps to obtain additional security or modify the loan's terms when it became clear that neither the borrowers nor the collateral could support the loan.
   d.     Defendants' multiple renewals of the loan were imprudent. Each of the four loan renewals was made after the loan had defaulted and the real

estate market was in sharp decline. The September 2009 renewal and loan
increase was without Board of Directors' approval.

e.     The loan and its renewals evidenced Defendants' disregard for regulatory
warnings about the Bank's underwriting and over-concentrations of
ADC/CRE out-of-territory loans.

**ANSWER:**     McMahon is without knowledge or information sufficient to form a belief as to

the allegations contained in Paragraph 90.

91.     When the interest reserve was depleted, the loan went into default. Defendants
took no action to pursue the borrowers.

**ANSWER:**     McMahon is without knowledge or information sufficient to form a belief as to

the allegations contained in Paragraph 91.

92.     The Bank has sustained estimated damages of $5 million plus accrued interest on
this loan.

**ANSWER:**     McMahon is without knowledge or information sufficient to form a belief as to

the allegations contained in Paragraph 92.

## Loan to John R. DeSilva

93.     In March 2007, Officer Defendants Sguros and D'Costa and Director Defendants
Demetris Giannoulias and George Giannoulias, as members of the Loan Committee, approved a
one-year $10.5 million interest-only loan to John DeSilva. The Board of Directors, including
Defendants Demetris and George Giannoulias, Balourdos, Conlon, Dry and Zagorski, also
approved the loan. The loan's primary purposes were to refinance and renovate investment
properties in Florida, buy out DeSilva's business partner in a Florida resort, acquire a personal
residence in Florida, and renovate other properties in California and Florida. The loan was
collateralized by a first mortgage on two of the Florida properties. Interest payments were funded
by an interest reserve created out of the loan's proceeds.

**ANSWER:**     McMahon is without knowledge or information sufficient to form a belief as to

the allegations contained in Paragraph 93.

94.     The loan had numerous deficiencies including, but not limited to, the following:

a.     Defendants approved the loan without proper underwriting. The borrower
did not submit a loan application; DeSilva's unaudited financial
statements showed that virtually all of his assets were illiquid.

b.     Defendants allowed the loan to be funded before the Board of Directors
approved the loan and before a completed appraisal had been received.

      c.      In June 2008, Defendants allowed the loan to be renewed and increased by over $2 million after the loan had matured and defaulted, without an updated appraisal. Defendants approved this increase even though the borrower's financial condition had deteriorated and the value of the collateral had decreased.

      d.      The loan and its renewal evidenced Defendants' disregard of repeated regulatory warnings about the Bank's underwriting and over-concentrations of ADC/CRE out-of-territory loans.

**ANSWER:**    McMahon is without knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 94.

95.    When the interest reserve was depleted, the loan went into default. Defendants took no action to pursue DeSilva.

**ANSWER:**    McMahon is without knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 95.

96.    The estimated damages to the Bank related to this loan are $8.1 million, plus accrued interest.

**ANSWER:**    McMahon is without knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 96.

### Loans to Stark and Perlmutter or Entities They Owned or Controlled

**(a)**    **The Bedford Lofts, LLC**

97.    In February, 2007, the Bank made a $6.2 million construction loan to the Bedford Lofts, LLC, Menachem Stark, and Israel Perlmutter to develop a condominium project in Brooklyn, New York. The loan was approved by Officer Defendants Sguros and D'Costa and the Board of Directors, including Demetris Giannoulias and George Giannoulias, Balourdos, Conlon, Dry and Zagorski. Interest payments were funded by an interest reserve created from the loan proceeds.

**ANSWER:**    McMahon is without knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 97.

98.    This loan had numerous deficiencies including, but not limited to, the following:

      a.      Defendants approved the loan without proper underwriting. The borrowers' financial statements showed that they were highly illiquid and

                    unable to pay the loan. Perlmutter lacked sufficient credit to obtain a credit score; Stark's credit score was poor.

      b.     Despite the real estate market's condition, the depletion of the interest reserve and the borrowers' deteriorating financial condition, the Defendant members of the Loan Committee (Demetris and George Giannoulias, Sguros, and D'Costa) renewed the loan twice, without requiring an updated appraisal or complete and current financial information from the borrowers. These renewals included new interest reserves, which masked borrower repayment stress.

      c.     Approving this loan and its renewals evidenced Defendants' disregard of repeated regulatory warnings about out-of-territory loans and poor underwriting.

**ANSWER:**    McMahon is without knowledge or information sufficient to form a belief as to

        the allegations contained in Paragraph 98.

    99. When the interest reserves from the loan renewals were exhausted, the loans went into default.

**ANSWER:**    McMahon is without knowledge or information sufficient to form a belief as to

        the allegations contained in Paragraph 99.

    100.   The Bank sustained estimated damages of $1.5 million plus accrued interest on this loan.

**ANSWER:**    McMahon is without knowledge or information sufficient to form a belief as to

        the allegations contained in Paragraph 100.

    **(b)**    **Southside House, LLC**

    101.   In December 2007, Officer Defendants Sguros and D'Costa and Director Defendants Demetris Giannoulias and George Giannoulias, as members of the Loan Committee, approved a one-year $1.5 million interest-only loan to South Side House, LLC, Menachem Stark, and Israel Perlmutter. The loan's purpose was to provide undefined working capital for the borrowers' New York-based real estate business. The last four interest payments were funded by an interest reserve.

**ANSWER:**    McMahon is without knowledge or information sufficient to form a belief as to

        the allegations contained in Paragraph 101.

    102.   The loan had numerous deficiencies including, but not limited to, the following:

a. Defendants approved the loan without proper underwriting. The borrowers did not submit a loan application; their unaudited financial statements contained little detail; virtually all of the borrowers' assets were illiquid and the borrowers did not have the ability to repay the loan.

b. The loan presentation did not adequately describe the purpose of the loan, merely stating that the loan would be used for "working capital" for the borrowers' real estate business.

c. The loan was secured by a $1.5 million second mortgage on a property in New York behind a $29 million mortgage.

c. The loan evidenced Defendants' disregard for repeated regulatory warnings about loans outside of the Bank's territory.

**ANSWER:** McMahon is without knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 102.

103. The borrower defaulted on the first mortgage and foreclosure proceedings were initiated by the first mortgage holder, extinguishing the Bank's interest in the collateral. Defendants took no action to pursue Stark and Perlmutter.

**ANSWER:** McMahon is without knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 103.

104. The Bank has sustained estimated damages of $1.9 million plus accrued interest on this loan.

**ANSWER:** McMahon is without knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 104.

### 625 W. Division Condominiums, L.P.

105. In December 2007, Officer Defendants Sguros and D'Costa and Director Defendants Demetris Giannoulias and George Giannoulias, as members of the Loan Committee, approved a nine-month $5.35 million interest-only loan to 625 W. Division Condominiums, L.P., John Breugelmans, and Jan-Peter Breugelmans. The loan's purpose was to refinance raw land in Chicago, Illinois, at a time when the real estate market was in sharp decline. The interest payments were funded by an interest reserve created out of the loan proceeds.

**ANSWER:** McMahon is without knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 105.

106. The loan had numerous deficiencies including, but not limited to, the following:

a.   Defendants approved the loan without proper underwriting. The borrowers' financial statements showed that virtually all of their assets were illiquid. The borrowers did not submit tax returns in violation of the Bank's Loan Policy.

b.   Defendants approved the loan even though the appraisal of the subject property was over a year old and did not reflect its current value.

c.   In September 2009, Defendants approved a renewal of the loan even though the investors who were expected to make the payments for the renewal term had been indicted and the borrower had been unable to obtain funding to redevelop the land.

**ANSWER:**   McMahon is without knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 106.

107.   When the interest reserve was depleted, the borrowers defaulted on the loan. Defendants took no action to pursue the Breugelmans.

**ANSWER:**   McMahon is without knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 107.

108.   The Bank has sustained estimated damages of $2.8 million plus accrued interest on this loan.

**ANSWER:**   McMahon is without knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 108.

### Loans to Lawrence Properties, 4750 N. Winthrop, James Gouskos and Alexander Dobroveanu

109.   In March and April 2007, Officer Defendants Sguros and D'Costa and Director Defendants Demetris Giannoulias and George Giannoulias, as members of the Loan Committee, approved two loans to James Gouskos, Alexander Dobroveanu, and real estate entities owned by them known as Lawrence Properties, LLC and 4750 N. Winthrop, LLC.

**ANSWER:**   McMahon is without knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 109.

110.   The April 2007 loan was a five-year $2.9 million loan to refinance a commercial property in Chicago secured by a mortgage on the commercial property being refinanced by the loan. The March 2007 loan was a six-month $2.7 million interest-only loan secured by a mortgage on a vacant lot in Chicago on which the borrower was planning to develop a mixed use

condominium building. The interest payments on the March 2007 loan were funded by an interest reserve created out of the loan proceeds.

**ANSWER:**   McMahon is without knowledge or information sufficient to form a belief as to

the allegations contained in Paragraph 110.

111.   These loans had numerous deficiencies including, but not limited to, the following:

     a.   Defendants approved the loan without proper underwriting. The borrowers did not submit a loan application. Their unaudited, self-prepared, outdated financial statements showed that their assets were limited and illiquid. The Bank's cash flow analysis of the April 2007 loan showed that the expected rental income for the property could not service the debt.

     b.   In violation of the Loan Policy, the appraisal for the March 2007 loan was received after the loan was approved.

     c.   Defendants renewed the March 2007 loan, even though the borrowers had defaulted when the six-month interest reserve was depleted.

**ANSWER:**   McMahon is without knowledge or information sufficient to form a belief as to

the allegations contained in Paragraph 111.

112.   After the loans closed, a second bank claimed to have a first mortgage on certain property securing the loans. Defendants did not conduct proper due diligence on this issue or protect the Bank's interest. When the renewed interest reserve was depleted, the March 2007 loan went into default. Likewise, the borrower defaulted on the April 2007 loan. Broadway commenced foreclosure proceedings on both loans, but these proceedings were fatally compromised by the second bank's claim that it had a first mortgage on the property.

**ANSWER:**   McMahon is without knowledge or information sufficient to form a belief as to

the allegations contained in Paragraph 112.

113.   The Bank has sustained estimated damages of $4.2 million plus accrued interest on these loans.

**ANSWER:**   McMahon is without knowledge or information sufficient to form a belief as to

the allegations contained in Paragraph 113.

### Krieger SPE, LLC

114.   In January 2007, the Bank made a two-year, $15.35 million, interest-only loan to Krieger SPE, LLC, Andrew Krieger, and Valerie Krieger, the stated purpose of which, according to the credit analysis, was "to refinance [the borrowers'] real estate portfolio." The credit analysis did not identify the loans to be refinanced.

**ANSWER:**    Upon information and belief, McMahon admits that a two-year approximately $15.35 million interest only loan was approved in approximately 2007 for Krieger SPE, LLC, Andrew Krieger and Valerie Krieger, and that the purpose of the loan was to refinance existing mortgages on the property. McMahon denies the remaining allegations contained in Paragraph 114.

115.    The loan was approved by Officer Defendants Sguros and D'Costa and Director Defendants Demetris Giannoulias and George Giannoulias, as members of the Loan Committee. The Board of Directors, including Director Defendants Demetris Giannoulias, George Giannoulias, McMahon, Conlon, Dry, Balourdos and Zagorski, also approved the loan.

**ANSWER:**    McMahon is without knowledge or information sufficient to form a belief as the allegations contained in Paragraph 115.

116.    Loan proceeds of $1.5 million were used to establish an interest reserve to fund monthly interest payments for one year.

**ANSWER:**    McMahon admits that interest payments on the loan were originally to be made from an interest reserve funded by the loan proceeds but denies that there was anything improper with such arrangement.

117.    This loan had numerous deficiencies including, but not limited to, the following:
   a.    The Loan Committee and Board of Directors failed to require proper underwriting. The borrowers' unaudited financial statements showed that they had insufficient liquid assets with which to repay the loan. From the borrowers' tax returns, it was apparent that the borrowers lacked sufficient cash flow to make the interest payments once the interest reserve was depleted.
   b.    In addition to selling their personal residence, the sources of repayment for the loan were a yet-to-be-obtained construction loan with another lender and liquidation of the collateral. There was no analysis in the loan file confirming that construction financing could be obtained or an explanation as to how the proceeds of a construction loan could be used to repay Broadway's loan.
   d.    The loan was outside of the Bank's geographic area, where the Bank did not have staff or familiarity with the local real estate market to allow it to adequately assess or monitor the loan.

**ANSWER:**    With respect to subparagraph (a), McMahon denies that the loan was approved without proper underwriting and further denies that the borrowers had no ability to repay the loan when it was approved.   McMahon is without knowledge or information sufficient to form a belief as to the remaining allegations in subparagraph (a), but denies any suggestion that he acted improperly.   With respect to subparagraph (b), upon information and belief, McMahon admits that sources of repayment for this loan included, among other sources, the sale of a personal residence and construction loan, but denies that they were the only sources of repayment.   McMahon is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in subparagraph (b), but denies any suggestion that he acted improperly.   McMahon denies the allegations contained in subparagraph (d).

118.    In January 2009, when the loan came due, the borrowers defaulted. In February 2010, the Bank foreclosed on the loan.

**ANSWER:**    Upon information and belief, McMahon admits that the borrower defaulted. McMahon is without knowledge or information sufficient to form a belief as to the remaining allegations contained in Paragraph 118.

119.    The Bank has sustained estimated damages of $4.5 million plus accrued interest on this loan.

**ANSWER:**    McMahon is without knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 119, but denies that he caused any alleged damages in connection with this loan.

### **Lynn & Anderson Homes, LLC**

120.    In April 2007, the Bank extended a $9.1 million one-year, interest only, non-revolving line of credit to Lynn & Anderson Homes LLC, Fuel Group, LLC, Northgate

Investment, LLC, Indira Lalwani, and Raj Assomul. The loan was approved by Officer Defendants Sguros and D'Costa and Director Defendants Demetris Giannoulias and George Giannoulias, as members of the Loan Committee. The Board of Directors, including Director Defendants Demetris Giannoulias, George Giannoulias, McMahon, Conlon, Dry, Balourdos and Zagorski, also approved the loan.

**ANSWER:**     Upon information and belief, McMahon admits that an approximately $9.1 million one-year, interest-only, non-revolving line of credit was approved in approximately 2007 for Lynn & Anderson Homes, LLC, Fuel Group, LLC, Northgate Investment, Indira Lalwani, and Raj Assomul. McMahon is without knowledge or information sufficient to form a belief as to the remaining allegations contained in Paragraph 120.

121.     The loan's purpose was to refinance a property in Tampa, Florida and fund the development of townhomes and condominiums at the site. The loan proceeds were to finance the first phase of project costs and fund an interest reserve. At origination, the appraised value of the collateral property "as is" was $2.7 million, which was well below the loan amount.

**ANSWER:**     Upon information and belief, McMahon admits the first and second sentences in Paragraph 121, but denies that there is anything improper with funding an interest reserve from loan proceeds. Upon information and belief, McMahon further admits that the appraised "as is" value of the collateral property was approximately $2.7 million but further states that this amount was above the amount funded for this loan. McMahon denies the remaining allegations contained in Paragraph 121.

122.     In April 2008, when the loan matured, the borrowers defaulted. By then, the appraised value of the collateral "as is" had dropped to $2.3 million. The borrowers were unable to obtain permanent construction financing for the project. Nonetheless, the Loan Committee (Defendants Demetris Giannoulias, George Giannoulias, Sguros and D'Costa) converted the loan from a line of credit to an interest-only loan of $2.4 million, the principal balance on the line of credit.

**ANSWER:**     Upon information and belief, McMahon admits that the loan was renewed in approximately 2008 and that the "as is" appraisal at that time was approximately $2.3 million. McMahon is without knowledge or information sufficient to form a belief as to the allegations in the third sentence in Paragraph 122. Upon information and belief, McMahon admits that this loan was converted into an interest-only line of credit of approximately $2.4 million. McMahon is without knowledge or information sufficient to form a belief as to the composition of the Loan Committee with respect to the renewal of this loan. McMahon is without knowledge or information sufficient to form a belief as to the principal balance on the line of credit. McMahon denies the remaining allegations contained in Paragraph 122.

123.     Both the initial loan and subsequent modification had numerous deficiencies including, but not limited to, the following:

    a.    The Loan Committee and Board of Directors failed to require proper underwriting. Lalwani's unaudited personal financial statement showed that she had insufficient liquid assets or income with which to repay the loan. In violation of the Bank's loan policy, the Loan Committee and Board of Directors failed to require current tax returns or income data from the borrowers before approving the loan.

    b.    This was a speculative development project with insufficient funding. The loan funds and the borrower's equity were insufficient to complete the first phase of the construction project and there was no funding in place to complete the second phase. Moreover, the borrower was unable to repay the loan at the end of its one-year term since construction could not be finished and the individual condominium units sold within that time period.

    c.    In approving the original loan, the Loan Committee and Board of Directors improperly relied on the "as completed" value of the property rather than the "as is" value. Using the property's "as is" value, the loan exceeded the allowable loan-to-value ratio under the Bank's loan policy and violated 35 C.F.R. § 365.2, Appendix A.

    d.    The Loan Committee approved the loan's renewal even though the borrowers had been unable to start construction and had depleted their available cash.

     e.    The loan was outside of the Bank's geographic area, where the Bank did not have staff or familiarity with the local real estate market to allow it to adequately assess or monitor the loan.

**ANSWER:**    With respect to subparagraph (a), McMahon denies that the loan was approved without proper underwriting and further denies that Lalwani was unable to repay the loan when it was approved. McMahon is without knowledge or information sufficient to form a belief as to the remaining allegations in subparagraph (a), but denies any suggestion that he acted improperly. With respect to subparagraph (b), McMahon denies that the loan was for a speculative development project with insufficient funding. McMahon is without knowledge or information sufficient to form a belief as to the remaining allegations in subparagraph (b), but denies any suggestion that he acted improperly. With respect to subparagraph (c), McMahon is without knowledge or information sufficient to form a belief as to the truth of the allegations, but denies any suggestion that he acted improperly. With respect to subparagraph (d), upon information and belief, McMahon admits that the loan was renewed. McMahon is without knowledge or information sufficient to form a belief as to the remaining allegations in subparagraph (d), but denies any suggestion that he acted improperly. McMahon denies the allegations contained in subparagraph (e).

    124.    When the renewed loan came due in December 2008, the borrowers defaulted. The Bank took no action to pursue Lalwani or Assomul.

**ANSWER:**    Upon information and belief, McMahon admits that the borrowers defaulted. McMahon is without knowledge or information sufficient to form a belief as to

when the default occurred.  McMahon denies the remaining allegations contained

in Paragraph 124.

125.    The Bank has sustained estimated damages of $2 million plus accrued interest on this loan.

**ANSWER:**    McMahon is without knowledge or information sufficient to form a belief as to

the allegations contained in Paragraph 125, but denies that he caused any alleged

damages in connection with this loan.

## CLAIMS FOR RELIEF

## COUNT I

### (Gross Negligence — Director Defendants and Officer Defendants)

126.    FDIC-R realleges and incorporates by reference the allegations contained in paragraphs 1 through 125 as if fully set forth herein.

**ANSWER:**    McMahon realleges and incorporates by reference his answers contained in

Paragraphs 1 through 125 as if fully set forth herein.

127.    Section 1821(k) of the Financial Institutions Reform, Recovery and Enforcement Act ("FIRREA") holds directors and officers of financial institutions personally liable for loss or damage caused by their "gross negligence," as defined by applicable state law.

**ANSWER:**    McMahon states that Section 1821(k) of FIRREA speaks for itself and therefore

denies the allegations in Paragraph 127 to the extent they are inconsistent with

Section 1821(k) of FIRREA.

128.    The Officer Defendants and Director Defendants owed Broadway a duty to use reasonable care, skill, and diligence in the performance of their duties, including, but not limited to: (a) conducting proper due diligence on each proposed loan to inform themselves about the risks such loan posed to the Bank before approving it; (b) complying with the Bank's Loan Policy; (c) ensuring that the loans they approved were underwritten in a safe and sound manner; (d) ensuring that the loans they approved were secured by sufficiently valuable collateral and guarantees to prevent or minimize the Bank's risk of loss; (e) ensuring that the loans they approved did not violate applicable banking laws and regulations; (f) ensuring that the loans they approved did not create unsafe and unsound concentrations of credit; and (g) properly monitoring the performance of loans to minimize the Bank's risk of loss.

**ANSWER:**     McMahon denies the allegations contained in Paragraph 128.

129.     Given the Officer Defendants' and Director Defendants' knowledge of the Bank's troubled condition, the receipt of multiple regulatory warnings and the impaired state of the real estate market, the Officer Defendants' and Director Defendants' responsibilities to the Bank were heightened.

**ANSWER:**     McMahon denies the allegations contained in Paragraph 129.

130.     Notwithstanding these obligations, the Officer Defendants and Director Defendants disregarded these duties and were grossly negligent by, among other things: (a) failing to conduct proper due diligence on each of the Loss Loans and failing to inform themselves about the risks the loans posed to the Bank before approving them; (b) disregarding the Bank's loan policies and approving the Loss Loans on terms that violated the Bank's Loan Policy; (c) failing to ensure that the Loss Loans were underwritten in a safe and sound manner; (d) failing to ensure that the Loss Loans were secured by sufficiently valuable collateral and guarantees to prevent or minimize the Bank's risk of loss; (e) failing to ensure that the Loss Loans did not violate applicable banking laws and regulations; (f) failing to ensure that the Loss Loans did not create unsafe and unsound concentrations of credit; and (g) ignoring regulatory warnings about the Bank's lending operations.

**ANSWER:**     McMahon denies the allegations contained in Paragraph 130.

131.     The Officer Defendants and Director Defendants knew or should have known of the risks that such deficient practices represented but they persisted in this grossly negligent conduct by approving the Loss Loans. This was very great or gross negligence. It also was reckless.

**ANSWER:**     McMahon denies the allegations contained in Paragraph 131.

132.     Defendant members of the Board of Directors were grossly inattentive to the affairs of the Bank - deferring excessively to the whims of the Giannoulias family. As a consequence, reports were not closely read, little or no due diligence into the Bank's condition was done, regulatory criticisms were discounted, and, for Defendant McMahon, important Board meetings frequently were missed or ignored.

**ANSWER:**     McMahon denies the allegations contained in Paragraph 132.

133.     As a direct and proximate cause of the gross negligence of the Officer Defendants and Director Defendants, the Bank suffered damages in excess of $114 million.

**ANSWER:**     McMahon denies the allegations in contained Paragraph 133.

## COUNT II

**(Breach of Fiduciary Duty of Care — Director Defendants and Officer Defendants)**

134.    FDIC-R realleges and incorporates by reference the allegations contained in paragraphs 1 through 125, as if fully set forth herein.

**ANSWER:**    McMahon realleges and incorporates by reference his answers contained in

Paragraphs 1 through 125 as if fully set forth herein.

135.    Based on their positions as officers and directors, the Officer Defendants and Director Defendants were fiduciaries of the Bank and owed the Bank fiduciary duties.

**ANSWER:**    McMahon admits the allegations contained in Paragraph 135.

136.    The Officer Defendants and Director Defendants owed Broadway fiduciary duties to exercise reasonable care, skill and diligence in the performance of their responsibilities, including: (a) conducting proper due diligence on each proposed loan to inform themselves about the risks the loans posed to the Bank before approving it; (b) complying with the Bank's Loan Policy and approving loans on terms that complied with the Loan Policy; (c) ensuring that the loans they approved were underwritten in a safe and sound manner; (d) ensuring that the loans they approved were secured by sufficiently valuable collateral and guarantees to prevent or minimize the Bank's risk of loss; (e) ensuring that the loans they approved did not violate applicable banking laws and regulations; (f) ensuring that the loans they approved did not create unsafe and unsound concentrations of credit; and (g) properly monitoring the performance of loans to minimize the Bank's risk of loss.

**ANSWER:**    McMahon states that Illinois law regarding the duties imposed upon bank

directors and officers speaks for itself and therefore denies the allegations in

Paragraph 136 to the extent they are inconsistent with said Illinois law.

137.    Given the Officer Defendants' and Director Defendants' knowledge of the Bank's troubled condition, the receipt of multiple regulatory warnings and the impaired state of the real estate market, the Officer Defendants' and Director Defendants' responsibilities to the Bank were heightened.

**ANSWER:**    McMahon denies the allegations contained in Paragraph 137.

138.    The Officer Defendants and Director Defendants breached these fiduciary duties by, among other things: (a) failing to conduct proper due diligence on each of the Loss Loans and failing to inform themselves about the risks such loans posed to the Bank before they approved them; (b) approving the Loss Loans on terms that violated the Bank's loan policies; (c) failing to ensure that the Loss Loans were underwritten in a safe and sound manner; (d) failing to

ensure that the Loss Loans were secured by sufficiently valuable collateral and guarantees in order to prevent or minimize the Bank's risk of loss; (e) failing to ensure that the Loss Loans did not violate applicable banking laws and regulations; (f) failing to ensure that the Loss Loans did not create unsafe and unsound concentrations of credit; and (g) ignoring regulatory warnings about the Bank's lending operations.

**ANSWER:**     McMahon denies the allegations contained in Paragraph 138.

139.    Defendant members of the Board of Directors were grossly inattentive to the affairs of the Bank - deferring excessively to the whims of the Giannoulias family. As a consequence, reports were not closely read, regulatory criticisms were discounted, and, for Defendant McMahon, important Board meetings frequently were missed or ignored.

**ANSWER:**     McMahon denies the allegations contained in Paragraph 139.

140.    As a direct and proximate cause of the breach of the fiduciary duty of care by the Officer Defendants and Director Defendants, the Bank suffered damages in excess of $114 million.

**ANSWER:**     McMahon denies the allegations in contained Paragraph 140.

## COUNT III

### (Negligence — Director Defendants and Officer Defendants)

141.    FDIC-R realleges and incorporates by reference the allegations contained in paragraphs 1 through 125, as if fully set forth herein.

**ANSWER:**     McMahon realleges and incorporates by reference his answers contained in

Paragraphs 1 through 125 as if fully set forth herein.

142.    The allegations of negligence in this Count III are pleaded in the alternative to the allegations of breach of fiduciary duty in Count II.

**ANSWER:**     Paragraph 142 is a statement of Plaintiff's intention that does not require a

response.  To the extent a response is required, McMahon denies the allegations

contained in Paragraph 142.

143.    The Officer Defendants and Director Defendants owed Broadway a duty to use reasonable care, skill and diligence in the performance of their duties, including, but not limited to: (a) conducting proper due diligence on each proposed loan to inform themselves about the risks the loans posed to the Bank before approving it; (b) complying with the Bank's Loan Policy; (c) ensuring that the loans they approved were underwritten in a safe and sound manner;

(d) ensuring that the loans they approved were secured by sufficiently valuable collateral and guarantees to prevent or minimize the Bank's risk of loss; (e) ensuring that the loans they approved did not violate applicable banking laws and regulations; (f) ensuring that the loans they approved did not create unsafe and unsound concentrations of credit; and (g) properly monitoring the performance of loans to minimize the Bank's risk of loss.

**ANSWER:**     McMahon denies the allegations contained in Paragraph 143.

144.     Given the Officer Defendants' and Director Defendants' knowledge of the Bank's troubled condition, the receipt of multiple regulatory warnings and the impaired state of the real estate market, the Officer Defendants' and Director Defendants' responsibilities to the Bank were heightened.

**ANSWER:**     McMahon denies the allegations contained in Paragraph 144.

145.     Defendants, however, breached these duties and were negligent by, among other things: (a) failing to conduct proper due diligence on each of the Loss Loans and failing to inform themselves about the risks such loans posed to the Bank before they approved them; (b) approving the Loss Loans on terms that violated the Bank's loan policies; (c) failing to ensure that the Loss Loans were underwritten in a safe and sound manner; (d) failing to ensure that the Loss Loans were secured by sufficiently valuable collateral and guarantees to prevent or minimize the Bank's risk of loss; (e) failing to ensure that the Loss Loans did not violate applicable banking laws and regulations; (f) failing to ensure that the Loss Loans did not create unsafe and unsound concentrations of credit; and (g) ignoring regulatory warnings about the Bank's lending operations.

**ANSWER:**     McMahon denies the allegations contained in Paragraph 145.

146.     Defendant members of the Board of Directors were grossly inattentive to the affairs of the Bank - deferring excessively to the whims of the Giannoulias family. As a consequence, reports were not closely read, regulatory criticisms were discounted, and, for Defendant McMahon, important Board meetings frequently were missed or ignored.

**ANSWER:**     McMahon denies the allegations contained in Paragraph 146.

147.     As a direct and proximate cause of the negligence of the Officer Defendants and Director Defendants, the Bank suffered damages in excess of $114 million.

**ANSWER:**     McMahon denies the allegations contained in Paragraph 147.

## AMENDED AFFIRMATIVE DEFENSES

For his Amended Affirmative Defenses against the FDIC-R, McMahon states as follows:

### FIRST AFFIRMATIVE DEFENSE – BUSINESS JUDGMENT RULE

1.      The FDIC-R's claims are barred in whole or in part by the business judgment rule because they are based on the well informed and good faith business judgments that McMahon made as a director of the Bank.  McMahon alleges this affirmative defense without conceding that the business judgment rule can only be asserted as an affirmative defense, and McMahon specifically reserves the right to assert the business judgment rule as an affirmative defense in the event that the Seventh Circuit ultimately determines that the business judgment rule can only be asserted as an affirmative defense.

2.      The business judgment rule establishes a presumption that corporate officers and directors make decisions on an informed basis, in good faith, and in the honest belief that they are acting in the best interest of the corporation.

3.      McMahon acted with due care, adequate information, and good faith in carrying out his duties as a director of the Bank and in approving the four alleged "Loss Loans" attributed to him in the FDIC-R's Complaint.  The Bank had prior relationships with many of its borrowers at issue who had successfully completed CRE and ADC projects and fully repaid prior loans. McMahon acted in good faith and reasonably and justifiably relied upon information, advice, or opinions about the loans at issue presented to him by others, including without limitation, other Bank personnel, counsel, auditors, third-party loan reviewers, other experts, and regulators, in approving the loans at issue.  The Bank's management met extensively with borrowers and visited projects multiple times before and after the "Loss Loans" were approved.

4.      McMahon also reasonably relied upon the positive examination reports delivered to the Bank's Directors during the time period that the loans at issue were approved.  Between 2005 and 2010, the regulators provided constant ongoing supervision of the Bank.  The regulators conducted five onsite examinations and three onsite visitations of the Bank during this period.  The Bank also had numerous other formal and informal discussions with regulators and case managers, which provided regulators with even more supervision of the Bank.

5.      All of the alleged "Loss Loans" were initially approved when the Bank had an overall composite rating of "1"—the highest rating available, indicating that the Bank was considered to be "sound in every respect"—as reflected in the regulators' Reports of Examination ("ROE" or "ROEs").  During the period of substantial growth in the Bank's loan portfolio from 2005 to 2007, the regulators upgraded Broadway's overall composite rating from the second highest rating of a "2" to the highest rating of a "1."  In addition to receiving high overall composite ratings, the Bank received the highest management rating of a "1," which indicates "strong performance by management" and "strong risk management practices," in the 2006 and 2007 ROEs.

6.      The 2005 through 2007 examination reports did not report that the Bank's allowance for loan losses was deficient, that the loan officers lacked expertise to engage in commercial real estate lending, that the Bank's commercial real estate loan program was doomed to fail, or that the Bank's capital was deficient.  The regulators also reviewed and approved the Bank's loan concentrations, loan policies, and allowances for loan losses during this time period.

7.      McMahon also was informed and reasonably believed that adequate policies, procedures, and controls were in place at the Bank.

## SECOND AFFIRMATIVE DEFENSE – ILLINOIS BANKING ACT

1.      The FDIC-R's claims are barred in whole or in part by the Illinois Banking Act,

205 ILCS § 5/16(7)(b).

2.      Under the Illinois Banking Act, McMahon was entitled to rely upon "advice, information, opinions, reports or statements, including financial statements and financial data, prepared or presented by" credit analysts, employees, accountants or consultants whom McMahon believed to be reliable and competent in the matter presented.

3.      McMahon properly relied upon such information presented by credit analysts, employees, accountants, consultants, auditors, and third-party loan reviewers retained by the Bank.

4.      McMahon also properly relied upon information presented by the FDIC and IDFPR regulators and examiners in written examination reports and in oral reports at board meetings, including the examiners' repeated conclusion that the Bank was "sound in every respect" at the time the four alleged "Loss Loans" were initially approved.

### THIRD AFFIRMATIVE DEFENSE – WAIVER

1.      The FDIC-R is seeking damages in the amount of approximately $116,000,000.

2.      The FDIC-R's claims are barred in whole or in part by the doctrine of waiver.

3.      For example, the FDIC-R was responsible for administering the Federal Street Loan after the closure of the Bank. The FDIC-R's conduct in administering and disposing of the Federal Street Loan caused a material decrease in the value and the amount recovered on the loan.

4.      The FDIC-R did not follow its internal procedures and practices in administering the Federal Street Loan after the closure of the Bank. The FDIC-R maintained a "structured sales" listing of certain loans that it acquired from closed banks on a website. Upon information and belief, prospective buyers, who have been pre-approved by the FDIC-R, have access to this

"structured sales" website in order to view and potentially bid on the loans listed on this website. Per the FDIC-R's internal procedures and practices, loans listed on the "structured sales" website cannot be removed from this pool of loans until they are approved and a 10% down payment is received.

5.      Upon information and belief, the FDIC-R listed the Federal Street Loan as part of the pool of loans identified on the FDIC-R's "structured sales" website.  Upon information and belief, in contravention of the FDIC-R's internal policies and practices, the FDIC-R removed the Federal Street Loan from the "structured sales" website without receipt of the required 10% down payment.  Rather than following its internal procedures and practices, the FDIC-R pulled the Federal Street Loan from the "structured sales" website because of pending negotiations with the Federal Street borrowers.

6.      The FDIC-R obtained a $18,000,000 settlement on the Federal Street Loan, which was originally a $26,880,000 note, from the Federal Street borrowers in May 2011.  In connection with this settlement, the FDIC-R relied upon an "as is" $18,500,000 appraisal amount, instead of the available "as completed" $25,600,000 appraisal amount.  Upon information and belief, in June 2011, approximately one month after the FDIC-R received $18,000,000 from the Federal Street borrowers, the Federal Street borrowers sold a 57-percent interest in the Federal Street project to Milan Capital Management for $22,000,000.

7.      The FDIC-R's decision to pull the Federal Street Loan from the "structured sales" website in violation of its internal procedures and practices, as well as its reliance on a lower "as is" appraisal, resulted in the FDIC-R obtaining a settlement amount from the Federal Street borrowers that was significantly less than the actual value of the Federal Street Loan.

8.     The FDIC-R's intentional conduct on the Federal Street Loan, including, but not limited to, (i) its failure to follow its own internal procedures and practices with respect to the disposition of the Federal Street loan; (ii) its decision to dispose of the Federal Street Loan at an unreasonably low value; and (iii) its failure to maximize the value of the Federal Street Loan when disposing of it, resulted in the FDIC-R causing its own damages.  The FDIC-R's conduct amounted to an intentional relinquishment of its right to seek damages caused by its own conduct, and, therefore, the FDIC-R has waived its right to seek damages arising out of its own conduct.

9.     The FDIC-R also entered into a Purchase and Assumption Agreement, including a Commercial Shared-Loss Agreement (collectively, the "Loss Share Agreement"), with an assuming institution (the "Assuming Institution") on or about April 23, 2010 that gave the Assuming Institution little to no economic incentive to maximize the value of the Loss Loans subject to the Loss Share Agreement (which included all of the Loss Loans except the Federal Street Loan).

10.     In addition, the FDIC-R failed to adequately audit, monitor, and supervise the administration and disposition of the Loss Loans.  The FDIC-R's failures resulted in, among other things, (i) the sale of notes and collateral at below fair market value; (ii) a failure to maximize the recovery available on the loans; (iii) payments for expenses unrelated to the administration or disposition of a loan; (iv) a failure to adequately pursue guarantors; and/or (v) actions that adversely affected collateral values and/or loan recovery.

11.     For example, with respect to the Gold Johnson Holding Loan, the FDIC-R permitted the note to be sold to an entity named Gold 613, LLC on or about October 26, 2011 for $8,500.000, which was less than market value.  Upon information and belief, only five months

later, on or about March 30, 2012, the broker for Gold 613, LLC, Massey Knakal, listed the property for sale at $25,500,000. Upon information and belief, in May 2012, the property was sold to Brooklyn Princess, LLC for $19,000.000. Thus, on the Gold Johnson Holding, LLC Loan, the FDIC-R failed to adequately audit, monitor, and supervise the sale of the note, which led to, among other things, a failure to maximize the recovery available on this loan and the disposition of this loan at an unreasonably low value. The FDIC-R's conduct amounted to an intentional relinquishment of its right to seek damages caused by its own conduct, and, therefore, the FDIC-R has waived its right to seek damages arising out of its own conduct.

12.     For example, with respect to the 261 E. 78 Realty Corp. Loan, the FDIC-R is seeking approximately $3,036,907 in reimbursable expenses as damages. However, upon information and belief, approximately $484,000, if not more, of these expenses are not expenses relating to actions taken by the Bank before the closure of the Bank, and such expenses are not necessarily expenses related to the administration or disposition of the loan. The FDIC-R failed to adequately audit, monitor, or supervise the reimbursable expenses that were incurred in connection with this loan, and the FDIC-R now seeks such expenses. The FDIC-R's conduct amounted to an intentional relinquishment of its right to seek damages caused by its own conduct, and, therefore, the FDIC-R has waived its right to seek damages arising out of its own conduct.

13.     For example, with respect to the Wilshire Blvd. BH Loan, upon information and belief, the FDIC-R permitted the property to be sold for $16,500,000 to New Pacific Realty Corp. on or about November 12, 2010, even though this amount was not the highest and best offer received for the property and even though this was below market value. Therefore, the FDIC-R failed to adequately audit, monitor, and supervise the sale of the collateral, which led to,

among other things, a failure to maximize the recovery available on this loan and the disposition of this loan at an unreasonably low value. The FDIC-R's conduct amounted to an intentional relinquishment of its right to seek damages caused by its own conduct, and, therefore, the FDIC-R has waived its right to seek damages arising out of its own conduct.

14.     For example, with respect to the 625 W. Division Condominiums, L.P. Loan, upon information and belief, the FDIC-R permitted the entry of a settlement agreement with the borrower that permitted the borrower to sell the property to Pearson Street Partners, LLC for $2,800,000, which was below market value. This sale for $2,800,000 closed on or about March 14, 2013. Upon information and belief, also on March 14, 2013 or shortly thereafter in March 2013, the same property was then sold by Pearson Street Partners, LLC to Gerding Edlen Development Inc. for $5,000,000. Thus, FDIC-R failed to adequately audit, monitor, and supervise the disposition of the collateral, which resulted in, among other things, a failure to maximize the recovery available on this loan and the disposition of this loan at an unreasonably low value. The FDIC-R's conduct amounted to an intentional relinquishment of its right to seek damages caused by its own conduct, and, therefore, the FDIC-R has waived its right to seek damages arising out of its own conduct.

15.     For example, with respect to the Southside House, LLC Loan, upon information and belief, the FDIC-R permitted the assignment of the bankruptcy claim associated with this loan to the Investors Team, LLC for $110,000 on or about May 15, 2012. On or about August 7, 2014, the Investors Team, LLC received approximately $2,900,000 for the Initial Allowed Investors Claim portion of its assigned claim in the bankruptcy proceeding. Upon information and belief, the Investors Team, LLC is expected to receive another $900,000 in connection with its Disputed Investors Claim portion of the assigned claim in the bankruptcy proceeding.

Therefore, the FDIC-R failed to adequately audit, monitor, and supervise the disposition of the collateral, which resulted in, among other things, a failure to maximize the recovery available on this loan and the assignment of the bankruptcy claim on this loan at an unreasonably low value. The FDIC-R's conduct amounted to an intentional relinquishment of its right to seek damages caused by its own conduct, and, therefore, the FDIC-R has waived its right to seek damages arising out of its own conduct.

16.     For example, with respect to the 4750 N. Winthrop Loan, upon information and belief, the FDIC-R failed to supervise the administration of the loan by allowing a title impairment to remain on the property, rather than pursing a claim against the title company, which resulted in a substantial decline in the value of the collateral. The FDIC-R's conduct amounted to an intentional relinquishment of its right to seek damages caused by its own conduct, and, therefore, the FDIC-R has waived its right to seek damages arising out of its own conduct.

17.     With respect to the Bedford Lofts, LLC Loan, upon information and belief, the approximately $6,850,000 was received in connection with the sale of the notes on this loan in or around January 2013. Upon information and belief, this recovery amount satisfied the remaining balances on the notes, as well as the sole charge-off previously taken for this loan. Nevertheless, the FDIC-R still seeks $ 1,474,233 in damages in connection with this loan. By accepting $6,850,000 in recovery on this loan, which, upon information and belief, amounts to more than a full recovery on this loan, the FDIC-R's conduct amounted to an intentional relinquishment of its right to seek damages, and, therefore, the FDIC-R has waived its right to seek damages on this loan.

### FOURTH AFFIRMATIVE DEFENSE – FAILURE TO MITIGATE

1.      The FDIC-R is seeking damages in the amount of approximately $116,000,000.

2.      The FDIC-R's claims are barred in whole or in part by its failure to mitigate its alleged damages.

3.      The FDIC-R had a duty to make reasonable efforts to mitigate or reduce any losses alleged in the Complaint.

4.      For example, the FDIC-R failed to take reasonable steps to reduce the loss on the Federal Street Loan.  The FDIC-R did not follow its internal procedures and practices in administering the Federal Street Loan after the closure of the Bank.  The FDIC-R maintained a "structured sales" listing of certain loans that it acquired from closed banks on a website.  Upon information and belief, prospective buyers, who have been pre-approved by the FDIC-R, have access to this "structured sales" website in order to view and potentially bid on the loans listed on this website.  Per the FDIC-R's internal procedures and practices, loans listed on the "structured sales" website cannot be removed from this pool of loans until they are approved and a 10% down payment is received.

5.      Upon information and belief, the FDIC-R listed the Federal Street Loan as part of the pool of loans identified on the FDIC-R's "structured sales" website.  Upon information and belief, in contravention of the FDIC-R's internal policies and practices, the FDIC-R removed the Federal Street Loan from the "structured sales" website without receipt of the required 10% down payment.  Rather than following its internal procedures and practices, the FDIC-R pulled the Federal Street Loan from the "structured sales" website because of pending negotiations with the Federal Street borrowers.

6.      The FDIC-R obtained a $18,000,000 settlement on the Federal Street Loan, which was originally a $26,880,000 note, from the Federal Street borrowers in May 2011.   In connection with this settlement, the FDIC-R relied upon an "as is" $18,500,000 appraisal amount, instead of the available "as completed" $25,600,000 appraisal amount.   Upon information and belief, in June 2011, approximately one month after the FDIC-R received $18,000,000 from the Federal Street borrowers, the Federal Street borrowers sold a 57-percent interest in the Federal Street project to Milan Capital Management for $22,000,000.

7.      The FDIC-R's decision to pull the Federal Street Loan from the "structured sales" website in violation of its internal procedures and practices, its reliance on a lower "as is" appraisal, and its acceptance of a settlement amount from the Federal Street borrowers that was significantly less than the actual value of the Federal Street Loan constitutes a failure to mitigate damages with respect to the Federal Street Loan.

8.      The FDIC-R also entered into a Loss Share Agreement with the Assuming Institution on or about April 23, 2010 that gave the Assuming Institution little to no economic incentive to maximize the value of the Loss Loans subject to the Loss Share Agreement (which included all of the Loss Loans except the Federal Street Loan).

9.      In addition, the FDIC-R failed to adequately audit, monitor, and supervise the administration and disposition of the Loss Loans in order to maximize the value of the Loss Loans.   The FDIC-R's failures resulted in, among other things, (i) the creation of an incentive to obtain less than the maximum level of recovery available on loans under the applicable Loss-Share Agreement governing the Bank's assets; (ii) a failure to maximize the value of the collateral; (iii) a failure to take the steps necessary to maximize the collection on the loans; (iv) the sale of loans at unreasonably low values; (v) a failure to adequately work out loans; (vi) a

failure to adequately pursue guarantors; and/or (vii) other actions which adversely affected collateral values and/or the loan recovery.

10.     For example, with respect to the Gold Johnson Holding Loan, the FDIC-R permitted the note to be sold to an entity named Gold 613, LLC on or about October 26, 2011 for $8,500.000, which was below market value.  Upon information and belief, only five months later, on or about March 30, 2012, the broker for Gold 613, LLC, Massey Knakal, listed the property for sale at $25,500,000.  Upon information and belief, in May 2012, the property was sold to Brooklyn Princess, LLC for $19,000.000.  Thus, on the Gold Johnson Holding, LLC Loan, the FDIC-R failed to adequately audit, monitor, and supervise the sale of the note, which led to, among other things, a failure to maximize the recovery available on this loan and the disposition of this loan at an unreasonably low value.  As such, the FDIC-R failed to mitigate its damages with respect to the Gold Johnson Holding Loan.

11.     For example, with respect to the Wilshire Blvd. BH Loan, upon information and belief, the FDIC-R permitted the property to be sold for $16,500,000 to New Pacific Realty Corp. on or about November 12, 2010, even though this amount was not the highest and best offer received for the property and even though this was below market value.  Therefore, the FDIC-R failed to adequately audit, monitor, and supervise the sale of the collateral, which led to, among other things, a failure to maximize the recovery available on this loan and the disposition of this loan at an unreasonably low value.  As such, the FDIC-R failed to mitigate its damages with respect to the Wilshire Blvd. BH Loan.

12.     For example, with respect to the 625 W. Division Condominiums, L.P. Loan, upon information and belief, the FDIC-R permitted the entry of a settlement agreement with the borrower that permitted the borrower to sell the property to Pearson Street Partners, LLC for

$2,800,000, which was below market value. This sale for $2,800,000 closed on or about March 14, 2013. Upon information and belief, also on March 14, 2013 or shortly thereafter in March 2013, the same property was then sold by Pearson Street Partners, LLC to Gerding Edlen Development Inc. for $5,000,000. Thus, FDIC-R failed to adequately audit, monitor, and supervise the disposition of the collateral, which resulted in, among other things, a failure to maximize the recovery available on this loan and the disposition of this loan at an unreasonably low value. As such, the FDIC-R failed to mitigate its damages with respect to the 625 W. Division Condominiums, L.P. Loan.

13.     For example, with respect to the Southside House, LLC Loan, upon information and belief, the FDIC-R permitted the assignment of the bankruptcy claim associated with this loan to the Investors Team, LLC for $110,000 on or about May 15, 2012. On or about August 7, 2014, the Investors Team, LLC received approximately $2,900,000 for the Initial Allowed Investors Claim portion of its assigned claim in the bankruptcy proceeding. Upon information and belief, the Investors Team, LLC is expected to receive another $900,000 in connection with its Disputed Investors Claim portion of the assigned claim in the bankruptcy proceeding. Therefore, the FDIC-R failed to adequately audit, monitor, and supervise the disposition of the collateral, which resulted in, among other things, a failure to maximize the recovery available on this loan and the assignment of the bankruptcy claim on this loan at an unreasonably low value. As such, the FDIC-R failed to mitigate its damages with respect to the Southside House, LLC Loan.

14.     For example, with respect to the 4750 N. Winthrop Loan, upon information and belief, the FDIC-R failed to supervise the administration of the loan by allowing a title impairment to remain on the property, rather than pursing a claim against the title company,

which resulted in a substantial decline in the value of the collateral.  As such, the FDIC-R failed to mitigate its damages with respect to the 4750 N. Winthrop Loan.

15.     For example, with respect to the 261 E. 78 Realty Corp. Loan, upon information and belief, the FDIC-R failed to supervise the administration of the loan, which resulted in a lender liability action brought by the borrower relating to actions following the closure of the Bank.  This led to, among other things, the expenditure of substantial legal fees and a significant decline in the value of the loan unrelated to the Bank.  As such, the FDIC-R failed to mitigate its damages with respect to the 261 E. 78 Realty Corp. Loan.

## FIFTH AFFIRMATIVE DEFENSE – COMPARATIVE NEGLIGENCE

1.     The FDIC-R had a duty to exercise ordinary care in the management and disposition of the Bank's assets.

2.     For example, the FDIC-R failed to exercise ordinary care in the management and disposition of the Federal Street Loan.  The FDIC-R did not follow its internal procedures and practices in administering the Federal Street Loan after the closure of the Bank.  The FDIC-R maintained a "structured sales" listing of certain loans that it acquired from closed banks on a website.  Upon information and belief, prospective buyers, who have been pre-approved by the FDIC-R, have access to this "structured sales" website in order to view and potentially bid on the loans listed on this website.  Per the FDIC-R's internal procedures and practices, loans listed on the "structured sales" website cannot be removed from this pool of loans until they are approved and a 10% down payment is received.

3.     Upon information and belief, the FDIC-R listed the Federal Street Loan as part of the pool of loans identified on the FDIC-R's "structured sales" website.  Upon information and belief, in contravention of the FDIC-R's internal policies and practices, the FDIC-R removed the

Federal Street Loan from the "structured sales" website without receipt of the required 10% down payment. Rather than following its internal procedures and practices, the FDIC-R pulled the Federal Street Loan from the "structured sales" website because of pending negotiations with the Federal Street borrowers.

4.     The FDIC-R obtained a $18,000,000 settlement on the Federal Street Loan, which was originally a $26,880,000 note, from the Federal Street borrowers in May 2011. In connection with this settlement, the FDIC-R relied upon an "as is" $18,500,000 appraisal amount, instead of the available "as completed" $25,600,000 appraisal amount. Upon information and belief, in June 2011, approximately one month after the FDIC-R received $18,000,000 from the Federal Street borrowers, the Federal Street borrowers sold a 57-percent interest in the Federal Street project to Milan Capital Management for $22,000,000.

5.     The FDIC-R's decision to pull the Federal Street Loan from the "structured sales" website in violation of its internal procedures and practices, as well as its reliance on a lower "as is" appraisal, resulted in the FDIC-R obtaining a settlement amount from the Federal Street borrowers that was significantly less than the actual value of the Federal Street Loan. Accordingly, any losses attributed to the Federal Street Loan are a direct and proximate result of the FDIC-R's negligence.

6.     The FDIC-R also entered into a Loss Share Agreement with the Assuming Institution on or about April 23, 2010 that gave the Assuming Institution little to no economic incentive to maximize the value of the Loss Loans subject to the Loss Share Agreement (which included all of the Loss Loans except the Federal Street Loan).

7.     The FDIC-R, also failed to exercise ordinary care in its supervision of the administration and disposition of the Loss Loans. The FDIC-R's failures resulted in, among

other things, (i) the creation of an incentive to obtain less than the maximum level of recovery available on loans under the applicable Loss-Share Agreement governing the Bank's assets; (ii) a failure to maximize the value of the collateral; (iii) a failure to take the steps necessary to maximize the collection on the loans; (iv) the sale of loans at unreasonably low values; (v) a failure to adequately work out loans; (vi) a failure to adequately pursue guarantors; and/or (vi) other actions which adversely affected collateral values and/or the loan recovery.

8.      For example, with respect to the Gold Johnson Holding Loan, the FDIC-R permitted the note to be sold to an entity named Gold 613, LLC on or about October 26, 2011 for $8,500.000, which was less than market value.  Upon information and belief, only five months later, on or about March 30, 2012, the broker for Gold 613, LLC, Massey Knakal, listed the property for sale at $25,500,000.  Upon information and belief, in May 2012, the property was sold to Brooklyn Princess, LLC for $19,000.000.  Thus, on the Gold Johnson Holding, LLC Loan, the FDIC-R failed to adequately audit, monitor, and supervise the sale of the note, which led to, among other things, a failure to maximize the recovery available on this loan and the disposition of this loan at an unreasonably low value.  Accordingly, any losses attributed to the Gold Johnson Holding Loan are a direct and proximate result of the FDIC-R's negligence in failing to adequately audit, monitor, and supervise the administration and disposition of this loan.

9.      For example, with respect to the Wilshire Blvd. BH Loan, upon information and belief, the FDIC-R permitted the property to be sold for $16,500,000 to New Pacific Realty Corp. on or about November 12, 2010, even though this amount was not the highest and best offer received for the property and even though this was below market value.  Therefore, the FDIC-R failed to adequately audit, monitor, and supervise the sale of the collateral, which led to, among other things, a failure to maximize the recovery available on this loan and the disposition

of this loan at an unreasonably low value. Accordingly, any losses attributed to the Wilshire Blvd. BH Loan are a direct and proximate result of the FDIC-R's negligence in failing to adequately audit, monitor, and supervise the administration and disposition of this loan.

10. For example, with respect to the 625 W. Division Condominiums, L.P. Loan, upon information and belief, the FDIC-R permitted the entry of a settlement agreement with the borrower that permitted the borrower to sell the property to Pearson Street Partners, LLC for $2,800,000, which was below market value. This sale for $2,800,000 closed on or about March 14, 2013. Upon information and belief, also on March 14, 2013 or shortly thereafter in March 2013, the same property was then sold by Pearson Street Partners, LLC to Gerding Edlen Development Inc. for $5,000,000. Thus, FDIC-R failed to adequately audit, monitor, and supervise the disposition of the collateral, which resulted in, among other things, a failure to maximize the recovery available on this loan and the disposition of this loan at an unreasonably low value. Accordingly, any losses attributed to the 625 W. Division Condominiums, L.P. Loan are a direct and proximate result of the FDIC-R's negligence in failing to adequately audit, monitor, and supervise the administration and disposition of this loan.

11. For example, with respect to the Southside House, LLC Loan, upon information and belief, the FDIC-R permitted the assignment of the bankruptcy claim associated with this loan to the Investors Team, LLC for $110,000 on or about May 15, 2012. On or about August 7, 2014, the Investors Team, LLC received approximately $2,900,000 for the Initial Allowed Investors Claim portion of its assigned claim in the bankruptcy proceeding. Upon information and belief, the Investors Team, LLC is expected to receive another $900,000 in connection with its Disputed Investors Claim portion of the assigned claim in the bankruptcy proceeding. Therefore, the FDIC-R failed to adequately audit, monitor, and supervise the disposition of the

collateral, which resulted in, among other things, a failure to maximize the recovery available on this loan and the assignment of the bankruptcy claim on this loan at an unreasonably low value. Accordingly, any losses attributed to the Southside House, LLC Loan are a direct and proximate result of the FDIC-R's negligence in failing to adequately audit, monitor, and supervise the administration and disposition of this loan.

12. For example, with respect to the 4750 N. Winthrop Loan, upon information and belief, the FDIC-R failed to supervise the administration of the loan by allowing a title impairment to remain on the property, rather than pursing a claim against the title company, which resulted in a substantial decline in the value of the collateral. Accordingly, any losses attributed to the 4750 N. Winthrop Loan are a direct and proximate result of the FDIC-R's negligence in failing to adequately supervise the administration of this loan.

13. For example, with respect to the 261 E. 78 Realty Corp. Loan, upon information and belief, the FDIC-R failed to supervise the administration of the loan, which resulted in a lender liability action brought by the borrower relating to actions following the closure of the Bank. This led to, among other things, the expenditure of substantial legal fees and a significant decline in the value of the loan unrelated to the Bank. Accordingly, any losses attributed to the 261 E. 78 Realty Corp. Loan are a direct and proximate result of the FDIC-R's negligence in failing to adequately audit, monitor, and supervise the administration and disposition of this loan.

### SIXTH AFFIRMATIVE DEFENSE – LACK OF STANDING

1. The FDIC-R obtained its "status" vis-a-vis the Bank through a statutory receivership appointment by the IDFPR. The IDFPR closed the Bank and appointed the FDIC-R as receiver pursuant to the Illinois Banking Act, 205 ILCS 5/1, *et seq.* and the Federal Deposit Insurance Act, 12 U.S.C. § 1821, *et seq.*

61

2.      Those statutes, however, failed to provide the Bank with any right of pre-deprivation or post-deprivation judicial review, which is a constitutional requirement under the Due Process Clause and the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution.

3.      These constitutional infirmities nullify the FDIC-R's appointment as receiver and negate the FDIC-R's standing to prosecute this action.

WHEREFORE, James McMahon prays this Honorable Court deny the relief sought by Plaintiff, enter judgment in favor of James McMahon, award James McMahon his costs, and whatever further and other relief this Court deems just and proper.

August 8, 2014

Respectfully submitted,

James McMahon,


By:____/s/ Robert J. Ambrose_____
     One of the Attorneys for
     Defendant James McMahon


Robert J. Ambrose
David C. Van Dyke
Scott Frost
Joseph W. Barber
Howard & Howard Attorneys PLLC
200 S. Michigan Avenue
Suite 1100
Chicago, IL 60604
(312) 372-4000

## PROOF OF SERVICE BY ELECTRONIC MAIL

I, Robert J. Ambrose, an attorney, hereby certify that I electronically filed the foregoing notice, together with the documents referenced therein with the Clerk of the United States Court using the CM/ECF system which will send notification of such filing to the person referenced above on August 8, 2014.

/s/ Robert J. Ambrose

Howard & Howard Attorneys, PLLC
200 South Michigan Ave., Ste. 1100
Chicago, Illinois 60604
(312) 372-4000