**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR BROADWAY BANK, <br><br> Plaintiff, <br><br> v. <br><br> DEMETRIS GIANNOULIAS, GEORGE GIANNOULIAS, JAMES MCMAHON, SEAN CONLON, STEVEN DRY, DONNA ZAGORSKI, STEVEN BALOURDOS, GLORIA SGUROS and ANTHONY D'COSTA, <br><br> Defendants. | Case No. 12 Civ. 1665 <br><br> Judge John F. Grady <br><br> Magistrate Judge Daniel Martin |

**DEFENDANTS DEMETRIS GIANNOULIAS AND
GEORGE GIANNOULIAS' ANSWER AND AMENDED AFFIRMATIVE
DEFENSES TO SECOND AMENDED COMPLAINT**

As and for their Answer and Amended Affirmative Defenses to Plaintiff Federal Deposit Insurance Corporation as Receiver for Broadway Bank's (the "FDIC-R") Second Amended Complaint (the "Complaint"), Defendants Demetris Giannoulias and George Giannoulias (collectively, the "Giannoulias Defendants") state as follows:

## I.    INTRODUCTION

### ALLEGATION NO. 1:

FDIC-R brings this lawsuit in its capacity as Receiver for Broadway Bank ("Broadway" or the "Bank") to recover over $114 million in losses that the Bank suffered on 20 commercial real estate ("CRE") and acquisition, development and construction ("ADC") loans (collectively, the "Loss Loans").

**ANSWER:**

The Giannoulias Defendants admit that the FDIC-R is bringing the present lawsuit in its capacity as Receiver for Broadway Bank. The Giannoulias Defendants deny the remaining allegations in this paragraph.

**ALLEGATION NO. 2:**

These losses were caused by the gross negligence, negligence and breaches of fiduciary duty by seven former directors of Broadway (the "Director Defendants") and two former officers of Broadway (the "Officer Defendants") (collectively the "Defendants"), who approved and caused the Loss Loans to be made.

**ANSWER:**

The Giannoulias Defendants admit that the Loss Loans alleged in the FDIC-R's Complaint were approved by certain of the Director Defendants and/or the Officer Defendants. The Giannoulias Defendants deny the remaining allegations in this paragraph.

**ALLEGATION NO. 3:**

As members of the Board of Directors and the Bank's Loan Committee, the Director Defendants and Officer Defendants recklessly re-approved the 20 Loss Loans without regard for appropriate underwriting and credit administration practices, the Bank's written loan policies, federal lending regulations and warnings from the Bank's regulators.

**ANSWER:**

The Giannoulias Defendants admit that the Director Defendants and the Officer Defendants were members of Board of Directors and/or the Bank's Loan Committee and that certain of the Loss Loans were re-approved by certain of the Director Defendants and/or the Officer Defendants. The Giannoulias Defendants deny the remaining allegations in this paragraph.

**ALLEGATION NO. 4:**

In fact, the Director Defendants approved two of the worst Loss Loans on June 24, 2008, after a meeting earlier that same day with the Bank's regulators in which the regulators specifically warned the Director Defendants about the risks that these types of loans posed to the

Bank. That day, the regulators also discussed with the Director Defendants the need to enter into a Memorandum of Understanding with Broadway which would impose restrictions on the Bank designed to stop this type of high-risk lending. In all, the Defendants approved three Loss Loans on or after June 24, 2008, which caused over $20 million in losses to the Bank, and were among the largest Loss Loans approved by the Defendants.

**ANSWER:**

The Giannoulias Defendants admit that two of the Loss Loans were approved on or around June 24, 2008 and that the Director Defendants met with the Bank's regulators on or around June 24, 2008, during which a draft Memorandum of Understanding was discussed. The Giannoulias Defendants are without knowledge or information sufficient to form a belief as to the alleged losses from the Loss Loans, but the Giannoulias Defendants deny that they caused any of the alleged losses. The Giannoulias Defendants deny the remaining allegations in this paragraph.

**ALLEGATION NO. 5:**

On April 23, 2010, the Illinois Department of Financial and Professional Regulation ("IDFPR") closed Broadway and appointed the FDIC as Receiver. At failure, the Bank's assets were $1.06 billion. The estimated loss to the FDIC's Deposit Insurance Fund from the Bank's failure is $391.4 million.

**ANSWER:**

The Giannoulias Defendants admit that the IDFPR closed the Bank on April 23, 2010, which, upon information and belief, had approximately $1.06 billion in assets, and appointed the FDIC as Receiver. The Giannoulias Defendants are without knowledge or information sufficient to form a belief as to the alleged loss to the FDIC's Deposit Insurance Fund. The Giannoulias Defendants deny that they caused any of the alleged losses. The Giannoulias Defendants deny all remaining allegations in this paragraph.

## II.    PARTIES

**ALLEGATION NO. 6:**

The FDIC is a corporation organized and existing under the laws of the United States of America.  12 U.S.C. § 1811, et seq.  The FDIC is an instrumentality of the United States of America and is charged with, among other things, the orderly liquidation of failed financial institutions.  Pursuant to 12 U.S.C. §1821(d)(2), the FDIC as Receiver succeeds to all of the rights, powers and privileges of the insured institution as well as the rights of any stockholder, member, account holder, depositor or officer or director with respect to the assets of the institution.

**ANSWER:**

The Giannoulias Defendants admit only that this paragraph purports to summarize the organization, existence and powers of the FDIC pursuant to 12 U.S.C. § 1811, et seq.  The Giannoulias Defendants deny any allegations in this paragraph that are different from, contrary to and/or which seek to characterize or draw legal conclusions from the express terms of 12 U.S.C. § 1811, et seq.  The Giannoulias Defendants further admit only that this paragraph attempts to summarize the powers of the FDIC-R pursuant to 12 U.S.C. § 1821(d)(2).  The Giannoulias Defendants deny all allegations in this paragraph that are different from, contrary to and/or which seek to characterize or draw legal conclusions from the express terms of 12 U.S.C. § 1821(d)(2).

**ALLEGATION NO. 7:**

Broadway was a state-chartered, nonmember bank established by the IDFPR and insured by the FDIC.  Broadway was a wholly-owned subsidiary of Broadway Bancorp, Inc.  The Bank's principal place of business was Chicago, Illinois.

**ANSWER:**

The Giannoulias Defendants admit the allegations in this paragraph.

4

**THE DIRECTOR DEFENDANTS**

**ALLEGATION NO. 8:**

Demetris Giannoulias was the Bank's President and Chief Executive Officer (from 2006 through closure) and a member of its Board of Directors (from 1994 through closure). From 2005 through closure, he also was a member of the Loan Committee. Demetris Giannoulias approved each of the 20 Loss Loans.

**ANSWER:**

The Giannoulias Defendants admit that Demetris Giannoulias was the Bank's President and Chief Executive Officer from approximately 2006 through the Bank's closure and a director from approximately 1994 through the Bank's closure. The Giannoulias Defendants admit that Demetris Giannoulias was a member of the Bank's Loan Committee from approximately 2005 through sometime in 2009 or 2010. The Giannoulias Defendants are without knowledge or information sufficient to form a belief as to whether Demetris Giannoulias approved each of the 20 Loss Loans because they are not in possession of materials that would permit them to admit or deny such allegations. The Giannoulias Defendants deny the remaining allegations in this paragraph.

**ALLEGATION NO. 9:**

George Giannoulias was a member of the Bank's Board of Directors (from 1999 through closure). In 2006, he became Chairman of the Board of Directors. From 2005 through closure, he also was a member of the Loan Committee. George Giannoulias approved each of the 20 Loss Loans.

**ANSWER:**

The Giannoulias Defendants admit that George Giannoulias was a director from approximately 1999 through the Bank's closure, was a member of the Bank's Loan Committee from approximately 2005 through the Bank's closure, and was Chairman of the Bank's Board of Directors since approximately 2006. The Giannoulias Defendants are without knowledge or information sufficient to form a belief as to whether George Giannoulias approved each of the 20

5

Loss Loans because they are not in possession of materials that would permit them to admit or deny such allegations. The Giannoulias Defendants deny the remaining allegations in this paragraph.

## ALLEGATION NO. 10:

James McMahon was a member of Broadway's Board of Directors from 2003 through December 22, 2008. As a member of the Board, McMahon approved four of the Loss Loans, including the $28 million loan to Normandy Shores, LLC, which caused over $19 million in losses to the Bank. Despite his Board responsibilities, McMahon repeatedly missed critical Board meetings.

## ANSWER:

The Giannoulias Defendants state that, upon information and belief, James McMahon was a director from approximately 2003 through approximately late 2008. The Giannoulias Defendants are without knowledge or information sufficient to form a belief as to whether James McMahon approved four of the Loss Loans because they are not in possession of materials that would permit them to admit or deny such allegations. The Giannoulias Defendants deny the remaining allegations in this paragraph.

## ALLEGATION NO. 11:

Sean Conlon was a member of Broadway's Board of Directors from 2005 through December 22, 2009. As a member of the Board, Conlon approved the 15 Loss Loans that were presented to the Board during his tenure.

## ANSWER:

The Giannoulias Defendants state that, upon information and belief, Sean Conlon was an outside director from approximately 2005 through approximately late 2009. The Giannoulias Defendants are without knowledge or information sufficient to form a belief as to whether Sean Conlon approved 15 of the Loss Loans because they are not in possession of materials that would permit them to admit or deny such allegations. The Giannoulias Defendants deny the remaining allegations in this paragraph.

**ALLEGATION NO. 12:**

Steven Dry was a member of Broadway's Board of Directors from 2005 through closure. As a member of the Board, Dry approved the 15 Loss Loans that were presented to the Board during his tenure.

**ANSWER:**

The Giannoulias Defendants state that, upon information and belief, Steven Dry was an outside director from approximately 2005 through the Bank's closure. The Giannoulias Defendants are without knowledge or information sufficient to form a belief as to whether Steven Dry approved 15 of the Loss Loans because they are not in possession of materials that would permit them to admit or deny such allegations. The Giannoulias Defendants deny the remaining allegations in this paragraph.

**ALLEGATION NO. 13:**

Donna Zagorski was a member of Broadway's Board of Directors from 2006 through closure. As a member of the Board, Zagorski approved the 14 Loss Loans that were presented to the Board during her tenure.

**ANSWER:**

The Giannoulias Defendants state that, upon information and belief, Donna Zagorski was an outside director from approximately 2006 through the Bank's closure. The Giannoulias Defendants are without knowledge or information sufficient to form a belief as to whether Donna Zagorski approved 14 of the Loss Loans because they are not in possession of materials that would permit them to admit or deny such allegations. The Giannoulias Defendants deny the remaining allegations in this paragraph.

**ALLEGATION NO. 14:**

Steven Balourdos was a member of Broadway's Board of Directors from 2006 through closure. As a member of the Board, Balourdos approved the 14 Loss Loans that were presented to the Board during his tenure.

**ANSWER:**

The Giannoulias Defendants state that, upon information and belief, Steven Balourdos was an outside director from approximately 2006 through approximately early 2010. The Giannoulias Defendants deny that Steven Balourdos was an outside director at the time of the Bank's closure. The Giannoulias Defendants are without knowledge or information sufficient to form a belief as to whether Steven Balourdos approved 14 of the Loss Loans because they are not in possession of materials that would permit them to admit or deny such allegations. The Giannoulias Defendants deny the remaining allegations in this paragraph.

## THE OFFICER DEFENDANTS

### ALLEGATION NO. 15:

Gloria Sguros was a Vice-President for Lending at Broadway from 2005 through closure. During that same period, she was a member of the Loan Committee and, in that position, approved all of the Loss Loans.

**ANSWER:**

The Giannoulias Defendants state that, upon information and belief, Gloria Sguros was a Vice-President of Lending at the Bank from approximately 2005 through approximately 2008 or 2009 and that she was a member of the Loan Committee during much of that time period. The Giannoulias Defendants are without knowledge or information sufficient to form a belief as to whether Gloria Sguros approved each of the 20 Loss Loans because they are not in possession of materials that would permit them to admit or deny such allegations. The Giannoulias Defendants deny the remaining allegations in this paragraph.

### ALLEGATION NO. 16:

Anthony D'Costa was a Vice-President for Lending at Broadway from 2005 through closure. In 2006, he became a member of the Loan Committee. He approved each of the Loss Loans considered by the Loan Committee while he was a member, with the exception of the Water Street Realty Loan on which he did not express an opinion.

**ANSWER:**

The Giannoulias Defendants state that, upon information and belief, Anthony D'Costa was a Vice-President for Lending at the Bank from approximately 2005 or 2006 through the Bank's closure and a member of the Loan Committee. The Giannoulias Defendants are without knowledge or information sufficient to form a belief as to whether Anthony D'Costa approved each of the 20 Loss Loans (with the exception of Water Street Realty) because they are not in possession of materials that would permit them to admit or deny such allegations. The Giannoulias Defendants deny the remaining allegations in this paragraph.

### III.   JURISDICTION AND VENUE

**ALLEGATION NO. 17:**

The Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1345.

**ANSWER:**

The Giannoulias Defendants admit that this Court has subject matter jurisdiction over this matter.

**ALLEGATION NO. 18:**

Venue is proper in this district under 28 U.S.C. § 1391(b).

**ANSWER:**

The Giannoulias Defendants admit that venue is proper in this district.

**ALLEGATION NO. 19:**

The Court has personal jurisdiction over Defendants under 735 ILCS § 5/2-209, *et seq*.

**ANSWER:**

The Giannoulias Defendants admit that this Court has personal jurisdiction over them.

## IV.    BACKGROUND FACTS

### A.    Introduction

**ALLEGATION NO. 20:**

From 2000 through 2009, Broadway's assets grew by more than 500 percent. This explosive growth was fueled by an unsustainable expansion of the Bank's CRE and ADC loans far in excess of the Bank's peer group. These types of loans, which are highly sensitive to market fluctuations, require close monitoring, lending expertise and respect for lending risk. None of these were present at Broadway Bank.

**ANSWER:**

The Giannoulias Defendants admit that the Bank's assets grew from 2000 through 2009. Answering further, the Giannoulias Defendants admit that CRE and ADC loans generally require monitoring, lending expertise, and awareness of lending risk. The Giannoulias Defendants are without knowledge or information sufficient to form a belief as to the percentage growth of the Bank's assets. The Giannoulias Defendants deny the remaining allegations in this paragraph.

**ALLEGATION NO. 21:**

Regarding the 20 Loss Loans at issue, Defendants failed to implement procedures that would have lessened the risks of the Bank's lending practices. Underwriting was perfunctory or non-existent. Limits on loan to value ratios repeatedly were ignored. Loans were made without appraisals or with grossly deficient appraisals. Construction draws were used for improper purposes with little or no active monitoring by the Bank. Little or no attention was paid to whether loan guarantors had sufficient liquidity to protect the Bank's interest. Loans were made to uncreditworthy borrowers with a history of bad loans - - in some cases with Broadway itself. In some instances, loans were made to assist other financial institutions avoid regulatory intervention or loss recognition.

**ANSWER:**

The Giannoulias Defendants deny the allegations in this paragraph.

### B.    The Bank's Loan Policy

**ALLEGATION NO. 22:**

Broadway's loan policy (the "Loan Policy") required diligent underwriting in conformity with state and federal law, close monitoring of concentrations of credit and rigorous documentation and prudent evaluation of borrower and project risk. In approving the Loss

Loans, however, Defendants routinely ignored and repeatedly failed to enforce the Loan Policy's provisions. The Bank's loan approval policies and procedures also were frequently bypassed.

**ANSWER:**

The Giannoulias Defendants admit that the Bank had a loan policy, and that the Loan Policy required underwriting in conformity with state and federal law, monitoring of concentrations of credit and documentation and evaluation of borrower and project risk. The Giannoulias Defendants deny the remaining allegations in this paragraph.

C.     **Broadway's Regulatory History**

**ALLEGATION NO. 23:**

Defendants were warned by state and federal bank examiners of the significant weaknesses in Broadway's lending and loan administration practices. The criticisms and warnings had no effect on the approval of the 20 Loss Loans.

**ANSWER:**

The Giannoulias Defendants admit that the Bank, at times, received comments concerning its lending and loan administration practices from state and federal bank examiners.

The Giannoulias Defendants deny the remaining allegations in this paragraph.

**The January 2007 Examination**

**ALLEGATION NO. 24:**

In January 2007, IDFPR examined Broadway's condition as of September 30, 2006. In the Report of Examination ("RoE"), the examiners noted their concern with the Bank's increasing concentrations in "construction and development, total out-of-area, State of New York, collateral type [hotel/motel] and relationship" loans. Examiners also noted weaknesses in loan administration and underwriting, including failing to obtain current financial statements from borrowers and the failure to obtain global cash flow analyses from borrowers with multiple loans. Additionally, the examiners criticized Broadway's Allowance for Loan and Lease Losses ("ALLL") methodology for failing to include an impairment analysis and failing to downgrade loans that were classified at previous examinations. The regulators concluded that Defendants' failure to ensure accurate ALLL calculations overstated the Bank's financial performance.

**ANSWER:**

The Giannoulias Defendants admit that, in approximately January 2007, IDFPR examined the Bank's condition as of September 30, 2006. The Giannoulias Defendants state that the 2007 ROE is the best evidence of its contents and deny the remaining allegations in this paragraph that are contrary thereto.

**ALLEGATION NO. 25:**

As part of the January 2007 examination, state regulators made several recommendations to enhance risk management practices and maintain more accurate reporting procedures. Defendants ignored these recommendations. In March 2007, the regulators met with management to discuss the examination findings. In April 2007, the RoE was provided to the Board of Directors.

**ANSWER:**

The Giannoulias Defendants admit that, as part of the 2007 examination, IDFPR made certain recommendations to enhance risk management practices and reporting procedures. The Giannoulias Defendants state that the 2007 ROE is the best evidence of its contents and deny the allegations in the first sentence of this paragraph that are contrary thereto. Answering further, the Giannoulias Defendants admit that the regulators met with the Bank's management to discuss the examination findings and that the ROE was provided to the Board of Directors in approximately April 2007. The Giannoulias Defendants are without knowledge or information sufficient to form a belief as to when the regulators met with the Bank's management to discuss the examination findings.

**The March 2008 Examination**

**ALLEGATION NO. 26:**

In March 2008, the FDIC and IDFPR conducted a joint investigation of the Bank's condition as of December 31, 2007.

**ANSWER:**

The Giannoulias Defendants admit that in approximately March 2008, the FDIC and IDFPR conducted a joint investigation of the Bank's condition as of December 31, 2007.

**ALLEGATION NO. 27:**

The regulators again found the Bank's overall condition less than satisfactory and criticized the deteriorating quality of the Bank's assets. They also criticized the Bank's inadequate loan review and watch-list programs, its ALLL methodology and its failure to improve credit risk management practices, including failing to properly identify and report developing risks and downgrade credit ratings in a timely manner.

**ANSWER:**

The Giannoulias Defendants state that the 2008 ROE is the best evidence of its contents and deny the allegations in this paragraph that are contrary thereto.

**ALLEGATION NO. 28:**

The criticism of the ALLL calculations once again suggested that the Defendants were understating the losses imbedded in the Bank's portfolio. Based on the Bank's deficiencies, the examiners required a $5.1 million adjustment to the ALLL, as of April 30, 2008.

**ANSWER:**

The Giannoulias Defendants state that the 2008 ROE is the best evidence of its contents and deny the allegations in the first sentence in this paragraph that are contrary thereto. Upon information and belief, the Giannoulias Defendants admit that the examiners requested a $5.1 million adjustment to ALLL, as of approximately April 30, 2008. The Giannoulias Defendants deny the remaining allegations in this paragraph.

**ALLEGATION NO. 29:**

On June 24, 2008, federal and state regulators met with the Board of Directors to discuss the regulators' concerns. At that meeting, regulators discussed with the Board a draft Memorandum of Understanding ("MOU"), which directed the Bank to take steps to improve its lending operations and to reduce risk in its loan portfolio. The regulators provided a sustained and constructive critique of the Bank's operations and, through the MOU, sought a written commitment from Defendants to address the criticisms and reduce the Bank's excessive risk-taking.

**ANSWER:**

The Giannoulias Defendants admit that the Bank's Board of Directors met with federal and state regulators to discuss the regulators' joint investigation on or around June 24, 2008 and that a draft Memorandum of Understanding was discussed. The Giannoulias Defendants state that the draft Memorandum of Understanding is the best evidence of its contents and deny all of the remaining allegations in this paragraph that are contrary thereto. The Giannoulias Defendants deny the remaining allegations in this paragraph.

**ALLEGATION NO. 30:**

Defendants ignored the regulators. Indeed, immediately following the June 24, 2008 meeting, the Board of Directors approved two grossly imprudent loans which resulted in losses to the Bank of approximately $12 million.

**ANSWER:**

The Giannoulias Defendants admit that two of the Loss Loans were approved on or around June 24, 2008. The Giannoulias Defendants are without knowledge or information sufficient to form a belief as to the alleged loss from these two Loss Loans, but the Giannoulias Defendants deny that they caused the alleged losses. The Giannoulias Defendants deny the remaining allegations in this paragraph.

**2008 Visitations and Communications**

**ALLEGATION NO. 31:**

In a July 22, 2008 communication to the Board of Directors, the FDIC warned that a high volume of adversely classified ADC loans in the Bank's portfolio, primarily related to projects located in Florida, had eroded Broadway's earnings and undermined its capital.

**ANSWER:**

The Giannoulias Defendants are without knowledge or information sufficient to form a belief as to July 22, 2008 communication referred to in this paragraph.

**ALLEGATION NO. 32:**

On September 17, 2008, Broadway entered into the MOU to address the weaknesses noted in the March 2008 examination. The MOU required a workout plan for classified assets, development of a sound loan review and grading system, more accurate charge-off losses and special mention deficiencies, complete loan documentation (including global cash flows for borrowers with multiple loans or projects) and provisions for loan and lease losses and ongoing review of ALLL adequacy. Defendants ignored the MOU's requirements.

**ANSWER:**

The Giannoulias Defendants admit that the Bank entered into a Memorandum of Understanding in the Fall of 2008. The Giannoulias Defendants state the Memorandum of Understanding is the best evidence of its contents and deny the allegations in the second sentence in this paragraph that are contrary thereto. The Giannoulias Defendants deny the remaining allegations in this paragraph.

**ALLEGATION NO. 33:**

On December 16, 2008, as a result of the significant deterioration of Broadway's assets, IDFPR and the FDIC conducted a joint visitation. The regulators concluded that the deterioration of Broadway's assets was continuing and noted a dramatic increase in loan delinquencies in October 2008 and November 2008 as a result of grossly improvident transactions approved by Defendants, notwithstanding regulatory criticisms.

**ANSWER:**

The Giannoulias Defendants admit that the IDFPR and the FDIC conducted a joint visitation in late 2008. The Giannoulias Defendants are without knowledge or information sufficient as to form a belief as what the regulators concluded, but the Giannoulias Defendants deny the existence of any grossly improvident transactions approved by the Giannoulias Defendants in contravention of any regulatory criticisms. The Giannoulias Defendants deny the remaining allegations in this paragraph.

**The April 2009 Examination**

**ALLEGATION NO. 34:**

In April 2009, the FDIC and IDFPR jointly examined Broadway's condition as of March 31, 2009. The regulators found the Bank to be deeply troubled and examiners informed the Board of Directors that (a) the Bank's asset quality was critically deficient; (b) adverse classifications were at unacceptable levels; (c) the Bank's internal grading system was inadequate and understated the nature of the Bank's problems; (d) the Bank's underwriting was substandard and the loan files were grossly incomplete; (e) management had not adequately analyzed or monitored the Bank's securities portfolio; and (f) the Loan Committee failed to keep accurate minutes of its deliberations. The regulators again noted that Defendants had not properly computed ALLL reserves and ordered a $19 million adjustment. The regulators concluded that "management performance is deficient" and that Defendants' failure to recognize and curtail risk was a significant cause of the Bank's poor financial condition.

**ANSWER:**

The Giannoulias Defendants admit that, in approximately April 2009, the IDFPR and the FDIC examined the Bank's condition as of March 31, 2009. The Giannoulias Defendants state the 2009 ROE is the best evidence of its contents and deny the remaining allegations in this paragraph that are contrary thereto.

**ALLEGATION NO. 35:**

On July 20, 2009, regulators informed the Board that Broadway was undercapitalized. On February 4, 2010, regulators informed the Board that Broadway's capital level had dropped to significantly undercapitalized. On April 23, 2010, Broadway was closed by the IDFPR and the FDIC was appointed receiver.

**ANSWER:**

The Giannoulias Defendants admit that the regulators informed the Bank's Board of Directors that the Bank was undercapitalized in the second half of 2009. The Giannoulias Defendants admit that the regulators informed the Bank's Board of Directors that the Bank's capital level had dropped in approximately the First Quarter of 2010. The Giannoulias Defendants admit that the Bank was closed by the IDFPR on April 23, 2010, at which time the

FDIC was appointed receiver. The Giannoulias Defendants deny the remaining allegations in this paragraph.

**D.**     **The Loss Loans and the Damage They Caused**

**ALLEGATION NO. 36:**

The loans made and approved by Defendants caused significant injury to the Bank. The following table lists 20 such Loss Loans and identifies the Officer Defendants and Director Defendants who voted to approve each loan.

| Loss Loan | D. Giannoulias | G. Giannoulias | Balourdos | Conlon | Dry | McMahon | Zagorski | Sguros | D'Costa |
|---|---|---|---|---|---|---|---|---|---|
| 1.  Gold Johnson Hold. LLC | X | X | X | X | X |  | X | X | X |
| 2.  Wilshire Blvd. BH, LLC | X | X | X | X | X |  | X | X | X |
| 3.  Federal Street L.A. LLC | X | X | X | X | X |  | X | X | X |
| 4.  Water Street Realty Group, LLC | X | X | X | X | X | X | X | X |  |
| 5.  Southside House LLC* | X | X |  |  |  |  |  | X | X |
| 6.  625 W. Div. Condos, LP* | X | X |  |  |  |  |  | X | X |
| 7.  Shubh Oceanic LLC* | X | X |  |  |  |  |  | X | X |
| 8.  Prospect R. Equities LLC | X | X | X | X | X |  | X | X | X |
| 9.  Prospect R. Equities LLC | X | X | X | X | X |  | X | X | X |
| 10. ASAT, Inc. | X | X | X | X | X |  | X | X | X |
| 11. 261 E. 78 Realty Corp. | X | X | X | X | X |  | X | X | X |
| 12. Lynn & Anderson Homes, LLC | X | X | X | X | X | X | X | X | X |
| 13. Shubh Hotels S. LLC | X | X | X | X | X |  | X | X | X |
| 14. Shubh Boca Condo LLC | X | X | X | X | X |  | X | X | X |
| 15. Lawrence Prop. LLC* | X | X |  |  |  |  |  | X | X |
| 16. John R. DeSilva | X | X | X | X | X |  | X | X | X |
| 17. 4750 N. Winthrop* | X | X |  |  |  |  |  | X | X |
| 18. The Bedford Lofts LLC | X | X | X | X | X |  | X | X | X |
| 19. Krieger SPE, LLC | X | X | X | X | X | X | X | X | X |
| 20. Normandy Shores LLC | X | X |  | X | X | X |  | X |  |

*Loan approved by Loan Committee only; no Board of Directors approval required.*

**ANSWER:**

The Giannoulias Defendants admit only that the allegations in this paragraph attempt to tabulate certain loans made by Broadway Bank and the persons who approved those loans. The Giannoulias Defendants are without knowledge or information sufficient to form a belief as to which Officer Defendants or Director Defendants approved the Loss Loans because they are not in possession of materials that would permit them to admit or deny such allegations. The Giannoulias Defendants deny the remaining allegations in this paragraph.

**ALLEGATION NO. 37:**

With regard to these loans, Defendants routinely failed to assess the repayment abilities of borrowers and guarantors, relied excessively on brokered deposits to finance the expanding loan portfolio, violated the Bank's loan policies, allowed use of interest reserves without adequately considering borrowers' repayment abilities, made out-of-territory loans without sufficient staff to monitor performance, failed to monitor the use of loan funds, and renewed loans without adequate underwriting or obtaining sufficient security. The Loss Loans were made in violation of the general safety and soundness standards of 12 C.F.R. §364.101, Appendix A, the general underwriting standards of 12 C.F.R. §364.101, Appendix A and the real estate lending standards of 12 C.F.R. §365.2, Appendix A. Much of this imprudent lending occurred after the real estate market began its precipitous decline.

**ANSWER:**

The Giannoulias Defendants deny the allegations in this paragraph.

**ALLEGATION NO. 38:**

The Bank repeatedly understated the losses imbedded in its portfolio by manipulation of loss reserves, overstating income and engaging in transactions designed to artificially remove non-performing assets from the Bank's balance sheet.

**ANSWER:**

The Giannoulias Defendants deny the allegations in this paragraph.

**ALLEGATION NO. 39:**

The indiscriminate use of interest reserves funded by loan proceeds gave the appearance that the loans were performing when, in fact, the interest payments came only from the Bank. Few of these borrowers or guarantors contributed their own funds to reduce the debt or meet interest obligations. The risk of these transactions was borne almost entirely by the Bank.

**ANSWER:**

The Giannoulias Defendants deny the allegations in this paragraph.

**ALLEGATION NO. 40:**

The current estimated losses from the 20 Loss Loans total approximately $114 million.

**ANSWER:**

The Giannoulias Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph. The Giannoulias Defendants deny that they caused the alleged losses for the 20 Loss Loans.

### Wilshire Blvd. BH, LLC

**ALLEGATION NO. 41:**

In May 2008, Officer Defendants Sguros and D'Costa and Director Defendants Demetris Giannoulias and George Giannoulias, as members of the Loan Committee, approved a one-year $22.04 million interest-only loan to Wilshire Blvd. BH, LLC, guaranteed by Hagop Sarisian. The purpose of the loan was to refinance the land loan on a vacant site in Beverly Hills, California and to provide funds to redevelop the property into a luxury condominium with retail space and parking. The interest payments were funded by an interest reserve created by the loan's proceeds. On June 24, 2008, the Board of Directors, including Demetris Giannoulias, George Giannoulias, Balourdos, Conlon, Dry and Zagorski, approved the loan *immediately* following a meeting with federal regulators that sharply criticized the making of such loans.

**ANSWER:**

The Giannoulias Defendants admit that a one-year approximately $22.04 million interest-only loan was approved on or around June 24, 2008 and that this loan was guaranteed by Hagop Sarisian. The Giannoulias Defendants admit that the purpose of the loan included refinancing a development site in Beverly Hills, California and providing funds to redevelop the property into a condominium with retail space and parking. The Giannoulias Defendants admit that interest payments were originally to be made from an interest reserve funded by the loan proceeds but deny that there was anything improper or imprudent with this arrangement. The Giannoulias Defendants are without knowledge or information sufficient to form a belief as to the

composition of the Loan Committee or the Board with respect to the approval of this loan because they are not in possession of materials that would permit them to admit or deny such allegations. The Giannoulias Defendants admit that they met with federal regulators on or around June 24, 2008. The Giannoulias Defendants deny the remaining allegations in this paragraph.

**ALLEGATION NO. 42:**

The Officer Defendants and Director Defendants caused this loan to be made at the request of Connaught Real Estate Finance ("CREF") of which Director Defendant Conlon was a major shareholder. CREF loaned Wilshire Blvd. BH, LLC an additional $6.8 million; it was essential to CREF's financial interests that Broadway make the loan. Despite his interest in CREF and CREF's interest in Wilshire Blvd., Defendant Conlon did not recuse himself from the Bank's approval process and voted to approve the loan.

**ANSWER:**

The Giannoulias Defendants admit that CREF approached the Bank about a loan to Wilshire Blvd. BH, LLC and that CREF loaned approximately $6.8 million to Wilshire Blvd. BH, LLC. The Giannoulias Defendants further deny that the loan was essential to CREF's financial interests that the Bank make the loan. The Giannoulias Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegation that Defendant Conlon owned an interest in CREF. The Giannoulias Defendants further are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph because they are not in possession of materials that would permit them to admit or deny such allegations.

**ALLEGATION NO. 43:**

The making of this loan and the Federal Street loan on the heels of the June 24, 2008 meeting with federal and state regulators reflects Defendants' disdain for the regulatory process and disregard for the regulators' expressed concern that Defendants' conduct jeopardized the Bank's safety and soundness.

**ANSWER:**

The Giannoulias Defendants deny the allegations in this paragraph.

**ALLEGATION NO. 44:**

The loan had numerous other deficiencies including, but not limited to, the following:

a.  Defendants caused the loan to be made even though there had been a major downturn in southern California's housing market, which was expected to further deteriorate, causing collateral values to plummet.

b.  Defendants failed to require proper underwriting. The borrower had no ability to repay the loan. The guarantor's finances were not verified. His self-prepared financial statement showed that most of his assets were illiquid. In violation of the Bank's loan policy, he did not provide his 2005 or 2007 tax returns. In violation of the Bank's loan policy, a credit report was not obtained.

c.  The loan evidenced Defendants' repeated disregard of regulatory warnings about the Bank's underwriting and its over-concentration of ADC/CRE out-of-territory loans.

**ANSWER:**

The Giannoulias Defendants deny the allegations in subparagraph (a). The Giannoulias Defendants deny that this loan was approved without proper underwriting. The Giannoulias Defendants deny that the borrower had no ability to repay the loan. The Giannoulias Defendants deny that a credit report was not obtained. The Giannoulias Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in subparagraph (b) because they are not in possession of materials that would permit them to admit or deny such allegations, but deny any suggestion that the Giannoulias Defendants acted improperly or imprudently. The Giannoulias Defendants deny the allegations in subparagraph (c).

**ALLEGATION NO. 45:**

Upon depletion of the interest reserve, the borrower and guarantor defaulted on the loan. The loan went into foreclosure. Defendants took no action to pursue the loan's guarantor to mitigate the Bank's losses.

Case: 1:12-cv-01665 Document #: 229 Filed: 08/08/14 Page 22 of 94 PageID #:3987

**ANSWER:**

The Giannoulias Defendants admit that this loan went into default. The Giannoulias Defendants are without knowledge or information to form a belief as to the depletion of the interest reserve or the foreclosure of the loan because they are not in possession of materials that would permit them to admit or deny such allegations. The Giannoulias Defendants deny the allegations in the third sentence in this paragraph.

**ALLEGATION NO. 46:**

The Bank has sustained estimated damages of $3.4 million plus accrued interest on this loan.

**ANSWER:**

The Giannoulias Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph. The Giannoulias Defendants deny that they caused the alleged damages for this loan.

**Federal Street L.A. LLC**

**ALLEGATION NO. 47:**

In June 2008, Officer Defendants Sguros and D'Costa and Director Defendants Demetris Giannoulias and George Giannoulias, as members of the Loan Committee, approved a one-year $26.88 million interest-only loan to Federal Street L.A. LLC, guaranteed by Michael Winter and Judi Fishman, to acquire and refurbish an apartment building in Los Angeles, California and convert the building to condominiums. The interest payments were to be funded by an interest reserve and cash flow, if any, from the borrower's property. On June 24, 2008, the Board of Directors, including Demetris Giannoulias, George Giannoulias, Balourdos, Conlon, Dry and Zagorski, approved the loan *immediately* following the June 24, 2008 meeting with the state and federal regulators that sharply criticized the making of such loans.

**ANSWER:**

The Giannoulias Defendants admit that a one-year interest-only loan for approximately $26.88 million to Federal Street L.A. LLC was approved on or around June 24, 2008 and that the loan was guaranteed by Michael Winter and Judi Fishman. The Giannoulias Defendants admit

that the loan was supposed to be used for the acquisition of an apartment building in Los Angeles, California. The Giannoulias Defendants admit that interest payments were originally to be made from an interest reserve to be funded by the loan applicant and by the cash flow from the property, but deny that there was anything improper or imprudent with this arrangement. The Giannoulias Defendants are without knowledge or information sufficient to form a belief as to the composition of the Loan Committee or Board with respect to the approval of this loan because they are not in possession of materials that would permit them to admit or deny such allegations. The Giannoulias Defendants admit that they met with federal regulators on or around June 24, 2008. The Giannoulias Defendants deny the remaining allegations in this paragraph.

## ALLEGATION NO. 48:

The making of this loan and the Wilshire Blvd. loan on the heels of the June 24, 2008 meeting with federal and state regulators reflects Defendants' disdain for the regulatory process and disregard for the regulators' expressed concern that Defendants' conduct jeopardized the Bank's safety and soundness.

## ANSWER:

The Giannoulias Defendants deny the allegations in this paragraph.

## ALLEGATION NO. 49:

The loan had numerous other deficiencies including, but not limited to, the following:

a.      Defendants approved the loan without proper underwriting. The borrower did not have the ability to repay the loan. The guarantors did not submit an application; their finances were not verified. Their financial statements showed that the guarantors' assets were illiquid. In violation of the Bank's loan policy, Winter did not provide his 2006 tax returns. Although Winter had other loans at the Bank, he was not required to provide a global cash flow analysis to assess his repayment ability.

b.      Defendants caused the loan to be made on the basis of an "as completed" appraisal instead of the property's value "as is." Had the "as is" value been used, the loan would have violated the loan-to-value ratio required by the Loan Policy.

    c.      The loan evidenced Defendants' disregard of repeated regulatory warnings about the Bank's underwriting and over-concentrations of ADC/CRE out-of-territory loans.

    d.      In August 2009, after the original note had matured, Defendant members of the Loan Committee approved a renewal of the loan even though financial information provided by guarantor Winter demonstrated that his financial condition was deteriorating. Further, several interest payments on this loan had been late and Winter was having difficulty making payments on other of his loans at the Bank. The renewal was made without requiring a new appraisal, despite the continuing downturn in the economy and real estate market.

**ANSWER:**

The Giannoulias Defendants deny that this loan was approved without proper underwriting. The Giannoulias Defendants deny that Winter did not provide his 2006 tax returns. The Giannoulias Defendants deny that Winter did not provide information concerning a global cash flow analysis to the Bank. The Giannoulias Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in subparagraph (a) because they are not in possession of materials that would permit them to admit or deny such allegations, but deny any suggestion that the Giannoulias Defendants acted improperly or imprudently. The Giannoulias Defendants deny the allegations in subparagraph (b). The Giannoulias Defendants deny the allegations in subparagraph (c). The Giannoulias Defendants admit that this loan was renewed. The Giannoulias Defendants deny the characterization of the economy and real estate market in subparagraph (d). The Giannoulias Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in subparagraph (d) because they are not in possession of materials that would permit them to admit or deny such allegations, but deny any suggestion that the Giannoulias Defendants acted improperly or imprudently.

**ALLEGATION NO. 50:**

Within a few months after the loan was renewed, the loan defaulted. No effort was made to pursue either Winter or Fishman as guarantors.

**ANSWER:**

The Giannoulias Defendants admit that this loan went into default but are without knowledge or information sufficient to form a belief as to the time of the default of this loan because they are not in possession of materials that would permit them to admit or deny such allegations. The Giannoulias Defendants deny the allegations in the second sentence in this paragraph.

**ALLEGATION NO. 51:**

The Bank has sustained estimated damages of $8.9 million plus accrued interest on this loan.

**ANSWER:**

The Giannoulias Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph. The Giannoulias Defendants deny that they caused the alleged damages on this loan.

**Loans to Atul Bisaria and Entities He Owned or Controlled**

**ALLEGATION NO. 52:**

In April 2007 and August 2007, Officer Defendants Sguros and D'Costa and Director Defendants Demetris Giannoulias and George Giannoulias, as members of the Loan Committee, approved two loans totaling $26.2 million to Atul Bisaria and entities owned or controlled by him. The loans included an eighteen-month $10.2 million interest-only loan to Shubh Boca Condominium LLC and Bisaria to acquire land and build an office condominium in Boca Raton, Florida, and an eighteen-month $16 million interest-only loan to Shubh Hotels Springdale LLC and Bisaria to refinance and reflag a hotel in Cincinnati, Ohio. The Board of Directors, including Defendants Demetris Giannoulias, George Giannoulias, Balourdos, Conlon, Dry and Zagorski, also approved these loans. The interest payments for each loan were funded by an interest reserve created out of the loan's proceeds.

**ANSWER:**

The Giannoulias Defendants admit that two loans totaling approximately $26.2 million were extended to Atul Bisaria and entities owned or controlled by him in approximately 2007. The Giannoulias Defendants admit that one of these loans was an eighteen-month interest-only loan for approximately $10.2 million to Shubh Boca Condominium LLC, which was supposed to be used to build an office condominium in Boca Raton, Florida. The Giannoulias Defendants admit that the second loan was an eighteen-month interest-only loan for approximately $16 million to Shubh Hotels Springdale, which to be used to refinance and remodel a hotel located in Cincinnati, Ohio. The Giannoulias Defendants are without knowledge or information sufficient to form a belief as to the composition of the Loan Committee or the Board with respect to the approval of these two loan because they are not in possession of materials that would permit them to admit or deny such allegations. The Giannoulias Defendants admit that interest payments on the Shubh Hotels Springdale LLC loan and the Shubh Boca Condominium LLC loan were originally to be made from an interest reserve funded by the loan proceeds but deny that there was anything improper or imprudent with such an arrangement.

**ALLEGATION NO. 53:**

Additionally, in August 2007, Defendant members of the Loan Committee approved a two-year $3.2 million interest-only loan to Shubh Oceanic, LLC, Bisaria, and his wife, ostensibly to purchase a passenger boat and transport it to Mumbai, India, to be used for "special events."

**ANSWER:**

The Giannoulias Defendants admit that a two-year interest-only loan for approximately $3.2 million was approved for Shubh Ocean, LLC, Atul Bisaria, and Mihu Bisaria in approximately 2007. The Giannoulias Defendants admit that this loan was supposed to be used for the acquisition of a passenger boat to be transported to India to be used for private parties and

corporate events.  The Giannoulias Defendants deny any suggestion that there was anything improper or imprudent about this boat loan.

## ALLEGATION NO. 54:

These loans shared numerous deficiencies including, but not limited to, the following:

a.      Defendants approved the loans without proper underwriting.  All three loans were based on the same self-prepared and unaudited financial information for Bisaria, which was incomplete and inadequate.  Bisaria did not submit loan applications for any of the transactions.  His tax returns were incomplete.  The borrowers themselves had no ability to pay down the loans and Bisaria's assets were illiquid.

b.      The loans improperly were approved on the value of the projects "as completed;" if based on the value of the properties "as is," the loans would have exceeded the Loan Policy's permitted loan-to-value ratio.

c.      The loans evidenced Defendants' disregard of repeated regulatory warnings about the Bank's over-concentrations of ADC/CRE out-of-territory loans.

d.      Defendants failed to monitor and administer the loans properly.  Although more than $2.5 million in construction draws were disbursed on the hotel loan, when the Bank inspected the property, no major construction had occurred.

e.      In December 2008, Defendant members of the Loan Committee renewed both the office building and hotel loans for six additional months despite a poor history of loan performance.  New appraisals, updated financials and/or additional collateral were not obtained.

f.      Defendant members of the Loan Committee imprudently increased the boat loan by $200,000 to meet the working capital requirements of Bisaria's hotel business in Detroit, Michigan, without requiring updated financial information or new appraisals.

## ANSWER:

The Giannoulias Defendants deny that the loans were approved without proper underwriting.  The Giannoulias Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in subparagraph (a) because they are not in possession of materials that would permit them to admit or deny such allegations, but deny any suggestion that the Giannoulias Defendants acted improperly or imprudently.  The Giannoulias Defendants deny that the Shubh Boca Condominium loan or the Shubh Oceanic

loan were approved on an "as completed" basis. The Giannoulias Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in subparagraph (b) because they are not in possession of materials that would permit them to admit or deny such allegations, but deny any suggestion that the Giannoulias Defendants acted improperly or imprudently. The Giannoulias Defendants deny the allegations in subparagraph (c). The Giannoulias Defendants deny the allegations in the first sentence in subparagraph (d). The Giannoulias Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in subparagraph (d) because they are not in possession of materials that would permit them to admit or deny such allegations, but deny any suggestion that the Giannoulias Defendants acted improperly or imprudently. The Giannoulias Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in subparagraph (e) because they are not in possession of materials that would permit them to admit or deny such allegations, but deny any suggestion that the Giannoulias Defendants acted improperly or imprudently. The Giannoulias Defendants deny that the Loan Committee acted imprudently with respect to the boat loan. The Giannoulias Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in subparagraph (f) because they are not in possession of materials that would permit them to admit or deny such allegations, but deny any suggestion that the Giannoulias Defendants acted improperly or imprudently.

**ALLEGATION NO. 55:**

In December 2008, when the loans were renewed, Bisaria and entities he owned and controlled had substantial obligations to Mutual Bank of Harvey, Illinois ("Mutual Bank"), an institution on the brink of failure. Ultimately, Bisaria's loans at Mutual Bank defaulted. Defendants undertook insufficient due diligence on these and other of Bisaria's positions at other banks or simply ignored the risk.

**ANSWER:**

The Giannoulias Defendants deny that they undertook insufficient due diligence on Bisaria or that they ignored any risk associated with Bisaria.  The Giannoulias Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph, but deny any suggestion that the Giannoulias Defendants acted improperly or imprudently.

**ALLEGATION NO. 56:**

After the loans were renewed, they went into default.  Defendants took no action to pursue Bisaria.

**ANSWER:**

The Giannoulias Defendants admit that the loans went into default.  The Giannoulias Defendants are without knowledge or information sufficient to form a belief as to when the loans went into default.  The Giannoulias Defendants deny the allegations in the second sentence in this paragraph.

**ALLEGATION NO. 57:**

The Bank has sustained estimated damages of $21.4 million plus accrued interest on these loans.

**ANSWER:**

The Giannoulias Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.  The Giannoulias Defendants deny that they caused the alleged damages on these loans.

**Loans to Yaron Hershco or Entities that He Owned or Controlled**

**(a)     Gold Johnson Holding, LLC**

**ALLEGATION NO. 58:**

In June 2007, Officer Defendants Sguros and D'Costa and Director Defendants Demetris Giannoulias and George Giannoulias, as members of the Loan Committee, approved a one-year $21 million loan to 167 Johnson Street, LLC, which was owned by Yaron Hershco. The Board of Directors, including Defendants Demetris Giannoulias, George Giannoulias, McMahon, Balourdos, Conlon, Dry and Zagorski, also approved the loan.

**ANSWER:**

The Giannoulias Defendants admit that a one-year approximately $21 loan was approved

for 167 Johnson Street, LLC, which was owned by Yaron Hershco, in approximately 2007. The

Giannoulias Defendants are without knowledge or information sufficient to form a belief as to

the composition of the Loan Committee or the Board with respect to the approval of this loan

because they are not in possession of materials that would permit them to admit or deny such

allegations.

**ALLEGATION NO. 59:**

Hershco was one of the Bank's largest borrowers. The purpose of this loan was to refinance the mortgage on vacant land located in Brooklyn, New York, and pay pre-construction expenses to develop a multi-unit rental building on that land.

**ANSWER:**

The Giannoulias Defendants admit that Hershco was one of the Bank's larger borrowers.

The Giannoulias Defendants admit that the purpose of the 167 Johnston Street, LLC loan was to

refinance the mortgage on a development site in Brooklyn, New York and to pay pre-

construction expenses to develop a multi-unit rental building. The Giannoulias Defendants deny

the remaining allegations in this paragraph.

**ALLEGATION NO. 60:**

Defendants approved the loan even though (a) the borrower had no ability to repay the loan and repayment of the loan depended entirely upon the borrower obtaining construction financing (which he never did); (b) the borrower did not provide his 2006 income tax return, a Loan Policy violation; (c) the loan-to-value ratio of the borrower's existing Broadway loan portfolio using "as is" appraisals for the collateral exceeded 98 %, a Loan Policy violation; (d) no global cash flow or global liability analysis was performed, a violation of the Loan Policy; and (e) the borrower's net worth cannot be determined from the loan file, because the borrower's financial statement presented only the "equity" for his holdings, without any detail on the liabilities attached to each of the holdings nor any of the payment obligations for any of these liabilities.

**ANSWER:**

The Giannoulias Defendants admit that the borrower ultimately did not obtain construction financing, but deny that the borrower had no ability to repay the loan when the loan was approved. The Giannoulias Defendants deny the remaining allegations in subparagraph (a). The Giannoulias Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph because they are not in possession of materials that would permit them to admit or deny such allegations, but deny any suggestion that the Giannoulias Defendants acted improperly or imprudently.

**ALLEGATION NO. 61:**

In August, 2007, the Loan Committee (Defendants Sguros, D'Costa, Demetris Giannoulias and George Giannoulias) renewed the loan for one year.

**ANSWER:**

The Giannoulias Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

**ALLEGATION NO. 62:**

Since Herscho [**sic**] never obtained construction financing for the project, the loan went into default.

**ANSWER:**

The Giannoulias Defendants admit that Hershco did not obtain construction financing for this project, but deny that the project went into default because of this.

**ALLEGATION NO. 63:**

To avoid recognizing losses attendant to the loan's nonperformance and to cover up the imprudent initial loan approval, in December 2008, Officer Defendants Sguros and D'Costa and Director Defendants Demetris Giannoulias and George Giannoulias, as members of the Loan Committee, approved the sale of the Hershco note with the Bank providing the financing. The Board of Directors, including Defendants Demetris Giannoulias, George Giannoulias, Balourdos, Conlon, Dry and Zagorski, also approved the transaction.

**ANSWER:**

The Giannoulias Defendants admit that the Hershco note was sold with the Bank providing the financing in approximately 2008. The Giannoulias Defendants deny that this sale was done in order to cover up any imprudent initial loan approval or to avoid recognizing the losses. The Giannoulias Defendants are without knowledge or information sufficient to form a belief as to which Officer Defendants or Director Defendants approved the sale. The Giannoulias Defendants deny the remaining allegations in this paragraph.

**ALLEGATION NO. 64:**

The Bank financed the sale of the note with a new two-year $22.1 million interest-only loan to Gold Johnson Holding, LLC. The loan was approved based on the original appraisal, even though the credit analysis recognized that the property had declined in value significantly.

**ANSWER:**

The Giannoulias Defendants admit that the Bank financed the sale of the note with a two-year approximately $22.1 million interest-only loan to Gold Johnson Holding, LLC. The Giannoulias Defendants deny the remaining allegations in the first sentence in this paragraph. The Giannoulias Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence in this paragraph because they are not in

32

possession of materials that would permit them to admit or deny such allegations, but deny any suggestion that the Giannoulias Defendants acted improperly or imprudently.

**ALLEGATION NO. 65:**

Gold Johnson Holding, LLC was owned or controlled by Sam Chang, one of Broadway's largest borrowers, with loans from the Bank totaling approximately $44 million. Chang was a developer of hotel properties in New York with a history of distressed projects. Chang was experiencing severe difficulties with other banks.

**ANSWER:**

The Giannoulias Defendants admit that Gold Johnson Holding, LLC was owned or controlled by Sam Chang and that Chang was one of the Bank's larger borrowers. The Giannoulias Defendants are without knowledge or information sufficient to form a belief as to the total amount of loans held by Chang at the Bank because they are not in possession of materials that would permit them to admit or deny such allegations. The Giannoulias Defendants admit that Chang was a developer of hotel properties in New York, but deny that he had a history of distressed projects. The Giannoulias Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in the third sentence in this paragraph.

**ALLEGATION NO. 66:**

By December 2008, Chang had substantial outstanding commitments to Mutual Bank that were lurching towards default. Defendants' due diligence on Chang and his relationship to Mutual Bank either was insufficient or Defendants simply ignored the risk.

**ANSWER:**

The Giannoulias Defendants deny that they undertook insufficient due diligence on Chang or that they ignored any risk associated with Chang. The Giannoulias Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph, but deny any suggestion that the Giannoulias Defendants acted improperly or imprudently.

**ALLEGATION NO. 67:**

This loan had numerous other deficiencies including, but not limited to, the following:

a.  Defendants approved the loan without proper underwriting. Gold Johnson Holdings, LLC had no assets with which to pay back the loan. The stated value of Chang's assets did not take into account his compromised financial condition or his multiple loans from Broadway and from other banks.

b.  Defendants approved the loan based on the assumption that Hershco had purchased the rights to additional buildable square footage, increasing the land's value. Defendants, however, performed no due diligence on whether such additional rights were ever obtained. Hershco had not obtained these rights.

c.  In violation of the Loan Policy, Defendants approved the loan before receiving a completed appraisal. When the appraisal was received, it resulted in a loan-to-value ratio in excess of that allowed under the Loan Policy.

d.  Approval of this loan evidenced Defendants' disregard of repeated regulatory warnings about the Bank's underwriting and over-concentrations of ADC/CRE out-of-territory loans.

**ANSWER:**

The Giannoulias Defendants deny that the loan was approved without proper underwriting. The Giannoulias Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in subparagraph (a) because they are not in possession of materials that would permit them to admit or deny such allegations, but deny any suggestion that the Giannoulias Defendants acted improperly or imprudently. The Giannoulias Defendants are unable to answer the allegations in subparagraphs (b) and (c) because it is unclear as to which loan(s) the allegations refer. The Giannoulias Defendants deny the allegations in subparagraph (d).

**ALLEGATION NO. 68:**

In effect, Defendants caused a large, nonperforming loan to be transferred to a borrower with equally poor prospects of repayment. Defendants' initial imprudent approval of the loan to 167 Johnson Street LLC and Hershco ultimately led to the imprudent approval of the loan to Gold Johnson Holding LLC and Chang, which resulted in significant losses to the Bank, as the Board and senior management attempted to avoid the consequences of their initial negligence.

**ANSWER:**

The Giannoulias Defendants deny the allegations in this paragraph.

**ALLEGATION NO. 69:**

The Bank has sustained estimated damages of $11 million plus accrued interest on these loans.

**ANSWER:**

The Giannoulias Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph. The Giannoulias Defendants deny that they caused the alleged damages on these loans.

       **(b)**       **Prospect Equities, LLC**

**ALLEGATION NO. 70:**

In June 2007, the same time that Defendants approved the $21 million loan to Hershco's entity 167 Johnson Street, the Bank made two other loans, totaling $15.5 million, to Hershco and a second Herscho entity, Prospect Equities, LLC. The first loan was an eighteen-month $9 million interest-only loan to purchase raw land in Brooklyn, New York. The second was an eighteen-month $6.5 million revolving line of credit to develop the property. Both loans were collateralized by the raw land. Interest payments were funded by an interest reserve created out of the loan proceeds.

**ANSWER:**

The Giannoulias Defendants admit that the Bank made two loans to Hershco and Prospect Equities, LLC in approximately 2007. The Giannoulias Defendants admit that one of those loans was an eighteen-month approximately $9 million interest-only loan for the acquisition of a development site in Brooklyn, New York. The Giannoulias Defendants deny the remaining allegations in the second sentence in this paragraph. The Giannoulias Defendants admit that the second loan was an eighteen-month approximately $6.5 million revolving line of credit to construct homes in Brooklyn, New York. The Giannoulias Defendants deny the allegations in fourth sentence in this paragraph. The Giannoulias Defendants are without

knowledge or information sufficient to form a belief as to the funding of the interest payments on these loans because they are not in possession of materials that would permit them to admit or deny such allegations, but deny any suggestion that the Giannoulias Defendants acted improperly or imprudently.

## ALLEGATION NO. 71:

Officer Defendants Sguros and D'Costa and Director Defendants Demetris Giannoulias and George Giannoulias, as members of the Loan Committee, approved these loans. The loans also were approved by the Board of Directors, including Defendants Demetris Giannoulias, George Giannoulias, Conlon, Dry, Balourdos, and Zagorski.

## ANSWER:

The Giannoulias Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph because they are not in possession of materials that would permit them to admit or deny such allegations.

## ALLEGATION NO. 72:

These loans had numerous deficiencies including, but not limited to, the following:

a. Defendants approved the loans without proper underwriting. Neither the borrower nor the guarantor submitted adequate financial information or tax returns. Defendants did not verify the assets described in the self-prepared, unaudited financial statements submitted by the borrower and guarantor.

b. Defendants approved the loan even though the loan-to-value ratio did not meet the standards set forth in the Loan Policy.

c. Monitoring of the borrowers' construction draws was inadequate. Virtually all of the construction funds were drawn by the time construction was only 50% complete.

d. In June 2008, the Defendants increased the second note to $7.1 million even though the borrower had sold part of the collateral securing the loan and no new collateral was provided.

e. Defendants renewed the loan in March 2009, even though the borrowers' financial difficulties were known, the project was not completed and the project's value had dramatically decreased.

      f.      Defendants' approval of this loan and renewals evidenced their disregard of repeated regulatory warnings about the Bank's underwriting and loan administration practices and over-concentrations of ADC/CRE out-of-territory loans.

**ANSWER:**

The Giannoulias Defendants deny that the loans were approved without proper underwriting. The Giannoulias Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in subparagraph (a) because they are not in possession of materials that would permit them to admit or deny such allegations, but deny any suggestion that the Giannoulias Defendants acted improperly or imprudently. The Giannoulias Defendants are unable to answer subparagraph (b) because it is unclear as to which loan(s) the allegations refer. The Giannoulias Defendants deny the allegations in the first sentence in subparagraph (c). The Giannoulias Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in subparagraph (c) because they are not in possession of materials that would permit them to admit or deny such allegations, but deny any suggestion that the Giannoulias Defendants acted improperly or imprudently. The Giannoulias Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in subparagraphs (d) and (e) because they are not in possession of materials that would permit them to admit or deny such allegations, but deny any suggestion that the Giannoulias Defendants acted improperly or imprudently. The Giannoulias Defendants deny the allegations in subparagraph (f).

**ALLEGATION NO. 73:**

At maturity, the borrowers defaulted on both loans.

**ANSWER:**

The Giannoulias Defendants admit that the loans went into default but the Giannoulias Defendants are without knowledge or information sufficient to form a belief as to the timing of the default because they are not in possession of materials that would permit them to admit or deny such allegations.

**ALLEGATION NO. 74:**

The Bank has sustained estimated damages of $8.1 million plus accrued interest on these loans.

**ANSWER:**

The Giannoulias Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph. The Giannoulias Defendants deny that they caused the alleged damages on these loans.

      **(c)**      **Water Street Realty Group, LLC**

**ALLEGATION NO. 75:**

In April 2008, with the real estate market in shambles, the Bank made a one-year $8 million loan to Hershco and a third Herscho entity, Water Street Realty Group, LLC. Defendants approved this loan even though at the time, Hershco had five other loans with the Bank with a total principal balance of over $40 million. Much of Hershco's loan portfolio was in distress. Hershco gave no clear or specific purpose for the loan other than for use towards his "future real estate investments."

**ANSWER:**

The Giannoulias Defendants admit that a one-year approximately $8 million loan was made to Hershco and Water Street Realty Group, LLC in approximately 2008. The Giannoulias Defendants deny the characterization of the real estate market in the first sentence in this paragraph. The Giannoulias Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in the second and third sentences in this paragraph because they are not in possession of materials that would permit them to admit or deny such

allegations, but deny any suggestion that the Giannoulias Defendants acted improperly or imprudently. The Giannoulias Defendants admit that this loan was to be used toward future real estate investments, but deny that Hershco gave no clear or specific purpose for this loan.

**ALLEGATION NO. 76:**

The loan was approved by Officer Defendant Sguros and Director Defendants Demetris Giannoulias and George Giannoulias, as members of the Loan Committee; Officer Defendant D'Costa was noted as "absent." The Board of Directors, including Director Defendants Demetris Giannoulias, George Giannoulias, Balourdos, Conlon, Dry, Zagorski and McMahon, also approved the loan.

**ANSWER:**

The Giannoulias Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph because they are not in possession of materials that would permit them to admit or deny such allegations.

**ALLEGATION NO. 77:**

The loan was secured by a second lien on an apartment building in Brooklyn, New York, and a first lien on eight of the units, the value of which was undetermined when the loan closed. Hershco built the project as condominiums but, when the real estate market fell, he began renting the units to generate cash flow. In February, 2009, less than a year after the $8 million loan was made, it became apparent that the value of the collateral was insufficient to protect the Bank.

**ANSWER:**

The Giannoulias Defendants admit that the loan was secured by a second mortgage and assignment of rents on a mixed use development and that the Bank was to receive a first mortgage on eight residential units within that development concurrent with the closing. The Giannoulias Defendants deny the remaining allegations in the first sentence in this paragraph. The Giannoulias Defendants are without knowledge or information sufficient to form a belief as the truth of the remaining allegations in this paragraph, but deny any suggestion that the Giannoulias Defendants acted improperly or imprudently.

**ALLEGATION NO. 78:**

This loan had numerous deficiencies including, but not limited to, the following:

a.    The Loan Committee and Board of Directors approved the loan even though there had been a major downturn in the real estate market. The Bank increased its exposure to a single high-volume borrower at a time when collateral values were plummeting.

b.    The Loan Committee and Board of Directors failed to require proper underwriting. The borrower had insufficient liquid assets with which to repay the loan. The income to be generated from the collateral property was insufficient to service the loan obligations. The calculation of the borrower's cash flow from which the principal and interest was to be paid was based his adjusted gross income, which, given the declining real estate market, similarly was subject to decline. Moreover, the credit analysis did not describe his obligations to other lenders.

c.    The loan was inadequately collateralized. The credit analysis improperly calculated the loan-to-value ratio based on the purported value of the project "as completed." Had the "as is" loan-to-value ratio been used, as it should have, the loan-to-value ratio would have violated the Bank's loan policy and 12 C.F.R. § 365.2, Appendix A. Moreover, the loan-to-value ratio of Hershco's portfolio at Broadway was based on "as completed" values and/or outdated appraisals, which did not reflect the declining real estate market.

d.    The loan presentation did not specify what the money would be used for, saying only that funds would be used for unspecified "future real estate investments." Given the declining real estate market when the loan was made, and the borrower's large preexisting indebtedness to the Bank, this was imprudent.

e.    The loan evidenced the Loan Committee and Board of Directors' repeated disregard of regulatory warnings about the Bank's underwriting and over-concentration of ADC/CRE out-of-territory loans.

**ANSWER:**

The Giannoulias Defendants admit that the loan was approved. The Giannoulias Defendants deny the characterization of the real estate market in the first sentence in subparagraph (a). The Giannoulias Defendants admit that the Bank increased its exposure to this borrower based on this loan, but deny any suggestion that the Giannoulias Defendants acted improperly or imprudently. The Giannoulias Defendants deny the remaining allegations in

subparagraph (a). The Giannoulias Defendants deny that the loan was approved without proper underwriting. The Giannoulias Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in subparagraph (b) because they are not in possession of materials that would permit them to admit or deny such allegations, but deny any suggestion that the Giannoulias Defendants acted improperly or imprudently. The Giannoulias Defendants deny the allegations in the first sentence in paragraph (c). The Giannoulias Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in subparagraph (c) because they are not in possession of materials that would permit them to admit or deny such allegations, but deny any suggestion that the Giannoulias Defendants acted improperly or imprudently. The Giannoulias Defendants deny the allegations in subparagraphs (d) and (e).

**ALLEGATION NO. 79:**

In February 2009, Water Street Realty Group, LLC filed for bankruptcy. The Bank took no efforts to pursue Hershco.

**ANSWER:**

The Giannoulias Defendants admit that Water Street Realty Group, LLC filed for bankruptcy in approximately 2009. The Giannoulias Defendants deny the allegations in the second sentence in this paragraph.

**ALLEGATION NO. 80:**

The Bank has sustained estimated damages of $4.3 million plus accrued interest on this loan.

**ANSWER:**

The Giannoulias Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph. The Giannoulias Defendants deny that they caused the alleged damages on this loan.

**Normandy Shores, LLC**

**ALLEGATION NO. 81:**

In May 2006, Officer Defendant Sguros and Director Defendants Demetris Giannoulias and George Giannoulias, as members of the Loan Committee, approved a two-year $28 million, interest-only loan to Normandy Shores, LLC, guaranteed by Les G. Jones. The Board of Directors, including Defendants Demetris and George Giannoulias, Conlon, McMahon and Dry, also approved the loan. The loan's purpose was to refinance a land loan and development of a townhouse condominium project in Miami Beach, Florida. The first year of interest payments was funded by a loan reserve created out of the loan proceeds.

**ANSWER:**

The Giannoulias Defendants admit that a two-year approximately $28 million loan was approved in approximately 2006 for Normandy Shores, LLC, which was guaranteed by Les G. Jones. The Giannoulias Defendants are without knowledge or information sufficient to form a belief as to the composition of the Loan Committee or the Board with respect to the approval of this loan because they are not in possession of materials that would permit them to admit or deny such allegations. The Giannoulias Defendants admit that the loan was to be used for the development of a townhouse condominium project in Miami Beach, Florida. The Giannoulias Defendants admit that interest payments on this loan were originally to be made from an interest reserve funded by the loan proceeds but deny that there was anything improper or imprudent with such an arrangement. The Giannoulias Defendants deny the remaining allegations in this paragraph.

**ALLEGATION NO. 82:**

The loan had numerous deficiencies including, but not limited to, the following:

a.  Defendants approved the loan without proper underwriting. In violation of the Loan Policy, neither the borrower nor the guarantor submitted a loan application or tax returns. The guarantor's financial information demonstrated that his net worth was limited and generally illiquid. The guarantor (who had lived in Brazil for the preceding five years) did not have the ability to repay the loan.

b.      Defendants caused the loan to be approved even though it was based on the appraised value of the property "as completed" as opposed to its value "as is." Had the "as is" value been used, the loan would have violated the Loan Policy's allowed loan-to-value ratio. Indeed, the "as is" value of the collateral was less than the loan amount.

c.      Even though construction was behind schedule and millions of dollars over budget, Defendants made no effort to protect the Bank either by requiring additional collateral or modifying the loan's terms.

## ANSWER:

The Giannoulias Defendants deny that the loan was approved without proper underwriting and that the guarantor did not have the ability to repay the loan when the loan was approved. The Giannoulias Defendants are without knowledge or information sufficient to form a belief as the truth of the remaining allegations in subparagraph (a) because they are not in possession of materials that would permit them to admit or deny such allegations, but deny any suggestion that the Giannoulias Defendants acted improperly or imprudently. The Giannoulias Defendants are without knowledge or information sufficient to form a belief as the truth of the allegations in subparagraph (b) because they are not in possession of materials that would permit them to admit or deny such allegations, but deny any suggestion that the Giannoulias Defendants acted improperly or imprudently. The Giannoulias Defendants deny that they took no effort to protect the Bank. The Giannoulias Defendants are without knowledge or information sufficient to form a belief as the truth of the remaining allegations in subparagraph (c) because they are not in possession of materials that would permit them to admit or deny such allegations, but deny any suggestion that the Giannoulias Defendants acted improperly or imprudently.

## ALLEGATION NO. 83:

When the interest reserve was depleted, the loan went into default. Defendants did not pursue the guarantor to mitigate the Bank's losses.

**ANSWER:**

The Giannoulias Defendants are without knowledge or information sufficient to form a belief as to the depletion of the interest reserve or the default of the loan because they are not in possession of materials that would permit them to admit or deny such allegations. The Giannoulias Defendants deny the allegations in the second sentence in this paragraph.

**ALLEGATION NO. 84:**

The Bank has sustained estimated damages of $19.4 million plus accrued interest on this loan.

**ANSWER:**

The Giannoulias Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph. The Giannoulias Defendants deny that they caused the alleged damages on this loan.

**ASAT, Inc.**

**ALLEGATION NO. 85:**

In May 2007, Officer Defendants Sguros and D'Costa and Director Defendants Demetris Giannoulias and George Giannoulias, as members of the Loan Committee, approved a two-year $12.7 million interest-only construction loan to ASAT, Inc. and Mohammed Siddiqui. The Board of Directors, including Defendants Demetris Giannoulias and George Giannoulias, Balourdos, Conlon, Dry and Zagorski, also approved the loan. The loan's purpose was to develop a mixed-use building in Chicago. The interest payments were funded by an interest reserve created out of the loan proceeds.

**ANSWER:**

The Giannoulias Defendants admit that a two-year approximately $12.7 million interest-only construction loan was approved in approximately 2007 for ASAT, Inc. and Mohammed Siddiqui. The Giannoulias Defendants are without knowledge or information sufficient to form a belief as to the composition of the Loan Committee or the Board with respect to the approval of this loan because they are not in possession of materials that would permit them to admit or deny

such allegations.  The Giannoulias Defendants admit the allegations in the third sentence in this

paragraph.  The Giannoulias Defendants admit that interest payments on this loan were originally

to be made from an interest reserve funded by the loan proceeds but deny that there was anything

improper or imprudent with such an arrangement.

## ALLEGATION NO. 86:

The loan had numerous deficiencies including, but not limited to, the following:

a.   Defendants approved the loan without proper underwriting.  The borrowers did not submit a loan application.  Siddiqui's unaudited, self-prepared financial statements contained little detail; his tax returns lacked information about his business income.  The borrowers were not required to provide global cash flow analyses.

b.   When the interest reserve funded by the loan was depleted, the loan went into default.  Construction draws continued to be funded even though the borrower was in default, the loan had not yet been renewed, and it was evident that the Bank would not be repaid.

c.   In August 2009, three months after the borrower's default, the loan was renewed without an updated appraisal despite the borrowers' obviously deteriorating financial conditions and the deterioration of the real estate market.

d.   The loan and its imprudent renewal evidenced Defendants' disregard for repeated regulatory warnings about the Bank's loan administration practices.

## ANSWER:

The Giannoulias Defendants deny that the loan was approved without proper

underwriting.  The Giannoulias Defendants are without knowledge or information sufficient to

form a belief as to the truth of the remaining allegations in subparagraph (a) because they are not

in possession of materials that would permit them to admit or deny such allegations, but deny

any suggestion that the Giannoulias Defendants acted improperly or imprudently.    The

Giannoulias Defendants are without knowledge or information sufficient to form a belief as to

the truth of the allegations in subparagraph (b) because they are not in possession of materials

that would permit them to admit or deny such allegations, but deny any suggestion that the

Giannoulias Defendants acted improperly or imprudently. The Giannoulias Defendants deny the characterization of the real estate market in subparagraph (c). The Giannoulias Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in subparagraph (c) because they are not in possession of materials that would permit them to admit or deny such allegations, but deny any suggestion that the Giannoulias Defendants acted improperly or imprudently. The Giannoulias Defendants deny the allegations in subparagraph (d).

**ALLEGATION NO. 87:**

When the loan went into default, Defendants did not pursue the borrowers.

**ANSWER:**

The Giannoulias Defendants deny the allegations in this paragraph.

**ALLEGATION NO. 88:**

The Bank has sustained estimated damages of $8.1 million plus accrued interest on this loan.

**ANSWER:**

The Giannoulias Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph. The Giannoulias Defendants deny that they caused the alleged damages on this loan.

### 261 East 78 Realty Corp.

**ALLEGATION NO. 89:**

In April 2007, Officer Defendants Sguros and D'Costa and Director Defendants Demetris Giannoulias and George Giannoulias, as members of the Loan Committee, approved a one-year $10 million interest-only loan to 261 East 78 Realty Corp. and Lee Moncho. The Board of Directors, including Defendants Demetris and George Giannoulias, Balourdos, Conlon, Dry and Zagorski, also approved the loan. The loan's purpose was to refinance property and acquire an adjacent building in New York, New York. The plan was to redevelop the properties as a medical office building. The interest payments were funded by an interest reserve created out of

the loan proceeds. Between June 2008 and September 2009, the loan was renewed four times and, at the last renewal, the loan was increased by $2.475 million.

**ANSWER:**

The Giannoulias Defendants admit that a one-year approximately $10 million interest-only loan was approved in approximately 2007 for 261 East 78 Realty Corp. and Lee Moncho. The Giannoulias Defendants are without knowledge or information sufficient to form a belief as to the composition of the Loan Committee or the Board with respect to the approval of this loan because they are not in possession of materials that would permit them to admit or deny such allegations. The Giannoulias Defendants admit that the loan's purpose was to acquire a development site with subsequent construction of a medical office building. The Giannoulias Defendants admit that interest payments on this loan were originally to be made from an interest reserve funded by the loan proceeds but deny that there was anything improper or imprudent with such an arrangement. The Giannoulias Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in the sixth sentence in this paragraph because they are not in possession of materials that would permit them to admit or deny such allegations, but deny any suggestion that the Giannoulias Defendants acted improperly or imprudently.

**ALLEGATION NO. 90:**

The loan had numerous deficiencies including, but not limited to, the following:

a.    Defendants approved the loan without proper underwriting. The borrowers did not submit a loan application. The borrowers had no capacity to repay the loan. Unaudited, self-prepared financial statements showed that virtually all of Moncho's assets were illiquid. His tax returns did not include information about his business income.

b.    Defendants approved the loan before a completed appraisal on the property was received.

c.      Defendants took no steps to obtain additional security or modify the loan's terms when it became clear that neither the borrowers nor the collateral could support the loan.

d.      Defendants' multiple renewals of the loan were imprudent. Each of the four loan renewals was made after the loan had defaulted and the real estate market was in sharp decline. The September 2009 renewal and loan increase was without Board of Directors' approval.

e.      The loan and its renewals evidenced Defendants' disregard for regulatory warnings about the Bank's underwriting and over-concentrations of ADC/CRE out-of-territory loans.

## ANSWER:

The Giannoulias Defendants deny that the loan was approved without proper underwriting and that the borrowers did not have the capacity to repay the loan when the loan was approved. The Giannoulias Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in subparagraph (a) because they are not in possession of materials that would permit them to admit or deny such allegations, but deny any suggestion that the Giannoulias Defendants acted improperly or imprudently. The Giannoulias Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in subparagraph (b) because they are not in possession of materials that would permit them to admit or deny such allegations, but deny any suggestion that the Giannoulias Defendants acted improperly or imprudently. The Giannoulias Defendants deny the allegations in subparagraph (c). The Giannoulias Defendants deny that they acted imprudently with respect to this loan. The Giannoulias Defendants deny the characterization of the real estate market in subparagraph (d). The Giannoulias Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in subparagraph (d) because they are not in possession of materials that would permit them to admit or deny such allegations,

but deny any suggestion that the Giannoulias Defendants acted improperly or imprudently. The Giannoulias Defendants deny the allegations in subparagraph (e).

## ALLEGATION NO. 91:

When the interest reserve was depleted, the loan went into default. Defendants took no action to pursue the borrowers.

## ANSWER:

The Giannoulias Defendants are without knowledge or information sufficient to form a belief as to the depletion of the interest reserve or default of the loan because they are not in possession of materials that would permit them to admit or deny such allegations. The Giannoulias Defendants deny the allegations in the second sentence in this paragraph.

## ALLEGATION NO. 92:

The Bank has sustained estimated damages of $5 million plus accrued interest on this loan.

## ANSWER:

The Giannoulias Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph. The Giannoulias Defendants deny that they caused the alleged damages on this loan.

## Loan to John R. DeSilva

## ALLEGATION NO. 93:

In March 2007, Officer Defendants Sguros and D'Costa and Director Defendants Demetris Giannoulias and George Giannoulias, as members of the Loan Committee, approved a one-year $10.5 million interest-only loan to John DeSilva. The Board of Directors, including Defendants Demetris and George Giannoulias, Balourdos, Conlon, Dry and Zagorski, also approved the loan. The loan's primary purposes were to refinance and renovate investment properties in Florida, buy out DeSilva's business partner in a Florida resort, acquire a personal residence in Florida, and renovate other properties in California and Florida. The loan was collateralized by a first mortgage on two of the Florida properties. Interest payments were funded by an interest reserve created out of the loan's proceeds.

**ANSWER:**

The Giannoulias Defendants admit that a one-year approximately $10.5 million interest-only loan was approved in approximately 2007 for John DeSilva. The Giannoulias Defendants are without knowledge or information sufficient to form a belief as to the composition of the Loan Committee or the Board with respect to the approval of this loan because they are not in possession of materials that would permit them to admit or deny such allegations. The Giannoulias Defendants admit the allegations in the third and fourth sentences in this paragraph. The Giannoulias Defendants admit that interest payments on this loan were originally to be made from an interest reserve funded by the loan proceeds but deny that there was anything improper or imprudent with such an arrangement.

**ALLEGATION NO. 94:**

The loan had numerous deficiencies including, but not limited to, the following:

a.   Defendants approved the loan without proper underwriting. The borrower did not submit a loan application; DeSilva's unaudited financial statements showed that virtually all of his assets were illiquid.

b.   Defendants allowed the loan to be funded before the Board of Directors approved the loan and before a completed appraisal had been received.

c.   In June 2008, Defendants allowed the loan to be renewed and increased by over $2 million after the loan had matured and defaulted, without an updated appraisal. Defendants approved this increase even though the borrower's financial condition had deteriorated and the value of the collateral had decreased.

d.   The loan and its renewal evidenced Defendants' disregard of repeated regulatory warnings about the Bank's underwriting and over-concentrations of ADC/CRE out-of-territory loans.

**ANSWER:**

The Giannoulias Defendants deny that the loan was approved without proper underwriting. The Giannoulias Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in subparagraph (a) because they are not

in possession of materials that would permit them to admit or deny such allegations, but deny any suggestion that the Giannoulias Defendants acted improperly or imprudently. The Giannoulias Defendants deny that they allowed the loan to be funded before the Board of Directors confirmed the loan. The Giannoulias Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in subparagraph (b) because they are not in possession of materials that would permit them to admit or deny such allegations, but deny any suggestion that the Giannoulias Defendants acted improperly or imprudently. The Giannoulias Defendants admit that the loan was renewed and increased after the Bank received additional collateral. The Giannoulias Defendants deny that the loan was renewed without an updated appraisal. The Giannoulias Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in subparagraph (c) because they are not in possession of materials that would permit them to admit or deny such allegations, but deny any suggestion that the Giannoulias Defendants acted improperly or imprudently. The Giannoulias Defendants deny the allegations in subparagraph (d).

**ALLEGATION NO. 95:**

When the interest reserve was depleted, the loan went into default. Defendants took no action to pursue DeSilva.

**ANSWER:**

The Giannoulias Defendants are without knowledge or information sufficient to form a belief as to the depletion of the interest reserve or default of the loan because they are not in possession of materials that would permit them to admit or deny such allegations. The Giannoulias Defendants deny the allegations in the second sentence in this paragraph.

**ALLEGATION NO. 96:**

The estimated damages to the Bank related to this loan are $8.1 million, plus accrued interest.

**ANSWER:**

The Giannoulias Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph. The Giannoulias Defendants deny that they caused the alleged damages on this loan.

### Loans to Stark and Perlmutter or Entities They Owned or Controlled

**(a)     The Bedford Lofts, LLC**

**ALLEGATION NO. 97:**

In February, 2007, the Bank made a $6.2 million construction loan to the Bedford Lofts, LLC, Menachem Stark, and Israel Perlmutter to develop a condominium project in Brooklyn, New York. The loan was approved by Officer Defendants Sguros and D'Costa and the Board of Directors, including Demetris Giannoulias and George Giannoulias, Balourdos, Conlon, Dry and Zagorski. Interest payments were funded by an interest reserve created from the loan proceeds.

**ANSWER:**

The Giannoulias Defendants admit that an approximately $6.2 million construction loan was approved in approximately 2007 for Bedford Lofts, LLC, Menachem Stark, and Israel Perlmutter to develop a condominium project in Brooklyn, New York. The Giannoulias Defendants are without knowledge or information sufficient to form a belief as to the composition of the Loan Committee or the Board with respect to the approval of this loan because they are not in possession of materials that would permit them to admit or deny such allegations. The Giannoulias Defendants admit that interest payments on this loan were originally to be made from an interest reserve funded by the loan proceeds but deny that there was anything improper or imprudent with such an arrangement.

**ALLEGATION NO. 98:**

This loan had numerous deficiencies including, but not limited to, the following:

a.      Defendants approved the loan without proper underwriting. The borrowers' financial statements showed that they were highly illiquid and unable to pay the loan. Perlmutter lacked sufficient credit to obtain a credit score; Stark's credit score was poor.

b.      Despite the real estate market's condition, the depletion of the interest reserve and the borrowers' deteriorating financial condition, the Defendant members of the Loan Committee (Demetris and George Giannoulias, Sguros, and D'Costa) renewed the loan twice, without requiring an updated appraisal or complete and current financial information from the borrowers. These renewals included new interest reserves, which masked borrower repayment stress.

c.      Approving this loan and its renewals evidenced Defendants' disregard of repeated regulatory warnings about out-of-territory loans and poor underwriting.

**ANSWER:**

The Giannoulias Defendants deny that the loan was approved without proper underwriting and that the borrowers were unable to pay the loan when the loan was approved. The Giannoulias Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in subparagraph (a) because they are not in possession of materials that would permit them to admit or deny such allegations, but deny any suggestion that the Giannoulias Defendants acted improperly or imprudently. The Giannoulias Defendants admit that the loan was renewed twice and that the renewals included interest reserves, but deny that there was anything improper or imprudent with including interest reserves. The Giannoulias Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in subparagraph (b) because they are not in possession of materials that would permit them to admit or deny such allegations, but deny any suggestion that the Giannoulias Defendants acted improperly or imprudently. The Giannoulias Defendants deny the allegations in subparagraph (c).

**ALLEGATION NO. 99:**

When the interest reserves from the loan renewals were exhausted, the loans [**sic**] went into default.

**ANSWER:**

The Giannoulias Defendants admit that the loan went into default. The Giannoulias Defendants are without knowledge or information sufficient to form a belief as to the reason for the default because they are not in possession of materials that would permit them to admit or deny such allegations.

**ALLEGATION NO. 100:**

The Bank sustained estimated damages of $1.5 million plus accrued interest on this loan.

**ANSWER:**

The Giannoulias Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph. The Giannoulias Defendants deny that they caused the alleged damages on this loan.

**(b)      Southside House, LLC**

**ALLEGATION NO. 101:**

In December 2007, Officer Defendants Sguros and D'Costa and Director Defendants Demetris Giannoulias and George Giannoulias, as members of the Loan Committee, approved a one-year $1.5 million interest-only loan to South Side House, LLC, Menachem Stark, and Israel Perlmutter. The loan's purpose was to provide undefined working capital for the borrowers' New York-based real estate business. The last four interest payments were funded by an interest reserve.

**ANSWER:**

The Giannoulias Defendants admit that a one-year approximately 1.5 million interest-only loan was approved in approximately 2007 for South Side House, LLC, Menachem Stark, and Israel Perlmutter. The Giannoulias Defendants admit that the loan's purpose was to provide funds for working capital needs for the borrowers' New-York based real estate businesses, but

deny that this purpose was "undefined." The Giannoulias Defendants are without knowledge or information sufficient to form a belief as to the composition of the Loan Committee or the Board with respect to the approval of this loan because they are not in possession of materials that would permit them to admit or deny such allegations. The Giannoulias Defendants are without knowledge or information sufficient to form a belief as to the last four interest payments because they are not in possession of materials that would permit them to admit or deny such allegations, but deny any suggestion that the Giannoulias Defendants acted improperly or imprudently.

**ALLEGATION NO. 102:**

The loan had numerous deficiencies including, but not limited to, the following:

a.    Defendants approved the loan without proper underwriting. The borrowers did not submit a loan application; their unaudited financial statements contained little detail; virtually all of the borrowers' assets were illiquid and the borrowers did not have the ability to repay the loan.

b.    The loan presentation did not adequately describe the purpose of the loan, merely stating that the loan would be used for "working capital" for the borrowers' real estate business.

c.    The loan was secured by a $1.5 million second mortgage on a property in New York behind a $29 million mortgage.

d.    The loan evidenced Defendants' disregard for repeated regulatory warnings about loans outside of the Bank's territory.

**ANSWER:**

The Giannoulias Defendants deny that the loan was approved without proper underwriting and that the borrowers did not have the ability to repay the loan when the loan was approved. The Giannoulias Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in subparagraph (a) because they are not in possession of materials that would permit them to admit or deny such allegations, but deny any suggestion that the Giannoulias Defendants acted improperly or imprudently. The Giannoulias

Defendants deny the allegations in subparagraph (b). The Giannoulias Defendants admit the allegations in subparagraph (c). The Giannoulias Defendants deny the allegations in subparagraph (d).

## ALLEGATION NO. 103:

The borrower defaulted on the first mortgage and foreclosure proceedings were initiated by the first mortgage holder, extinguishing the Bank's interest in the collateral. Defendants took no action to pursue Stark and Perlmutter.

## ANSWER:

The Giannoulias Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence in this paragraph because they are not in possession of materials that would permit them to admit or deny such allegations, but deny any suggestion that the Giannoulias Defendants acted improperly or imprudently. The Giannoulias Defendants deny the allegations in the second sentence in this paragraph.

## ALLEGATION NO. 104:

The Bank has sustained estimated damages of $1.9 million plus accrued interest on this loan.

## ANSWER:

The Giannoulias Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph. The Giannoulias Defendants deny that they caused the alleged damages on this loan.

### 625 W. Division Condominiums, L.P.

## ALLEGATION NO. 105:

In December 2007, Officer Defendants Sguros and D'Costa and Director Defendants Demetris Giannoulias and George Giannoulias, as members of the Loan Committee, approved a nine-month $5.35 million interest-only loan to 625 W. Division Condominiums, L.P., John Breugelmans, and Jan-Peter Breugelmans. The loan's purpose was to refinance raw land in Chicago, Illinois, at a time when the real estate market was in sharp decline. The interest payments were funded by an interest reserve created out of the loan proceeds.

**ANSWER:**

The Giannoulias Defendants admit that a nine-month approximately $5.35 million interest-only loan was approved in approximately 2007 for 625 W. Division Condominiums, L.P., John Breugelmans, and Jan-Peter Breugelmans. The Giannoulias Defendants are without knowledge or information sufficient to form a belief as to the composition of the Loan Committee or the Board with respect to the approval of this loan because they are not in possession of materials that would permit them to admit or deny such allegations. The Giannoulias Defendants admit that the loan's purpose was to refinance property located in Chicago, Illinois. The Giannoulias Defendants deny the characterization of the real estate market in the second sentence in this paragraph. The Giannoulias Defendants admit that interest payments on this loan were originally to be made from an interest reserve funded by the loan proceeds but deny that there was anything improper or imprudent with such an arrangement.

**ALLEGATION NO. 106:**

The loan had numerous deficiencies including, but not limited to, the following:

a.  Defendants approved the loan without proper underwriting. The borrowers' financial statements showed that virtually all of their assets were illiquid. The borrowers did not submit tax returns in violation of the Bank's Loan Policy.

b.  Defendants approved the loan even though the appraisal of the subject property was over a year old and did not reflect its current value.

c.  In September 2009, Defendants approved a renewal of the loan even though the investors who were expected to make the payments for the renewal term had been indicted and the borrower had been unable to obtain funding to redevelop the land.

**ANSWER:**

The Giannoulias Defendants deny that the loan was approved without proper underwriting. The Giannoulias Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in subparagraph (a) because they are not

in possession of materials that would permit them to admit or deny such allegations, but deny any suggestion that the Giannoulias Defendants acted improperly or imprudently. The Giannoulias Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in subparagraph (b) because they are not in possession of materials that would permit them to admit or deny such allegations, but deny any suggestion that the Giannoulias Defendants acted improperly or imprudently. The Giannoulias Defendants admit that the loan was renewed in approximately the second half of 2009 but deny that this renewal was improper or imprudent. The Giannoulias Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in subparagraph (c) because they are not in possession of materials that would permit them to admit or deny such allegations, but deny any suggestion that the Giannoulias Defendants acted improperly or imprudently.

**ALLEGATION NO. 107:**

When the interest reserve was depleted, the borrowers defaulted on the loan. Defendants took no action to pursue the Breugelmans.

**ANSWER:**

The Giannoulias Defendants admit that the loan went into default, but they are without knowledge or information sufficient to form a belief as to the reason for the default or the timing relative to the interest reserve because they are not in possession of materials that would permit them to admit or deny such allegations. The Giannoulias Defendants deny the allegations in the second sentence in this paragraph.

**ALLEGATION NO. 108:**

The Bank has sustained estimated damages of $2.8 million plus accrued interest on this loan.

**ANSWER:**

The Giannoulias Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph. The Giannoulias Defendants deny that they caused the alleged damages on this loan.

**Loans to Lawrence Properties, 4750 N. Winthrop, James Gouskos and
Alexander Dobroveanu**

**ALLEGATION NO. 109:**

In March and April 2007, Officer Defendants Sguros and D'Costa and Director Defendants Demetris Giannoulias and George Giannoulias, as members of the Loan Committee, approved two loans to James Gouskos, Alexander Dobroveanu, and real estate entities owned by them known as Lawrence Properties, LLC and 4750 N. Winthrop, LLC.

**ANSWER:**

The Giannoulias Defendants admit that two loans were approved in approximately 2007 for James Gouskos, Alexander Dobroveanu, and real estate entities owned by them known as Lawrence Properties, LLC and 4750 N. Winthrop, LLC. The Giannoulias Defendants are without knowledge or information sufficient to form a belief as to the composition of the Loan Committee or the Board with respect to the approval of these loans because they are not in possession of materials that would permit them to admit or deny such allegations.

**ALLEGATION NO. 110:**

The April 2007 loan was a five-year $2.9 million loan to refinance a commercial property in Chicago secured by a mortgage on the commercial property being refinanced by the loan. The March 2007 loan was a six-month $2.7 million interest-only loan secured by a mortgage on a vacant lot in Chicago on which the borrower was planning to develop a mixed use condominium building. The interest payments on the March 2007 loan were funded by an interest reserve created out of the loan proceeds.

**ANSWER:**

The Giannoulias Defendants admit that a five-year approximately $2.9 million loan to refinance commercial property in Chicago, secured by a mortgage on the commercial property

being refinanced, was approved in approximately 2007 for Lawrence Properties, LLC. The Giannoulias Defendants admit that a six-month approximately $2.7 million interest-only loan secured by a mortgage on a development site in Chicago was approved in approximately 2007 for 4750 N. Winthrop, LLC. The Giannoulias Defendants admit that interest payments on the March 2007 loan were originally to be made from an interest reserve funded by the loan proceeds but deny that there was anything improper or imprudent with such an arrangement.

**ALLEGATION NO. 111:**

These loans had numerous deficiencies including, but not limited to, the following:

a. Defendants approved the loan without proper underwriting. The borrowers did not submit a loan application. Their unaudited, self-prepared, outdated financial statements showed that their assets were limited and illiquid. The Bank's cash flow analysis of the April 2007 loan showed that the expected rental income for the property could not service the debt.

b. In violation of the Loan Policy, the appraisal for the March 2007 loan was received after the loan was approved.

c. Defendants renewed the March 2007 loan, even though the borrowers had defaulted when the six-month interest reserve was depleted.

**ANSWER:**

The Giannoulias Defendants deny that the loan was approved without proper underwriting. Defendants are without knowledge or information to form a belief as to the truth of the remaining allegations in subparagraph (a) because they are not in possession of materials that would permit them to admit or deny such allegations, but deny any suggestion that the Giannoulias Defendants acted improperly or imprudently. The Giannoulias Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in subparagraphs (b) and (c) because they are not in possession of materials that would permit them to admit or deny such allegations, but deny any suggestion that the Giannoulias Defendants acted improperly or imprudently.

**ALLEGATION NO. 112:**

After the loans closed, a second bank claimed to have a first mortgage on certain property securing the loans. Defendants did not conduct proper due diligence on this issue or protect the Bank's interest. When the renewed interest reserve was depleted, the March 2007 loan went into default. Likewise, the borrower defaulted on the April 2007 loan. Broadway commenced foreclosure proceedings on both loans, but these proceedings were fatally compromised by the second bank's claim that it had a first mortgage on the property.

**ANSWER:**

The Giannoulias Defendants admit the allegations in the first sentence in this paragraph. The Giannoulias Defendants deny the allegations in the second sentence in this paragraph. The Giannoulias Defendants admit that both loans went into default and that the Bank commenced foreclosure proceedings. The Giannoulias Defendants deny that the foreclosure proceedings were compromised by the second bank's claim that it had a first mortgage on the property. The Giannoulias Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph because they are not in possession of materials that would permit them to admit or deny such allegations, but deny any suggestion that the Giannoulias Defendants acted improperly or imprudently.

**ALLEGATION NO. 113:**

The Bank has sustained estimated damages of $4.2 million plus accrued interest on these loans.

**ANSWER:**

The Giannoulias Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph. The Giannoulias Defendants deny that they caused the alleged damages on this loan.

## Krieger SPE, LLC

**ALLEGATION NO. 114:**

In January 2007, the Bank made a two-year, $15.35 million, interest-only loan to Krieger SPE, LLC, Andrew Krieger, and Valerie Krieger, the stated purpose of which, according to the credit analysis, was "to refinance [the borrowers'] real estate portfolio." The credit analysis did not identify the loans to be refinanced.

**ANSWER:**

The Giannoulias Defendants admit that a two-year approximately $15.35 million, interest-only loan was approved in approximately 2007 for Krieger SPE, LLC, Andrew Krieger, and Valerie Krieger. The Giannoulias Defendants admit that the purpose of the loan was to refinance existing mortgages on property. The Giannoulias Defendants deny the remaining allegations in this paragraph.

**ALLEGATION NO. 115:**

The loan was approved by Officer Defendants Sguros and D'Costa and Director Defendants Demetris Giannoulias and George Giannoulias, as members of the Loan Committee. The Board of Directors, including Director Defendants Demetris Giannoulias, George Giannoulias, McMahon, Conlon, Dry, Balourdos and Zagorski, also approved the loan.

**ANSWER:**

The Giannoulias Defendants are without knowledge or information sufficient to form a belief as to the composition of the Loan Committee or the Board with respect to the approval of this loan because they are not in possession of materials that would permit them to admit or deny such allegations.

**ALLEGATION NO. 116:**

Loan proceeds of $1.5 million were used to establish an interest reserve to fund monthly interest payments for one year.

**ANSWER:**

The Giannoulias Defendants admit that interest payments on the loan were originally to be made from an interest reserve funded by the loan proceeds but deny that there was anything improper or imprudent with such an arrangement.

**ALLEGATION NO. 117:**

This loan had numerous deficiencies including, but not limited to, the following:

a.  The Loan Committee and Board of Directors failed to require proper underwriting. The borrowers' unaudited financial statements showed that they had insufficient liquid assets with which to repay the loan. From the borrowers' tax returns, it was apparent that the borrowers lacked sufficient cash flow to make the interest payments once the interest reserve was depleted.

b.  In addition to selling their personal residence, the sources of repayment for the loan were a yet-to-be-obtained construction loan with another lender and liquidation of the collateral. There was no analysis in the loan file confirming that construction financing could be obtained or an explanation as to how the proceeds of a construction loan could be used to repay Broadway's loan.

d. [**sic**] The loan was outside of the Bank's geographic area, where the Bank did not have staff or familiarity with the local real estate market to allow it to adequately assess or monitor the loan.

**ANSWER:**

The Giannoulias Defendants deny that the loan was approved without proper underwriting and that the borrowers had no ability repay the loan when the loan was approved. The Giannoulias Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in subparagraph (a) because they are not in possession of materials that would permit them to admit or deny such allegations, but deny any suggestion that the Giannoulias Defendants acted improperly or imprudently. The Giannoulias Defendants admit that sources of repayment for this loan included, among other things, the sale of a personal residence and construction loan, but deny that these were the only sources of repayment. The Giannoulias Defendants are without knowledge or information sufficient to form a belief as to

63

the truth of the remaining allegations in subparagraph (b) because they are not in possession of materials that would permit them to admit or deny such allegations, but deny any suggestion that the Giannoulias Defendants acted improperly or imprudently. The Giannoulias Defendants deny the allegations in subparagraph (d).

**ALLEGATION NO. 118:**

In January 2009, when the loan came due, the borrowers defaulted. In February 2010, the Bank foreclosed on the loan.

**ANSWER:**

The Giannoulias Defendants admit that the borrower defaulted, but they are without knowledge or information sufficient to form a belief as to the reason or date for the default because they are not in possession of materials that would permit them to admit or deny such allegations. The Giannoulias Defendants admit that the Bank foreclosed on the loan in approximately 2010.

**ALLEGATION NO. 119:**

The Bank has sustained estimated damages of $4.5 million plus accrued interest on this loan.

**ANSWER:**

The Giannoulias Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph. The Giannoulias Defendants deny that they caused the alleged damages on this loan.

## Lynn & Anderson Homes, LLC

**ALLEGATION NO. 120:**

In April 2007, the Bank extended a $9.1 million one-year, interest only, non-revolving line of credit to Lynn & Anderson Homes LLC, Fuel Group, LLC, Northgate Investment, LLC, Indira Lalwani, and Raj Assomul. The loan was approved by Officer Defendants Sguros and D'Costa and Director Defendants Demetris Giannoulias and George Giannoulias, as members of the Loan Committee. The Board of Directors, including Director Defendants Demetris

Giannoulias, George Giannoulias, McMahon, Conlon, Dry, Balourdos and Zagorski, also approved the loan.

**ANSWER:**

The Giannoulias Defendants admit that an approximately $9.1 million one-year, interest only, non-revolving line of credit was approved in approximately 2007 for Lynn & Anderson Homes LLC, Fuel Group, LLC, Northgate Investment, LLC, Indira Lalwani, and Raj Assomul. The Giannoulias Defendants are without knowledge or information sufficient to form a belief as to the composition of the Loan Committee or the Board with respect to the approval of this loan because they are not in possession of materials that would permit them to admit or deny such allegations.

**ALLEGATION NO. 121:**

The loan's purpose was to refinance a property in Tampa, Florida and fund the development of townhomes and condominiums at the site. The loan proceeds were to finance the first phase of project costs and fund an interest reserve. At origination, the appraised value of the collateral property "as is" was $2.7 million, which was well below the loan amount.

**ANSWER:**

The Giannoulias Defendants admit the first and second sentences in this paragraph, but deny that there is anything improper or imprudent with funding an interest reserve from loan proceeds. The Giannoulias Defendants admit that the appraised "as is" value of the collateral property was approximately $2.7 million but state that this appraisal amount was above the amount funded on this loan. The Giannoulias Defendants deny the remaining allegations in this paragraph.

**ALLEGATION NO. 122:**

In April 2008, when the loan matured, the borrowers defaulted. By then, the appraised value of the collateral "as is" had dropped to $2.3 million. The borrowers were unable to obtain permanent construction financing for the project. Nonetheless, the Loan Committee (Defendants Demetris Giannoulias, George Giannoulias, Sguros and D'Costa) converted the loan from a line of credit to an interest-only loan of $2.4 million, the principal balance on the line of credit.

**ANSWER:**

The Giannoulias Defendants admit that the loan was renewed in approximately 2008 and that the "as is" appraisal at that time was approximately $2.3 million. The Giannoulias Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in the third sentence in this paragraph because they are not in possession of materials that would permit them to admit or deny such allegations. The Giannoulias Defendants admit that this loan was converted into an interest-only line of credit of approximately $2.4 million. The Giannoulias Defendants are without knowledge or information sufficient to form a belief as to the composition of the Loan Committee with respect to the renewal of this loan because they are not in possession of materials that would permit them to admit or deny such allegations. The Giannoulias Defendants are without knowledge or information sufficient to form a belief as to the principal balance on the line of credit because they are not in possession of materials that would permit them to admit or deny such allegations. The Giannoulias Defendants deny the remaining allegations in this paragraph.

**ALLEGATION NO. 123:**

Both the initial loan and subsequent modification had numerous deficiencies including, but not limited to, the following:

a. The Loan Committee and Board of Directors failed to require proper underwriting. Lalwani's unaudited personal financial statement showed that she had insufficient liquid assets or income with which to repay the loan. In violation of the Bank's loan policy, the Loan Committee and Board of Directors failed to require current tax returns or income data from the borrowers before approving the loan.

b. This was a speculative development project with insufficient funding. The loan funds and the borrower's equity were insufficient to complete the first phase of the construction project and there was no funding in place to complete the second phase. Moreover, the borrower was unable to repay the loan at the end of its one-year term since construction could not be finished and the individual condominium units sold within that time period.

      c.        In approving the original loan, the Loan Committee and Board of Directors improperly relied on the "as completed" value of the property rather than the "as is" value. Using the property's "as is" value, the loan exceeded the allowable loan-to-valtie ratio under the Bank's loan policy and violated 35 C.F.R. § 365.2, Appendix A.

      d.        The Loan Committee approved the loan's renewal even though the borrowers had been unable to start construction and had depleted their available cash.

      e.        The loan was outside of the Bank's geographic area, where the Bank did not have staff or familiarity with the local real estate market to allow it to adequately assess or monitor the loan.

**ANSWER:**

The Giannoulias Defendants deny that the loan was approved without proper underwriting and that Lalwani was unable to repay the loan when the loan was approved. The Giannoulias Defendants deny that the Bank failed to require tax returns from the borrowers. The Giannoulias Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in subparagraph (a) because they are not in possession of materials that would permit them to admit or deny such allegations, but deny any suggestion that the Giannoulias Defendants acted improperly or imprudently. The Giannoulias Defendants deny the first sentence in subparagraph (b). The Giannoulias Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in subparagraph (b) because they are not in possession of materials that would permit them to admit or deny such allegations, but deny any suggestion that the Giannoulias Defendants acted improperly or imprudently. The Giannoulias Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in subparagraph (c) because they are not in possession of materials that would permit them to admit or deny such allegations, but deny any suggestion that the Giannoulias Defendants acted improperly or imprudently. The Giannoulias Defendants admit that the loan was renewed. The Giannoulias Defendants are

without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in subparagraph (d) because they are not in possession of materials that would permit them to admit or deny such allegations, but deny any suggestion that the Giannoulias Defendants acted improperly or imprudently. The Giannoulias Defendants deny the allegations in subparagraph (e).

## ALLEGATION NO. 124:

When the renewed loan came due in December 2008, the borrowers defaulted. The Bank took no action to pursue Lalwani or Assomul.

## ANSWER:

The Giannoulias Defendants admit that the borrower defaulted. The Giannoulias Defendants are without knowledge or information sufficient to form a belief as when the default occurred because they are not in possession of materials that would permit them to admit or deny such allegations. The Giannoulias Defendants deny the allegations in the second sentence in this paragraph.

## ALLEGATION NO. 125:

The Bank has sustained estimated damages of $2 million plus accrued interest on this loan.

## ANSWER:

The Giannoulias Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph. The Giannoulias Defendants deny that they caused the alleged damages on this loan.

## CLAIMS FOR RELIEF

## COUNT I

### (Gross Negligence – Director Defendants and Officer Defendants)

**ALLEGATION NO. 126:**

FDIC-R realleges and incorporates by reference the allegations contained in paragraphs 1 through 125 as if fully set forth herein.

**ANSWER:**

The Giannoulias Defendants repeat and incorporate their answers to paragraphs 1 through 125.

**ALLEGATION NO. 127:**

Section 1821(k) of the Financial Institutions Reform, Recovery and Enforcement Act ("FIRREA") holds directors and officers of financial institutions personally liable for loss or damage caused by their "gross negligence," as defined by applicable state law.

**ANSWER:**

The Giannoulias Defendants admit that this paragraph purports to summarize Section 1821(k) of FIRREA. Answering further, the Giannoulias Defendants deny any allegations in this paragraph that are different from, contrary to and/or seek to characterize or draw legal conclusions from the express terms of FIRREA.

**ALLEGATION NO. 128:**

The Officer Defendants and Director Defendants owed Broadway a duty to use reasonable care, skill, and diligence in the performance of their duties, including, but not limited to:  (a) conducting proper due diligence on each proposed loan to inform themselves about the risks such loan posed to the Bank before approving it; (b) complying with the Bank's Loan Policy; (c) ensuring that the loans they approved were underwritten in a safe and sound manner; (d) ensuring that the loans they approved were secured by sufficiently valuable collateral and guarantees to prevent or minimize the Bank's risk of loss; (e) ensuring that the loans they approved did not violate applicable banking laws and regulations; (f) ensuring that the loans they approved did not create unsafe and unsound concentrations of credit; and (g) properly monitoring the performance of loans to minimize the Bank's risk of loss.

**ANSWER:**

The Giannoulias Defendants admit only that Illinois law imposes certain duties on directors and officers of a bank. Answering further, the Giannoulias Defendants deny all remaining allegations in this paragraph that are different from, contrary to and/or which seek to characterize or draw conclusions from Illinois or other applicable law.

**ALLEGATION NO. 129:**

Given the Officer Defendants' and Director Defendants' knowledge of the Bank's troubled condition, the receipt of multiple regulatory warnings and the impaired state of the real estate market, the Officer Defendants' and Director Defendants' responsibilities to the Bank were heightened.

**ANSWER:**

The Giannoulias Defendants deny the allegations in this paragraph.

**ALLEGATION NO. 130:**

Notwithstanding these obligations, the Officer Defendants and Director Defendants disregarded these duties and were grossly negligent by, among other things: (a) failing to conduct proper due diligence on each of the Loss Loans and failing to inform themselves about the risks the loans posed to the Bank before approving them; (b) disregarding the Bank's loan policies and approving the Loss Loans on terms that violated the Bank's Loan Policy; (c) failing to ensure that the Loss Loans were underwritten in a safe and sound manner; (d) failing to ensure that the Loss Loans were secured by sufficiently valuable collateral and guarantees to prevent or minimize the Bank's risk of loss; (e) failing to ensure that the Loss Loans did not violate applicable banking laws and regulations; (f) failing to ensure that the Loss Loans did not create unsafe and unsound concentrations of credit; and (g) ignoring regulatory warnings about the Bank's lending operations.

**ANSWER:**

The Giannoulias Defendants deny the allegations in this paragraph.

**ALLEGATION NO. 131:**

The Officer Defendants and Director Defendants knew or should have known of the risks that such deficient practices represented but they persisted in this grossly negligent conduct by approving the Loss Loans. This was very great or gross negligence. It also was reckless.

**ANSWER:**

The Giannoulias Defendants deny the allegations in this paragraph.

**ALLEGATION NO. 132:**

Defendant members of the Board of Directors were grossly inattentive to the affairs of the Bank – deferring excessively to the whims of the Giannoulias family. As a consequence, reports were not closely read, little or no due diligence into the Bank's condition was done, regulatory criticisms were discounted, and, for Defendant McMahon, important Board meetings frequently were missed or ignored.

**ANSWER:**

The Giannoulias Defendants deny the allegations in this paragraph.

**ALLEGATION NO. 133:**

As a direct and proximate cause of the gross negligence of the Officer Defendants and Director Defendants, the Bank suffered damages in excess of $114 million.

**ANSWER:**

The Giannoulias Defendants deny the allegations in this paragraph.

## COUNT II

**(Breach of Fiduciary Duty of Care – Director Defendants and Officer Defendants)**

**ALLEGATION NO. 134:**

FDIC-R realleges and incorporates by reference the allegations contained in paragraphs 1 through 125, as if fully set forth herein.

**ANSWER:**

The Giannoulias Defendants repeat and incorporate their answers to paragraphs 1 through

125.

**ALLEGATION NO. 135:**

Based on their positions as officers and directors, the Officer Defendants and Director Defendants were fiduciaries of the Bank and owed the Bank fiduciary duties.

**ANSWER:**

The Giannoulias Defendants admit only that Illinois law imposes certain duties on directors and officers of a bank. Answering further, the Giannoulias Defendants deny all remaining allegations in this paragraph that are different from, contrary to and/or which seek to characterize or draw conclusions from Illinois or other applicable law.

**ALLEGATION NO. 136:**

The Officer Defendants and Director Defendants owed Broadway fiduciary duties to exercise reasonable care, skill and diligence in the performance of their responsibilities, including: (a) conducting proper due diligence on each proposed loan to inform themselves about the risks the loans posed to the Bank before approving it; (b) complying with the Bank's Loan Policy and approving loans on terms that complied with the Loan Policy; (c) ensuring that the loans they approved were underwritten in a safe and sound manner; (d) ensuring that the loans they approved were secured by sufficiently valuable collateral and guarantees to prevent or minimize the Bank's risk of loss; (e) ensuring that the loans they approved did not violate applicable banking laws and regulations; (f) ensuring that the loans they approved did not create unsafe and unsound concentrations of credit; and (g) properly monitoring the performance of loans to minimize the Bank's risk of loss.

**ANSWER:**

The Giannoulias Defendants admit only that Illinois law imposes certain duties on directors and officers of a bank. Answering further, the Giannoulias Defendants deny all remaining allegations in this paragraph that are different from, contrary to and/or which seek to characterize or draw conclusions from Illinois or other applicable law.

**ALLEGATION NO. 137:**

Given the Officer Defendants' and Director Defendants' knowledge of the Bank's troubled condition, the receipt of multiple regulatory warnings and the impaired state of the real estate market, the Officer Defendants' and Director Defendants' responsibilities to the Bank were heightened.

**ANSWER:**

The Giannoulias Defendants deny the allegations in this paragraph.

**ALLEGATION NO. 138:**

The Officer Defendants and Director Defendants breached these fiduciary duties by, among other things:  (a) failing to conduct proper due diligence on each of the Loss Loans and failing to inform themselves about the risks such loans posed to the Bank before they approved them; (b) approving the Loss Loans on terms that violated the Bank's loan policies; (c) failing to ensure that the Loss Loans were underwritten in a safe and sound manner; (d) failing to ensure that the Loss Loans were secured by sufficiently valuable collateral and guarantees in order to prevent or minimize the Bank's risk of loss; (e) failing to ensure that the Loss Loans did not violate applicable banking laws and regulations; (f) failing to ensure that the Loss Loans did not create unsafe and unsound concentrations of credit; and (g) ignoring regulatory warnings about the Bank's lending operations.

**ANSWER:**

The Giannoulias Defendants deny the allegations in this paragraph.

**ALLEGATION NO. 139:**

Defendant members of the Board of Directors were grossly inattentive to the affairs of the Bank – deferring excessively to the whims of the Giannoulias family.  As a consequence, reports were not closely read, regulatory criticisms were discounted, and, for Defendant McMahon, important Board meetings frequently were missed or ignored.

**ANSWER:**

The Giannoulias Defendants deny the allegations in this paragraph.

**ALLEGATION NO. 140:**

As a direct and proximate cause of the breach of the fiduciary duty of care by the Officer Defendants and Director Defendants, the Bank suffered damages in excess of $114 million.

**ANSWER:**

The Giannoulias Defendants deny the allegations in this paragraph.

## COUNT III

### (Negligence – Director Defendants and Officer Defendants)

**ALLEGATION NO. 141:**

FDIC-R realleges and incorporates by reference the allegations contained in paragraphs 1 through 125, as if fully set forth herein.

**ANSWER:**

The Giannoulias Defendants repeat and incorporate their answers to paragraphs 1 through 125.

**ALLEGATION NO. 142:**

The allegations of negligence in this Count III are pleaded in the alternative to the allegations of breach of fiduciary duty in Count II.

**ANSWER:**

The Giannoulias Defendants admit that the FDIC-R pleads Count III in the alternative to Count II.

**ALLEGATION NO. 143:**

The Officer Defendants and Director Defendants owed Broadway a duty to use reasonable care, skill and diligence in the performance of their duties, including, but not limited to: (a) conducting proper due diligence on each proposed loan to inform themselves about the risks the loans posed to the Bank before approving it; (b) complying with the Bank's Loan Policy; (c) ensuring that the loans they approved were underwritten in a safe and sound manner; (d) ensuring that the loans they approved were secured by sufficiently valuable collateral and guarantees to prevent or minimize the Bank's risk of loss; (e) ensuring that the loans they approved did not violate applicable banking laws and regulations; (f) ensuring that the loans they approved did not create unsafe and unsound concentrations of credit; and (g) properly monitoring the performance of loans to minimize the Bank's risk of loss.

**ANSWER:**

The Giannoulias Defendants admit only that Illinois law purports to impose certain duties on directors and officers of a bank. Answering further, the Giannoulias Defendants deny all remaining allegations in this paragraph that are different from, contrary to and/or which seek to characterize or draw conclusions from Illinois or other applicable law.

**ALLEGATION NO. 144:**

Given the Officer Defendants' and Director Defendants' knowledge of the Bank's troubled condition, the receipt of multiple regulatory warnings and the impaired state of the real estate market, the Officer Defendants' and Director Defendants' responsibilities to the Bank were heightened.

**ANSWER:**

The Giannoulias Defendants deny the allegations in this paragraph.

**ALLEGATION NO. 145:**

Defendants, however, breached these duties and were negligent by, among other things: (a) failing to conduct proper due diligence on each of the Loss Loans and failing to inform themselves about the risks such loans posed to the Bank before they approved them; (b) approving the Loss Loans on terms that violated the Bank's loan policies; (c) failing to ensure that the Loss Loans were underwritten in a safe and sound manner; (d) failing to ensure that the Loss Loans were secured by sufficiently valuable collateral and guarantees to prevent or minimize the Bank's risk of loss; (e) failing to ensure that the Loss Loans did not violate applicable banking laws and regulations; (f) failing to ensure that the Loss Loans did not create unsafe and unsound concentrations of credit; and (g) ignoring regulatory warnings about the Bank's lending operations.

**ANSWER:**

The Giannoulias Defendants deny the allegations in this paragraph.

**ALLEGATION NO. 146:**

Defendant members of the Board of Directors were grossly inattentive to the affairs of the Bank – deferring excessively to the whims of the Giannoulias family. As a consequence, reports were not closely read, regulatory criticisms were discounted, and, for Defendant McMahon, important Board meetings frequently were missed or ignored.

**ANSWER:**

The Giannoulias Defendants deny the allegations in this paragraph.

**ALLEGATION NO. 147:**

As a direct and proximate cause of the negligence of the Officer Defendants and Director Defendants, the Bank suffered damages in excess of $114 million.

**ANSWER:**

The Giannoulias Defendants deny the allegations in this paragraph.

**AMENDED AFFIRMATIVE DEFENSES**

For their Amended Affirmative Defenses against the FDIC-R, the Giannoulias Defendants state as follows:

### FIRST AFFIRMATIVE DEFENSE – BUSINESS JUDGMENT RULE

1.      The FDIC-R's claims are barred in whole or in part by the business judgment rule because they are based on the well informed and good faith business judgments that The Giannoulias Defendants made as officers or directors of the Bank in their honest belief that they were acting in the best interests of the Bank.  The Giannoulias Defendants allege this affirmative defense without conceding that the business judgment rule can only be asserted as an affirmative defense, and The Giannoulias Defendants specifically reserve the right to assert the business judgment rule as an affirmative defense in the event that the Seventh Circuit ultimately determines that the business judgment rule can only be asserted as an affirmative defense.

2.      The business judgment rule establishes a presumption that corporate officers and directors make decisions on an informed basis, in good faith, and in the honest belief that they are acting in the best interest of the corporation.

3.      The Giannoulias Defendants acted with due care, adequate information, and good faith in carrying out their duties as directors and officers of the Bank and in approving the alleged "Loss Loans."  The Bank had prior relationships with many of its borrowers at issue, who had successfully completed CRE and ADC projects and fully repaid prior loans.   In approving the "Loss Loans," The Giannoulias Defendants acted in good faith and reasonably and justifiably relied upon information, advice, or opinions about the loans at issue presented to them in the loan write-ups and presented to them by others, including without limitation, other Bank personnel, counsel, auditors, third-party loan reviewers, other experts, and regulators.   In addition, the Bank's management, including one or more of The Giannoulias Defendants, met extensively with borrowers and visited projects before and after the "Loss Loans" were approved.

4.      The Director Defendants also reasonably relied upon the positive examination reports delivered to the Bank's Directors during the time period that the loans at issue were approved.  Between 2005 and 2010, the regulators provided constant ongoing supervision of the Bank.  The regulators conducted five onsite examinations and three onsite visitations of the Bank during this period.  The Bank also had numerous other formal and informal discussions with regulators and case managers, which provided regulators with even more supervision of the Bank.

5.      All of the alleged "Loss Loans" were initially approved when the Bank had an overall composite rating of "1"—the highest rating available, indicating that the Bank was considered to be "sound in every respect"—as reflected in the regulators' Reports of Examination ("ROE" or "ROEs").  Indeed, during the period of substantial growth in the Bank's loan portfolio from 2005 to 2007, the regulators upgraded Broadway's overall composite rating from the second highest rating of a "2" to the highest rating of a "1."  In addition to receiving high overall composite ratings, the Bank received the highest management rating of a "1," which indicates "strong performance by management" and "strong risk management practices," in the 2006 and 2007 ROEs.

6.      The 2005 through 2007 examination reports did not report that the Bank's allowance for loan losses was deficient, that the loan officers lacked expertise to engage in commercial real estate lending, that the Bank's commercial real estate loan program was doomed to fail, or that the Bank's capital was deficient.  The regulators also reviewed and approved the Bank's loan concentrations, loan policies, and allowances for loan losses during this time period.

7.      The Giannoulias Defendants also were informed and reasonably believed that adequate policies, procedures, and controls were in place at the Bank.

## SECOND AFFIRMATIVE DEFENSE – ILLINOIS BANKING ACT

1.      The FDIC-R's claims are barred in whole or in part by the Illinois Banking Act, 205 ILCS § 5/16(7)(b).

2.      Under the Illinois Banking Act, the Director Defendants were entitled to rely upon "advice, information, opinions, reports or statements, including financial statements and financial data, prepared or presented by" credit analysts, employees, accountants or consultants whom the Director Defendants believed to be reliable and competent in the matter presented.

3.      The Director Defendants properly relied upon such information presented by credit analysts, employees, accountants, consultants, auditors, and third-party loan reviewers retained by the Bank.

4.      The Director Defendants also properly relied upon information presented by the FDIC and IDFPR regulators and examiners in written examination reports and in oral reports at board meetings, including the examiners' repeated conclusion that the Bank was "sound in every respect" at the time the alleged "Loss Loans" were initially approved.

## THIRD AFFIRMATIVE DEFENSE – WAIVER

1.      The FDIC-R is seeking damages from the Defendants in the amount of approximately $116,000,000.

2.      The FDIC-R's claims are barred in whole or in part by the doctrine of waiver.

3.      The FDIC-R was responsible for administering the Federal Street Loan after the closure of the Bank.  The FDIC-R's conduct in administering and disposing of the Federal Street Loan caused a material decrease in the value and the amount recovered on the loan.

4.      For example, the FDIC-R did not follow its internal procedures and practices in administering the Federal Street Loan after the closure of the Bank.  The FDIC-R maintained a "structured sales" listing of certain loans that it acquired from closed banks on a website.  Upon

information and belief, prospective buyers, who have been pre-approved by the FDIC-R, have access to this "structured sales" website in order to view and potentially bid on the loans listed on this website. Per the FDIC-R's internal procedures and practices, loans listed on the "structured sales" website cannot be removed from this pool of loans until they are approved and a 10% down payment is received.

5.      Upon information and belief, the FDIC-R listed the Federal Street Loan as part of the pool of loans identified on the FDIC-R's "structured sales" website. Upon information and belief, in contravention of the FDIC-R's internal policies and practices, the FDIC-R removed the Federal Street Loan from the "structured sales" website without receipt of the required 10% down payment. Rather than following its internal procedures and practices, the FDIC-R pulled the Federal Street Loan from the "structured sales" website because of pending negotiations with the Federal Street borrowers.

6.      The FDIC-R obtained a $18,000,000 settlement on the Federal Street Loan, which was originally a $26,880,000 note, from the Federal Street borrowers in May 2011. In connection with this settlement, the FDIC-R relied upon an "as is" $18,500,000 appraisal amount, instead of the available "as completed" $25,600,000 appraisal amount. Upon information and belief, in June 2011, approximately one month after the FDIC-R received $18,000,000 from the Federal Street borrowers, the Federal Street borrowers sold a 57-percent interest in the Federal Street project to Milan Capital Management for $22,000,000.

7.      The FDIC-R's decision to pull the Federal Street Loan from the "structured sales" website in violation of its internal procedures and practices, its reliance on a lower "as is" appraisal, and its acceptance of a settlement amount from the Federal Street borrowers that was

significantly less than the actual value of the Federal Street Loan constitute an intentional relinquishment of its right to seek damages caused by its own conduct.

8.      The FDIC-R's intentional conduct on the Federal Street Loan, including, but not limited to, (i) its failure to follow its own internal procedures and practices with respect to the disposition of the Federal Street loan; (ii) its decision to dispose of the Federal Street Loan at an unreasonably low value; and (iii) its failure to maximize the value of the Federal Street Loan when disposing of it, resulted in the FDIC-R causing its own damages.  The FDIC-R's conduct amounted to an intentional relinquishment of its right to seek damages caused by its own conduct, and, therefore, the FDIC-R has waived its right to seek damages arising out of its own conduct.

9.      The FDIC-R also entered into a Purchase and Assumption Agreement, including a Commercial Shared-Loss Agreement (collectively, the "Loss Share Agreement"), with an assuming institution (the "Assuming Institution") on or about April 23, 2010 that gave the Assuming Institution little to no economic incentive to maximize the value of the Loss Loans subject to the Loss Share Agreement (which included all of the Loss Loans except the Federal Street Loan).

10.     In addition, the FDIC-R failed to adequately audit, monitor, and supervise the administration and disposition of the Loss Loans.  Upon information and belief, the FDIC-R's failures resulted in, among other things, (i) the sale of notes and collateral at below fair market value; (ii) a failure to maximize the recovery available on the loans; (iii) payments for unnecessary expenses or expenses unrelated to the administration or disposition of a loan; (iv) a failure to adequately pursue guarantors; and/or (v) other actions that adversely affected collateral values and/or loan recovery.

11.  For example, with respect to the Gold Johnson Holding Loan, the FDIC-R permitted the note to be sold to an entity named Gold 613, LLC on or about October 26, 2011 for $8,500.000, which was less than market value.  Upon information and belief, only five months later, on or about March 30, 2012, the broker for Gold 613, LLC, Massey Knakal, listed the property for sale at $25,500,000.  Upon information and belief, in May 2012, the property was sold to Brooklyn Princess, LLC for $19,000.000.  Thus, on the Gold Johnson Holding, LLC Loan, the FDIC-R failed to maximize the recovery available on this loan and permitted the disposition of this loan at an unreasonably low value.  The FDIC-R's conduct amounted to an intentional relinquishment of its right to seek damages caused by its own conduct, and, therefore, the FDIC-R has waived its right to seek damages arising out of its own conduct.

12.  For example, with respect to the 261 E. 78 Realty Corp. Loan, the FDIC-R has purportedly paid and is seeking approximately $3,036,907 in reimbursable expenses as damages from the Defendants.  However, upon information and belief, a substantial portion of these expenses relate to defense costs incurred in defending a lender liability claim arising out of alleged actions taken following the closure of the Bank and such expenses are not necessarily expenses related to the administration or disposition of the loan.  The FDIC-R now seeks such expenses against the Defendants.  The FDIC-R's conduct amounted to an intentional relinquishment of its right to seek damages caused by its own conduct, and, therefore, the FDIC-R has waived its right to seek damages arising out of its own conduct.

13.  For example, with respect to the Wilshire Blvd. BH Loan, upon information and belief, the FDIC-R permitted the property to be sold for $16,500,000 to New Pacific Realty Corp. on or about November 12, 2010, even though this amount was not the highest and best offer received for the property and even though this was below market value.  Therefore, the

FDIC-R failed to maximize the recovery available on this loan and permitted the disposition of this loan at an unreasonably low value. The FDIC-R's conduct amounted to an intentional relinquishment of its right to seek damages caused by its own conduct, and, therefore, the FDIC-R has waived its right to seek damages arising out of its own conduct.

14.     For example, with respect to the 625 W. Division Condominiums, L.P. Loan, upon information and belief, the FDIC-R permitted the entry of a settlement agreement with the borrower that permitted the borrower to sell the property to Pearson Street Partners, LLC for $2,800,000, which was below market value. This sale for $2,800,000 closed on or about March 14, 2013. Upon information and belief, also on March 14, 2013 or shortly thereafter in March 2013, the same property was then sold by Pearson Street Partners, LLC to Gerding Edlen Development Inc. for $5,000,000. Thus, FDIC-R failed to maximize the recovery available on this loan and permitted the disposition of this loan at an unreasonably low value. The FDIC-R's conduct amounted to an intentional relinquishment of its right to seek damages caused by its own conduct, and, therefore, the FDIC-R has waived its right to seek damages arising out of its own conduct.

15.     For example, with respect to the Southside House, LLC Loan, upon information and belief, the FDIC-R permitted the assignment of the bankruptcy claim associated with this loan to the Investors Team, LLC for $110,000 on or about May 15, 2012. On or about August 7, 2014, the Investors Team, LLC received approximately $2,900,000 for the Initial Allowed Investors Claim portion of its assigned claim in the bankruptcy proceeding. Upon information and belief, the Investors Team, LLC is expected to receive another $900,000 in connection with its Disputed Investors Claim portion of the assigned claim in the bankruptcy proceeding. Therefore, the FDIC-R failed to maximize the recovery available on this loan and permitted the

assignment of the bankruptcy claim on this loan at an unreasonably low value. The FDIC-R's conduct amounted to an intentional relinquishment of its right to seek damages caused by its own conduct, and, therefore, the FDIC-R has waived its right to seek damages arising out of its own conduct.

16.     For example, with respect to the 4750 N. Winthrop Loan, upon information and belief, the FDIC-R permitted a title impairment to remain on the property, rather than pursing a claim against the title company, which resulted in a substantial decline in the value of the collateral. The FDIC-R's conduct amounted to an intentional relinquishment of its right to seek damages caused by its own conduct, and, therefore, the FDIC-R has waived its right to seek damages arising out of its own conduct.

17.     With respect to the Bedford Lofts, LLC Loan, upon information and belief, approximately $6,850,000 was received in connection with the sale of the notes on this loan in or around January 2013. Upon information and belief, this recovery amount satisfied the remaining balances on the notes, as well as the sole charge-off previously taken for this loan. Nevertheless, the FDIC-R still seeks $ 1,474,233 in damages from the Defendants in connection with this loan. By accepting $6,850,000 in recovery on this loan, which, upon information and belief, amounts to more than a full recovery on this loan, the FDIC-R's conduct amounted to an intentional relinquishment of its right to seek damages, and, therefore, the FDIC-R has waived its right to seek damages on this loan.

### FOURTH AFFIRMATIVE DEFENSE – FAILURE TO MITIGATE

1.     The FDIC-R is seeking damages from The Defendants in the amount of approximately $116,000,000.

2.      The FDIC-R's claims are barred in whole or in part by its failure to mitigate its alleged damages.

3.      The FDIC-R had a duty to make reasonable efforts to mitigate or reduce any losses alleged in the Complaint.

4.      The FDIC-R failed to take reasonable steps to reduce the loss on the Federal Street Loan.  For example, the FDIC-R did not follow its internal procedures and practices in administering the Federal Street Loan after the closure of the Bank.  The FDIC-R maintained a "structured sales" listing of certain loans that it acquired from closed banks on a website.  Upon information and belief, prospective buyers, who have been pre-approved by the FDIC-R, have access to this "structured sales" website in order to view and potentially bid on the loans listed on this website.  Per the FDIC-R's internal procedures and practices, loans listed on the "structured sales" website cannot be removed from this pool of loans until they are approved and a 10% down payment is received.

5.      Upon information and belief, the FDIC-R listed the Federal Street Loan as part of the pool of loans identified on the FDIC-R's "structured sales" website.  Upon information and belief, in contravention of the FDIC-R's internal policies and practices, the FDIC-R removed the Federal Street Loan from the "structured sales" website without receipt of the required 10% down payment.  Rather than following its internal procedures and practices, the FDIC-R pulled the Federal Street Loan from the "structured sales" website because of pending negotiations with the Federal Street borrowers.

6.      The FDIC-R obtained a $18,000,000 settlement on the Federal Street Loan, which was originally a $26,880,000 note, from the Federal Street borrowers in May 2011.  In connection with this settlement, the FDIC-R relied upon an "as is" $18,500,000 appraisal

amount, instead of the available "as completed" $25,600,000 appraisal amount. Upon information and belief, in June 2011, approximately one month after the FDIC-R received $18,000,000 from the Federal Street borrowers, the Federal Street borrowers sold a 57-percent interest in the Federal Street project to Milan Capital Management for $22,000,000.

7.      The FDIC-R's decision to pull the Federal Street Loan from the "structured sales" website in violation of its internal procedures and practices, its reliance on a lower "as is" appraisal, and its acceptance of a settlement amount from the Federal Street borrowers that was significantly less than the actual value of the Federal Street Loan constitute a failure to mitigate damages with respect to the Federal Street Loan.

8.      The FDIC-R also entered into a Loss Share Agreement with the Assuming Institution on or about April 23, 2010 that gave the Assuming Institution little to no economic incentive to maximize the value of the Loss Loans subject to the Loss Share Agreement (which included all of the Loss Loans except the Federal Street Loan).

9.      In addition, the FDIC-R failed to adequately audit, monitor, and supervise the administration and disposition of the Loss Loans in order to maximize the value of the Loss Loans.  Upon information and belief, the FDIC-R's failures resulted in, among other things, (i) the creation of an incentive to obtain less than the maximum level of recovery available on loans under the applicable Loss-Share Agreement governing the Bank's assets; (ii) a failure to maximize the value of the collateral; (iii) a failure to take the steps necessary to maximize the collection on the loans; (iv) the sale of loans at unreasonably low values; (v) a failure to adequately work out loans; (vi) a failure to adequately pursue guarantors; (vii) payments for unnecessary expenses or expenses unrelated to the administration or disposition of a loan; and/or (viii) other actions which adversely affected collateral values and/or the loan recovery.

10.     For example, with respect to the Gold Johnson Holding Loan, the FDIC-R permitted the note to be sold to an entity named Gold 613, LLC on or about October 26, 2011 for $8,500.000, which was below market value.   Upon information and belief, only five months later, on or about March 30, 2012, the broker for Gold 613, LLC, Massey Knakal, listed the property for sale at $25,500,000.   Upon information and belief, in May 2012, the property was sold to Brooklyn Princess, LLC for $19,000.000.   Thus, on the Gold Johnson Holding, LLC Loan, the FDIC-R failed to maximize the recovery available on this loan and permitted the disposition of this loan at an unreasonably low value.   As such, the FDIC-R failed to mitigate its damages with respect to the Gold Johnson Holding Loan.

11.     For example, with respect to the Wilshire Blvd. BH Loan, upon information and belief, the FDIC-R permitted the property to be sold for $16,500,000 to New Pacific Realty Corp. on or about November 12, 2010, even though this amount was not the highest and best offer received for the property and even though this was below market value.   Therefore, the FDIC-R failed to maximize the recovery available on this loan and permitted the disposition of this loan at an unreasonably low value.   As such, the FDIC-R failed to mitigate its damages with respect to the Wilshire Blvd. BH Loan.

12.     For example, with respect to the 625 W. Division Condominiums, L.P. Loan, upon information and belief, the FDIC-R permitted the entry of a settlement agreement with the borrower that permitted the borrower to sell the property to Pearson Street Partners, LLC for $2,800,000, which was below market value.   This sale for $2,800,000 closed on or about March 14, 2013.   Upon information and belief, also on March 14, 2013 or shortly thereafter in March 2013, the same property was then sold by Pearson Street Partners, LLC to Gerding Edlen Development Inc. for $5,000,000.   Thus, FDIC-R failed to maximize the recovery available on

this loan and permitted the disposition of this loan at an unreasonably low value. As such, the FDIC-R failed to mitigate its damages with respect to the 625 W. Division Condominiums, L.P. Loan.

13.     For example, with respect to the Southside House, LLC Loan, upon information and belief, the FDIC-R permitted the assignment of the bankruptcy claim associated with this loan to the Investors Team, LLC for $110,000 on or about May 15, 2012. On or about August 7, 2014, the Investors Team, LLC received approximately $2,900,000 for the Initial Allowed Investors Claim portion of its assigned claim in the bankruptcy proceeding. Upon information and belief, the Investors Team, LLC is expected to receive another $900,000 in connection with its Disputed Investors Claim portion of the assigned claim in the bankruptcy proceeding. Therefore, the FDIC-R failed to maximize the recovery available on this loan and permitted the assignment of the bankruptcy claim on this loan at an unreasonably low value. As such, the FDIC-R failed to mitigate its damages with respect to the Southside House, LLC Loan.

14.     For example, with respect to the 4750 N. Winthrop Loan, upon information and belief, the FDIC-R permitted a title impairment to remain on the property, rather than pursing a claim against the title company, which resulted in a substantial decline in the value of the collateral. As such, the FDIC-R failed to mitigate its damages with respect to the 4750 N. Winthrop Loan.

15.     For example, with respect to the 261 E. 78 Realty Corp. Loan, upon information and belief, the FDIC-R failed to supervise the administration of the loan, which resulted in a lender liability action brought by the borrower relating to actions following the closure of the Bank. This led to, among other things, the expenditure of substantial legal fees and a significant

decline in the value of the loan unrelated to the Bank. As such, the FDIC-R failed to mitigate its damages with respect to the 261 E. 78 Realty Corp. Loan.

FIFTH AFFIRMATIVE DEFENSE – COMPARATIVE NEGLIGENCE

1.      The FDIC-R had a duty to exercise ordinary care in the management and disposition of the Bank's assets.

2.      The FDIC-R failed to exercise ordinary care in the management and disposition of the Federal Street Loan. For example, the FDIC-R did not follow its internal procedures and practices in administering the Federal Street Loan after the closure of the Bank. The FDIC-R maintained a "structured sales" listing of certain loans that it acquired from closed banks on a website. Upon information and belief, prospective buyers, who have been pre-approved by the FDIC-R, have access to this "structured sales" website in order to view and potentially bid on the loans listed on this website. Per the FDIC-R's internal procedures and practices, loans listed on the "structured sales" website cannot be removed from this pool of loans until they are approved and a 10% down payment is received.

3.      Upon information and belief, the FDIC-R listed the Federal Street Loan as part of the pool of loans identified on the FDIC-R's "structured sales" website. Upon information and belief, in contravention of the FDIC-R's internal policies and practices, the FDIC-R removed the Federal Street Loan from the "structured sales" website without receipt of the required 10% down payment. Rather than following its internal procedures and practices, the FDIC-R pulled the Federal Street Loan from the "structured sales" website because of pending negotiations with the Federal Street borrowers.

4.      The FDIC-R obtained a $18,000,000 settlement on the Federal Street Loan, which was originally a $26,880,000 note, from the Federal Street borrowers in May 2011. In

88

connection with this settlement, the FDIC-R relied upon an "as is" $18,500,000 appraisal amount, instead of the available "as completed" $25,600,000 appraisal amount. Upon information and belief, in June 2011, approximately one month after the FDIC-R received $18,000,000 from the Federal Street borrowers, the Federal Street borrowers sold a 57-percent interest in the Federal Street project to Milan Capital Management for $22,000,000.

5.      The FDIC-R's decision to pull the Federal Street Loan from the "structured sales" website in violation of its internal procedures and practices, its reliance on a lower "as is" appraisal, and its acceptance of a settlement amount from the Federal Street borrowers that was significantly less than the actual value of the Federal Street Loan demonstrate that any losses attributed to the Federal Street Loan are a direct and proximate result of the FDIC-R's negligence.

6.      The FDIC-R also entered into a Loss Share Agreement with the Assuming Institution on or about April 23, 2010 that gave the Assuming Institution little to no economic incentive to maximize the value of the Loss Loans subject to the Loss Share Agreement (which included all of the Loss Loans except the Federal Street Loan).

7.      The FDIC-R, also failed to exercise ordinary care in its supervision of the administration and disposition of the Loss Loans. Upon information and belief, the FDIC-R's failures resulted in, among other things, (i) the creation of an incentive to obtain less than the maximum level of recovery available on loans under the applicable Loss-Share Agreement governing the Bank's assets; (ii) a failure to maximize the value of the collateral; (iii) a failure to take the steps necessary to maximize the collection on the loans; (iv) the sale of loans at unreasonably low values; (v) a failure to adequately work out loans; (vi) a failure to adequately pursue guarantors; (vii) payments for unnecessary expenses or expenses unrelated to the

administration or disposition of a loan; and/or (viii) other actions which adversely affected collateral values and/or the loan recovery.

8.      For example, with respect to the Gold Johnson Holding Loan, the FDIC-R permitted the note to be sold to an entity named Gold 613, LLC on or about October 26, 2011 for $8,500.000, which was less than market value.  Upon information and belief, only five months later, on or about March 30, 2012, the broker for Gold 613, LLC, Massey Knakal, listed the property for sale at $25,500,000.  Upon information and belief, in May 2012, the property was sold to Brooklyn Princess, LLC for $19,000.000.  Thus, on the Gold Johnson Holding, LLC Loan, the FDIC-R failed to maximize the recovery available on this loan and permitted the disposition of this loan at an unreasonably low value.  Accordingly, any losses attributed to the Gold Johnson Holding Loan are a direct and proximate result of the FDIC-R's negligence in failing to adequately audit, monitor, and supervise the administration and disposition of this loan.

9.      For example, with respect to the Wilshire Blvd. BH Loan, upon information and belief, the FDIC-R permitted the property to be sold for $16,500,000 to New Pacific Realty Corp. on or about November 12, 2010, even though this amount was not the highest and best offer received for the property and even though this was below market value.  Therefore, the FDIC-R failed to maximize the recovery available on this loan and permitted the disposition of this loan at an unreasonably low value.  Accordingly, any losses attributed to the Wilshire Blvd. BH Loan are a direct and proximate result of the FDIC-R's negligence in failing to adequately audit, monitor, and supervise the administration and disposition of this loan.

10.      For example, with respect to the 625 W. Division Condominiums, L.P. Loan, upon information and belief, the FDIC-R permitted the entry of a settlement agreement with the borrower that permitted the borrower to sell the property to Pearson Street Partners, LLC for

$2,800,000, which was below market value.  This sale for $2,800,000 closed on or about March 14, 2013.  Upon information and belief, also on March 14, 2013 or shortly thereafter in March 2013, the same property was then sold by Pearson Street Partners, LLC to Gerding Edlen Development Inc. for $5,000,000.  Thus, FDIC-R failed to maximize the recovery available on this loan and permitted the disposition of this loan at an unreasonably low value.  Accordingly, any losses attributed to the 625 W. Division Condominiums, L.P. Loan are a direct and proximate result of the FDIC-R's negligence in failing to adequately audit, monitor, and supervise the administration and disposition of this loan.

11.     For example, with respect to the Southside House, LLC Loan, upon information and belief, the FDIC-R permitted the assignment of the bankruptcy claim associated with this loan to the Investors Team, LLC for $110,000 on or about May 15, 2012.  On or about August 7, 2014, the Investors Team, LLC received approximately $2,900,000 for the Initial Allowed Investors Claim portion of its assigned claim in the bankruptcy proceeding.  Upon information and belief, the Investors Team, LLC is expected to receive another $900,000 in connection with its Disputed Investors Claim portion of the assigned claim in the bankruptcy proceeding. Therefore, the FDIC-R failed to maximize the recovery available on this loan and permitted the assignment of the bankruptcy claim on this loan at an unreasonably low value.  Accordingly, any losses attributed to the Southside House, LLC Loan are a direct and proximate result of the FDIC-R's negligence in failing to adequately audit, monitor, and supervise the administration and disposition of this loan.

12.     For example, with respect to the 4750 N. Winthrop Loan, upon information and belief, the FDIC-R permitted a title impairment to remain on the property, rather than pursing a claim against the title company, which resulted in a substantial decline in the value of the

collateral. Accordingly, any losses attributed to the 4750 N. Winthrop Loan are a direct and proximate result of the FDIC-R's negligence in failing to adequately supervise the administration of this loan.

13. For example, with respect to the 261 E. 78 Realty Corp. Loan, upon information and belief, the FDIC-R failed to supervise the administration of the loan, which resulted in a lender liability action brought by the borrower relating to actions following the closure of the Bank. This led to, among other things, the expenditure of substantial legal fees and a significant decline in the value of the loan unrelated to the Bank. Accordingly, any losses attributed to the 261 E. 78 Realty Corp. Loan are a direct and proximate result of the FDIC-R's negligence in failing to adequately audit, monitor, and supervise the administration and disposition of this loan.

## SIXTH AFFIRMATIVE DEFENSE – LACK OF STANDING

1. The FDIC-R obtained its "status" vis-a-vis the Bank through a statutory receivership appointment by the IDFPR. The IDFPR closed the Bank and appointed the FDIC-R as receiver pursuant to the Illinois Banking Act, 205 ILCS 5/1, *et seq.* and the Federal Deposit Insurance Act, 12 U.S.C. § 1821, *et seq.*

2. Those statutes, however, failed to provide the Bank with any right of pre-deprivation or post-deprivation judicial review, which is a constitutional requirement under the Due Process Clause and the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution.

3. These constitutional infirmities nullify the FDIC-R's appointment as receiver and negate the FDIC-R's standing to prosecute this action.

WHEREFORE, Defendants Demetris Giannoulias and George Giannoulias respectfully request that this Court enter judgment in their favor on all counts in Plaintiff Federal Deposit

Insurance Corporation's Second Amended Complaint, together with costs and any such additional relief in their favor as this Court deems just and proper.

Dated:  August 8, 2014                                          Respectfully submitted,

                                                               DEMETRIS GIANNOULIAS
                                                               and GEORGE GIANNOULIAS

                                                               By:_____/s/ Eric Y. Choi_____
                                                                        One of Their Attorneys

William L. Charron, Esq.
Bryan T. Mohler, Esq.
PRYOR CASHMAN LLP
7 Times Square
New York, New York 10036
T: (212) 421-4100
F: (212) 326-0806
wcharron@pryorcashman.com
bmohler@pryorcashman.com

-and-

Eric Y. Choi, Esq.
NEAL, GERBER & EISENBERG LLP
Two North LaSalle Street, Suite 1700
Chicago Illinois 60602
T: (312) 827-1053
F: (312) 980-0736
echoi@ngelaw.com

**CERTIFICATE OF SERVICE**

   The undersigned certifies that a copy of the foregoing **DEFENDANTS DEMETRIS GIANNOULIAS AND GEORGE GIANNOULIAS' ANSWER AND AMENDED AFFIRMATIVE DEFENSES TO SECOND AMENDED COMPLAINT** was served on the following counsel of record:

| | |
|---|---|
| Susan G. Feibus | Robert J. Ambrose |
| Dean J. Polales | Joseph W. Barber |
| F. Thomas Hecht | David C. Van Dyke |
| Richard Henry Tilghman | Scott C. Frost |
| Ungaretti & Harris LLP | Howard & Howard |
| 70 W. Madison | 200 S. Michigan Ave. #1100 |
| Suite 3500 | Chicago, IL 60604 |
| Chicago, Illinois 60602 | rambrose@howardandhoward.com |
| sgfeibus@uhlaw.com | jwbarber@howardandhoward.com |
| djpolales@uhlaw.com | dvd@h2law.com |
| fthecht@uhlaw.com | sfrost@howardandhoward.com |
| rhtilghman@uhlaw.com | |

Randall M. Lending
Rachel T. Copenhaver
Vedder Price P.C.
222 North LaSalle Street
Suite 2600
Chicago, IL  60601-1003
T:  (312) 609-7500
rlending@vedderprice.com
rcopenhaver@vedderprice.com

this 8th day of August, 2014 via ECF and first class U.S. Mail, postage pre-paid.

         s/     Eric Y. Choi
          An Attorney for Defendants