**IN THE UNITED STATES DISTRICT COURT FOR THE**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| FEDERAL DEPOSIT INSURANCE ) | |
| CORPORATION AS RECEIVER FOR ) | |
| BROADWAY BANK, ) | |
| ) | |
|      Plaintiff, ) | |
| ) | |
| v. ) | **Case No: 12 C 1665** |
| ) | |
| DEMETRIS GIANNOULIAS, GEORGE ) | **Magistrate Judge Daniel G. Martin** |
| GIANNOULIAS, JAMES MCMAHON, ) | |
| SEAN CONLON, STEVEN DRY, DONNA ) | |
| ZAGORSKI, STEVEN BALOURDOS, ) | |
| GLORIA SGUROS and ANTHONY ) | |
| D'COSTA, ) | |
| ) | |
|      Defendants. ) | |

## ORDER

For the reasons and to the extent stated herein, Defendants Demetris and George Giannoulias's Motion to Compel Subpoena Responses by Third Party FDIC-C [210] is denied and the Federal Deposit Insurance Corp.'s Motion for Protective Order Regarding Subpoena Issued By Giannoulias Defendants [214] is granted. Status hearing set for 11/13/2014 at 9:30 a.m. stands.

## STATEMENT

This case concerns allegations by Plaintiff Federal Deposit Insurance Corporation, as receiver for Broadway Bank ("FDIC-R"), that former officers and directors of the seized Broadway Bank (the "Bank") breached their fiduciary duties and acted negligently in extending 20 commercial real estate loans (the "Loss Loans") in the mid-2000s. Defendants deny the material allegations of the complaint and assert six affirmative defenses. Defendants explain that the Bank, like financial institutions around the country, suffered from the Great Recession of 2007 and 2008. Defendants Demetris and George Giannoulias (collectively, "Giannoulias Defendants") state that the "Bank took a hit on the 20 Loss Loans at issue because the borrowers of those loans were rocked by the Great Recession." (Doc. 210 at 2). According to the Giannoulias Defendants, "[t]here was nothing innately wrong with the Loss Loans–they conformed to the same lending strategy and operations that the FDIC-C had otherwise praised as sound between 2005-2007 according to the FDIC-C's 'CAMELS' ratings." Id. at 203. In their current motion to compel, the Giannoulias Defendants seek an order directing non-party FDIC-C to supplement its responses to the subpoena dated June 3, 2013 (the "Subpoena") by running additional search terms tailored to the "CAMELS" acronym and the ratings. The Giannoulias Defendants argue that the additional searches are justified by this Court's prior Order dated March 21, 2014.

The FDIC-C, a non-party to this litigation, has filed a protective order motion that mirrors the Giannoulias Defendants' motion to compel and seeks entry of a protective order providing that the FDIC-C need not produce additional documents or ESI in response to the Subpoena. In

response to the Subpoena, the FDIC-C originally produced the examiners' regulatory work papers for the examinations of Broadway Bank in which the FDIC-C participated from 2005 through the Bank's closure in early 2010. That production of regulatory work papers consisted of 45,457 pages. The FDIC-C also agreed to produce "non-privileged, responsive email communications relating to the Loss Loans referenced in the FDIC-R's complaint." (Doc. 216 at 2). Based on agreed-upon search parameters, the FDIC-C then made two ESI productions. Its first ESI production consisted of 4,352 pages, and its second ESI production consisted of 5,867 pages. The FDIC-C argues that requiring it to produce more than the extensive documents and ESI already provided to Defendants would be oppressive and unduly burdensome.

## LEGAL STANDARD

"The scope of material obtainable by a Rule 45 subpoena is as broad as permitted under the discovery rules." Williams v. Blagojevich, 2008 WL 68680, at *3 (N.D. Ill. Jan. 2, 2008); see also Advisory Committee Notes regarding 1991 amendments to Rule 45 (stating "non-party witness is subject to the same scope of discovery under this rule as that person would be as a party to whom a request is addressed pursuant to Rule 34."). Under Rule 26(b), "[p]arties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party . . . . Relevant information need not be admissible at trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." Fed. R. Civ. P. 26(b)(1). Upon a showing of good cause, a court may order "discovery of any matter relevant to the subject matter involved in the action." Id. A court shall limit discovery if it determines the discovery sought to be unreasonably cumulative or duplicative, the party seeking discovery has had ample opportunity to obtain the information by discovery in the action, or the burden or expense of the proposed discovery outweighs its likely benefit. Fed. R. Civ. P. 26(b)(2)(C)(i)–(iii).

Furthermore, a court must quash or modify a subpoena if it "subjects a person to undue burden." Fed. R. Civ. P. 45(d)(3)(A)(iv). "Whether a subpoena imposes an 'undue burden' upon a witness is a case specific inquiry that turns on 'such factors as relevance, the need of the party for the documents, the breadth of the document request, the time period covered by it, the particularity with which the documents are described and the burden imposed.'" Builders Association of Greater Chicago v. City of Chicago, 2001 WL 664453, at *8 (N.D. Ill. June 12, 2001). Ultimately, the Court must balance the burden of compliance against the benefits of the requested production. Northwestern Memorial Hospital v. Ashcroft, 362 F.3d 923 (7th Cir. 2004). Finally, magistrate judges are granted broad discretion in addressing and resolving discovery disputes. Weeks v. Samsung Heavey Indus., Co., Ltd., 126 F.3d 926, 943 (7th Cir. 1997).

## DISCUSSION

The Giannoulias Defendants' motion to compel is based on this Court's Order dated March 21, 2014 which, among other things, directed the FDIC-R to supplement is responses to four contention interrogatories propounded by Defendant Demetris Giannoulias. The Giannoulias Defendants contend that for the same reason that the FDIC-R was required to supplement its interrogatory responses, the FDIC-C should similarly supplement its responses to the Subpoena. They seek supplemental production by the FDIC-C concerning Request Nos. 3-13, 15-18, 23, 24, 30-34, and 37 of the Subpoena. The Giannoulias Defendants state that these requests all concern, in one manner or another, the FDIC-C's and IDFPR's joint examinations of the Bank between 2003-2009. Specifically, the Giannoulias Defendants ask the Court to compel the FDIC-C to run the

following additional search terms, which are designed to capture "hits" for documents bearing on the regulators' positive statements and CAMELS ratings: Broadway AND capital*; Broadway AND assets; Broadway AND management; Broadway AND earning*; Broadway AND liquidity; Broadway AND sensitivity; Broadway AND CAMEL*; Broadway AND rating*; Broadway AND exam*; Broadway AND ROE*; and Broadway AND "report of examination" ("Search Terms"). The Giannoulias Defendants assert that information regarding positive statements and ratings by regulators has already been found to be relevant by this Court's prior Order.

The FDIC-C responds that the March 21, 2014 Order did not expand the scope of this case beyond the 20 Loss Loans. The FDIC-C states that it has produced all ESI and regulatory work papers relevant to the 20 Loss Loans. The FDIC-C explains that it has produced over 10,000 pages of ESI based on agreed-upon search parameters (time frame, custodians and search terms) designed to capture relevant information regarding the 20 Loss Loans. The email accounts of 16 custodians were searched and 80 distinct search terms were applied, which included the names of the Loss Loans, the unique loan identifier number for the Loss Loans, the names of the properties securing the Loss Loans, and the names of the guarantors for the Loss Loans. The FDIC-C argues that based on the breadth of the 80 search terms, any electronic documents referencing the Loss Loans would have been included in the FDIC-C's prior production. The FDIC-C also produced its regulatory work papers consisting of 45,457 pages. These materials are the examiners' back-up documentation for the Reports of Examination ("ROEs").

The scope of the FDIC-R's lawsuit remains limited to the 20 Loss Loans. (Doc. 158-1 at 5) (Judge Grady stating that "[t]here's absolutely no point in the court addressing or a jury addressing the question of whether the bank, generally speaking was well run. We're talking about 20 loans."). As this Court noted in its March 21, 2014 Order: "[f]or purposes of this lawsuit, the only relevant aspect of the Bank's operation is the 20 Loss Loans. The FDIC-R's position on loans other than the Loss Loans and the Bank's overall condition is irrelevant to the FDIC-R's theories of liability as the FDIC-R is not seeking to recover for any aspects of the Bank's operations other than the 20 Loss Loans." (Doc. 206 at 6). The Giannoulias Defendants acknowledge that the FDIC-R's case is about the 20 Loss Loans, but argue that the FDIC-R's "case is inextricably predicated on the FDIC-R's allegations that the FDIC-C and IDFPR, through their 'criticisms' of the Bank over time, practically foreshadowed the Loss Loans, and that the Defendants' 'disregarded' such foreshadowing." (Doc. 224 at 4-5).

In the March 21, 2014 Order, this Court noted that the FDIC-R's Second Amended Complaint ("SAC") about the 20 Loss Loans "rest[s] expressly on the regulators' criticisms of the Bank's condition between January 2007 and April 2009." (Doc. 206 at 9). In its SAC, the FDIC-R alleges that Defendants ignored these criticisms and warnings by regulators with respect to the approval of the 20 Loss Loans. SAC at ¶¶ 23-25, 27, 29-34. With regard to four contention interrogatories, the Court held that "[g]iven the FDIC-R's explicit reliance on the regulators' criticisms in connection with the 20 Loss Loans, fairness dictates that Giannoulias should be permitted to discover the FDIC-R's contentions regarding the Bank's regulatory history and positive CAMELS ratings." Id. at 10. The Court explained that the FDIC-R could not rely on the regulators' criticisms and ignore positive statements and ratings made by the same regulators by refusing to answer certain contention interrogatories. The Giannoulias Defendants explain that the four contention interrogatories at issue "focused on the discrepancy between the FDIC-R's allegations in this case, and the FDIC-C's glowing CAMELS ratings that preceded this case." (Doc. 210 at 4). Requiring the FDIC-R to supplement its answers to three contention interrogatories relating to the FDIC-C's pre-closure regulatory conduct and CAMELS ratings and one contention interrogatory

regarding the Bank's underwriting practices from 2005 through 2009 and having the FDIC-C run additional electronic searches that will result in over 6,000 "hits" are two different things, however.

The scope of allowable discovery must balance the cost against the likely benefit in complying with the Subpoena. Although the Giannoulias Defendants assert that the relevance of the FDIC-C's internal documentation regarding the CAMELS acronym and ratings is high and the burden to the FDIC-C of having to run the additional Search Terms is exceedingly low, the Court is not convinced. The Subpoena calls for FDIC-C internal files and information about positive reviews, statements and ratings that its regulators gave the Bank between 2005-2009. The Giannoulias Defendants argue that the relevance of the FDIC-C's internal files and information cannot reasonably be questioned because "[e]very time that an internal e-mail of the FDIC-C reflects commendation of similar practices and decision-making that the Bank exercised in connection with the Loss Loans, the FDIC-C's allegations crumble further and further apart" and "[e]very time the FDIC-C internally commended the Bank's management and responsiveness to regulator comments, the FDIC-R's allegation that management showed 'distain for the regulatory process' becomes more and more difficult for the FDIC-R to prove." (Doc. 224 at 5). The Giannoulias Defendants are not necessarily entitled to discover "every" positive email or statement by the regulators but rather, are limited to "a reasonable opportunity to investigate the facts–and no more." Vakharia v. Swedish Covenant Hosp., 1994 WL 75055, at *2 (N.D. Ill. March 9, 1994) (Moran, J.).

The Giannoulias Defendants have had a reasonable opportunity for discovery related to the Loss Loans. They fail to convincingly demonstrate how electronic, internal positive statements by regulators will significantly help them prepare their defense. Defendants currently possess the files of the FDIC-C examiners who participated in the examinations and related regulatory activity of the Bank from 2005 to closure. Because the Bank received overall "1" CAMELS ratings in 2006 and 2007, the FDIC-C's production presumably includes positive statements by the FDIC-C. Defendants also have all the published ROEs and CAMELS ratings from 2005 until closure. Finally, the FDIC-C produced substantial ESI in accordance with agreed-upon search terms and custodians relating to the 20 Loss Loans.

The Giannoulias Defendants state that their defense is based "in substantial part on the fact that the Loss Loans originated out of the same practices and policies that the FDIC-C's regulators had positively reviewed in the past, to the point of repeatedly awarding the Bank the highest CAMELS ratings possible." (Doc. 224 at 2). A closer look at the Giannoulias Defendants' Answer reveals that their relevant defenses are based on their reliance upon the regulators' positive reports. For example, their business judgment rule affirmative defense alleges that the Director Defendants "reasonably relied" upon the positive examination reports delivered to the Bank's Directors during the time period that the loans at issue were approved. (Doc. 150 at 77). A second affirmative defense based on the Illinois Banking Act alleges that the Director Defendants "properly relied upon information presented by the FDIC and IDFPR regulators and examiners in written examination reports and in oral reports at board meetings, including the examiners' repeated conclusion that the Bank was 'sound in every respect' at the time the alleged 'Loss Loans' were initially approved." Id. at 78. In order to adequately prepare their defense against the FDIC-R's allegations, Defendants have the positive reports and comments the Defendants allegedly relied upon. Defendants did not have and could not rely on internal positive comments by regulators during the time period that the loans at issue were approved. Therefore, the Giannoulias Defendants' first two affirmative defenses do not justify discovery of internal, unpublished positive statements about the Bank's management and practices by the FDIC-C.

The Giannoulias Defendants' claim that the FDIC-R has "cherrypick[ed] th[e] 'criticisms' out of a sea of overall positive statements by the exact same regulators about the exact same Bank" is inaccurate with respect to discovery. Given that the FDIC-C has produced all of its examiners' regulatory work papers related to the Bank from 2005 through 2010, the FDIC-C has not withheld positive non-ESI information about the Bank. Furthermore, the FDIC-R 's case does not rely on internal criticisms and warnings of the Bank and its management. Instead, the SAC asserts that Defendants were made fully aware of the regulators' criticisms of the Bank's lending and loan administration practices and ignored the regulators' warnings.

As to burden, the FDIC-C has articulated precisely how the Giannoulias Defendants' request is burdensome. The FDIC-C ran the Giannoulias Defendants' proposed additional search on its ESI, which resulted in "hits" of 2,928 emails and 3,077 attachments for a total of 6,005 documents. Before production, each of the "hits" must be reviewed for Suspicious Activity Reports (SARS) that cannot be disclosed, privilege, and responsiveness. The FDIC-C states that in a typical eight-hour day, an experienced paralegal can review 1,000 documents. As a result, to review over 6,000 documents by an experienced paralegal would take approximately six full days.

On balance, the Court concludes that the documents and ESI already produced by the FDIC-C is sufficient evidence to address the Giannoulias Defendants' needs. The FDIC-C has produced its regulatory work papers (45,457 pages) related to the Bank from 2005 to the Bank's closure as well over 10,000 pages of ESI from the email accounts of 16 custodians based on 80 agreed-upon search terms. Defendants also have the published documents and communicated comments containing regulators' positive statements about the Bank. The Giannnoulias Defendants' request for additional ESI searches designed to capture electronic, internal positive statements by regulators is overly broad and unduly burdensome in light of their limited relevance and the substantial burden the production of this information would place on FDIC-C.

The case cited by the Giannoulias Defendants, <u>FDIC v. Willets</u>, 2014 U.S. Dist. LEXIS 131804 (E.D. N.C. Sept. 10, 2014), does not compel the conclusion that Defendants are entitled to additional ESI. <u>Willets</u> was a ruling on a summary judgment motion and did not address the proper scope of discovery. That case held that defendants were entitled to the business judgment rule's protection because the "the process that defendants used to make the challenged loans were expressly reviewed, addressed, and graded by FDIC regulator in the 2006 ROE" and the "regulators assigned defendants a passing grade of "2" in the CAMELS system." <u>Id</u>, at *11. There is no indication of what discovery the <u>Willets</u> defendants received from the FDIC-C, but the district court relied only on the 2006 ROE and CAMELS rating. Here, the Giannoulias Defendants have the positive ROEs and CAMELS ratings of the Bank. The <u>Willets</u> case can hardly be cited for the position that the Giannoulias Defendants are entitled to discover every electronic, unpublished positive statement by the FDIC-C.

**Dated:  October 27, 2014**                    /s/ Daniel G. Martin